FILED IN OPEN COURT
ON ___ 8/21/2013
Julie A. Richards, Clerk
US District Court
Eastern District of NC

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

NO. 4:13-CR-57-1   (3)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | INDICTMENT |
| | ) | |
| THOMAS L. KIMMEL | ) | |

The Grand Jury charges that:

## INTRODUCTION

I.   PURPOSE OF THE SCHEME TO DEFRAUD

1.   Sure Line Acceptance Corporation (SLAC) is a Nevada Corporation, incorporated on June 16, 2005. Between in or around October 2007, through in or around December 2011, its office was located at 1527 West 5th Street, Washington, North Carolina 27889.

2.   From in or around February 2006, and continuing through in or around December 2010, defendant THOMAS L. KIMMEL participated in a scheme and artifice to defraud investors and to obtain money by means of materially false and fraudulent pretenses, representations, and promises through SLAC's investment program.

## II. THE SCHEME AND ARTIFICE

3. Between 2006 and 2011, SLAC raised more than $15,000,000 from investors around the country through its collateralized note program.

4. SLAC claimed that it was the financing wing of AUTOMOĆION, LLC, a group of three used car dealerships in Smithfield, Washington, and Middlesex, NC.

5. SLAC promised investors that their investment was backed by collateral. In other words, it promised that for every dollar invested, there was a dollar or more of collateral that existed to protect that investment.

6. These promises were false. SLAC used new money from investors primarily to repay past investors' principal and interest and to pay commissions to three of its officers.

7. In this way, SLAC was a Ponzi scheme where investors were paid their interest from new investor money and not business profits. These payments created the appearance of a successful investment but created a cycle where increasing amounts of new investor money was needed to pay increasing interest payments to past investors.

8. The promises of collateralization were also false. For most of the period SLAC sold its investments, the combined

2

assets of SLAC and AUTOMOĆION were less, often far less, than what SLAC owed to investors.

III. KIMMEL AND FAITHFUL STEWARDS

9.    Defendant THOMAS L. KIMMEL ("KIMMEL") operates a closely held corporation called Faithful Stewards, Inc. in Indiana.

10.   KIMMEL incorporated Faithful Stewards on March 22, 2004.   The incorporation documents and business entity reports show that KIMMEL and his wife are the sole incorporators and officers of the company.

11.   The Business Entity reports for each year identify KIMMEL as the President and Treasurer of Faithful Stewards.

12.   Through Faithful Stewards, KIMMEL offered Debt-Free Conferences to churches.   KIMMEL also referred to these conferences as "GOD'S PLAN FOR HIS MONEY CONFERENCES."

13.   These conferences were hosted by churches and would usually last a few days.   KIMMEL taught more than a dozen of these conferences across the country each year.

14.   KIMMEL promoted the conferences as teaching Biblical principles for personal finance.

15.   Among other things, his brochures and web site stated that the benefits of such a conference were that:

3

a. "Your people will be given straightforward, practical Bible teaching on how to get out of debt, live DEBT-FREE and according to Romans 13:8."

b. "When the people learn personally to be good stewards of the money God has trusted them with through the DEBT-FREE program, church revenues from tithes and offerings will increase."

c. "The GOD'S PLAN FOR HIS MONEY CONFERENCE is Bible-based, therefore, it is God-blessed."

16. Churches who hosted KIMMEL's conferences paid for his travel and lodging. In addition, the church would collect a "love offering" each night that KIMMEL spoke, consisting of voluntary contributions from church members who attended.

17. In addition to these conferences, KIMMEL's church in Indiana provided him an office to use for financial counseling.

18. Starting in or around 2005, KIMMEL agreed to begin selling investments in SLAC in exchange for a commission.

19. While KIMMEL initially received a 3% commission, from in or around 2006 forward, SLAC paid KIMMEL a commission of 10% for the notes that he sold.

20. KIMMEL sold the vast majority of investments for SLAC—raising most of the money that SLAC received from investors.

4

21. KIMMEL marketed the SLAC investment program at the conferences he taught and at his church office.

22. Often, KIMMEL would say a few things about SLAC's investment program during the conference itself. Later, during individual meetings with attendees, KIMMEL would provide more information about SLAC and encourage attendees to invest.

23. KIMMEL told prospective investors, among other things, that:

   a. There is no risk.

   b. SLAC is taking in $600,000 or $700,000 a month.

   c. SLAC is making 200% per car sold.

   d. The two year contract guarantees investors 12% for two years.

   e. Every dollar is protected by at least one dollar in collateral.

   f. The fund has been deemed legitimate by the FBI.

   g. SLAC has a spiritual board of directors consisting of pastors who advise the company.

   h. He is on the board of directors, receives the profit and loss statements for the company, and has seen the profits being made.

   i. He bought 20% of the company.

5

j. After he became part of SLAC, the company began earmarking money for missions.

k. All of his money and his family's money is invested in SLAC.

24. Most of these statements were false or misleading. KIMMEL grossly over-represented SLAC's earnings. The FBI never "deemed" SLAC to be legitimate. And while a "spiritual board of directors" had been selected, they never had any meetings, reviewed the company's business, or advised the company.

25. KIMMEL's promises that SLAC was collateralized were also false. Starting in 2010, SLAC's own internal monthly financial reports showed that investor notes exceeded total assets of both SLAC and AUTOMOĆION. A review of SLAC's actual financial situation suggests that its claims of collateralization were false from in or around 2008 forward.

26. KIMMEL's statements about his level of involvement and knowledge of SLAC's financial situation were also false.

27. While KIMMEL claimed to be on the board of directors, he did not attend or participate in any corporate meetings in SLAC other than a 2006 meeting where he was made a director.

28. KIMMEL received only sporadic financial information from SLAC, receiving few, if any, financial reports or statements after March, 2009.

29. KIMMEL did not even visit SLAC or AUTOMOCIÓN anytime in 2008, 2009, 2010, and 2011 or personally meet with any of the other officers or directors.

30. While KIMMEL claimed he had bought 20% of SLAC, he paid nothing for his shares.

31. In short, KIMMEL's claims that he had personally reviewed the finances of SLAC and was satisfied that it was a safe investment were false.

32. KIMMEL's assurances that a spiritual board of directors had also reviewed the finances of SLAC and could speak for the safety of the SLAC note program were also false.

33. KIMMEL never disclosed the commission he received from SLAC or his own financial interest in selling investments.

IV. HANDLING OF INVESTMENTS

34. When prospective investors were interested in investing in SLAC, KIMMEL gave them materials related to the investment or a form to complete requesting materials.

35. If KIMMEL did not provide materials to investors, Glen E. Smith, Jr. ("Smith"), SLAC's Chief Financial Officer, mailed

7

materials to prospective investors who requested them. These materials made false claims about collateralization and other false statements about SLAC and AUTOMOĆION.

36. These materials included a letter, a summary of the SLAC business plan, the SLAC Business Plan, and a collateralized note agreement.

37. These materials identified KIMMEL as a VP/Director on the Management Team for SLAC.

38. Interested investors completed and signed the forms contained with the materials and mailed these forms to SLAC in North Carolina. Investors who paid by check also mailed their checks with the completed forms.

39. SLAC mailed monthly interest checks to investors from its office in North Carolina.

40. Some investors wired their money to SLAC.

41. SLAC also allowed investors to invest qualified retirement funds. These funds could not go directly to SLAC but had to go through a third party company that served as an administrator of those funds and forwarded them to SLAC. Many investors invested their retirement funds in SLAC. SLAC then made monthly interest payments to the third party company rather than sending investors monthly interest checks.

## V. SECURITIES INVESTIGATION

42. In the spring of 2009, the Alabama Securities Commission (ASC) determined that KIMMEL had solicited Alabama residents to purchase securities in SLAC through the collateralized note program. As part of its investigation, the ASC also reviewed a letter dated May 12, 2009, executed by Smith, in which Smith solicited the Alabama residents to become involved in the SLAC collateralized note program.

43. The ASC determined that the collateralized note being marketed by SLAC represented the sale of an unregistered security and that neither KIMMEL nor Smith was registered to sell securities in Alabama.

44. On April 19, 2010, the ASC issued a Cease and Desist Order (C&D) to SLAC, Faithful Stewards, KIMMEL, James Willis Kirk, Jr. ("Kirk"), and Smith. Kirk was the Chief Executive Officer and Director of SLAC. The C&D ordered them to cease further sales of the SLAC collateralized note program in Alabama.

45. On November 4, 2009, a federal grand jury in the Eastern District of North Carolina indicted a lawyer for SLAC who had advised it on the legality of its note program of

9

Conspiracy, Mail Fraud, and Sale of Unregistered Securities, all unrelated to SLAC.

46.     On November 18, 2010, a jury convicted SLAC's lawyer of all charges, including Sale of Unregistered Securities.  The lawyer was taken into custody that same day.

47.     Despite knowing that Alabama had classified the SLAC collateralized note program as an unregistered security and that the lawyer who had advised SLAC that its note program was not a security had been convicted of Sale of Unregistered Securities, KIMMEL continued to market the SLAC collateralized note program in states other than Alabama.

48.     KIMMEL generally did not disclose the existence of the ASC C&D or the conviction of SLAC's lawyer to investors.

49.     In fact, KIMMEL told some investors that an SEC lawyer had recommended the investment without telling them that the lawyer was currently in federal prison for fraud and the sale of unregistered securities.

50.     KIMMEL also told investors that SLAC had been looked at by the Securities and Exchange Commission ("SEC"), implying that that the SEC had determined that SLAC was not a security.

10

VI.  PURCHASES OF MORE THAN $10,000

51.  KIMMEL recommended that Kirk and Smith use some of SLAC's money and the money that they received from SLAC commissions to purchase Iraqi currency.

52.  KIMMEL told them that the Iraqi currency was likely to be revalued and that any investment would likely realize a large profit.

53.  SLAC purchased Iraqi currency on multiple occasions, including the following:

    a.  2/9/10 - $16,045

    b.  8/5/10 - $20,930

    c.  11/2/10 - $21,356

    d.  2/1/11 - $10,596.

### COUNT ONE
### Conspiracy to Commit Wire and Mail Fraud
### 18 U.S.C. § 1349

Paragraphs 1 through 53 of the Introduction are incorporated herein by reference.

Beginning in or around February 2006, and continuing through in or around December 2011, in the Eastern District of North Carolina, defendant THOMAS L. KIMMEL did unlawfully and knowingly combine, conspire, confederate and agree with others to commit offenses against the United States as follows:

11

A.   Mail Fraud.   Having devised a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, for the purpose of executing such scheme and artifice, to knowingly cause to be delivered by mail or commercial interstate carrier according to the direction therein matters and things, in violation of Title 18, United States Code, Section 1341;

B.   Wire Fraud.   Having devised a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, for the purpose of executing such scheme, to transmit in interstate commerce, by means of wire communications, certain signals, that is wire transfers of money to and from the bank accounts used by the defendants for the purpose of executing, and attempting to execute, the scheme and artifice to defraud, in violation of Title 18, United States Code Section 1343.

All in violation of Title 18, United States Code, Section 1349.

## COUNT TWO
### Conspiracy to Sell Unregistered Securities
### 18 U.S.C. § 371

Paragraphs 1 through 53 of the Introduction are incorporated herein by reference.

Beginning in or around November 2010, and continuing through in or around December 2011, in the Eastern District of North Carolina, defendant THOMAS L. KIMMEL did unlawfully and knowingly combine, conspire, confederate and agree with others to directly and indirectly willfully offer and sell securities when no registration statement was filed with the United States Securities and Exchange Commission ("SEC") and in effect as to the securities, and use the means and instruments of transportation and communication in interstate commerce and the mails in connection with the offer and sale.

In furtherance of the conspiracy and to promote its unlawful objects, KIMMEL and his conspirators committed and caused to be committed overt acts in the Eastern District of North Carolina, including but not limited to:

a. KIMMEL made statements to investors and prospective investors to induce them to invest in SLAC's collateralized note program, each meeting or presentation constituting a separate overt act.

13

b. KIMMEL and his coconspirators provided investors with materials about SLAC and AUTOMOĆION either in person or by mail, including materials needed to invest in SLAC, each provision of materials constituting a separate overt act.

c. SLAC deposited the money provided by investors into a bank account, each deposit constituting a separate overt act.

d. KIMMEL, Smith, and Kirk received commissions for each investment in SLAC, each receipt of a commission payment constituting a separate overt act.

All in violation of Title 18, United States Code, Section 371.

**COUNT THREE**
**Conspiracy to Engage in Unlawful Monetary Transactions**
**18 U.S.C. § 1956(h)**

Paragraphs 1 through 53 of the Introduction are incorporated herein by reference.

Beginning in or around early 2010, and continuing through in or around February 2011, in the Eastern District of North Carolina, defendant THOMAS L. KIMMEL did unlawfully and knowingly combine, conspire, confederate and agree with others to knowingly engage and attempt to engage in monetary

14

transactions affecting interstate commerce in criminally derived property of a value greater than $10,000 and derived from specified unlawful activity, namely, the purchase of Iraqi currency using money derived from a specified unlawful activity, that is, Mail Fraud and Wire Fraud, in violation of Title 18, United States Code, Sections 1341 and 1343, in violation of Title 18, United States Code, Section 1957(a).

All in violation of Title 18, United States Code, Section 1956(h).

**COUNTS FOUR THROUGH THIRTY-SIX**
**Mail Fraud**
**18 U.S.C. § 1341**

Paragraphs 1 through 53 of the Introduction are incorporated herein by reference.

From in or around February 2006 to in or around December 2011, defendant THOMAS L. KIMMEL, with the intent to defraud, devised and willfully participated in, with knowledge of its fraudulent nature, the above-described scheme and artifice to defraud and obtain money by materially false and fraudulent pretenses, representations, and promises.

On or about the dates set forth below, in the Eastern District of North Carolina, for the purpose of executing and attempting to execute the above-described scheme and artifice to

defraud and deprive, defendant KIMMEL, aiding and abetting others both known and unknown to the Grand Jury, knowingly caused to be delivered by mail and private and commercial interstate carrier according to the direction thereon the following matters:

| COUNT | DATE | FROM | DESCRIPTION |
|-------|------|------|-------------|
| 4 | 11/8/08 | KP | Individual Retirement Custodial Agreement Application and Investor Direction and Certification for $9,000 |
| 5 | 11/28/08 | VP | Check to SLAC for $2,500 |
| 6 | 12/18/08 | KP | Collateralized Loan Agreement for $9,000 |
| 7 | 2/26/09 | SP | Collateralized Loan Agreement with SLAC and Check to SLAC for $15,000 |
| 8 | 3/30/09 | JS | Check to SLAC for $30,000 |
| 9 | 4/1/09 | VP | Check to SLAC for $2,500 |
| 10 | 7/25/09 | M&DH | Collateralized Loan Agreement with SLAC and Check to SLAC for $350,000 |
| 11 | 2/1/10 | J&KR | Collateralized Loan and Promissory Note with SLAC for $175,500 |
| 12 | 2/19/10 | VP | Check to SLAC for $2,500 |
| 13 | 2/25/10 | JW | Collateralized Loan Agreement with SLAC for $101,400 |
| 14 | 9/23/10 | RL | Collateralized Loan Agreements with SLAC and Checks to SLAC for $50,000 and $157,117.70 |
| 15 | 9/24/10 | ML | Collateralized Loan Agreement with SLAC and Check to SLAC for $6,223.70 |
| 16 | 10/14/10 | TK | Collateralized Loan Agreement with SLAC for $190,300 |
| 17 | 10/17/10 | RL | Add on Purchase Agreement with SLAC and Check to SLAC for $10,000 |
| 18 | 12/13/10 | JW | Add on Purchase Agreement with SLAC for $9,100 |
| 19 | 12/31/10 | J&GC | Collateralized Loan Agreement with SLAC for $25,000 |
| 20 | 1/11/11 | JJ | Check to SLAC for $40,000 |
| 21 | 1/15/11 | JJ | Collateralized Loan Agreement with SLAC for $40,000 |
| 22 | 1/26/11 | VP | Check to SLAC for $2,500 |

16

| 23 | 2/7/11 | JPS | Direction of Investment to SLAC for $7,400 |
| 24 | 3/1/11 | PS | Collateralized Loan Agreement with SLAC for $32,100 |
| 25 | 5/10/11 | PS | Check to SLAC for $7,400 |
| 26 | 8/2/11 | JJ | Check to SLAC for $15,000 |
| 27 | 8/15/11 | RL | Add on Purchase Agreement with SLAC and Check to SLAC for $20,000 |
| 28 | 8/18/11 | JDL | Collateralized Loan Agreement with SLAC for $25,900 |
| 29 | 9/1/11 | HF | Check to SLAC for $60,000 |
| 30 | 9/16/11 | HF | ACH authorization to SLAC |
| 31 | 9/18/11 | WJ | Check to SLAC for $25,000 |
| 32 | 9/23/11 | WJ | Collateralized Loan Agreement with SLAC and Check to SLAC for $25,000 |
| 33 | 10/1/11 | JDL | Collateralized Loan Agreement with SLAC and Check to SLAC for $15,000 |
| 34 | 10/14/11 | ML | Collateralized Loan Agreement with SLAC and Check to SLAC for $100,000 |
| 35 | 11/1/11 | ML | Collateralized Loan Agreement with SLAC for $77,000 |
| 36 | 11/19/11 | PS | Add-on Purchase Agreement with SLAC for $2,800 |

Each entry constituting a separate violation of Title 18, United States Code, Section 1341 and Section 2.

## COUNTS THIRTY-SEVEN THROUGH FORTY-THREE
### Sale of Unregistered Securities and Aiding and Abetting
### 15 U.S.C. §§ 77e, 77x and 2

Paragraphs 1 through 53 of the Introduction are incorporated herein by reference.

On or about the dates set forth below, in the Eastern District of North Carolina and elsewhere, defendant THOMAS L. KIMMEL, willfully offered and sold, and caused the offer and sale of, securities to the individuals identified below when no

17

registration statement was filed with the United States Securities and Exchange Commission and in effect as to the securities, and used the means and instruments of transportation and communication in interstate commerce and the mails in connection with the offer and sale of the securities.

| COUNT | DATE | VICTIM | AMOUNT |
|-------|------|--------|--------|
| 37 | 2/7/11 | JPS | $7,400 |
| 38 | 3/1/11 | PS | $32,100 |
| 39 | 8/10/11 | JDL | $25,990.36 |
| 40 | 9/1/11 | HF | $60,000 |
| 41 | 9/23/11 | WJ | $25,000 |
| 42 | 10/1/11 | JDL | $15,000 |
| 43 | 10/14/11 | ML | $100,000 |

KIMMEL also aided, abetted, induced, procured, counseled, commanded, and caused others to do so, each entry constituting a separate violation of Title 15, United States Code, Sections 77e and 77x, and Title 18, United States Code, Section 2.

**COUNT FORTY-FOUR**
**Engaging in Unlawful Monetary Transactions**
**18 U.S.C. § 1957**

Paragraphs 1 through 53 of the Introduction are incorporated herein by reference.

On or about November 16, 2010, in the Eastern District of North Carolina and elsewhere, defendant THOMAS L. KIMMEL did knowingly engage and attempt to engage in a monetary transaction through a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value

greater than $10,000, that is, a purchase of a 2004 BMW 325i with a check for $12,305, such property having been derived from a specified unlawful activity, that is, Mail Fraud and Wire Fraud, in violation of Title 18, United States Code, Sections 1341 and 1343, all in violation of Title 18, United States Code, Section 1957.

19

## FORFEITURE NOTICE

Defendant THOMAS L. KIMMEL is given notice pursuant to Federal Rule of Criminal Procedure 32.2(a) that, under the provisions of 18 U.S.C. § 981(a)(1)(C) and 18 U.S.C. § 982(a)(1), all of his interest in all property specified herein is subject to forfeiture.

As a result of the foregoing offenses in Counts 1, 3-36, and 44 of this Indictment, the defendant shall forfeit to the United States any and all property constituting, or derived from, any proceeds defendants obtained directly or indirectly as a result of the offenses and, in addition, with respect to Counts 3 and 44, all property involved in the violations stated therein, or proceeds traceable to that property.

If any of the above-described forfeitable property, as a result of any act or omission of a defendant (a) cannot be located upon the exercise of due diligence; (b) has been transferred or sold to, or deposited with, a third person; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property which cannot be subdivided without difficulty, it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to

seek forfeiture of any other property of said defendant up to
the value of the above forfeitable property.

A TRUE BILL

**REDACTED VERSION**
Pursuant to the E-Government Act and the
federal rules, the unredacted version of
this document has been filed under seal.

FOREPERSON

DATE: _21 Aug 13_

THOMAS G. WALKER
United States Attorney

_David A. Bragdon_

BY: DAVID A. BRAGDON
Assistant United States Attorney