UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION


UNITED STATES OF AMERICA,       )
                                 )
        V.                    )     4:13-CR-57-D
                                 )
THOMAS L. KIMMEL,          )
                                 )
        DEFENDANT.        )
_____  )


TRIAL TESTIMONY OF THOMAS KIMMEL
JUNE 23-24, 2014
BEFORE THE HONORABLE JAMES C. DEVER III
CHIEF U.S. DISTRICT JUDGE



<u>APPEARANCES</u>:

<u>FOR THE GOVERNMENT</u>:

MR. DAVID BRAGDON
MR. EVAN RIKHYE
ASST. U.S. ATTORNEY
310 NEW BERN AVE.
RALEIGH, NC



<u>FOR THE DEFENDANT</u>:

MR. HAROLD WOOD VANN
ATTORNEY AT LAW
120 E. PARRISH ST.
DURHAM, NC




COURT REPORTER:  DONNA J. TOMAWSKI
STENOTYPE WITH COMPUTER AIDED TRANSCRIPTION

```
1                         JUNE 23, 2014

2                              * * *

3              MR. VANN:  YOUR HONOR, AT THIS POINT IN TIME WE

4    WILL CALL MR. THOM KIMMEL.

5    THOMAS L. KIMMEL, BEING FIRST DULY SWORN, TESTIFIED AS

6    FOLLOWS DURING DIRECT EXAMINATION:

7              THE COURT:  GOOD MORNING, MR. KIMMEL.  MR. VANN

8    WILL HAVE QUESTIONS FOR YOU, THEN MR. BRAGDON.  IF THE

9    LAWYER WHO'S NOT ASKING YOU QUESTIONS OBJECTS TO THE OTHER

10   LAWYER'S QUESTION, PLEASE DON'T SAY ANYTHING UNTIL I RULE

11   ON THE OBJECTION.  KEEP YOUR VOICE UP SO THE LADIES AND

12   GENTLEMEN OF THE JURY CAN HEAR YOUR TESTIMONY.  THAT

13   MICROPHONE WILL MOVE UP AND DOWN.  YOU MAY EXAMINE THE

14   WITNESS.

15   BY MR. VANN:

16   Q    MR. KIMMEL, STATE YOUR FULL NAME AND SPELL YOUR LAST

17   NAME.

18   A    THOMAS L. KIMMEL, K-I-M-M-E-L.

19   Q    AND WHERE DO YOU LIVE?

20   A    I LIVE IN HIGHLAND, INDIANA.

21   Q    WHERE EXACTLY IS HIGHLAND, INDIANA?

22   A    NORTHWEST INDIANA.

23   Q    IS THAT IN THE CHICAGO AREA, NEAR THE CHICAGO END OF

24   INDIANA?

25   A    ABOUT 30 MINUTES FROM DOWNTOWN CHICAGO.
```

| | |
|---|---|
| 1 | **Q**   AND HOW LONG HAVE YOU LIVED THERE? |
| 2 | **A**   SINCE 1980. |
| 3 | **Q**   AND WHAT'S YOUR -- ARE YOU CURRENTLY MARRIED? |
| 4 | **A**   I AM. |
| 5 | **Q**   AND TO WHOM ARE YOU MARRIED? |
| 6 | **A**   CATHY KIMMEL. |
| 7 | **Q**   HOW LONG HAVE YOU BEEN MARRIED TO MS. KIMMEL? |
| 8 | **A**   FORTY-FIVE YEARS. |
| 9 | **Q**   AND DO YOU HAVE ANY CHILDREN? |
| 10 | **A**   WE DO, WE HAVE TWO. |
| 11 | **Q**   AND WHAT ARE THEIR NAMES AND AGES? |
| 12 | **A**   TJ AND ANN, EDITH ANN. |
| 13 | **Q**   WHAT ARE THEIR AGES? |
| 14 | **A**   I DON'T KNOW AT THIS MOMENT.  TJ WAS BORN IN '81 AND |
| 15 | ANN WAS BORN IN '79. |
| 16 | **Q**   AND TJ TESTIFIED HERE IN THIS COURTROOM JUST A FEW |
| 17 | MINUTES AGO; IS THAT CORRECT? |
| 18 | **A**   YES, SIR. |
| 19 | **Q**   AND WHERE DOES ANN RESIDE? |
| 20 | **A**   SHE'S IN HAMMOND, INDIANA. |
| 21 | **Q**   HOW CLOSE IS HAMMOND FROM HIGHLAND, INDIANA? |
| 22 | **A**   A MILE, 2 MILES. |
| 23 | **Q**   ANY GRANDCHILDREN? |
| 24 | **A**   WE DO.  ANNIE HAS THREE AND TJ HAS TWO. |
| 25 | **Q**   I'M NOT GOING TO ASK YOU THEIR AGES. |

1    WHERE DID YOU GROW UP AND WHAT'S YOUR EDUCATIONAL

2  BACKGROUND?

3  **A**   I GREW UP IN PRIMARILY SOUTHERN INDIANA UNTIL ABOUT

4  1980, WHEN WE MOVED TO NORTHERN INDIANA.  EDUCATION IS

5  HIGH SCHOOL GRAD.

6  **Q**   DID YOU DO ANY OTHER EDUCATIONAL WORK AFTER, YOU

7  KNOW, AFTER HIGH SCHOOL?

8  **A**   JUST SOME HOME STUDIES.

9  **Q**   SUCH AS?

10  **A**   OVER THE YEARS, MECHANICS; IN MY LATER YEARS IN

11  SALES, MOTIVATIONAL SPEAKING, FINANCES, THINGS LIKE THAT.

12  **Q**   WHAT WAS THE NAME OF THE TOWN YOU GREW UP IN?

13  **A**   THE NAME OF THE TOWN I GREW UP IN?

14  **Q**   YES, SIR.

15  **A**   FOR THE PRIMARY PART OF MY YOUNGER YEARS WAS NEW

16  ALBANY IN INDIANA.

17  **Q**   NOW, SUBSEQUENT TO HIGH SCHOOL, WHAT DID YOU DO?

18  AFTER YOU GRADUATED FROM HIGH SCHOOL.

19  **A**   I JOINED THE ARMY.  WENT TO U. S. ARMY, SPENT 28

20  MONTHS IN VIET NAM.  FROM THERE, I CAME OUT AND WENT TO

21  WORK, JUST LABOR TYPE JOBS UNTIL 1980 -- ACTUALLY 1977, I

22  WENT TO WORK FOR A COMPANY --

23  **Q**   LET ME STOP YOU THERE.  I DIDN'T ASK YOU AND I SHOULD

24  HAVE, BUT WHEN WERE YOU BORN?

25  **A**   I WAS BORN IN IRONTON, OHIO.

1 **Q**   I'M SORRY, WHEN?

2 **A**   1946.

3 **Q**   YOU DID YOUR TOUR, YOUR STINT IN VIET NAM?

4       **MR. BRAGDON:**  OBJECTION, YOUR HONOR, AS TO

5 RELEVANCE.

6       **THE COURT:**  SUSTAINED.  NEXT QUESTION.

7 **BY MR. VANN:**

8 **Q**   I BELIEVE YOU INDICATED THAT YOU DID THREE TOURS; IS

9 THAT CORRECT?

10       **MR. BRAGDON:**  OBJECTION, RELEVANCE.

11       **MR. VANN:**  YOUR HONOR, I DIDN'T OBJECT WHEN --

12       **THE COURT:**  I KNOW, BUT HE SAID HE SPENT 28

13 MONTHS IN VIET NAM.  NEXT QUESTION.

14 **BY MR. VANN:**

15 **Q**   WERE YOU EVENTUALLY DISCHARGED FROM THE U.S. ARMY?

16 **A**   I WAS.

17       **MR. BRAGDON:**  OBJECTION AS TO RELEVANCE.

18       **THE COURT:**  OVERRULED.

19 **BY MR. VANN:**

20 **Q**   WHAT TYPE OF DISCHARGE DID YOU RECEIVE?

21 **A**   HONORABLE.

22 **Q**   NOW, DO YOU RECALL WHEN YOU WERE DISCHARGED?

23       **MR. BRAGDON:**  OBJECTION AS TO RELEVANCE.

24       **THE COURT:**  OVERRULED, BUT MR. VANN, LET'S GO.

25 DO YOU REMEMBER WHEN YOU WERE DISCHARGED, SIR, WHAT YEAR?

1          **THE WITNESS:**  1968.

2          **THE COURT:**  OKAY.  NEXT QUESTION.

3   **BY MR. VANN:**

4   **Q**    SO YOU INDICATED THAT, YOU KNOW, FROM THE TIME PERIOD

5   OF 1968 TO 1980 YOU DID BASICALLY MANUAL TYPE JOBS.  WOULD

6   YOU PLEASE EXPLAIN?

7   **A**    FACTORY-TYPE STUFF UNTIL 1977, THEN I WENT TO WORK

8   FOR SUN ELECTRIC CORPORATION.

9   **Q**    SUN ELECTRIC?

10  **A**    YES, SIR.

11  **Q**    WHAT DID YOU DO FOR SUN ELECTRIC BEGINNING IN 1977?

12  **A**    I WAS A TERRITORIAL MANAGER FOR THE LOUISVILLE,

13  KENTUCKY AREA.

14  **Q**    HOW LONG DID YOU STAY IN THAT POSITION?

15  **A**    THROUGH 1984, I BELIEVE.

16  **Q**    AND WHAT DID YOU DO IN 1984?

17  **A**    I HAD STARTED A FIRE SAFETY EQUIPMENT BUSINESS.

18  **Q**    NOW, WHEN YOU SAY "I," DO YOU MEAN JUST YOU, YOU

19  STARTED YOUR OWN BUSINESS?

20  **A**    ACTUALLY I OPENED THE DOORS WHILE I WAS WORKING WITH

21  SUN ELECTRIC CORPORATION AS A PART-TIME THING, AND STARTED

22  SELLING FIRE EXTINGUISHERS AND FIRE EQUIPMENT TYPE STUFF.

23  **Q**    NOW, DURING THIS TIME PERIOD, DID YOU EVER BEGIN

24  ATTENDING THE CHURCH IN HAMMOND?

25  **A**    WE MOVED TO HAMMOND TO ATTEND THAT CHURCH IN 1980.

1    **Q**    PRIOR TO 1980 -- AND WAS THAT THE FIRST BAPTIST

2    CHURCH?

3    **A**    YES, SIR.

4    **Q**    NOW, IN REGARD TO -- WHAT WAS YOUR RESPONSIBILITIES

5    WITH REGARD TO THE BUSINESS, THE FIRE SAFETY BUSINESS?

6                **MR. BRAGDON:**    OBJECTION AS TO RELEVANCE.

7                **THE COURT:**    OVERRULED.

8                **THE WITNESS:**    WHAT WAS MY WHAT?

9    **BY MR. VANN:**

10   **Q**    WHAT WERE YOUR DUTIES AND RESPONSIBILITIES IN

11   ASSOCIATION WITH YOUR ESTABLISHING THE FIRE SAFETY

12   BUSINESS?

13   **A**    I MANAGED IT AND SOLD AND INSTALLED EQUIPMENT.

14   **Q**    AND WOULD THIS BE LOCATED WITHIN THE INDIANA AREA?

15   **A**    IT WAS IN HAMMOND, INDIANA, YES.

16   **Q**    HOW LONG DID YOU STAY IN THAT EMPLOY?

17   **A**    I THINK WE DID THAT A COUPLE YEARS.  I'M NOT SURE.

18   **Q**    AND SUBSEQUENT TO THAT, WHO WERE YOU EMPLOYED BY?

19   **A**    AGAIN, WITH TWO OTHER PEOPLE WE STARTED A COMPANY

20   CALLED ALL TOOL.

21   **Q**    EXPLAIN WHAT ALL TOOL IS.

22   **A**    ALL TOOL WAS A COMPANY THAT SOLD AUTOMOTIVE

23   EQUIPMENT, HEAVY EQUIPMENT, TIRE CHANGERS, LIFTS, THINGS

24   LIKE THAT.

25   **Q**    WHERE WAS THAT BUSINESS LOCATED?

1    **A**    THE OFFICE WAS IN CRYSTAL LAKE, ILLINOIS.

2    **Q**    DO YOU REMEMBER WHEN YOU STARTED THAT BUSINESS?

3    **A**    I WANT TO SAY MAYBE '86.

4    **Q**    AND DO YOU REMEMBER HOW LONG YOU STAYED ASSOCIATED

5    WITH THAT BUSINESS?

6    **A**    1986 THROUGH I THINK '94, I BELIEVE, EARLY '94 OR

7    LATE '93.

8    **Q**    DID YOU AT SOME POINT IN TIME BEGIN A SECOND LINE,

9    BEGIN ANOTHER BUSINESS INVOLVING PROVIDING SEMINARS, DEBT

10    AND CREDIT SEMINARS?

11    **A**    I STARTED DOING DEBT SEMINARS IN '96.

12    **Q**    SO DID YOU GO STRAIGHT FROM THE ALL TOOL JOB TO

13    STARTING WORK WITH THE SEMINARS?

14    **A**    NO, I HAD TO QUIT THE ALL TOOL THING FOR HEALTH

15    ISSUES.  I COULDN'T MOVE HEAVY EQUIPMENT ANYMORE AND I

16    WENT TO HELP TWO GENTLEMEN AGAIN TO START, ANOTHER TWO

17    GENTLEMEN, TO START CHICAGO LASER.

18    **Q**    WHAT WAS CHICAGO LASER?

19    **A**    CHICAGO LASER WAS A MAIN FRAME COMPUTER/PRINTER

20    REPAIR COMPANY.

21    **Q**    AND DID YOU STAY WITH THEM UP THROUGH THE TIME YOU

22    BEGAN DOING YOUR DEBT SEMINARS?

23    **A**    RIGHT, 1996.

24    **Q**    NOW, FOR THE RECORD, WHAT WAS THE NAME OF THE COMPANY

25    THAT YOU HAD STARTED TO DO THESE DEBT SEMINARS?

1    **A**    WE CALLED IT FAITHFUL STEWARDS.

2    **Q**    AND WHEN DID YOU CREATE THAT COMPANY?

3    **A**    THE NAME AND WHEN I STARTED TRAVELING WAS RIGHT AT

4    '96 WE STARTED THAT.

5    **Q**    DID YOU EVER INCORPORATE IT?

6    **A**    WE DID.

7    **Q**    DO YOU REMEMBER WHEN YOU DID THAT?

8    **A**    SEVERAL YEARS LATER.

9    **Q**    DESCRIBE WHAT BROUGHT ABOUT YOUR DECISION TO CREATE

10   FAITHFUL STEWARDS.

11   **A**    WELL, I DON'T KNOW THAT I COMPLETELY UNDERSTAND YOUR

12   QUESTION.  I WAS IN DEBT, WHAT I CONSIDER PRETTY SERIOUS

13   DEBT, AND I HAD LEARNED ABOUT A PROGRAM WHERE I COULD GET

14   OUT OF DEBT.  I APPLIED THOSE PRINCIPLES AND SAW THAT I

15   WAS GETTING MYSELF OUT OF DEBT AND THOUGHT THAT OTHERS

16   MIGHT LIKE TO LEARN THAT.  I WANTED TO SEE IF I COULD HELP

17   OTHER PEOPLE GET OUT OF DEBT.  I KNEW WHAT DEBT AND DEBT

18   BONDAGE DID TO PEOPLE.

19   **Q**    WHAT SORT OF EDUCATIONAL TRAINING DID YOU OBTAIN IN

20   ORDER TO BE ABLE TO PRESENT THESE SEMINARS?

21   **A**    AT THAT TIME THERE WAS A COMPANY IN CHICAGO, I DON'T

22   RECALL THE NAME, BUT THEY DID A WEEK-LONG TRAINING

23   SEMINAR.  I REMEMBER THE COST WAS ABOUT A THOUSAND BUCKS.

24   I WAS GETTING WHAT THEY CALLED A CERTIFICATION,

25   INDEPENDENT CERTIFIED -- INDEPENDENT -- I CAN'T EVEN

1  REMEMBER THE NAME NOW, BUT IT WAS A CERTIFICATION WHERE I

2  COULD TEACH THE SAME PROCESS THAT I HAD LEARNED, I COULD

3  TEACH THAT PROCESS TO OTHERS.

4  **Q**    AND WHEN YOU STARTED THIS COMPANY, WAS THERE ANYONE

5  ELSE INVOLVED IN IT BUT YOU?

6  **A**    NO.

7  **Q**    DESCRIBE EXACTLY WHAT YOUR SEMINARS WERE WANTING TO

8  DO.

9  **A**    A TYPICAL SEMINAR WAS THREE DAYS.  WELL, LET ME BACK

10  UP.  WHEN THE SEMINAR WAS FIRST STARTED, IT WAS A

11  CARRYOVER FROM MY JOB AT CHICAGO LASER AND DOING THE

12  SEMINARS.  I WORKED A TYPICAL FIVE DAY A WEEK JOB AT

13  CHICAGO LASER AND THEN I WOULD LEAVE OUT ON A SATURDAY

14  MORNING, NORMALLY ARRIVED AT A CHURCH NOONISH, AND WE

15  WOULD TEACH ALL DAY SATURDAY AND INTO THE NIGHT AND THEN I

16  WOULD TYPICALLY PREACH ON SUNDAY MORNING, CLOSE THE

17  CONFERENCE OUT, AND THEN GO HOME, BE BACK READY TO GO TO

18  WORK MONDAY.

19       LATER, AGAIN, MY HEALTH PROBLEMS AROSE AGAIN AND SO I

20  COULD NO LONGER DO THOSE LONG --

21            **MR. BRAGDON:**  OBJECTION.

22            **THE COURT:**  OVERRULED.

23            **MR. BRAGDON:**  YOUR HONOR, THERE IS A MOTION IN

24  LIMINE.  I BELIEVE IT'S BEEN TOUCHED UPON.

25            **THE COURT:**  I UNDERSTAND.  NEXT QUESTION.

1    **THE WITNESS:** SHOULD I CONTINUE?

2    **THE COURT:** NO, NEXT QUESTION.

3    **BY MR. VANN:**

4    **Q** YOU HAD INDICATED YOU WERE WORKING BOTH IN

5    COMBINATION WITH CHICAGO LASER AND FAITHFUL STEWARDS?

6    **A** RIGHT.

7    **Q** WHAT BROUGHT YOU TO THE POINT -- YOU WERE DESCRIBING

8    TO US THE PROCESS OF YOUR DEVELOPING THIS SEMINAR FOR

9    FAITHFUL STEWARDS. EXACTLY WHAT BROUGHT ABOUT THE

10   SEMINARS THAT YOU BEGAN TO TEACH?

11   **A** WELL, AGAIN, I KNEW FROM EXPERIENCE WHAT DEBT DOES TO

12   YOU PERSONALLY, YOUR FAMILY, AND YOUR TESTIMONY AMONG

13   OTHER CHRISTIANS, AND IT WAS A BAD TESTIMONY. SO I HAD A

14   DESIRE TO HELP CHRISTIANS, THAT'S WHY MOST, IF NOT ALL OF

15   MY WORK, WAS IN THE CHRISTIAN REALM.

16       SO WE STARTED DOING THESE SEMINARS. EVENTUALLY WE

17   TRANSFERRED INTO THREE NIGHTS A WEEK, BECAUSE I LEFT

18   CHICAGO LASER AND WAS DOING THIS NOW FULL-TIME. SO MY

19   SCHEDULE WAS MORE FLEXIBLE. SO TYPICALLY I WOULD LEAVE ON

20   A WEDNESDAY, ARRIVE WEDNESDAY NIGHT, TEACH WEDNESDAY

21   NIGHT, THURSDAY NIGHT, FRIDAY NIGHT, AND TYPICALLY COME

22   HOME SATURDAY.

23   **Q** NOW, YOU INDICATED YOU HAD MENTIONED TWICE THE

24   CHRISTIAN ASPECT OF THIS. ARE YOU -- FOR THE RECORD, ARE

25   YOU IN FACT A CHRISTIAN?

**A**   YES, SIR.

**Q**   WHAT DENOMINATION?

**A**   BAPTIST.

**Q**   DO YOU KNOW, IS THERE A PROCESS WHERE ONE

ESSENTIALLY, I BELIEVE THE TERM WOULD BE, "SAVED."  DO YOU

RECALL WHEN THAT OCCURRED TO YOU?

**A**   YES.

            **MR. BRAGDON:**  OBJECTION AS TO RELEVANCE.

            **THE COURT:**  SUSTAINED.

**BY MR. VANN:**

**Q**   DID YOU EVER BECOME MORE INVOLVED IN YOUR CHURCH?

**A**   I TAUGHT SUNDAY SCHOOL FOR SEVERAL YEARS, I THINK TEN

YEARS.  I WAS A DEACON FOR OVER 30 YEARS.

**Q**   AND WHICH CHURCHES WERE THEY?

**A**   FIRST BAPTIST CHURCH, HAMMOND.

**Q**   NOW, IN REGARD TO FAITHFUL STEWARDS, WAS THERE A TIME

THAT YOU BEGAN TO INTEGRATE THE CHRISTIAN TEACHINGS THAT

YOU WERE LEARNING OR HAD LEARNED, AND THE CREDIT AND

DEBT -- DOING AWAY WITH DEBT AND CREDIT ISSUES THAT YOU

HAD LEARNED?

**A**   IN MY STUDY OF THE BIBLE, I FOUND OVER 700 REFERENCES

CONCERNING MONEY OR MATERIAL POSSESSIONS AND HOW TO HANDLE

THOSE THINGS.  I MARRIED THOSE TO SOME JUST I THOUGHT

GOOD, COMMON SENSE SECULAR THINGS.  SO I WOULD TEACH -- I

WOULD LAY THE FOUNDATION FOR TEACHING THE SECULAR BY

1   TEACHING THE SPIRITUAL. BUT, AGAIN, I WAS TALKING TO

2   CHRISTIANS SO I WAS TRYING TO EMPHASIZE THE REASONS WHY WE

3   AS CHRISTIANS OUGHT TO BE DEBT FREE AND HOW WE COULD BE

4   BETTER STEWARDS OF GOD'S MONEY, HOW TO TITHE CORRECTLY,

5   WHAT THE TITHE WAS, WHAT THE BIBLE STATED ABOUT ALL

6   ASPECTS OF FINANCES. THEN I WOULD USE SOME SIMPLE THINGS

7   THAT MANY, MANY FINANCIAL COUNSELORS USE ABOUT DEBT

8   ELIMINATION, ABOUT HOW TO ELIMINATE ONE DEBT AT A TIME AND

9   I MARRIED THOSE TWO PROGRAMS.

10 **Q**   I'M SORRY?

11 **A**   I SAID THEN I MARRIED THOSE TWO PROGRAMS. THAT'S

12   WHAT FORMED THE BASIS OF FAITHFUL STEWARDS.

13 **Q**   AND THIS WAS, I BELIEVE YOU INDICATED, THAT INITIALLY

14   YOUR SEMINAR WAS ONE NIGHT. DO YOU RECALL WHEN IT

15   EXPANDED TO THREE NIGHTS?

16 **A**   I CAN'T TELL YOU THE YEAR. I'M GOING TO SAY, I WOULD

17   JUST BE GUESSING, I WOULD SAY '95, '96. I'M NOT SURE.

18   NOT '96, IT WOULD BE A COUPLE OF YEARS AFTER THAT. SO --

19   I REALLY CAN'T REMEMBER.

20 **Q**   THAT'S ALL RIGHT. DID YOUR WORK WITH FAITHFUL

21   STEWARDS BECOME YOUR PRINCIPAL LINE OF WORK?

22 **A**   FOR 16 YEARS THAT'S ALL I DID.

23 **Q**   DESCRIBE HOW YOU WOULD -- HOW THESE SEMINARS WOULD BE

24   SET UP AT A PARTICULAR CHURCH?

25 **A**   HOW THEY WOULD BE SET UP?

1  Q    YES.

2  A    TYPICALLY I WOULD GET A CALL FROM A PASTOR WHO MAYBE

3  HEARD ABOUT ME, MAYBE HE HAD SEEN ME AT ANOTHER SEMINAR,

4  MAYBE REFERRED TO ME, BUT ANYWAY I WOULD GET A CALL FROM

5  HIM.  TYPICALLY THEY WOULD ASK QUESTIONS ABOUT THE

6  CONFERENCE, THE LENGTH AND WHAT WAS GOING TO BE COVERED.

7  SOME PASTORS WOULD ASK FOR A DVD, ORIGINAL TAPES, OF

8  COURSE, SOME OF THEM WANTED TO SEE SOMETHING BEFOREHAND.

9  AND THEN WE WOULD SET A DATE, SET A DATE THAT MATCHED HIS

10 SCHEDULE AND MY SCHEDULE.  THEN WE WOULD GO.

11 Q    WHAT WOULD BE THE UNDERSTANDING IN REGARD TO

12 COMPENSATION THAT YOU MIGHT RECEIVE FOR PUTTING ON THIS

13 SEMINAR, WHETHER IT WAS INITIALLY THE ONE DAY OR

14 SUBSEQUENTLY THE THREE DAY SEMINAR?

15 A    I WOULD ALWAYS ASK THE PASTORS TO PICK UP MY TRAVEL

16 EXPENSES.  I WOULD ASK THEM TO PUT ME UP SOMEWHERE.  AND

17 THEN FEES WOULD ALWAYS COME UP AND I WOULD TELL THEM THERE

18 ARE NO FEES BUT LOVE OFFERINGS WOULD BE ACCEPTABLE, BUT

19 THERE WERE NO FEES FOR THE CONFERENCE.

20 Q    WHEN YOU SAY "LOVE OFFERING," WHAT DO YOU MEAN?

21 A    TYPICALLY, WELL LOVE OFFERING IS A TERM THAT WE USE,

22 THAT MOST CHRISTIANS ARE FAMILIAR WITH, THAT WHEN A

23 SPEAKER COMES TO A CHURCH THEY WOULD GIVE AN OFFERING THAT

24 THEY TYPICALLY CALL A LOVE OFFERING.

25 Q    LIKE PASSING THE BASKET FOR THE PERSON THAT WAS

1  THERE?

2  **A**    YES.

3  **Q**    WAS THAT OF A VOLUNTARY NATURE?

4  **A**    WAS THAT WHAT?

5  **Q**    THE LOVE OFFERINGS THAT WERE COLLECTED, WAS THAT OF A

6  VOLUNTARY NATURE?

7  **A**    YES.

8  **Q**    WERE YOU ALSO ABLE TO OBTAIN ANY OTHER SOURCE OF

9  INCOME OR MATERIALS THAT WERE USED AT THE VARIOUS

10  SEMINARS?

11  **A**    OVER A PERIOD OF TIME I DEVELOPED SOME DVD'S.  ONE

12  CHURCH, I THINK IN ATLANTA, I HAD DID A REAL PROFESSIONAL

13  DVD AND WE GOT PERMISSION TO COPY THAT AND SELL THAT.

14  ORIGINALLY I HAD AUDIO TAPES.  WE DIDN'T DO THOSE IN LATER

15  YEARS.  WE HAD A LITTLE BOOKLET THAT I HAD WRITTEN FOR MY

16  WIFE HELPING HER IN THE EVENT OF AN EMERGENCY, MY DEATH,

17  AND THE ESTATE PLANNING KIT I BOUGHT FROM ANOTHER COMPANY

18  THAT PRIVATE LABELED IT FOR ME.  THOSE TYPE THINGS I WOULD

19  HAVE ON THE TABLE.  AND TJ'S PRAYER CARDS, I ALWAYS TOOK

20  THOSE WITH ME.

21  **Q**    AND I BELIEVE YOU INDICATED THESE SEMINARS WOULD LAST

22  THREE DAYS?

23  **A**    TYPICALLY.

24  **Q**    HOW WOULD THEY BE BROKEN UP?

25  **A**    TYPICALLY WE WOULD, BASED ON THE PASTOR'S SCHEDULE,

1    WE WOULD ALMOST ALWAYS START WEDNESDAY NIGHT AT A REGULAR

2    WEDNESDAY NIGHT BIBLE STUDY TIME SO THAT IT WOULDN'T HAVE

3    TO DISRUPT THE SCHEDULE WITH PEOPLE WHO ARE USED TO COMING

4    ON WEDNESDAY NIGHT.  AND THEN WE WOULD ANNOUNCE THE TIMES

5    FOR THURSDAY AND FRIDAYS, AGAIN, BASED ON THE CHURCH'S

6    SCHEDULE.  SOMETIMES THE PASTOR WOULD GO AHEAD AND

7    ANNOUNCE EVERY NIGHT AT 7 O'CLOCK, FOR INSTANCE, BUT THE

8    PASTOR PRETTY MUCH SET THE TIME WE STARTED, TYPICALLY IN

9    THE EVENINGS.

10   **Q**    AND THEY WOULD LAST FOR HOW LONG EACH NIGHT?

11   **A**    WE WOULD SCHEDULE -- MANY TIMES THE PASTOR WOULD JUST

12   SAY THE CONFERENCE STARTS AT 7, AND HE WOULDN'T GIVE US AN

13   END TIME.  I ALWAYS TRIED TO BE DONE, AT LEAST STOP BY 9,

14   9:30 P.M.  MORE THAN NOT, IT WAS 9:30 OR 10, JUST BECAUSE

15   PEOPLE WERE INTERACTING AND ENJOYING IT, SO WE SOMETIMES

16   STAYED LATER.  NEVER LESS THAN SIX HOURS AND SOMETIMES AS

17   MANY AS EIGHT OR TEN HOURS.

18   **Q**    NOW, FOR THE RECORD, YOU HEARD IN THIS TRIAL THE FIVE

19   SEPARATE ADIOS AND SEEN THE VIDEOS.  ARE THEY PARTS OF

20   SEMINARS THAT YOU HAVE GIVEN OVER THE YEARS?

21   **A**    NO, THAT PART OF THE SEMINAR STARTED SOMETIME IN

22   2006.  IT WASN'T PART OF THE SEMINAR, IT WAS MORE OF A,

23   THROUGH ONE OF THE POINTS OF THE CONFERENCE, THE THING I

24   CALLED "YOU KNOW YOU ARE IN FINANCIAL TROUBLE IF," AND

25   THERE WAS ABOUT 14 DIFFERENT INDICATORS OF FINANCIAL

1    TROUBLE.  ONE OF THOSE INDICATORS WERE WE WEREN'T SAVING

2    OR INVESTING.  AT THAT POINT IS WHEN I WOULD SPEND A FEW

3    MINUTES TALKING, AS I DID WITH ALL THE POINTS, EXPLAINING

4    THAT POINT AND ABOUT HOW THEY SHOULD SAVE AND HOW THEY

5    SHOULD BE INVESTING.

6    **Q**    IF I MAY JUST BACK UP JUST A LITTLE BIT.  SO BETWEEN

7    1996 AND 2006, WOULD YOU HAVE SEEN TALKS SIMILAR TO WHAT

8    WE SAW IN REGARD TO VIDEOS THAT WERE PLAYED FOR THIS COURT

9    DURING THE GOVERNMENT'S CASE?

10   **A**    THE ONLY THING THE GOVERNMENT PLAYED, OF COURSE, WAS

11   WHAT I SAID IN 2006 AND 2011.

12   **Q**    AND WOULD YOU TOUCH ON OR DISCUSS INVESTMENTS FROM

13   1996 -- DID YOU TOUCH ON INVESTMENTS FROM 1996 TO 2006?

14   **A**    YES, SIR.

15   **Q**    IN REGARD TO THE SEMINARS BETWEEN 1996 AND 2006,

16   WOULD THERE ALSO BE SCHEDULED TIME TO MEET WITH

17   INDIVIDUALS AFTER EACH PARTICULAR EVENING?

18   **A**    WE WOULD ALWAYS MAKE ONE-ON-ONE APPOINTMENTS

19   AVAILABLE, TYPICALLY 15, 20 MINUTES AT THE END OF EACH

20   SERVICE.  AFTER SPEAKING TWO OR THREE HOURS, I WAS PRETTY

21   SHOT, SO I WOULD TRY TO LIMIT IT TO TWO OR THREE PEOPLE AT

22   THE END OF EACH NIGHT.

23   **Q**    WHAT WOULD PEOPLE COME TO TALK TO YOU ABOUT?

24          **MR. BRAGDON:**  OBJECTION AS TO RELEVANCE FOR 1996

25   TO 2006.

```
 1              THE COURT:  SUSTAINED AS TO THIS TIME PERIOD.
 2    BY MR. VANN:
 3    Q    MR. KIMMEL, HOW MANY SEMINARS WOULD YOU PARTICIPATE
 4    IN IN ANY GIVEN YEAR?
 5    A    PROBABLY, FROM THE START TO THE END, PROBABLY NO LESS
 6    THAN 24 WEEKS A YEAR TO AS MANY AS 40 WEEKS A YEAR.
 7    Q    DID YOU SAY 24 TO 40?
 8    A    YES, SIR.
 9    Q    AND IS THIS CONSISTENT FROM 1996 THROUGH 2011?
10    A    YES, SIR.
11    Q    DO YOU DO THAT NOW?
12    A    DO I DO THAT NOW?
13    Q    STRIKE THAT.  I'LL WITHDRAW.
14         NOW, DID YOU EVENTUALLY -- I'M SORRY, WHEN YOU
15    WEREN'T DOING YOUR SEMINARS, WHAT RESPONSIBILITIES OR DID
16    YOU HAVE A SECOND JOB BACK HOME IN HIGHLAND?
17    A    I DID.
18    Q    WHAT WERE YOU DOING?
19    A    ACTUALLY IN HAMMOND.
20    Q    I'M SORRY, OKAY.  WHAT WERE YOU DOING?
21    A    I DID PERSONAL ONE-ON-ONE COUNSELING AT OUR CHURCH.
22    Q    AND WAS YOUR OFFICE IN FACT LOCATED AT THE CHURCH?
23    A    IT WAS IN A BUILDING NEXT TO THE CHURCH.  IT WAS ON
24    CHURCH PROPERTY.  THE CHURCH IS QUITE LARGE IN DOWNTOWN
25    HAMMOND.  THEY HAVE PROBABLY 15 BUILDINGS OR SO, AND IN
```

1    ONE OF THE STORE FRONTS THEY HAD AN OFFICE THERE FOR ME.

2    **Q**    WHAT WAS YOUR NORMAL PROCEDURE FOR WORKING OUT OF

3    THAT OFFICE?

4    **A**    THE CHURCH WOULD SET APPOINTMENTS FOR ME AND I WOULD

5    COME IN AND WHOEVER SHOWED UP I WOULD COUNSEL.

6    **Q**    WAS THERE ANY FEE ASSOCIATED WITH THAT?

7    **A**    NO FEES, NO, SIR.

8    **Q**    WAS THERE EVER A TIME WHEN YOU WOULD CHARGE A FEE FOR

9    THE INVESTMENT COUNSELING THAT YOU WOULD OFFER?

10   **A**    INVESTMENT COUNSELING OR DEBT COUNSELING OR JUST --

11   **Q**    EITHER ONE.

12   **A**    ARE WE TALKING 2006 TO 2012?

13   **Q**    LET'S START FIRST UP UNTIL 2006.

14          **MR. BRAGDON:**   OBJECTION AS TO RELEVANCE FOR UP

15   UNTIL 2006.

16          **THE COURT:**   OVERRULED.  YOU CAN ANSWER.

17          **THE WITNESS:**   I DID NOT CHARGE A FEE.

18   **BY MR. VANN:**

19   **Q**    AND AFTER 2006?

20   **A**    AFTER 2006?

21   **Q**    YES.

22   **A**    WAS YOUR FIRST QUESTION BEFORE 2006?

23   **Q**    YES.

24   **A**    OKAY, SORRY.  LET ME REPHRASE.  IN 1996, I WAS DOING

25   IT AS A BUSINESS AND I WAS CHARGING A FEE AT THAT TIME

1   INITIALLY IN 1996.  I STARTED DOING THE CHURCH CONFERENCES

2   AS WELL AS THE BUSINESS CONFERENCES AND IT GOT -- IT WAS

3   TOO MUCH, IT WAS TOO BUSY, SO I QUIT DOING THE FOR FEE

4   COUNSELING TO INDIVIDUAL AND PERSONAL COUNSELING FOR NO

5   FEE.

6   **Q**   WHY DID YOU HAVE YOUR OFFICE WITHIN THE CONFINES OF

7   FIRST BAPTIST CHURCH?

8   **A**   MY PASTOR I HAD WHEN I WENT TO HAMMOND, INDIANA,

9   DR. JACK HYLES, HAD COUNSELED ME AND ASKED ME TO HELP HIM.

10   I HAD GONE TO HIM IN '96.  WHEN I HAD STARTED TRAVELING, I

11   HAD ALREADY DONE A COUPLE MEETINGS, I WENT FOR COUNSEL.  I

12   WAS TRYING TO DECIDE WHO I WAS; WAS I A PASTOR, WAS I A

13   MISSIONARY, WAS I AN EVANGELIST.  I WAS TRYING TO DECIDE

14   WHO I WAS.  THE PASTOR ASKED ME THE QUESTION, "ARE YOU

15   TRYING TO HELP PEOPLE OR ARE YOU TRYING TO MAKE MONEY?"  I

16   SAID, "I'M TRYING TO HELP PEOPLE."  HE SAID TWO THINGS YOU

17   NEED TO DECIDE THEN, IF IT'S GOING TO BE A MINISTRY, NOT A

18   BUSINESS.  SO THAT'S WHEN I DECIDED I COULDN'T CHARGE

19   ANYMORE BECAUSE IT'S A MINISTRY.

20      THEN HE ENCOURAGED ME TO REMAIN A LAYMAN.  HIS

21   THINKING WAS I WOULD HAVE MORE -- HIS TERM WAS, YOU WOULD

22   HAVE MORE INFLUENCE WITH LAY PEOPLE IF YOU STAY A LAY

23   PERSON, YOU WILL HAVE A RAPPORT WITH THEM.  SO I ALWAYS

24   BUILT MYSELF AS A LAY PERSON AND THAT I DID FINANCIAL

25   COUNSELING AND I DID THESE CONFERENCES.

**Q**   HOW IMPORTANT WAS IT TO YOU TO CONTINUE TO GET THIS
SPIRITUAL GUIDANCE THROUGHOUT THIS PROCESS OF YOUR
EVOLVING OF BUSINESS AND BUSINESS LIFE?

**A**   HOW IMPORTANT WAS IT TO GET THE COUNSELING?

**Q**   YES.

**A**   IT WAS VERY IMPORTANT.  I BELIEVE THE BIBLE TEACHES
US THAT WE WON'T BE SUCCESSFUL IN ANYTHING WE DO IF WE
DON'T GET SPIRITUAL COUNSELING.

**Q**   DID YOU EVENTUALLY BEGIN TO LOOK INTO OR GET INVOLVED
IN PROVIDING INVESTMENT INFORMATION AS PART OF YOUR
FAITHFUL STEWARDS SEMINARS?

**A**   I NEVER LOOKED FOR THOSE THINGS IN MY EARLY DAYS.
THERE WAS A SEGMENT I USED TO USE WHERE I TAUGHT FINANCING
PRINCIPLES, INVESTING PRINCIPLES, BUT I WOULD TEACH A
PRINCIPLE ABOUT SELECTING DIFFERENT THINGS.  I FOUND THAT
PEOPLE WOULD WANT THAT INFORMATION TO USE AS AN EFFORT TO
GET OUT OF DEBT, AND I DIDN'T THINK THAT WAS WISE.  I HAD
KNOWN TOO MANY PEOPLE AND TOO MANY INSTANCES WHERE PEOPLE
TRIED TO INVEST TO GET RICH AND THEY LOST EVERYTHING.

     SO AFTER JUST A MATTER OF MONTHS OF STARTING GIVING
THAT TYPE OF ADVICE, I QUIT GIVING THAT ADVICE.  THE ONLY
ADVICE I WOULD GIVE WAS YOU NEED TO BE INVESTING.  THE
BIBLE TALKS ABOUT THAT IN MATTHEW, AND THE TYPE OF
INVESTING THAT YOU SHOULD LOOK FOR IS SOMETHING THAT HAS A
GOOD FIXED RATE, SOMETHING YOU COULD DEPEND ON IN YOUR

1   LATER YEARS.  THERE'S DIFFERENT TYPES OF THINGS THAT DO

2   THAT:  ANNUITIES, T-BILLS AND PASSBOOK ACCOUNTS, THINGS

3   LIKE THAT.

4       I DID MENTION INDEX FUNDS.  MY PASTOR HAD REACHED --

5   HE THOUGHT IT WAS A RELATIVELY SAFE THING, AND SO I

6   MENTIONED THAT AND I WOULD TELL THEM TO GO GET COUNSEL, GO

7   GET COUNSEL ABOUT IT.

8   **Q**   WHEN DID YOU EVENTUALLY START INCLUDING A SPECIFIC

9   INVESTMENT OPPORTUNITY WITHIN YOUR SURE LINE SEMINARS -- I

10  MEAN YOUR FAITHFUL STEWARDS SEMINARS, SPECIFICALLY SURE

11  LINE?

12  **A**   YES, I STARTED TO REFER PEOPLE TO SURE LINE.

13  **Q**   WHEN DID YOU FIRST HEAR OF SURE LINE?

14  **A**   I THINK THE FIRST RECOLLECTION I HAVE OF SURE LINE OR

15  ANYTHING TO DO WITH SURE LINE WAS IN '05.

16  **Q**   INITIALLY, WHAT DID YOU HEAR?

17  **A**   I HAD HEARD FROM AN ATTORNEY THAT THERE WAS A COMPANY

18  IN NORTH CAROLINA THAT SOLD CARS AND THEY WERE PAYING

19  12 PERCENT ALONG WITH -- IT WAS A COLLATERALIZED LOAN, AND

20  THE COLLATERAL WAS A COMBINATION OF SOLD CARS AND

21  CONTRACTS, THINGS OF THAT SORT.

22  **Q**   WHAT WAS THE NEXT THING YOU DID ONCE YOU HEARD OR HAD

23  BEEN GIVEN THIS INFORMATION?

24  **A**   I DIDN'T UNDERSTAND IT AT ALL.

25  **Q**   DID THAT EVENTUALLY CHANGE?

1  **A**    IT EVENTUALLY CHANGED, YES.

2  **Q**    WHAT BROUGHT ABOUT THAT CHANGE?

3  **A**    I HAD GOTTEN A CALL FROM MR. KIRK AND HE WANTED TO

4  KNOW IF HE COULD SPEAK WITH ME, WANTED TO KNOW IF -- HE

5  WANTED TO KNOW IF I WOULD SPEND SOME TIME WITH HIM AND LET

6  HIM TRY TO EXPLAIN TO ME WHAT HE WAS DOING AND HOW HE WAS

7  DOING IT.  HE STARTED A CONVERSATION UP, HE WANTED TO TALK

8  TO BUT ME, BUT GIVE ME A COUPLE MINUTES.

9  **Q**    NOW, PRIOR TO YOUR CALL FROM MR. KIRK, HAD YOU DONE,

10 EVEN THOUGH YOU SAID YOU WEREN'T INTERESTED, HAD YOU BEEN

11 ASKED TO DO SOME SALES FOR SURE LINE?

12 **A**    HAD WHAT?

13 **Q**    HAD YOU BEEN ASKED TO DO SOME SALES FOR SURE LINE?

14 **A**    I HAD NOT BEEN ASKED TO DO ANYTHING FOR SURE LINE AT

15 THAT TIME.

16 **Q**    WHAT HAD YOU BEEN ASKED TO DO AND BY WHOM?

17 **A**    THE ATTORNEY THAT I MENTIONED, MR. BARTKO, HAD ASKED

18 ME TO REFER PEOPLE TO HIS COMPANY, WHICH AT THAT TIME I

19 THINK WAS CALLED CAPSTONE.

20 **Q**    SO AT THAT POINT IN TIME DID YOU HAVE ANY PARTICULAR

21 OR SPECIFIC KNOWLEDGE WITH REGARD TO WHO OR WHAT SURE LINE

22 WAS?

23 **A**    DIDN'T KNOW SURE LINE.

24         **THE COURT:**  MR. VANN, WE'RE GOING TO HAVE THE

25 JURY TAKE THEIR LUNCH BREAK AT THIS TIME.  LADIES AND

1 GENTLEMEN OF THE JURY, WE'LL TAKE AN HOUR FOR LUNCH.

2 DON'T TALK ABOUT THE CASE, DON'T LET ANYBODY TALK ABOUT

3 THE CASE WITH YOU.  DON'T DO ANY INDEPENDENT RESEARCH.

4 FOLLOW MY INSTRUCTIONS.  ENJOY YOUR LUNCH.

5     EVERYONE REMAIN SEATED WHILE THE LADIES AND GENTLEMEN

6 OF THE JURY LEAVE THE ROOM.

7     (LUNCH RECESS TAKEN.)

8          **THE COURT:**  LET'S BRING THE JURY BACK.

9     (JURORS ENTER INTO THE COURTROOM.)

10     WELCOME BACK, LADIES AND GENTLEMEN.  HOPE YOU ALL

11 ENJOYED YOUR LUNCH.  I JUST NEED TO CONFIRM YOU DIDN'T

12 TALK ABOUT THE CASE WITH ANYONE AND NO ONE TALKED ABOUT

13 THE CASE WITH YOU AND YOU FOLLOWED MY OTHER INSTRUCTIONS.

14     MR. VANN, YOU MAY CONTINUE DIRECT EXAMINATION.

15 **BY MR. VANN:**

16 **Q**    MR. KIMMEL, WE WERE AT OR NEAR THE SWITCHOVER IN 2005

17 TO 2006 WHERE FAITHFUL STEWARDS BEGAN TO INTEGRATE

18 ACTIVITIES ITSELF TO A DEGREE WITH SURE LINE.  IN PUTTING

19 TOGETHER YOUR SEMINARS -- LET ME BACKTRACK.

20     WE HEARD NUMEROUS TIMES ABOUT THE THREE RULES YOU HAD

21 FOR INVESTING.  HOW DID YOU COME ABOUT PUTTING TOGETHER

22 THOSE THREE RULES AND WHEN DID YOU START USING IT?

23 **A**    THE BEST OF MY MEMORY, I USED THEM EARLY ON IN MY

24 CONFERENCE, AGAIN BLENDING THE SPIRITUAL TO THE SECULAR.

25     THE ONE IS, DO YOUR DUE DILIGENCE.  I THINK EVERYONE

1   SHOULD DO THEIR DUE DILIGENCE ON ANY TYPE OF INVESTMENTS,

2   MARRIAGE, ANYTHING LIKE THAT.  THEY NEED TO FIND OUT AS

3   MUCH AS THEY CAN ABOUT WHAT THEY ARE ABOUT TO GET INVOLVED

4   IN.

5        NUMBER TWO WAS TO GET REFERRALS AND TALK TO PEOPLE

6   WHO HAVE EITHER GONE TO WORK FOR THIS COMPANY OR INVESTED

7   IN THIS, THIS INSTITUTION.  AGAIN, TO GET SOME REFERENCES

8   BEFORE YOU TOOK A JOB WITH SOMEONE.

9        AND THIRDLY, AND PROBABLY MOST IMPORTANTLY, MAYBE

10  SHOULD HAVE BEEN NUMBER ONE, WAS TO GET SPIRITUAL VALUES.

11  THE BIBLE TELLS US IN PSALMS 1 THAT BLESSED OR HAPPY OR

12  SUCCESSFUL IS THE MAN WHO WALK IN THE HOUSE OF THE

13  UNGODLY, WHICH INFERS TO YOU WILL BE HAPPY OR SUCCESSFUL

14  IF YOU WALK IN THE COUNSEL OF THE GODLY.  SO FROM THAT I

15  ALWAYS ADMONISH PEOPLE TO GET GODLY COUNSEL.

16  **Q**   AND PERSONALLY, PRIOR TO GETTING TO SURE LINE, HOW

17  WAS YOUR FINANCIAL SITUATION IN REGARD TO YOUR PERSONAL

18  FINANCES?

19  **A**   WE HAD GOTTEN OUT OF DEBT, OF COURSE.  PRIOR TO

20  2005 -- WE BOUGHT A CONDO IN 2005, DID GET A MORTGAGE BUT

21  PRIOR TO THAT WE WERE OUT OF DEBT.  WE HAD MONEY IN THE

22  BANK AND WE PAID OUR BILLS.

23  **Q**   WAS MS. KIMMEL WORKING?

24  **A**   MS. KIMMEL WAS WORKING.

25  **Q**   DO YOU REMEMBER WHO SHE WAS WORKING FOR?

1  **A**    OH, MY.

2  **Q**    WITHDRAW IT.  WAS SHE ABLE TO SET ASIDE MONEY THROUGH

3  THE WORK SHE HAD THEN AND MAYBE BEFORE, THAT WAS PUT INTO

4  A 401K?

5  **A**    YES, SHE HAD A 401K AND SHE HAD MADE ONE OR TWO

6  CAREER CHANGES AND, OF COURSE, THE 401K JUST FOLLOWED HER.

7  I CAN'T REMEMBER THE EXACT YEARS BUT SHE WORKED ALONG THE

8  YEARS.

9  **Q**    SO WE GET TO 2005 AND YOU ARE INTRODUCED TO SURE LINE

10  THROUGH GREG BARTKO; IS THAT CORRECT, OR BECOME AWARE?

11  **A**    ULTIMATELY YEAH, IT WAS GREG BARTKO WHO I WAS

12  REFERRING PEOPLE TO AT THAT TIME AND LATER ON FOUND OUT

13  THAT HE WAS IN TURN USING SURE LINE.

14  **Q**    WHEN DID YOU -- WHEN WAS YOUR FIRST CONTACT WITH

15  SOMEONE YOU KNEW WAS DIRECTLY ASSOCIATED WITH SURE LINE?

16  **A**    I GOT A PHONE CALL.  I WAS DOING A MEETING OUT WEST

17  SOMEWHERE, I BELIEVE, HAVING LUNCH WITH PASTOR.  I GET A

18  PHONE CALL FROM MR. KIRK AND HE WANTED TO KNOW IF HE

19  COULD, I THINK HIS STATEMENT WAS REALLY, THOM, I'M JIM

20  KIRK, I HEARD THAT YOU DON'T WANT TO TALK TO ME BUT COULD

21  I HAVE A COUPLE MINUTES OF YOUR TIME.

22  **Q**    WHAT HAPPENED AFTER THAT?

23  **A**    I GAVE HIM A COUPLE MINUTES OF TIME.  I NEVER EVEN

24  TOLD GREG BARTKO I DIDN'T WANT TO TALK TO HIM, I JUST

25  DIDN'T WANT TO BE INVOLVED WITH HOW THEY RAN THEIR

1    BUSINESS.  SO WE CHATTED PROBABLY HALF HOUR.

2    **Q**    WAS THAT OVER THE PHONE?

3    **A**    THAT WAS OVER THE PHONE.

4    **Q**    WHAT HAPPENED AFTER THAT CONVERSATION WITH JIM KIRK?

5    **A**    HE EXPLAINED TO ME THAT THE BUSINESS THAT BARTKO WAS

6    USING WAS HIS AND THAT HE WAS PAYING BARTKO, AND I BELIEVE

7    BARTKO THEN WAS DONATING TO MY MINISTRY.  AND THEN -- BUT

8    THAT WAS HIS COMPANY, JIM KIRK'S COMPANY, AND HE WANTED TO

9    KNOW IF I WOULD AT LEAST COME DOWN AND TAKE A LOOK AT IT.

10   **Q**    WHAT WAS YOUR RESPONSE?

11   **A**    I SAID I WOULD.

12   **Q**    WHAT HAPPENED AFTER THAT?

13   **A**    SO I DID.  I FLEW TO NORTH CAROLINA.  I THOUGHT I

14   COULD HAVE A LITTLE BIT OF EXPERTISE.  I WAS IN THE

15   CAR-TYPE BUSINESS, I SOLD EQUIPMENT TO THOSE TYPE SHOPS

16   FOR SEVERAL YEARS, AND I HAVE BEEN IN SEVERAL BUSINESSES.

17       SO I FLEW DOWN THERE AND LOOKED AT THEIR OPERATION

18   AND SAW THAT THEY HAD SEVERAL BAYS.  I SAW THAT THEY HAD A

19   GOOD LINE OF EQUIPMENT.  I SAW THEY HAD BUILDINGS,

20   EMPLOYEES.  THEY HAD SOME CARS ON THE FRONT LOT, THEY HAD

21   SEVERAL CARS ON THE BACK LOT.  AFTER TAKING THE TOUR, JIM

22   HAD GIVEN ME THE TOUR, WE WENT INTO THE OFFICE AND HE

23   INTRODUCED ME TO SEVERAL MEN.

24   **Q**    WHEN YOU SAY THE BACK LOT AND OTHER BUILDINGS, WE

25   HAVE SEEN PICTURES AND THE JURY HAS SEEN PICTURES OF THE

1  THREE FRONTS OF SURE LINE'S LOTS AT SMITHFIELD, MIDDLESEX

2  AND WASHINGTON.  WAS THERE MORE TO THE SMITHFIELD

3  OPERATION THAN WAS SHOWN IN THE PICTURES THAT WERE

4  PRESENTED?

5  **A**    YES, THE SMITHFIELD PICTURE THAT YOU SAW WAS JUST A

6  SNAPSHOT OF THE VERY, VERY FRONT OF THE BUILDING.  BEHIND

7  THAT BUILDING, AS I REMEMBER, MAYBE T-SHAPED, THERE WAS

8  SEVERAL BAYS BEHIND THAT BUILDING, I BELIEVE IT TO BE A

9  CONCRETE BLOCK BUT I'M NOT SURE ABOUT THAT.  BEHIND THAT

10 THEY HAD A STORAGE LOT.  AND THAT IMPRESSED ME BECAUSE A

11 TYPICAL USED CAR LOT WAS NOT THAT BIG.  A USED CAR LOT IS

12 USUALLY A SMALL OPERATION.  THIS WAS A LARGE OPERATION.

13 **Q**    AT THAT POINT DID THEY HAVE TWO LOTS OR THREE LOTS?

14 **A**    I'M NOT REAL SURE.  I FOUND OUT DURING TESTIMONY

15 THERE WAS THE MIDDLESEX LOT.  I KNEW THEY HAD WHAT THEY

16 CALLED A GET READY FACILITY, WHERE THEY WOULD TAKE THE

17 CARS AND DO MINOR REPAIRS TO THEM.  THEN LATER ON I THINK

18 THAT LOT, THAT WAS THE MIDDLESEX LOT.  THAT BECAME A CAR

19 LOT AS WELL.

20 **Q**    DO YOU REMEMBER --

21 **A**    -- INCIDENTALLY, ONE THING THAT DID IMPRESS ME ALSO

22 WAS, ALONG THE EQUIPMENT LINE, THEY HAD A ROLL BACK.  I

23 DON'T KNOW IF YOU KNOW WHAT THAT IS OR NOT, BUT IT'S A

24 BIGGER TRUCK THAT ROLLS BACK.  YOU CAN PUT NICER CARS ON

25 IT OR CARS THAT WERE WRECKED AND COULDN'T BE TOWED AND

1    THEY HAD A TOW TRUCK.  SORRY.  GO AHEAD.

2    **Q**    DO YOU RECALL EXACTLY WHEN THIS MEETING WAS?

3    **A**    I WOULD GUESS EARLY 2006.

4    **Q**    HOW DID YOU GET FROM THE AIRPORT TO SMITHFIELD AND

5    BACK?

6    **A**    MR. KIRK PICKED ME UP.

7    **Q**    DID YOU MEET OTHER PEOPLE ASSOCIATED WITH THE

8    BUSINESS BESIDES MR. KIRK?

9    **A**    YES.  ONE OF THE THINGS THAT I DO IS I TRY TO

10   CONVINCE MYSELF THAT I'M WORKING WITH CHRISTIANS.  THE

11   BIBLE TEACHES US NOT TO BE IN EQUITY WITH NONBELIEVERS.

12   SO I WAS IMPRESSED.

13        FROM THE TIME I DID THE TOUR, WE WENT INTO THE OFFICE

14   AND THE FELLOW NAMED BOBBY STANLEY, WHO I WAS TO FIND OUT

15   GAVE THE INITIAL HALF MILLION DOLLARS TO START WHAT BECAME

16   SURE LINE, INTRODUCED HIMSELF TO ME.  THE FIRST QUESTION

17   OUT OF HIS MOUTH WAS WAS I A CHRISTIAN.  THAT'S NOT

18   USUALLY WHAT THEY ASK YOU.  HE GAVE ME HIS CARD, CHRIST IS

19   THE ANSWER.  HE ASKED ME IF I WAS A CHRISTIAN.  I TOLD HIM

20   I WAS.  HE ASKED ME -- HE WASN'T SATISFIED WITH THAT, HE

21   WANTED TO KNOW HOW I KNEW I WAS A CHRISTIAN AND I TRUSTED

22   CHRIST AS MY SAVIOR.  HE WANTED TO KNOW WHAT MY BOOK WAS,

23   WHICH IS WHAT BIBLE DO YOU USE.

24        THEN HE TOLD ME ABOUT HIS HISTORY, THAT HE WAS A LONG

25   TIME CHRISTIAN, WAS A CONFEDERATE WITH SOME OLD BAPTIST

1    PREACHERS THAT I READ ABOUT YEARS GONE BY.

2    **Q**    I'M SORRY, GO AHEAD.

3    **A**    THEN HE INTRODUCED ME TO GLEN SMITH AND GLEN SMITH

4    PICKED UP THE FLAG AND WAS TRYING TO LET ME KNOW WHO HE

5    WAS.  HE TOLD ME THAT HE WAS A CHRISTIAN AND THAT HE, IN

6    FACT, HE WAS MARRIED TO BILLY GRAHAM'S NIECE, TRYING TO

7    IMPRESS ME WITH THAT CREDENTIAL.  I DON'T KNOW IF THAT IS

8    OR NOT, BUT THAT'S WHAT HE SAID, HE WAS MARRIED TO BILLY

9    GRAHAM'S NIECE.  THEN I THINK THE MEETING STARTED FROM

10   THERE.

11   **Q**    DID YOU EVENTUALLY COME TO HAVE A MORE PRIVATE

12   CONVERSATION WITH JIM KIRK ON THE WAY BACK FROM THIS

13   MEETING TO DRIVING BACK TO THE AIRPORT AT RALEIGH-DURHAM?

14   **A**    I DID, BECAUSE THE MEETING STARTED RIGHT AFTER THOSE

15   INTRODUCTIONS.  I ALREADY MET JIM, AND THEN THE

16   INTRODUCTIONS I JUST DESCRIBED TO YOU.  I HAD NOT GOT TO

17   PIN JIM DOWN ABOUT HIS SALVATION.  SO ON THE WAY BACK TO

18   THE AIRPORT, I WOULD SAY IT WAS PROBABLY AN HOUR OR SO

19   DRIVE, I'M NOT SURE ABOUT THAT, I ASKED HIM ABOUT HIS

20   SALVATION.  HE HAD TOLD ME THAT AS A YOUNG BOY, I THINK HE

21   SAID SEVEN YEARS OLD, HE HAD TRUSTED CHRIST AS HIS SAVIOR

22   AND HE STRAYED FROM THE LORD IN HIS TEEN-AGE YEARS, LATER

23   ON GOT MARRIED AND GOT DIVORCED AND FELT LIKE THOSE THINGS

24   CAUSED HIM TO LOSE HIS SALVATION.  I DON'T BELIEVE THAT.

25   I BELIEVE THAT THE BIBLE SAYS WHEN YOU ARE SAVED THAT YOU

1    ARE SAVED ETERNALLY.

2        SO I TRIED TO COUNSEL HIM ABOUT THAT, ABOUT

3    SALVATION, WHAT SALVATION WAS AND WAS NOT, AND THE FACT

4    THAT I BELIEVE HE REALLY TRUSTED CHRIST AS A YOUNG MAN.

5    THOUGH HE HAD STRAYED FROM CHRIST, CHRIST HADN'T STRAYED

6    FROM HIM AND HE WAS STILL A SAVED MAN.  HE LITERALLY BROKE

7    DOWN AND STARTED CRYING.  HE TOLD ME HE WOULD LIKE TO

8    BELIEVE THAT, THAT HE DON'T THINK HE COULD BUT HE WOULD

9    LIKE TO BELIEVE THAT.  HE ASKED ME WHAT COULD HE DO THAT

10   WOULD GET HIM CLOSER TO GOD.  I SAID, I DON'T KNOW WHAT

11   YOU MEAN.  IF YOU ARE SAVED, YOU ARE SAVED.  HE SAID, WHAT

12   COULD I DO PHYSICALLY TO GET CLOSER TO GOD.  I SAID, GOD

13   LOVES MISSIONARIES.  JESUS, I BELIEVE, WAS A MISSIONARY,

14   HE LEFT HIS HOME AND CAME HERE.  I THINK IF YOU SUPPORT

15   MISSIONARIES, IT WOULD BE PLEASING TO GOD, I BELIEVE IT

16   WOULD BE HELPFUL TO THE BUSINESS AND IT'S SOMETHING WE'VE

17   ALWAYS PRACTICED.  HE AGAIN THANKED ME.  LATER ON CALLED

18   ME AND TOLD ME HOW MUCH HE APPRECIATED IT AND HOW IT

19   TOUCHED HIS HEART AND HE WOULD GIVE IT CAREFUL

20   CONSIDERATION.  THAT WAS IT.  AND HE DROPPED ME OFF AT THE

21   AIRPORT.

22   **Q**   DURING THIS MEETING, DID YOU DISCUSS WHAT SORT OF

23   FINANCIAL ARRANGEMENTS THERE MAY BE BETWEEN SURE LINE AND

24   FAITHFUL STEWARDS?

25   **A**   I'D ASKED HIM SEVERAL QUESTIONS ABOUT HOW THE

1   BUSINESS WAS RAN AND WHAT THEY DID AND WHAT THE PROCEDURE

2   WAS, HOW THE NOTES WERE PROTECTED.  OBVIOUSLY I WAS

3   CONCERNED ABOUT IF I RECOMMENDED SOMEBODY, THAT THE

4   PEOPLE'S MONEY WOULD BE PROTECTED, THEY WOULD BE TAKEN

5   CARE OF.

6       THEN HE -- I CAN'T TELL YOU EXACTLY HOW WE GOT INTO

7   THE CONVERSATION, BUT HE SAID HE WANTED TO HIRE ME.  I

8   TOLD HIM I WASN'T FOR HIRE, THAT THIS MEETING WAS ABOUT

9   WHETHER OR NOT I COULD FEEL SAFE IN REFERRING PEOPLE TO

10  HIM.  HE SAID, WE'D LIKE TO HIRE YOU, WE'D LIKE TO GIVE

11  YOU A COMMISSION, WE'D LIKE TO PAY YOU, WE WERE PAYING

12  BARTKO, WE WOULD LIKE TO PAY YOU.  I SAID THAT THEY COULD

13  NOT HIRE ME.  ONE TIME A CONTRACT WAS MENTIONED, WOULD I

14  SIGN A CONTRACT, I WOULD NOT SIGN A CONTRACT.  THEY COULD

15  NOT HIRE ME AND AS LONG AS THEY TOOK CARE OF MY PEOPLE I

16  WAS HAPPY.

17      AND THEN BOBBY STANLEY, THE CHRISTIAN, HE SAID, WELL

18  YOU WILL TAKE A DONATION, WON'T YOU?  I SAID SURE, THAT'S

19  HOW I LIVE, I GO FROM CHURCH TO CHURCH, PREACH, THEY TAKE

20  UP AN OFFERING, THAT'S A DONATION.  THAT'S WHAT I LIVE ON.

21  HE SAID WHAT ABOUT IF WE JUST SEND YOU 10 PERCENT?  I SAID

22  WITH A STIPULATION, WITH A CAVEAT THE MONEY COULD NOT COME

23  FROM THE INVESTORS IN ANY WAY, SHAPE OR FORM.

24      EARLIER IN MY LIFE I WORKED IN THE INSURANCE FIELD

25  AND I KNEW OF A THING CALLED AN ANNUITY.  IN ANNUITY

SALES, THERE WAS A COMMISSION TAKEN OFF THE VERY TOP OF

THAT SALE FOR THAT SALESMAN, AND IF THE ANNUITANT DECIDED

TO BACK OUT OF THAT ANNUITY THE VERY NEXT DAY, HE WOULD

HAVE LOST THAT MONEY.  SO I WAS VERY CONSCIOUS ABOUT THE

FACT THAT I DID NOT WANT THEIR MONEY TOUCHED.  I SAID, ANY

MONEYS YOU WANT TO GIVE ME, FIRST OF ALL IT'S FREE WILL,

DO WHAT YOU WANT TO.  NUMBER TWO, I SAID THEY MUST COME

FROM NON-INVESTOR MONEY.  I DON'T CARE IF YOU DO IT OR

NOT, I DON'T CARE HOW MUCH YOU DO, BUT IT MUST COME FROM

NON-INVESTOR MONEY.  IN MY THINKING, CAR SALES.  MAYBE I

SAID CAR SALES AT THAT TIME, I'M NOT SURE IT WAS CAR SALES

THAT MADE ALL THE MONEY, OR FINANCING.  I FOUND OUT LATER

IT WAS FINANCING OF CARS, IS WHERE THEY MAKE THEIR MONEY.

THEY AGREED TO THAT, THAT I WOULD HAVE NO CONTRACT, I

WOULD HAVE NO COMMISSION.  THEY WOULD GIVE FREE WILL

OFFERING AS THEY CHOSE FIT.  I WOULD NEVER KNOW WHERE THE

OFFERINGS CAME FROM.  THERE WAS TIMES IN LATER YEARS FROM

TIME TO TIME THEY PUT A NOTE AT THE BOTTOM OF A CHECK AND

SAY THANK YOU AND MENTION A NAME, BUT FOR THE MOST PART I

NEVER KNEW WHERE THEY CAME FROM, IT WASN'T THE ISSUE.

THE ISSUE WAS NOT GETTING PAID FROM THE REFERRALS OF

PEOPLE.  I WANTED TO BE A HUNDRED PERCENT SURE THEY

UNDERSTOOD MY POSITION, THAT THE MONEYS HAD TO COME FROM

THE PROFITS OF THE BUSINESS.  NOW, I FOUND OUT LATER THERE

WASN'T ANY, BUT AT THAT TIME I DIDN'T KNOW THAT.  IT

1    LOOKED PROFITABLE TO ME, IT LOOKED LIKE THEY WERE MOVING

2    CARS AND IT LOOKED LIKE THEY KNEW WHAT THEY WERE DOING.

3    SO THAT WAS OUR AGREEMENT.

4    **Q**    DID YOU EVER SIGN A CONTRACT?

5    **A**    NEVER SIGNED A CONTRACT.

6    **Q**    DID FAITHFUL STEWARDS EVER SIGN A CONTRACT?

7    **A**    NEVER SIGNED A CONTRACT.  INCIDENTALLY, ONE THING --

8              **THE COURT:**  NO, MR. KIMMEL, THE PROCESS IS HE'LL

9    ASK YOU ANOTHER QUESTION.  NEXT QUESTION.

10             **THE WITNESS:**  I'M SORRY.  YES, SIR.

11   **BY MR. VANN:**

12   **Q**    SO WAS IT AFTER THIS POINT IN TIME THAT YOU BEGAN TO

13   INTEGRATE YOUR SURE LINE INFORMATION INTO THE SEMINARS

14   THAT YOU WERE GIVING AT THE VARIOUS CHURCHES THROUGHOUT

15   THE COUNTRY?

16   **A**    THE PROCESS WAS, I MENTIONED THE 14 INDICATORS OF

17   FINANCIAL TROUBLE.  IN THOSE 14 INDICATORS, ONE OF THEM

18   WAS, WE'RE NOT SAVING SCRIPTURALLY OR INVESTING.

19        AT THAT TIME I WOULD MENTION THE FACT THAT IF YOU

20   COME TO SEE ME AND WE TALK ABOUT INVESTMENTS, THE FIRST

21   INVESTMENT WE'RE GOING TO TALK ABOUT IS DEBT ELIMINATION.

22   AND THEN I WOULD SAY, WOULD YOU LIKE TO EARN 10 PERCENT ON

23   YOUR MONEY, WOULD YOU LIKE TO EARN 12 PERCENT ON YOUR

24   MONEY, AND THEN 30 PERCENT OF YOUR MONEY, HOW MANY WOULD

25   LIKE TO DO THAT.  THEY WOULD RAISE THEIR HANDS.  I WOULD

1   SAY OKAY, IF YOU PAY OFF -- I THINK IN THE VIDEOS YOU

2   PLAYED I USED A 19 PERCENT EXAMPLE.  BUT I WOULD SAY YOU

3   PAY OFF A 19 PERCENT CREDIT CARD, YOU JUST EARNED

4   19 PERCENT TAX FREE, AND THAT WAS A GOOD INVESTMENT.  SO

5   THE FIRST INVESTMENT WE WERE GOING TO TALK ABOUT WAS DEBT

6   ELIMINATION.

7   **Q**   NOW, DO YOU RECALL EXACTLY WHEN YOU STARTED

8   MENTIONING SURE LINE.  TECHNICALLY, WOULD YOU EVER

9   MENTION -- WOULD IT BE SURE LINE BY NAME OR WOULD IT BE

10  THE 1 PERCENT PROGRAM OR 12 PERCENT PROGRAM OR WAS IT SOME

11  COMBINATION?

12  **A**   I DON'T RECALL MENTIONING THE WORD SURE LINE IN THE

13  MEETINGS.  I WOULD TALK ABOUT A 12 PERCENT COLLATERALIZED

14  NOTE EARNING 1 PERCENT PER MONTH.

15  **Q**   WOULD YOU EVENTUALLY BRING UP THE NAME IF YOU HAD A

16  PRIVATE CONFERENCE WITH AN INDIVIDUAL?

17  **A**   IF PEOPLE REQUESTED INFORMATION IN THE ONE-ON-ONE.

18  YOU HAVE TO UNDERSTAND THE ONE-ON-ONE MEETINGS, EASILY 90,

19  95 PERCENT OF THE TIME WASN'T ABOUT INVESTMENTS, IT WAS

20  ABOUT HOW TO GET THEIR FAMILY ON BUDGET, A LOT OF MARITAL

21  COUNSELING, THINGS OF THAT NATURE.

22      THE OTHER PERCENTAGE OF PEOPLE, THE MEETINGS WE WOULD

23  HAVE, PEOPLE WOULD SAY TO ME WHAT ABOUT THIS 12 PERCENT

24  FUND, TELL ME ABOUT THIS 12 PERCENT FUND.  THEN I WOULD

25  SAY THIS IS A SMALL COMPANY DOWN IN SMITHFIELD, THE NAME

1    IS SURE LINE, SO ON AND SO FORTH.

2    **Q**    WHAT WAS YOUR -- AFTER THIS, WHAT WAS YOUR

3    INVOLVEMENT IN REGARD TO STAYING IN TOUCH WITH THE CENTRAL

4    OFFICE OF SURE LINE IN NORTH CAROLINA AND MAINTAINING

5    CONTACT WITH IT?

6    **A**    ALL THE CONTACT I HAD, AGAIN, THE VAST MAJORITY OF

7    THE CONTACT I HAD WAS NOT WITH NORTH CAROLINA, IT WAS WITH

8    GLEN SMITH IN FLORIDA.

9    **Q**    WAS THERE A TIME PERIOD THAT YOU DID OBTAIN THE

10   FINANCIAL RECORDS IN 2006, 2007, 2008?

11   **A**    I DON'T REMEMBER ONE IN 2006.  I THINK THERE WAS ONE

12   IN 2007 AND I HAVE SEEN '08 AND '09.

13   **Q**    DID YOU ALSO RECEIVE THE YEAR END STATEMENT LETTERS

14   THAT WERE WRITTEN IN 2008 FOR THE YEAR ENDING 2008, FOR

15   THE YEAR ENDING 2009?

16   **A**    YES, SIR.

17   **Q**    I BELIEVE YOU MENTIONED JUST A FEW MINUTES AGO THAT

18   MR. KIRK SAID, WHAT CAN I DO TO HELP YOU AND YOU SAID

19   MISSIONS WORK, MISSION WORK.  DID THAT REMAIN A THEME IN

20   YOUR CONVERSATIONS WITH SURE LINE AND THE INVESTMENTS OR

21   THE ACTS THAT SURE LINE WAS TAKING?

22   **A**    IT WAS FOREMOST IN MY HEART.  OBVIOUSLY MY SON WAS A

23   MISSIONARY AND MY HEART WAS THERE.  SO IT WAS IN MY

24   SUGGESTION THAT WE DO WHAT WE COULD TO HELP MISSIONARIES,

25   FROM THE $500 A DAY THAT I ENCOURAGED JIM TO COMMIT TO, TO

THE CONFERENCE IN HAMMOND.  THE CONFERENCE ITSELF WAS

CALLED MONEYS FOR MISSIONS.  I DIDN'T NAME THAT, I WAS NOT

ON THE PLANNING COMMITTEE OF THAT MEETING.  IRONICALLY IT

WAS MONEY FOR MISSIONS.

JIM AGREED TO $500 A DAY TO RANDOMLY SELECT EITHER A

MISSIONARY OR A PASTOR WHO WOULD USE THAT MONEY FOR

MISSIONS.  THEN WE, CATHY AND I, ENCOURAGED THEM TO

CONSIDER DIFFERENT MISSIONARIES TO GIVE VEHICLES TO.  WHEN

I HEARD ABOUT THEIR MEETING, THERE WAS A SITUATION IN

AFRICA WHERE THEY NEEDED SEVERAL VEHICLES AND I TRIED TO

ENCOURAGE THEM TO DO THAT.

I THINK, INDEED, OVER THAT TIMEFRAME WE HAD GIVEN

AWAY OR THEY HAD GIVEN AWAY SEVERAL VANS.  THERE WAS A

PASTOR WHO CAME TO MEET WITH ME IN HAMMOND WHOSE BABY HAD

SPINA BIFIDA AND HE WAS WORKING OUT OF THE BACK OF A

LITTLE MUSTANG OR SOMETHING, SO I ENCOURAGED HIM TO GIVE

HIM A VAN, AND THAT BROUGHT ABOUT THE IDEA OF HANDICAPPED

VANS, COULD WE GIVE HANDICAPPED VANS TO PEOPLE WHO HAVE

CHILDREN.

SO WE HAD A TWOFOLD THING, OR THREEFOLD IF YOU COUNT

THE PASTORS.  THERE WAS PASTORS WE GAVE VEHICLES TO THAT

DIDN'T HAVE THEM.  THE AVERAGE PASTOR DOESN'T MAKE A LOT

OF MONEY, AT LEAST IN OUR CIRCLES, AND THEY DON'T HAVE A

LOT OF MONEY.  THEY PUT IT ALL IN THE MINISTRY, SO THEY

DON'T BUY CARS.  SO WE TRIED TO GIVE PASTORS CARS.

1    THEN I ENCOURAGED THEM TO DO THIS HANDICAP THING,

2   HANDICAPPED VANS FOR KIDS.  THEN WE GAVE, IN EACH CHURCH

3   THAT WOULD USE A VEHICLE, ONE HERE IN DURHAM, AS A MATTER

4   OF FACT, IN THEIR MISSION WORK, THAT I ENCOURAGED THEM

5   LET'S DO THAT AS WELL.  SO WE WORKED HARD TO GET JIM AND

6   THE SURE LINE PHILOSOPHY TOWARDS HELPING FOLKS, AND I

7   THOUGHT SPIRITUALLY THAT WOULD HELP THE COMPANY, KEEP IT

8   STRONG.

9   **Q**   DO YOU KNOW WHETHER THERE WAS EVER ANY ACTION TAKEN

10  ON YOUR REQUEST FOR VANS TO BE SENT TO MISSIONARIES IN

11  AFRICA?

12  **A**   I DON'T KNOW ABOUT THAT.

13  **Q**   YOU DON'T KNOW IF ANYTHING HAPPENED WITH THAT?

14  **A**   I DON'T KNOW IF THEY DID OR NOT.  I KNOW I WROTE IT

15  UP OR TALKED TO THEM ABOUT IT, BUT THAT WAS THE PLAN.

16  THAT WAS THE PLAN, WAS TO GET SOME VANS TO THE FOLKS IN

17  AFRICA.

18  **Q**   DESCRIBE FOR US BRIEFLY, BECAUSE I KNOW THEY ARE

19  EIGHT HOURS LONG, ROUGHLY HOW YOUR THREE OR FOUR DAY

20  SEMINAR, WHAT PART OF IT WOULD BE DIRECTLY RELATED TO

21  DISCUSSING THE 12 PERCENT INVESTMENT PROGRAM?

22  **A**   WELL, AS YOU HAVE SEEN ON THE TAPES, YOU SEE MOST, IF

23  NOT ALL, OF WHAT I WOULD SAY IN A CONFERENCE.  THERE WOULD

24  BE TIMES WHEN A PASTOR WOULD SAY AT THE BREAK, COULD YOU

25  GIVE US SOME MORE INFORMATION, AND I HAVE DONE THAT.

1   THERE HAVE BEEN TIMES WHEN THE PASTOR SAID, I DON'T WANT

2   TO TALK ABOUT THAT, AND WE DIDN'T DO THAT AS WELL.

3       BUT THE TIMEFRAME DURING THE CONFERENCE MAY HAVE BEEN

4   TEN MINUTES MAYBE PERHAPS, MAYBE 15.  AND THEN THE

5   ONE-ON-ONES WOULD BE PROBABLY LESS THAN THAT.  AND THEN

6   THE TIMES I DID BETWEEN BREAKS, THE BREAKS WERE TYPICALLY

7   30 MINUTES LONG.  SO COULD HAVE BEEN MORE THAN 30 MINUTES,

8   PROBABLY LESS.

9   **Q**   NOW, THESE CHURCHES YOU WOULD GO TO, WERE YOU AWARE

10  THAT YOUR CONFERENCES WERE BEING AUDIO OR VIDEOTAPED?

11  **A**   SURE.  ALMOST ALL CHURCHES DO.

12  **Q**   DID YOU EVER REQUEST IT NOT HAPPEN?

13  **A**   NO, SIR.  NO, THEY WOULD SOMETIMES ASK COULD THEY

14  TAPE THEM AND DO I MIND, BECAUSE I WAS SELLING A

15  PROFESSIONALLY DONE CONFERENCE TAPE OR DISKS.  THERE WERE

16  FOUR DISKS AT THAT TIME SO I WAS SELLING THOSE.  SOME

17  PASTORS SAY, I KNOW YOU HAVE THEM FOR SALE, DO YOU MIND IF

18  WE TAPE IT AS WELL?  I SAID NO, YOU CAN TAPE IT AND DO

19  WHAT YOU WANT WITH IT.  SO I WAS FINE WITH THAT.

20  **Q**   HOW QUICKLY WERE YOU ABLE TO INTEGRATE SURE LINE INTO

21  YOUR SEMINAR SO THAT YOUR REFERRALS WERE BEING ACTED ON BY

22  THIRD PARTIES?

23  **A**   I DON'T KNOW HOW QUICKLY.  I DON'T UNDERSTAND.

24  **Q**   DID IT TAKE LONG FOR YOU TO START SEEING RESULTS FROM

25  YOUR MENTIONING OR DISCUSSING REFERRING SURE LINE?

1    **A**    OH, I WOULD SAY IT STARTED REAL QUICK.  AS A MATTER

2    OF FACT, THE DAY THAT I WAS THERE, THE VERY FIRST DAY I

3    WAS IN SMITHFIELD, MR. KIRK GAVE ME AN OFFERING CHECK THAT

4    DAY.  I DON'T KNOW WHY, HE JUST GAVE ME AN OFFERING CHECK,

5    WOULD I ACCEPT AN OFFERING CHECK, AND I SAID SURE.

6    **Q**    WHEN DID YOU START SEEING THE BENEFITS OF YOUR

7    REFERRALS, MEANING THAT SURE LINE -- PEOPLE WERE STARTING

8    TO INVEST IN SURE LINE?

9    **A**    I CAN'T REALLY TELL YOU THAT.  I DON'T KNOW HOW QUICK

10   PEOPLE RESPONDED.  MANY, MANY TIMES I NEVER KNEW WHO

11   RESPONDED.  MOST OF THE TIME I DIDN'T KNOW WHO RESPONDED.

12   **Q**    WHAT WAS THE STANDARD PRACTICE FOR A PROCEDURE FOR A

13   SURE LINE REFERRAL THAT MAY HAVE OCCURRED IN ONE OF THE

14   SEMINARS?

15   **A**    I HAD A FORM CALLED A REQUEST FOR INFORMATION FORM

16   AND IT SAID SOMETHING TO THE EXTENT YES, I WOULD LIKE TO

17   HAVE SOME INFORMATION, I UNDERSTAND IT'S BASED ON THIS

18   12 PERCENT FUND, I UNDERSTAND IT'S COLLATERALIZED AND THE

19   SECURITY, THE TITLE IS HELD WITH WILLIAM F. HILL,

20   ATTORNEY, I UNDERSTAND THERE'S NO OBLIGATION, PLEASE SEND

21   ME THE PACKAGE.  THEY WOULD FILL THOSE THINGS OUT AND THEN

22   I WOULD COLLECT THEM, SOMETIMES THE CHURCH WOULD COLLECT

23   THEM, BUT I WOULD COLLECT THOSE AND TAKE THEM BACK WITH ME

24   AND I WOULD FAX THEM TO GLEN SMITH.

25   **Q**    WOULD YOU DO ANY FOLLOW-UP?

1  **A**   TYPICALLY ABOUT A WEEK OR TWO LATER I WOULD CALL AND

2  SAY, DID YOU GET YOUR PACKET.  SOMETIMES MR. SMITH WAS NOT

3  REAL DILIGENT ABOUT PAPERWORK, AND I WOULD CALL AND MAKE

4  SURE THEY GOT THE PAPER.  IF THEY HAD, I WOULD SAY, DO YOU

5  HAVE A QUESTION.  IF THEY HAD QUESTIONS, I WOULD SAY YOU

6  NEED TO DIRECT YOUR QUESTIONS TO GLEN SMITH.  SOMETIMES

7  THEY WOULD TELL ME IF THEY HAD A QUESTION.  IF THEY

8  DIDN'T, I WOULD SAY OKAY, GLAD YOU GOT IT, LET ME KNOW IF

9  I CAN HELP YOU.  THAT WAS IT.

10 **Q**   WOULD THERE BE TIMES WHEN YOU WOULD ASSIST IN

11 PREPARING THE PAPERWORK AND SEND THE PACKAGE OFF?

12 **A**   YES.

13 **Q**   WHAT WOULD NORMALLY BE THE NORMAL PROCEDURE IN THE

14 EVENT SOMEBODY WANTED YOU TO HELP THEM?

15 **A**   THERE WAS SITUATIONS OF OLDER PEOPLE WHO WOULD JUST

16 ASK ME TO HELP THEM, YOU KNOW, WHAT DO I PUT HERE.  SO

17 THAT WOULD BE A SITUATION THERE.  THERE WOULD BE

18 SITUATIONS WHERE PEOPLE WOULD JUST BRING ME THE PAPERWORK.

19 MOST OF THIS STUFF HAPPENED IN MY CHURCH WHERE PEOPLE

20 BRING ME THE PAPERWORK AND I WOULD SEND IT.

21     THERE WOULD BE SITUATIONS IN CHURCHES AROUND THE

22 COUNTRY WHERE PEOPLE SAID, I WANT THE PAPERWORK NOW.

23 TYPICALLY, I WOULD CALL LATER, GLEN WOULD E-MAIL IT OR FAX

24 IT, I WOULD GIVE IT TO THEM AND THEY WOULD FILL IT OUT.

25 IN THOSE SITUATIONS, MANY TIMES I CARRIED THOSE BACK TO

1    INDIANA, THEN I'M DONE.

2    **Q**    WOULD THIS BE, ONE OR THE OTHER, EITHER THE REFERRAL

3    PAGE OR YOU PROVIDING -- WERE THOSE THE TWO PRIMARY WAYS

4    THAT MONEYS -- THAT ANYTHING THAT WOULD HAVE BEEN REFERRED

5    OUT OF THE SEMINARS WOULD HAVE GOTTEN TO SURE LINE?

6    **A**    YES, EXCEPT FOR THE STERLING TRUST STUFF.  THE IRA,

7    STUFF LIKE THAT, MOST OF THAT STUFF I NEVER SAW.  THEY

8    WOULD GET PAPERWORK FROM GLEN AND FILL IT OUT.  MANY TIMES

9    IT HAD TO BE TAKEN TO THE BANK AND DIFFERENT THINGS, BUT I

10   WOULD BE GONE BY THAT TIME, AND IT WOULD GO STRAIGHT TO

11   GLEN.

12   **Q**    NOW, AFTER 2009 DID YOU CONTINUE TO OBTAIN OR EVEN

13   TRY TO OBTAIN FINANCIAL STATEMENTS FROM SURE LINE'S HOME

14   OFFICE?

15   **A**    NO, I HAD CALLED AND PROBABLY LATE IN 2009, MAYBE IN

16   2010, AND ASKED ABOUT THEM, IF THEY WERE DOING THOSE AND I

17   WOULD GET A COMMENT THAT WE'RE GOING TO GET THEM OUT BUT

18   EVERYTHING IS GOING WELL, EVERYTHING IS GOOD.  THAT'S

19   BASICALLY ABOUT IT.  I JUST GOT -- FROM THERE ON I GOT

20   INFORMATION FROM GLEN.  PERHAPS I SHOULD HAVE DUG DEEPER,

21   BUT I WAS GETTING INFORMATION FROM SOMEONE I TRUSTED AND I

22   TOOK IT.

23   **Q**    HOW OFTEN FROM 2010 AND 2011 WOULD YOU SPEAK TO GLEN

24   SMITH?

25   **A**    OH, AT LEAST WEEKLY; AT LEAST WEEKLY.

1  **Q**    HOW OFTEN WOULD YOU SPEAK TO JIM KIRK?

2  **A**    NOT AS OFTEN, NOT NEARLY AS OFTEN.

3  **Q**    WHAT ABOUT CAROL GRAFF?

4  **A**    ALMOST NEVER.

5  **Q**    IN ANY OF THESE CONVERSATIONS, DID EITHER MR. KIRK OR

6  MR. GLEN EVER RELAY TO YOU THAT THERE WERE FINANCIAL

7  TROUBLES ASSOCIATED WITH SURE LINE, AUTOMOCION, OR

8  STERLING TRUST?

9  **A**    NO, QUITE THE CONTRARY.  EVERY CONVERSATION WAS ROSY,

10  EVERYTHING WAS GOOD, EVERYTHING WAS FINE.  I KNEW FROM

11  SOME PEOPLE IN MY CHURCH THAT THEY WERE GETTING THEIR

12  CHECKS, THEY WERE HAPPY WITH ME.

13      MS. SMITH ON ONE OCCASION WAS SAYING TO ME HOW WASN'T

14  IT WONDERFUL THAT THIS MONEY WAS THERE AND SHE COULD HELP

15  HER KIDS.  SO WHAT REPORTS I GOT FROM THE PEOPLE, THE

16  INVESTORS, WERE ALWAYS GOOD.  THE MONEYS THAT WE HAD IN

17  SURE LINE WAS -- WE HAD A QUARTERLY STATEMENT AND THAT

18  SHOWED AN INCREASE EVERY MONTH.  MY SISTER AND

19  BROTHER-IN-LAW WAS HAPPY WITH EVERYTHING, AND EVERY VERBAL

20  REPORT I GOT FROM ANYBODY IN SURE LINE WAS ALWAYS VERY,

21  VERY POSITIVE.

22  **Q**    NOW, YOU SAID YOU GOT REPORTS.  DOES THAT MEAN --

23  WHEN YOU SAY THAT, DO YOU MEAN THAT YOU AND MRS. KIMMEL

24  GOT REPORTS AS WELL?

25  **A**    REPORTS, IS THAT WHAT YOU SAID?

1  **Q**    YES.

2  **A**    YES, QUARTERLY STATEMENTS.

3  **Q**    WHAT WAS YOUR INVESTMENT, YOURS AND MRS. KIMMEL'S

4  INVESTMENT, IN SURE LINE?

5  **A**    OUR INVESTMENT WAS THE $75,000 THAT RESULTED

6  INITIALLY FROM, I THINK, 35 OR $40,000 IRA THAT SHE HAD

7  THAT WE ADDED TO OVER THE YEARS.

8  **Q**    SO WAS THE 35,000, THE INITIAL 35 TO 40,000, WAS THAT

9  THE INITIAL INVESTMENT IN SURE LINE?

10  **A**    THAT'S THE NUMBER I RECALL.

11  **Q**    AND WHO WOULD BE THE SOURCE OF THE INCREMENTAL

12  INCREASES THAT BROUGHT IT UP TO APPROXIMATELY 75,000 AS OF

13  2012?

14  **A**    WELL, OF COURSE, IT WAS A COMBINATION OF THE INTEREST

15  EARNED AND OF THE MONEYS THAT I PUT IN.

16  **Q**    SO, AGAIN, WHO WOULD BE THE SOURCE OF THE

17  NON-INTEREST INCREASES, WHO WAS THE SOURCE OF THOSE?

18  **A**    THAT WAS ME.

19  **Q**    DID YOU EVER OPEN UP YOUR OWN ACCOUNT?

20  **A**    I DID NOT.

21  **Q**    WHY NOT?

22  **A**    I WAS INVESTING IN PEOPLE.  THE BULK OF MY MONEY WENT

23  THROUGH OUR CHURCH AND MISSION WORK.  I THOUGHT THAT WAS A

24  BETTER INVESTMENT.

25  **Q**    AND ANY MONEY YOU DID PUT IN WAS PUT IN WHERE, OR DID

1  YOU EVER PUT ANY OF YOUR MONEY INTO SURE LINE?

2  **A**    OTHER THAN WHAT I GAVE CATHY FOR HER 401K, NO, OR

3  IRA.

4  **Q**    DID YOU HAVE, DURING THIS TIME PERIOD, ANY OTHER

5  INVESTMENT ACCOUNTS?

6  **A**    I BELIEVE I HAD A SMALL, IT WAS ORIGINALLY AG EDWARDS

7  AND I THINK IT BECAME WELLS FARGO, I'M NOT SURE ABOUT

8  THAT, BUT MAYBE HAD A SMALL TWO TO $5,000 ACCOUNT THERE

9  THAT I USED, I CALLED IT PLAY MONEY, WHERE IF I SAW A

10  STOCK I LIKED I WOULD MAYBE PUT A FEW DOLLARS IN THAT.  I

11  DON'T RECALL GETTING ANY MONEYS ANYWHERE.

12  **Q**    DID YOU HAVE ANY STOCKS, ANY INDIVIDUAL STOCKS?

13  **A**    I BOUGHT -- I REALLY DON'T KNOW WHAT'S IN THAT AG

14  EDWARDS ACCOUNT.  I USED IT, LIKE I SAY, I BOUGHT SOME

15  PENNY STOCKS AND SOME FORD STOCK, BOUGHT AND SOLD IT.  IT

16  WAS A VERY SMALL AMOUNT THAT I PLAYED WITH.

17  **Q**    SEPARATE AND APART FROM THE AG EDWARDS ACCOUNT THAT

18  MADE THOSE PURCHASES, DID YOU OWN ANY OTHER SEPARATE

19  STOCKS OR BONDS OR MUTUAL FUNDS SEPARATE AND APART FROM AG

20  EDWARDS?

21  **A**    I DON'T RECALL THAT, NO.

22  **Q**    DID YOU HAVE ANY SORT OF 401K OR IRA SEPARATE AND

23  APART FROM WHAT WAS BEING HELD AT STERLING?

24  **A**    NO, SIR.

25  **Q**    DID YOU HAVE ANY SAVINGS ACCOUNTS OR CHECKING

1  ACCOUNTS THAT MAINTAINED SUBSTANTIAL BALANCES?

2  **A**    SUBSTANTIAL, THAT'S A RELATIVE WORD.  WE HAD, AT ONE

3  TIME, SHE HAD A CHECKING ACCOUNT, HAD A SAVINGS ACCOUNT, I

4  HAD A CHECKING ACCOUNT AND SAVINGS ACCOUNT AND MAYBE IN

5  ALL OF OUR ACCOUNTS WE WOULD RUN UP MAYBE A $10,000

6  BALANCE.  I'M REALLY NOT SURE, NOT A VERY BIG ONE.

7  **Q**    DO YOU RECALL -- STRIKE THAT.

8       THERE WAS TESTIMONY FROM GLEN SMITH THAT HE HAD HAD

9  CONVERSATIONS WITH YOU ABOUT THE FINANCIAL STATUS OF SURE

10  LINE.  DO YOU RECALL THOSE CONVERSATIONS?

11  **A**    WHO WAS THIS WITH?

12  **Q**    GLEN SMITH.

13  **A**    GLEN SMITH HAD A CONVERSATION?

14  **Q**    WITH YOU DURING CONCERNING THE FINANCIAL STATUS OF

15  SURE LINE AND NEEDING YOUR MONEY TO BE ABLE TO MAKE NOTE

16  PAYMENTS?

17  **A**    NO, SIR.  AGAIN, THE CONTRARY.  EVERY CONVERSATION I

18  HAD WITH GLEN SMITH WAS ALWAYS POSITIVE, THINGS WERE WELL,

19  EVERYTHING WAS GOOD.

20  **Q**    DO YOU RECALL MEETING A HUSBAND AND WIFE INVESTORS IN

21  SMITHFIELD?

22  **A**    DO I RECALL WHAT, SIR?  I'M SORRY.

23  **Q**    MEETING WITH A HUSBAND AND WIFE WHO WANTED TO INVEST

24  IN SURE LINE AND MEETING THEM IN SMITHFIELD?

25  **A**    YES, YES, YES.

1  **Q**    TELL US ABOUT THAT.

2  **A**    THERE WAS A COUPLE THAT CALLED ME.  I WANT TO SAY

3  THEIR NAMES WERE HENDRICKSON, I'M NOT SURE ABOUT THEIR

4  NAMES.  SHE WAS A PHILIPPINO, AS I REMEMBER, HE WAS A

5  RETIRED MILITARY AND THEY WERE WANTING TO GO BACK TO THE

6  MISSION FIELD.  I THINK THEY HEARD ME AT A CONFERENCE IN

7  MARYLAND, I'M NOT SURE WHERE, BUT SOMEWHERE OUT EAST.

8  THEY HEARD ME AT A CONFERENCE AND THEY LIKED WHAT THEY

9  HEARD ABOUT THE 12 PERCENT FUND AND THEY WANTED TO TALK TO

10  ME ABOUT THAT.  WE TALKED A BIT AND THEN THEY ASKED ME,

11  THEY ASKED SAID COULD THEY GO WHAT THEY CALLED THE HOME

12  OFFICE.  I SAID SURE.  I SAID, IF YOU'D LIKE I'LL MEET YOU

13  THERE, I'D BE GLAD TO MEET YOU THERE.  SO I TOOK TJ AND I

14  AND WE FLEW DOWN THERE.

15  **Q**    DID YOU EVER, IF REQUESTED, DID YOU EVER HESITATE IN

16  REFERRING PEOPLE TO VISIT THE OFFICES IN NORTH CAROLINA?

17  **A**    NO, I SUGGESTED IT ALMOST EVERY TIME.  I WOULD SAY,

18  YOU KNOW, IN YOUR DUE DILIGENCE, ESPECIALLY FOLKS FROM

19  NORTH CAROLINA, IN YOUR DUE DILIGENCE, YOU ARE CLOSE TO

20  IT, DRIVE DOWN THERE AND SEE WHAT YOU THINK, SEE IF YOU

21  SEE WHAT A SAW, SEE IF YOU LIKE WHAT I LIKED.

22  **Q**    DO YOU RECALL ANY CONVERSATIONS ABOUT THE HENDRICKSON

23  MEETING -- STRIKE THAT.  DID THE HENDRICKSONS EVENTUALLY

24  INVEST IN SURE LINE?

25  **A**    THEY DID.

1  **Q**   DO YOU REMEMBER HOW MUCH?

2  **A**   A HALF MILLION.

3  **Q**   DO YOU RECALL HOW YOU GOT BACK FROM SMITHFIELD TO THE

4  AIRPORT AT RALEIGH-DURHAM?

5  **A**   I DO.

6  **Q**   DESCRIBE THAT FOR US.

7  **A**   JIM WAS TAKING GLEN, TJ AND I BACK TO THE AIRPORT.

8  WE WERE FLYING OUT SO WE ALL FOUR DROVE TO THE AIRPORT

9  TOGETHER.

10 **Q**   THERE WAS A STATEMENT ATTRIBUTED TO YOU ABOUT

11 SOMETHING TO THE EFFECT OF HOW STUPID CAN SOMEBODY BE TO

12 INVEST IN THIS CAR LOT.  DO YOU RECALL THAT BEING

13 TESTIFIED TO?

14          **MR. BRAGDON:**  OBJECTION TO LEADING.

15          **THE COURT:**  SUSTAIN IT AS TO THE FORM.

16 **BY MR. VANN:**

17 **Q**   DO YOU RECALL A STATEMENT BEING MADE IN EARLIER

18 TESTIMONY BY GLEN SMITH?

19          **MR. BRAGDON:**  OBJECTION.

20          **THE COURT:**  I SUSTAIN IT AS TO THE FORM.  YOU

21 CAN ASK ABOUT STATEMENTS BUT WE'RE NOT GOING TO HAVE A

22 TEST FROM A WITNESS ABOUT WHAT SOMEBODY HEARD AT TRIAL.

23 SO THE FORM OF THE QUESTION CANNOT BE DID SOMEBODY TESTIFY

24 TO THAT OR THAT.  YOU CAN SET THE STAGE AND SET A

25 FOUNDATION FOR BEING IN THE VAN AND THEN YOU CAN ASK A

1    PROPER QUESTION, BUT IT'S NOT PROPER TO ASK ABOUT WHAT

2    SOME OTHER WITNESS TESTIFIED ABOUT.

3    **BY MR. VANN:**

4    **Q**    DO YOU RECALL TRAVELING BACK TO THE AIRPORT WITH JIM

5    KIRK AND GLEN SMITH?

6    **A**    I DO.

7    **Q**    WAS THERE A CONVERSATION THAT OCCURRED BETWEEN THE

8    FOUR OF YOU?

9    **A**    THERE WAS.

10   **Q**    WHAT DID YOU ALL TALK ABOUT?

11   **A**    WE TALKED ABOUT BUSINESS, WE TALKED ABOUT MISSIONS.

12   I VAGUELY REMEMBER ASKING MORE QUESTIONS ABOUT HOW THEY

13   WERE GOING IN MAY HAVE HAD A PRAYER WITH THEM AT THE

14   AIRPORT.  I DON'T REMEMBER THAT BUT THAT'S MY NATURE.  AND

15   THEN WE WENT ON.

16   **Q**    DID YOU AT ANY POINT IN TIME MENTION THE NEW

17   INVESTORS, THE HENDRICKS, FROM THAT MEETING?

18   **A**    I DON'T RECALL ANY MENTION OF THE NEW INVESTORS.

19   **Q**    MR. KIMMEL, DO YOU RECALL HAVING A MEETING WITH JIM

20   KIRK AND CAROL GRAFF WHILE ATTENDING A SEMINAR OVER AT THE

21   CHURCH IN DURHAM?

22   **A**    THEY DID ATTEND, YES.  THEY DID COME TO A SEMINAR I

23   HAD IN DURHAM, YES.

24   **Q**    DID THEY USE THAT AS AN OPPORTUNITY TO MEET WITH YOU?

25   **A**    I DON'T RECALL THEM MEETING.  I THINK WE WENT TO

1  LUNCH OR DINNER AFTERWARDS.  IN FACT, THAT WAS THE ONLY

2  THING.  THEY HAD NOT HEARD ME SPEAK.  I CALLED THEM AND

3  SAID I'M GOING TO BE IN DURHAM, HOW CLOSE IS THAT TO YOU,

4  WOULD YOU LIKE TO COME, AND THEY CAME ONE NIGHT.

5  **Q**    DO YOU RECALL WHETHER OR NOT THERE WAS ANY

6  CONVERSATION BETWEEN YOU AND JIM AND CAROL ABOUT THE

7  INVESTORS YOU WERE BRINGING IN?

8  **A**    THE INVESTORS WHAT?

9  **Q**    THAT YOU WERE BRINGING IN TO SURE LINE?

10  **A**    NOT AT THAT MEETING, NO.

11  **Q**    WAS THERE -- I'M SORRY, WAS THERE ANOTHER MEETING

12  WITH THEM IN CHICAGO?

13  **A**    THERE WAS.

14  **Q**    DESCRIBE THAT MEETING.

15  **A**    THEY HAD CALLED AND ASKED IF THEY COULD MEET WITH ME,

16  THEY WERE GOING TO FLY TO CHICAGO.  I SAID SURE, AND THEY

17  DID.  MY MEMORY IS THEY RENTED A CAR AND MET ME AT MY

18  CHURCH OFFICE IN HAMMOND.

19  **Q**    WHAT WAS THE PRIMARY PART OF THE CONVERSATION,

20  PRIMARY PART OF THE MEETING ABOUT?

21  **A**    WELL, I UNDERSTOOD THE MEETING TO BE JUST AN UPDATE

22  OF WHERE THEY WERE IN BUSINESS AND GIVE ME SOME REPORTS,

23  TELL ME WHAT WAS GOING ON, AND THEY DID THAT.  AND THEN

24  THE MEETING SHIFTED A LITTLE BIT, JIM KIND OF SAT BACK AND

25  SAID CAROL IS GOING TO TAKE THE MEETING FROM HERE.  CAROL

PROCEEDED TO -- I WAS GETTING READY TO TAKE NOTES AND
CAROL PROCEEDED TO GO IN AN AREA THAT WAS -- THAT I DIDN'T
LIKE.  SHE STARTED TALKING TO ME AS IF I WAS A SALESMAN,
AS IF I WORKED FOR THEM, AND THEN I STOPPED HER.  I RAISED
MY HAND, I LAID MY PAD DOWN, AND I SAID, "YOU NEED TO
UNDERSTAND, I DON'T WORK FOR YOU, I HAVE MY OWN MINISTRY
AND I REFER PEOPLE TO YOU.  AS I TOLD YOU FROM DAY ONE, AS
LONG AS YOU TOOK CARE OF THOSE PEOPLE THAT I WOULD
CONTINUE TO REFER YOU TO THOSE PEOPLE."

THE TENOR WAS I WASN'T DOING ENOUGH AND THEY NEEDED
MORE REFERRALS.  SHE USED THE WORD "PIPELINE" AND "FILL
THE PIPELINE" AND THAT WAS TOTALLY DIFFERENT THAN THE
ORIGINAL AGREEMENT.  I SAID, I THINK WE'RE DONE, I THINK
OUR RELATIONSHIP ENDS HERE, AT WHICH TIME JIM JUMPED IN
AND QUIETED CAROL DOWN, SAID NO, NO, NO, LET'S DON'T BE
HASTY, EVERYTHING IS FINE, LET'S JUST -- YOU KNOW,
BASICALLY LET'S END THE MEETING AND GO GET SOMETHING TO
EAT.  I SAID AS LONG AS YOU ALL UNDERSTAND THAT I DON'T
WORK FOR YOU, NEVER HAVE, NEVER WILL WORK FOR YOU.

I HAVE ALWAYS BEEN VERY, VERY CAREFUL.  I HAVE ALWAYS
BEEN AFRAID THAT IF I LENT MY NAME OR MY MINISTRY TO ANY
ENTITY, THAT THAT ENTITY WENT WRONG, IT WOULD TAKE NOT
ONLY MY MINISTRY DOWN THE TUBES, WHICH THIS ULTIMATELY
DID, AND IN THIS CASE HURT PEOPLE AND COST PEOPLE MONEY.
I WAS ALWAYS THAT SOMETHING LIKE THAT WOULD HAPPEN.  SO I

1    NEVER WOULD LEND MY NAME TO ANYTHING UNTIL THIS THING WITH

2    SURE LINE.  SO I WANTED TO HEAR THEM SAY ONE MORE TIME

3    THAT THAT'S NOT WHAT WE DO, I REFER PEOPLE TO YOU AND I

4    DON'T WORK FOR YOU.

5    **Q**    NOW, YOU JUST TESTIFIED THAT YOU STATED YOU REFER

6    PEOPLE TO SURE LINE.  IN FACT, YOU DID, DIDN'T YOU?

7    **A**    REFER PEOPLE TO SURE LINE?

8    **Q**    YES, SIR.

9    **A**    SURE.

10   **Q**    WHY?

11   **A**    WELL, I WAS COMFORTABLE WITH THEM.  I WAS COMFORTABLE

12   WITH THE LEADERSHIP.  EVERYONE I TALKED TO AT LEAST HAD

13   SOME PROFESSION OF FAITH.  THEY WERE LEANING MY DIRECTION

14   AS FAR AS MISSIONS AND GIVING MONEY AND VEHICLES AWAY.  IT

15   SEEMED LIKE MORE AND MORE THEY WERE LEANING THAT WAY, AND

16   I WANT TO HELP PEOPLE.

17       I MEAN, WHERE DO YOU GET AN OPPORTUNITY TO EARN

18   12 PERCENT?  I MEAN, MAYBE PEOPLE WHO MAKE ZILLIONS OF

19   DOLLARS EARN THAT KIND OF INTEREST BUT WE DON'T EARN THAT

20   KIND OF MONEY.  IT WAS A WAY FOR ME TO HELP THOSE PEOPLE.

21   THERE WAS SEVERAL PEOPLE THAT I KNEW, ONE PASTOR FELL OFF

22   A LADDER, HE WAS A QUADRAPLEGIC, HE COULD NEVER WORK

23   AGAIN.  WHEN HE ASKED ME WHAT CAN I DO WITH THIS LITTLE

24   MONEY I GOT AS A RESULT OF THIS INJURY, HOW DO I MAKE IT

25   LAST THE REST OF MY LIFE, I SAID THERE IS NO WAY TO MAKE

IT LIST.  I MEAN, I'M A FINANCIAL PLANNER BUT I DON'T

CREATE MAGIC.  THIS MONEY WILL NOT LAST UNLESS YOU INVEST

IT SOMEPLACE AND GET YOURSELF SOME KIND OF RETURN.  SO I

WANTED HIM TO HAVE A RETURN.  I WANTED SO MANY PEOPLE THAT

I KNEW IN MY CHURCH, MY GOAL WAS TO COME UP WITH A PLAN

WHERE; ONE, I COULD GET THEM OUT OF DEBT.  THE AVERAGE

PERSON HAS ABOUT 30 PERCENT OF THEIR INCOME EATEN UP IN

DEBT.  IF I COULD GET YOU TO GET RID OF THAT DEBT, THAT'S

LIKE GETTING A 30 PERCENT RAISE.  THAT'S A LOT OF MONEY.

SO I WOULD START THERE BECAUSE IT WOULDN'T DO ME GOOD TO

INVEST IF THEY ARE JUST DUMPING IT ON THEIR DEBT.

SO WE START WITH GETTING THEM OUT OF DEBT, CAPTURING

THAT MONEY AND THEN GET THEM IN SOME KIND OF A SOUND

INVESTMENT.  UP UNTIL PRIOR TO THIS TIME I WAS TRYING TO

GET THEM INTO INDEX FUNDS.  THEY HAVE A GOOD TRACK RECORD.

INDEX FUNDS, LAST TIME I LOOKED, HAD A 50, 60 YEAR TRACK

RECORD RUNNING EIGHT TO 10 PERCENT.  SO I WOULD RECOMMEND

THOSE THINGS.

WHEN SURE LINE CAME ALONG, I SAW ANOTHER THING.  MANY

TIMES IN OUR ONE-ON-ONE COUNSELING WE WOULD HAVE THE

OPTION OF SURE LINE OR AN ANNUITY OR SOME OTHER FUNDS.  I

WOULD SAY, HOW ARE YOU DOING ON THESE FUNDS, YOU DOING

GOOD THERE, STAY THERE.

THERE WAS ONE GENTLEMAN WANTED TO PUT $200,000 IN, I

WOULDN'T LET HIM.  I SAID I DON'T THINK THAT'S WISE, LET'S

1    KEEP SOME MONEY FOR YOU.  YOU MAY NEED SOME MONEY TO GET

2    YOUR HANDS ON.  HE'S AN EVANGELIST AND TRAVELS.  THERE'S

3    OLDER PEOPLE THAT WANTED ANNUITIES.  THOUGH THEY ONLY PAID

4    THREE, FOUR, FIVE PERCENT, THEY WERE FIXED RATES.  SO I

5    WOULD ENCOURAGE THEM TO STAY IN THOSE ANNUITIES, DON'T

6    TAKE THOSE MONEYS OUT.  IF YOU TAKE THE MONEY OUT YOU WILL

7    LOOSE A BUNCH OF MONEY BY TAKING IT OUT.

8        SO IT WASN'T THAT SURE LINE WAS THE ONLY THING I

9    RECOMMENDED.  WE COUNSEL, WE TALK ABOUT MANY DIFFERENT

10   THINGS.  NOW, THE TESTIMONY YOU HEARD WAS ABOUT THE SURE

11   LINE THING, BUT THERE WAS MANY, MANY THINGS.  THERE'S A

12   WIDE SPECTRUM OF THINGS THAT YOU CAN DO TO MAKE YOUR

13   FAMILY SECURE.  OF COURSE, I ALWAYS STARTED WITH SALVATION

14   OF THE PERSON.  I WOULD CHECK ON THEIR SALVATION; I WANTED

15   TO MAKE SURE THEY WERE SAVED.  I WANTED TO MAKE SURE THEY

16   WERE IN GOD'S FAMILY.  I THOUGHT THAT WAS IMPORTANT.  I

17   HOPE THAT ANSWERED YOUR QUESTION.

18   **Q**    DID YOU EVENTUALLY -- DID OTHER MEMBERS OF YOUR

19   FAMILY EVENTUALLY INVEST IN SURE LINE?

20   **A**    YES, SIR.

21   **Q**    WHEN DID THIS -- DO YOU KNOW THE TIMEFRAME OF WHEN

22   THIS TOOK PLACE?  I THINK I ALREADY ASKED YOU THAT SO I

23   WON'T GO ALL THE WAY THROUGH THAT.  DO YOU REMEMBER WHEN

24   THESE INVESTMENTS WOULD HAVE TAKEN PLACE?

25   **A**    SOMETIME BETWEEN 2007 AND 2012.  I CAN'T TELL YOU

1    WHEN.

2    **Q**    NOW, MR. KIMMEL, THERE WERE VARIOUS TAPES PLAYED OF

3    YOU GIVING THESE SEMINARS TALKING ABOUT THE INVESTMENTS AT

4    VARIOUS CHURCHES; ISN'T THAT CORRECT?

5    **A**    YES, SIR.

6    **Q**    AND THERE'S NO QUESTION THAT'S YOU ON THE VIDEOS?

7    **A**    THAT'S ME.

8    **Q**    AT TIMES YOU STATE CERTAIN THINGS ABOUT SURE LINE.

9    COULD YOU TELL US, AS BEST YOU CAN, WHAT BROUGHT ABOUT

10   YOUR MAKING ANY SORT OF PARTICULAR ASSERTION ABOUT SURE

11   LINE, WHETHER IT WAS ITS COLLATERALIZATION RATE OR ITS

12   SALES RATE OR ITS BEING INSPECTED BY A CERTAIN AGENCY.

13   TELL US --

14          **MR. BRAGDON:**  OBJECTION TO COMPOUND QUESTION.

15          **THE COURT:**  SUSTAINED.

16          **MR. VANN:**  APOLOGIZE, YOUR HONOR.

17   **BY MR. VANN:**

18   **Q**    WHAT LED YOU TO MAKE -- WHAT WERE THE BASES OF THE

19   STATEMENTS YOU WERE MAKING WITHIN THESE PRESENTATIONS WHEN

20   YOU WERE DISCUSSING SURE LINE?

21   **A**    ANY REFERENCE I MADE TO SURE LINE I EITHER READ THE

22   STATEMENT CONCERNING THE COLLATERAL BEING HELD BY

23   INITIALLY A COMPANY CALLED AATROC, LLC, WHICH IS ANXIOUSLY

24   AWAITING THE RETURN OF CHRIST, WHICH WAS A TRUSTEE AT THAT

25   TIME, THE FIRST TIME I HEARD ABOUT THEM.

1      THEN LATER MR. HILL, EVERY DOCUMENT THAT I SAW, THE

2   DOCUMENT THAT CATHY SIGNED FOR HER INVESTMENT, SAID THAT

3   THE COLLATERAL WAS OVERSAW OR OVERSEEN, THE OVERSEER WAS

4   THIS WILLIAM F. HILL.  I WAS TOLD BY EITHER JIM OR GLEN, I

5   DON'T RECALL WHICH ONE, MAYBE BOTH, THAT THE ACTUAL -- I

6   THINK KIRK TOLD ME THIS, THE ACTUAL TITLES WERE

7   TRANSFERRED TO A THIRD PARTY TRUST COMPANY THAT WERE HELD

8   FOR THE PROTECTION OF THE NOTE HOLDER, AND THAT THIS MAN,

9   THE LAST MAN WAS WILLIAM F. HILL, HE WAS AN ATTORNEY HERE

10  IN THE NORTH CAROLINA AREA, AND HE OVERSAW THOSE

11  COLLATERALIZED DOCUMENTS FOR THE NOTE HOLDER AND THAT IF

12  AT ANY TIME THE BUSINESS WENT BAD, THERE WASN'T ANY MONEY,

13  THE COLLATERAL WASN'T STABLE, THAT HE WOULD SEIZE THOSE

14  DOCUMENTS, SEIZE THOSE ASSETS AND, IN ESSENCE, SELL THEM

15  AND MAKE THE INVESTOR WHOLE.  AND THAT WAS -- SO I TOLD

16  THAT.  I SAW IT IN PRINT, I WAS TOLD IT, SO I TOLD IT.

17  **Q**    WERE THERE SOME TIMES YOU WOULD USE FINANCIAL FIGURES

18  RELATED TO SURE LINE?

19  **A**    I DID.  I GOT THOSE FIGURES, AGAIN, FROM THE ONLY

20  REPORTS THAT I HAD GOTTEN, A COMBINATION OF THOSE THINGS.

21  THE LAST NUMBERS THAT I SAW, IF I REMEMBER THE NUMBERS

22  CORRECTLY, THERE WAS AN AVERAGE OF 50 TO 60 CARS PER MONTH

23  BEING SOLD.  I THINK THE LAST REPORT I SAW OF THAT WAS THE

24  FIRST QUARTER OF 2009, IF I REMEMBER THAT CORRECTLY.  I

25  SAW A FIGURE THAT SAID THAT THERE WAS A 500 PERCENT

INCREASE AND THE BUSINESS WAS GOING WELL.

THOSE ARE THE PHYSICAL NUMBERS I SAW.  AND GLEN, AGAIN, WOULD REFER TO THOSE NUMBERS AND WAS PROJECTING 50, 60, 70 CARS A MONTH AT A RATE OF $10,000 AVERAGE PER CAR, WHICH TRANSLATED INTO SIX OR $700,000 A MONTH IN SALES FOR THAT TIME.

NOW, HE LED ME TO BELIEVE THAT THAT WAS AN ONGOING THING.  I DIDN'T SEE IT, I DIDN'T CHECK IT OUT, I JUST BELIEVED WHAT HE SAID.  AGAIN, EVERYBODY IS GETTING THEIR MONEY, EVERYBODY WAS HAPPY, I WAS HAPPY, I TRUSTED THESE PEOPLE.  SO I JUST TOOK THOSE NUMBERS AT FACE VALUE.

**Q**    MR. KIMMEL, DO YOU BELIEVE YOU MADE ANY MISTAKES IN REGARD TO YOUR RECOMMENDING SURE LINE?

**A**    YES, SIR, LOOKING BACK ON IT NOW --

**MR. BRAGDON:**  OBJECTION.

**THE COURT:**  SUSTAINED.

**BY MR. VANN:**

**Q**    IN REGARD TO PUTTING TOGETHER INFORMATION THAT WAS PRESENTED FOR SURE LINE -- ON BEHALF OF SURE LINE, HOW MUCH DID YOU RELY ON JIM KIRK OR GLEN SMITH?

**A**    AS FAR AS -- STATE IT JUST A LITTLE LOUDER FOR ME.

**Q**    IN REGARD TO THE INFORMATION THAT YOU WERE PRESENTING ON BEHALF OF SURE LINE, HOW MUCH DID YOU RELY ON JIM KIRK OR GLEN SMITH?

**A**    AFTER MY INITIAL MEETING WITH THEM, I RELIED ON THEM

1    A HUNDRED PERCENT.

2    **Q**    DID YOU RECOMMEND THAT SURE LINE PUT TOGETHER A

3    SPIRITUAL BOARD OF DIRECTORS?

4    **A**    I DID.

5    **Q**    WHY?

6    **A**    I WANTED TO HAVE -- IT WAS AN EFFORT, FEEBLE AS IT

7    MAY HAVE BEEN, IT WAS AN EFFORT ON MY PART TO GET SOME MEN

8    THAT I KNEW, I KNEW TO BE SPIRITUAL MEN, I KNEW THEM TO BE

9    PRAYING MEN, I KNEW THEM TO HAVE STRONG PERSONALITIES, I

10   KNEW THEM TO BE VERY, VERY INQUISITIVE.  SO MY HOPE WAS,

11   OR MY IDEA WAS THAT I COULD GET THESE MEN TO HELP ME

12   OBVIOUSLY PRAY FOR THE COMPANY, AND I WILL BE HONEST WITH

13   YOU, I REALLY THOUGHT THAT TWO OF THESE MEN SPECIFICALLY

14   WOULD HAVE REALLY CHECKED IT OUT BECAUSE THEY ARE JUST

15   THAT WAY, THEY ARE JUST VERY, VERY INQUISITIVE MEN.  I

16   THOUGHT THAT WOULD JUST GIVE US ANOTHER SET OF EYES OR TWO

17   SETS OF EYES, OR FIVE SETS OF EYES, AS THE CASE MAY BE, TO

18   MAKE SURE EVERYTHING WAS RUNNING CORRECTLY.  THEN, OF

19   COURSE, PRAYING FOR THE COMPANY, PRAYING FOR THE

20   LEADERSHIP, PRAYING FOR THE BUSINESS, PRAYING FOR THE

21   INVESTORS.  I WANTED PRAYING, KIND OF HARD-NOSED MEN TO BE

22   INVOLVED WITH THIS THING.

23        SO, YES, IT WAS MY IDEA; I TOOK IT TO KIRK AND HE

24   AGREED ALMOST IMMEDIATELY.

25   **Q**    DID THE SPIRITUAL BOARD OF DIRECTORS THOUGH EVER HAVE

1   THE OVERSIGHT OR INSIGHT INTO THE COMPANY THAT YOU

2   EXPECTED?

3   **A**    NO.  WHEN I TALKED TO JIM ABOUT THE COMPANY AND THE

4   SPIRITUAL BOARD OF DIRECTORS' PARTICIPATION, IT WAS

5   DETERMINED THAT THEY WOULD EACH RECEIVE 50,000 SHARES,

6   THAT THEY WOULD HAVE NO VOTING POWER IN THE COMPANY BUT

7   THAT THEY WOULD, AT ANY TIME, COULD OFFER SUGGESTIONS AND

8   WOULD OFFER SUGGESTIONS AND DIFFERENT TIMES ONE OR TWO MEN

9   DID DO THAT.  AND THAT IF THERE WAS A CHANGE IN THE

10  DIRECTION OF THE COMPANY, THE WAY THEY UNDERSTOOD IT, THAT

11  THEY WOULD HAVE, I DON'T THINK VETO POWER IS THE RIGHT

12  WORD, BUT THEY WOULD BE CONSULTED.

13      SEVERAL TIMES OVER THE YEARS FROM THE TIME WE STARTED

14  THE SPIRITUAL BOARD UNTIL THE TIME THE COMPANY WENT UNDER,

15  I WOULD ASK, YOU KNOW, PASTOR SCHOOL IS COMING UP, IT CAME

16  UP EVERY MARCH OF EACH YEAR, I WILL SEE THESE MEN, THEY

17  ARE GOING TO ASK ME DO WE NEED TO DO ANYTHING OR ANYTHING

18  NEED TO BE CHANGED, DO THEY NEED TO UPDATE ANYTHING.

19      I WAS TOLD EVERYTHING IS FINE AND THINGS ALL AROUND

20  ARE GOING GOOD.  I INDIVIDUALLY TOLD THE MEN THE LAST

21  NUMBERS WE HEARD WAS THE SAME AS WE HAVE NOW, EVERYTHING

22  WAS GOOD AND THERE'S NO CHANGE IN THE DIRECTION OF THE

23  COMPANY, THERE'S NOTHING FOR YOU TO DO.  SO THAT WAS -- IT

24  WAS MORE OF AN ADVISORY BOARD BUT, AGAIN, I WAS WANTING

25  SOME MEN ON THAT BOARD WHO I FELT LIKE IF THEY SAW

1    ANYTHING THEY WOULD BE VERY NOISY ABOUT IT.  THESE ARE

2    VERY INFLUENTIAL MEN AROUND AMERICA AND THEY COULD HAVE

3    STOPPED THE PROGRAM IN A HEART BEAT WITH A PHONE CALL, I'M

4    SURE.  NOT TO SMITH OR GLEN OR JIM, BUT WITH ANY INVESTORS

5    OR FUTURE INVESTORS.  THESE MEN WERE WELL RESPECTED.

6    **Q**    I BELIEVE YOU TESTIFIED THAT YOU HAD ALMOST WEEKLY

7    CONTACT WITH GLEN SMITH.  DID THIS CONTINUE THROUGH

8    JANUARY OF 2012?

9    **A**    YES, SIR, RIGHT AFTER JANUARY OF 2012.

10   **Q**    WAS THERE EVER ANY INDICATION -- STRIKE THAT.

11       DID HE EVER TELL YOU THAT THERE WERE FINANCIAL

12   CONCERNS WITH THE COMPANY GOING INTO 2011 THROUGH THE END

13   TO JANUARY 3, 2012?

14   **A**    NO, SIR.

15   **Q**    WHEN DID YOU BECOME AWARE THAT SURE LINE WAS NOT

16   GOING TO MAKE ITS MONTHLY NOTE PAYMENTS FOR JANUARY 2012?

17   **A**    I DON'T REMEMBER THE DATE.  I KNOW IT WAS IN 2012

18   BECAUSE I STARTED GETTING PHONE CALLS FROM PEOPLE WHO SAID

19   THEY HAD NOT GOTTEN THEIR CHECK AND DID I KNOW WHY THEY

20   HAD NOT GOTTEN THEIR CHECK.

21   **Q**    HOW MANY PHONE CALLS DO YOU THINK YOU GOT?

22   **A**    HOW MANY WHAT?

23   **Q**    HOW MANY PHONE CALLS DO YOU THINK YOU RECEIVED?

24   **A**    OH, DOZENS AND DOZENS.  AS A MATTER OF FACT, I WAS AT

25   MR. KENDALL'S CONDOMINIUM IN FLORIDA.  I THINK I WAS DOWN

1    THERE FOR A MEETING, I'M NOT SURE.  BUT MANY MORNINGS

2    WALKING AROUND THE POOL TAKING PHONE CALLS.

3    **Q**    DID YOU EVER DECLINE A PHONE CALL?

4    **A**    NO, SIR.

5    **Q**    TO THE BEST OF YOUR KNOWLEDGE, WAS THERE ANYONE WHO

6    TRIED TO REACH YOU BUT WASN'T ABLE TO?

7    **A**    NOT THAT I KNOW OF.  EVERYBODY HAD MY CELL NUMBER.

8    IT'S THE NUMBER I HAD FOR YEARS.  IT'S ON ALL MY PRINTED

9    MATERIAL, IT'S ON ALL OF MY BUSINESS CARDS.  I EVEN

10   PROVIDED INVESTORS AN 888 NUMBER, A TOLL FREE NUMBER.

11   **Q**    DID YOU EVENTUALLY SPEAK TO GLEN SMITH OR JIM KIRK?

12   **A**    I SPOKE TO GLEN, YES.

13   **Q**    WHEN WAS THAT?

14   **A**    THAT WAS IN THE FIRST WEEK OR TWO OF JANUARY.

15   **Q**    AND DO YOU RECALL WHAT EXPLANATION HE GAVE TO YOU

16   ABOUT THE FAILURE OF SURE LINE TO MAKE ITS PAYMENTS?

17   **A**    HE DIDN'T SAY THE FAILURE OF SURE LINE BECAUSE HE WAS

18   STILL OPTIMISTIC.  HE SAID, HIS STORY, THE THING HE TOLD

19   ME WAS THERE WAS, DUE TO THE DODD-FRANK BANKING LAWS,

20   WHICH I DON'T KNOW HOW THAT WORKS, BUT DUE TO THE

21   DODD-FRANK BANKING LAWS, THAT STERLING TRUST HAD NOT SENT

22   THE LAST DECEMBER MONEYS TO GLEN IN THE SUM OF, I WANT TO

23   SAY, $900,000.  THE MONEYS THAT THEY WERE HOLDING FOR

24   INVESTORS THAT THEY IN TURN FUNNELED IT INTO SURE LINE TO

25   BUY CARS, THAT'S HOW IT WORKED.  THEN DUE TO THE

1  DODD-FRANK BANKING LAWS, STERLING HAD STOPPED EVERYTHING

2  UNTIL THEY WERE SURE THAT SURE LINE COMPLIED, IS WHAT HE

3  TOLD ME.  IT SOUNDED GOOD, IT MADE SENSE TO ME.  AND SO

4  WHEN PEOPLE WOULD CALL ME I SAID GLEN SAYS IT HAS TO DO

5  WITH DODD-FRANK.

6  **Q**    WHEN DID YOU FIND OUT THAT IT WASN'T DODD-FRANK?

7  **A**    I DON'T KNOW.  I REALLY DON'T KNOW.  YOU SEE, UNTIL

8  MR. FRANKLIN'S PHONE CALL, AND I THOUGHT IT WAS AUGUST OF

9  '12, BUT IT WAS AUGUST OF '13 I FOUND OUT TODAY.

10      UNTIL THAT PHONE CALL, I, TO BE HONEST WITH YOU, I

11  STILL BELIEVED THAT EVEN THOUGH THE MONEYS HAD NOT BEEN

12  PAID TO THE INVESTORS I STILL BELIEVED THERE WASN'T A

13  PROBLEM WITH STERLING, WITH THE BUSINESS.  I BELIEVED IN

14  JIM KIRK AND GLEN SMITH UP UNTIL THE DAY HE TOLD ON THAT

15  PHONE CALL THAT THEY HAD CONFESSED TO A CRIME.  I WAS THE

16  MOST SHOCKED PERSON IN AMERICA.

17  **Q**    WAS THERE EVER ANY CONVERSATION BETWEEN YOU, GLEN

18  SMITH, JIM KIRK OR CAROL GRAFF THAT SURE LINE OR

19  AUTOMOCION WERE NOT LEGITIMATE BUSINESSES?

20  **A**    NO, SIR.

21  **Q**    WAS THERE EVER -- STRIKE THAT, YOUR HONOR.

22      PRIOR TO DECEMBER OF 2012, BASED ON YOUR KNOWLEDGE

23  ARE YOU AWARE OF ANY NOTE PAYMENT THAT WAS NOT MADE?

24  **A**    I DID NOT.  I NEVER HAD -- I WAS NEVER NOTIFIED WHO

25  GOT PAID OR NOT PAID BUT I DON'T KNOW OF ANY THAT WAS NOT

1  MADE.

2  **Q**    ARE YOU AWARE OR WERE YOU MADE AWARE THAT DURING THIS

3  TIME PERIOD WHETHER PERSONS REDEEMED THEIR NOTES AT THE

4  END OF THEIR TWO YEAR PERIOD OR BEFORE?

5  **A**    GLEN WOULD SAY FREQUENTLY THAT HE ALWAYS KEPT A SUM

6  OF MONEY, I DON'T RECALL, IN MY MIND IT WAS $50,000, THAT

7  HE WOULD KEEP AVAILABLE FOR PEOPLE WHO WANTED TO MAKE

8  REDEMPTIONS.  I KNOW THROUGHOUT THE -- BETWEEN AT LEAST

9  2007 THROUGH 2012, THERE WAS MANY PEOPLE THAT I KNEW WHO,

10  FOR DIFFERENT REASONS, HAD REDEEMED THEIR FUNDS.

11  **Q**    AND WERE THEY ABLE TO REDEEM THE FULL AMOUNT OF THE

12  INVESTMENT THAT THEY MADE, TO THE BEST OF YOUR KNOWLEDGE?

13  **A**    EVERYONE THAT I KNEW ABOUT HAD.  MR. LUDWICK MADE US

14  AWARE THAT HIS BROTHER GOT A HUNDRED PERCENT, OR

15  BROTHER-IN-LAW, GOT A HUNDRED PERCENT OF HIS FUNDS.

16          **MR. BRAGDON:**  OBJECTION, YOUR HONOR.

17          **THE COURT:**  STRIKE THAT LAST PART ABOUT WHAT

18  SOMEBODY ELSE TESTIFIED TO.  NEXT QUESTION.

19          **MR. VANN:**  IF I MAY HAVE ONE SECOND, YOUR HONOR?

20          **THE COURT:**  YOU MAY.

21      (PAUSE IN THE PROCEEDINGS.)

22  **BY MR. VANN:**

23  **Q**    MR. KIMMEL, WERE YOU AWARE PRIOR TO THIS WEEK THAT

24  MR. KIRK WAS MAKING IN EXCESS OF $600,000 FOR THE SIX

25  YEARS BETWEEN 2006 AND 2011?

1  **A**    I WAS NOT AWARE OF THAT.

2  **Q**    WERE YOU AWARE OF THE PAYMENT AMOUNTS BEING PAID TO

3  GLEN SMITH?

4  **A**    I WAS NOT.

5  **Q**    WERE YOU AWARE OF THE AMOUNTS BEING PAID TO CAROL

6  GRAFF?

7  **A**    I WAS NOT.

8  **Q**    NOW, YOU WERE WELL AWARE THAT YOU RECEIVED -- GOT

9  ALMOST $2 MILLION; IS THAT CORRECT?

10 **A**    YES, SIR.

11 **Q**    AND THOSE MONEYS WERE PAID TO FAITHFUL STEWARDS; IS

12 THAT CORRECT?

13 **A**    THEY WERE.

14 **Q**    AND WERE THEY PROPERLY REPORTED?

15 **A**    THEY WERE.

16 **Q**    AND WERE RETURNS -- JUST FOR THE RECORD, WERE RETURNS

17 THE SAME ONES FILED ON BEHALF OF YOU AND FAITHFUL

18 STEWARDS --

19          **MR. BRAGDON:**  OBJECTION.

20          **THE COURT:**  SUSTAINED.  THERE'S A MOTION IN

21 LIMINE RULE ON THAT, COUNSEL, AND YOU KNOW THAT.

22          **MR. VANN:**  NO OTHER QUESTIONS, YOUR HONOR.

23          **THE COURT:**  CROSS-EXAMINATION.

24                    **CROSS-EXAMINATION**

25 **BY MR. BRAGDON:**

1  Q    MR. KIMMEL, THE WAY YOU DESCRIBE IT, ABOUT MID-2006,

2  THAT WAS WHEN YOU STARTED MAKING REFERRALS TO SURE LINE,

3  AS FAR AS YOU KNEW.  BEFORE THAT IT WAS BARTKO; IS THAT

4  RIGHT?

5  A    AS I RECALL, YES, SIR.

6  Q    SO 2007 WOULD HAVE BEEN YOUR FIRST FULL YEAR?

7  A    I THINK THAT'S RIGHT, SIR.

8  Q    AND YOUR ONLY OTHER SOURCE OF INCOME DURING THIS TIME

9  PERIOD WAS THE MONEY YOU MADE IN LOVE OFFERINGS RIGHT?

10  A    LOVE OFFERINGS AND SALES OF BOOKS AND TAPES.

11  Q    I'D LIKE TO PUT UP, JUST FOR YOUR BENEFIT,

12  EXHIBIT 207, PAGE ONE.  ISN'T IT TRUE THAT IN 2007 THAT

13  THE AMOUNT YOU GOT FROM CHURCHES AND PRESENTATIONS WAS

14  ABOUT $34,000?

15  A    IF YOUR REPORT IS RIGHT IT IS.

16  Q    DOES THAT SOUND ABOUT RIGHT?

17  A    YES, SIR.

18  Q    OKAY.  AND THE AMOUNT YOU GOT FROM SALES OF YOUR

19  MATERIALS WAS A LITTLE UNDER $5,000?

20  A    YES, SIR.

21  Q    SO TOGETHER THAT'S ABOUT $40,000?

22  A    YES, SIR.

23  Q    AND THE AMOUNT YOU GOT FROM SURE LINE IN COMMISSION

24  WAS OVER $400,000?

25  A    YES, SIR.

1  **Q**    BUT YOU CLAIM HERE TODAY THAT YOU DIDN'T EVEN ASK

2  THEM FOR A COMMISSION?

3  **A**    I DID NOT.

4  **Q**    YOU WERE WILLING TO DO THIS FOR FREE?

5  **A**    I DID NOT ASK FOR COMMISSIONS.

6  **Q**    YOU WERE WILLING TO LIVE ON THE $40,000?

7  **A**    I HAD BEEN.

8  **Q**    THAT FIRST FULL YEAR YOU GOT TEN TIMES THE INCOME YOU

9  GOT FROM YOUR MATERIALS AND YOU ARE TELLING US TODAY THAT

10 THAT WAS COMPLETELY VOLUNTARY?

11 **A**    THAT'S THE WAY WE SET IT UP, YES, SIR.

12 **Q**    THEY DIDN'T HAVE TO PAY YOU THAT AT ALL?

13 **A**    THEY DID NOT.

14 **Q**    YOU WOULDN'T HAVE BEEN UPSET IF THEY HADN'T?

15 **A**    OF COURSE NOT.

16 **Q**    BUT THEY DID, RIGHT?

17 **A**    THEY DID, SIR.

18 **Q**    ON EACH AND EVERY TIME YOU REFERRED AN INVESTOR THEY

19 PAID YOU 10 PERCENT, DIDN'T THEY?

20 **A**    I HAD NO IDEA.

21 **Q**    YOU DIDN'T KEEP TRACK?

22 **A**    NO.

23 **Q**    SO IT'S YOUR TESTIMONY TODAY THAT YOU HAD NO CLUE IF

24 THEY ACTUALLY PAID YOU 10 PERCENT OR NOT?

25 **A**    I DID NOT.

1   **Q**   LET'S LOOK AT EXHIBIT 285, PAGE SEVEN.  LET'S ZOOM

2   IN.  THIS IS THE LAST PAGE OF COMMISSIONS YOU RECEIVED,

3   AND AS YOU MENTIONED SOME OF THE MEMOS SPECIFICALLY LIST

4   WHAT YOU RECEIVED; ISN'T THAT RIGHT?

5   **A**   YES, MOST OF THEM DID NOT, SOME DID.

6   **Q**   BUT FOR THIS ONE IN 2011, IT LISTS THAT MADDOX HAD

7   INVESTED $40,000?

8   **A**   YES, SIR.

9   **Q**   AND SO THIS COMMISSION HERE OF 11,000 IS RELATED TO

10   MADDOX, MCALLISTER AND BOLTON?

11   **A**   IT COULD HAVE BEEN.

12   **Q**   YOU WEREN'T KEEPING TRACK?

13   **A**   NO, SIR.

14   **Q**   LOOKING AT PAGE ONE OF THIS EXHIBIT, YOU DID RECEIVE

15   ABOUT $2 MILLION IN THIS TIME PERIOD?

16   **A**   1.976.

17   **Q**   YOU DIDN'T GIVE ANY MONEY BACK WHEN AN INVESTOR

18   REDEEMED SOME OF THEIR MONEY, RIGHT?

19   **A**   NO, SIR.  IT WAS A DONATION; IT WAS NOT A COMMISSION.

20   **Q**   IT WAS A DONATION?

21   **A**   YES, SIR.

22   **Q**   NOW, FAITHFUL STEWARDS IS NOT A CHARITABLE

23   ORGANIZATION, RIGHT?

24   **A**   THAT IS CORRECT.

25   **Q**   IT'S NOT A 501(C)(3)?

**A**    CORRECT.

**Q**    YOU CAN'T MAKE TAX DEDUCTIBLE DONATIONS, RIGHT?

**A**    YOU MEAN PEOPLE CAN'T MAKES TAX DONATIONS TO ME?

**Q**    TO YOU, RIGHT.

**A**    RIGHT.

**Q**    IT'S A FOR-PROFIT COMPANY?

**A**    YES, SIR.

**Q**    AND SO WHEN YOU TALK ABOUT DONATIONS TO YOUR MINISTRY, AT LEAST FROM A TAX PERSPECTIVE THIS WAS A BUSINESS, NOT A MINISTRY, RIGHT?

**A**    IT IS A MINISTRY, SIR.

**Q**    YOU DIDN'T WANT ANYBODY TO KNOW THAT YOU MADE MONEY WHEN THEY INVESTED, DID YOU?

**A**    THAT IS YOUR STATEMENT, NOT MINE.

**Q**    YES OR NO, DID YOU WANT ANYBODY TO KNOW THAT YOU MADE MONEY WHEN THEY INVESTED?

**A**    I DIDN'T CARE IF THEY KNEW OR NOT.  ANYBODY THAT ASKED ME, I TOLD THEM.

**Q**    LOOKING AT EXHIBIT 304, DIDN'T YOU TELL JOE ELWELL THAT YOU DIDN'T MAKE ANY MONEY WHEN HE INVESTED?

**A**    I TOLD JOE ELWELL I DIDN'T MAKE ANY MONEY OFF OF HIS INVESTMENT, YES, THAT'S CORRECT.

**Q**    DIDN'T YOU ACTUALLY SAY THAT YOU RECEIVED NO FEE WHEN HE INVESTED?

**A**    I DID NOT RECEIVE ANY FEES FROM HIS INVESTMENT,

1    THAT'S CORRECT.

2    **Q**    BUT YOU RECEIVED A FEE FROM SURE LINE?

3    **A**    I RECEIVED A DONATION FROM SURE LINE AND I'M ASSUMING

4    IT PAID ON HIS.

5    **Q**    LET'S LOOK AT EXHIBIT 171.  THIS IS A PICTURE OF

6    SOLID ROCK BAPTIST CHURCH IN GRANITE FALLS, NORTH

7    CAROLINA.  DO YOU RECALL THAT ONE?

8    **A**    I DO NOT.

9    **Q**    BUT YOU WENT THERE?

10   **A**    I DON'T RECALL.

11   **Q**    SO YOU DON'T RECALL GIVING A PRESENTATION AT ALL?

12   **A**    I DON'T RECALL ANY PARTICULAR CHURCH.  I HAVE BEEN

13   DOING THESE FOR 16 YEARS.

14   **Q**    OKAY.  WELL, LET'S LOOK AT EXHIBIT 141, I BELIEVE.

15   THIS IS YOUR CONFERENCE SCHEDULE FOR 2011; IS THAT RIGHT?

16   **A**    YES, SIR.

17   **Q**    AND SEPTEMBER 27 YOU WENT TO SOLID ROCK BAPTIST

18   CHURCH IN GRANITE FALLS, NORTH CAROLINA?

19   **A**    I'M ASSUMING I DID, IT'S ON THE SCHEDULE.

20   **Q**    OKAY.  AND LOOKING AT EXHIBIT 170, TYPICALLY YOU

21   WOULD SPEAK IN THE SANCTUARY, RIGHT?

22   **A**    IT WAS EITHER THE SANCTUARY OR WHAT WE CALL THE

23   FELLOWSHIP HALL.

24   **Q**    I'D LIKE YOU TO LOOK AT EXHIBIT 209T, PAGE TWO.

25   LET'S ZOOM IN ON CLIP TWO HERE.

1      DIDN'T YOU SAY IN THAT PRESENTATION:  WHEN YOU WRITE

2  A CHECK FOR THIS COMPANY I DON'T GET ANY MONEY?

3  **A**    I DID.

4  **Q**    WASN'T THAT FALSE?

5  **A**    NO, SIR.  I DID NOT GET ANY MONEY FOR THE CHECK THAT

6  THEY WROTE.  THAT IS A TRUE STATEMENT.

7  **Q**    SURE LINE WROTE YOU A CHECK WHEN CHECKS GOT SENT IN

8  FROM THE INVESTORS, RIGHT?

9  **A**    WHEN CHECKS GOT SENT TO SURE LINE, SURE LINE THEN

10  MADE A DONATION TO MY MINISTRY, YES, SIR.

11  **Q**    SO WHEN SOMEBODY WROTE A CHECK TO THE COMPANY, YOU

12  WOULD GET MONEY THE NEXT DAY OR THE NEXT WEEK, RIGHT?

13  **A**    WELL, AS I SAID BEFORE, I DON'T KNOW -- FIRST OF ALL,

14  I DON'T KNOW THAT I GOT A CHECK.  LET'S GO TO THIS

15  STATEMENT.  WHEN I SAY, YOU WRITE A CHECK FOR THIS

16  COMPANY, I DON'T GET ANY MONEY, I'M REFERRING TO THE FACT

17  I DON'T GET ANY MONEY FROM THAT CHECK.

18  **Q**    YOU DON'T SAY, I DON'T GET MONEY FROM THAT CHECK,

19  RIGHT?

20  **A**    NO.

21  **Q**    YOU SAY YOU DON'T GET ANY MONEY AT ALL.

22  **A**    WELL, THAT'S YOUR INFERENCE BUT THAT'S NOT MY

23  INTENTION.

24  **Q**    YOUR SON --

25  **A**    I'M SORRY?

1  **Q**    YOUR SON DIDN'T KNOW THAT YOU GOT MONEY WHEN

2  INVESTMENTS WERE MADE, DID HE?

3  **A**    I CAN'T TESTIFY TO WHAT HE KNEW AND DID NOT KNOW.

4  **Q**    YOU CAN TELL ME THAT YOU DIDN'T TELL HIM, RIGHT?

5  **A**    I DON'T RECALL IF I EVER TOLD HIM OR NOT.

6  **Q**    YOU DIDN'T TELL DONNIE HENDERSON EITHER?

7  **A**    I DON'T RECALL IF I EVER TOLD HIM OR NOT.  BOTH DON

8  AND I HAVE BEEN IN SALES ALL OF OUR LIFE.

9  **Q**    YOUR BROTHER-IN-LAW ACTUALLY FOUND OUT FROM THE U.S.

10  ATTORNEY'S OFFICE, NOT FROM YOU, THAT YOU WERE GETTING

11  10 PERCENT ON THE MONEYS INVESTED, DIDN'T HE?

12  **A**    I DON'T KNOW WHEN HE FOUND OUT.

13  **Q**    YOU TOLD PEOPLE THAT YOU STARTED YOUR RELATIONSHIP

14  WITH SURE LINE AS AN INVESTOR, RIGHT?

15  **A**    YES, I DID.

16  **Q**    AND THAT WAS FALSE?

17  **A**    WELL, AGAIN, THE INVESTMENT THAT I HAD WITH SURE LINE

18  INITIALLY WAS INVESTING IN MY TIME, MY MINISTRY AND MY

19  FAITH IN THEM.

20  **Q**    LET'S PUT UP EXHIBIT 204T AT PAGE THREE.  LET'S ZOOM

21  IN ON THE CENTER OF THAT BOTTOM PARAGRAPH.

22      YOU SAY HERE THAT YOU CAME IN AS AN INVESTOR.  WAS

23  THAT TRUE?

24  **A**    I DID SAY THAT, YES, SIR.

25  **Q**    WAS IT TRUE THAT YOU CAME IN AS AN INVESTOR?

1   **A**   I DID.

2   **Q**   LET'S LOOK AT EXHIBIT 201T, PAGE ONE.  LET'S ZOOM IN

3   ON CLIP TWO, THAT WHOLE BOTTOM HALF, IF WE COULD.

4      YOU TALK HERE ABOUT A LAWYER FROM ATLANTA, GEORGIA,

5   AND YOU TELLING HIM THAT YOU'RE NOT INVESTING, RIGHT?

6   **A**   WHICH PARAGRAPH ARE YOU?

7   **Q**   SORRY, LET'S LOOK AT THE SECOND PARAGRAPH.

8   **A**   I WAS TALKING TO A LAWYER IN ATLANTA, GEORGIA.  I SEE

9   THAT.  AND YOUR QUESTION WAS?

10  **Q**   YOU'RE TELLING PEOPLE HERE THAT YOU WERE HAVING A

11  CONVERSATION WITH A LAWYER FROM ATLANTA, RIGHT?

12  **A**   YES, SIR.

13  **Q**   THAT'S GREG BARTKO, RIGHT?

14  **A**   YES, SIR.

15  **Q**   AND HE ASKED YOU IF YOU'RE INVESTING?

16  **A**   YES, SIR.

17  **Q**   HE DIDN'T MEAN YOUR TIME, RIGHT?

18  **A**   NO, HE ASKED ME SPECIFICALLY WHERE I WAS PUTTING MY

19  MONEY.

20  **Q**   RIGHT.  AND YOU TELL HIM, ACCORDING TO THIS, THAT

21  YOU'RE NOT INVESTING?

22  **A**   I'M NOT INVESTING MY MONEY, CORRECT.

23  **Q**   AND THEN HE TELLS YOU THAT YOU ARE SUPPOSED TO BE

24  INVESTING?

25  **A**   CORRECT.

**Q**     THAT'S WHAT YOU ARE TELLING THOSE PEOPLE.  AND YOU

SAY -- AND THEN HE TELLS YOU ABOUT THIS FUND, RIGHT?

**A**     YES, SIR.

**Q**     AND THIS IS, AGAIN, WHAT YOU ARE SAYING AT SOUTH

HAVEN BAPTIST CHURCH?

**A**     I'M ASSUMING THAT'S WHERE THAT CLIP IS FROM.

**Q**     AND HE SAYS THAT IT'S COLLATERALIZED, RIGHT?

**A**     WHICH LINE ARE YOU ON?  YEAH, IT'S COLLATERALIZED.

**Q**     AND THAT YOU ASKED, ACCORDING TO THIS, WHEN YOU GET

YOUR INTEREST; IS THAT RIGHT?

**A**     I SAID, IS IT SAFE?  HE SAID IT'S COLLATERALIZED.  I

SAID, WHAT DOES THAT MEAN?  EVERY DOLLAR YOU HAVE IN THE

FUND HAS A DOLLAR WORTH OF COLLATERAL.  THAT MEANS YOUR

PRINCIPAL IS ALWAYS COLLECTED.  YEAH, BUT WHEN YOU GET

YOUR INTEREST.

**Q**     AND HIS ANSWER, ACCORDING TO THIS, IS THE FIRST

BUSINESS DAY OF EACH MONTH?

**A**     YOU GET YOUR INTEREST THE FIRST BUSINESS DAY OF EACH

MONTH.

**Q**     AND YOU SAY THEN THAT -- YOU SAID, I'M IN?

**A**     I DID SAY THAT, MEANING THAT I LIKE THE IDEA, IT

SOUNDED GOOD TO ME.

**Q**     NOT MEANING THAT YOU ACTUALLY INVESTED YOUR MONEY?

**A**     AT THIS TIME I HAD NOT INVESTED A PENNY.

**Q**     DON'T YOU THINK THAT THIS SUGGESTS TO PEOPLE THAT YOU

1  HAD ACTUALLY INVESTED MONEY IN IT?

2  **A**    I DON'T KNOW WHAT IT SUGGESTED TO THEM.

3  **Q**    ISN'T THAT WHAT YOU WANTED THEM TO THINK?  WASN'T

4  THAT YOUR GOAL?

5  **A**    MY GOAL WAS, AS I STATED BEFORE, TO PUT THESE PEOPLE

6  IN A POSITION WHERE THEY COULD BE SECURE AND I WANTED TO

7  HELP THEM ANY WAY I COULD.  SO I WAS SERIOUS ABOUT WHAT I

8  WAS DOING.  I BELIEVED IN WHAT I WAS DOING.

9  **Q**    LET'S FLIP OVER TO ACTUALLY PAGE TWO OF THIS CLIP OF

10  THIS EXHIBIT.  ACTUALLY, LET'S LOOK AT PAGE THREE.  OKAY,

11  THIS IS THE PAGE I'M LOOKING FOR, THIS IS PAGE FIVE.

12  LET'S ZOOM IN ON THE MIDDLE OF THIS PARAGRAPH, THIS LARGE

13  PARAGRAPH.

14      IN THIS PARAGRAPH YOU SAY THAT YOU STARTED TELLING

15  PEOPLE, THAT'S WHERE I HAVE EVERY DIME OF MY MONEY, I'M

16  NOT HOLDING BACK ONE PENNY, RIGHT?

17  **A**    I'M LOOKING FOR IT.  YES, I WAS TALKING TO THE

18  INVESTMENT MONEY THAT CATHY AND I HAVE, YES, SIR.  EVERY

19  DIME OF OUR INVESTMENT MONEY WAS IN THE PROGRAM.

20  **Q**    AND THEN DOWN HERE YOU SAY, SO SIX MONTHS LATER,

21  EIGHT MONTHS LATER, I CALLED THEM UP AND I SAID I GOT A

22  PROBLEM, RIGHT?

23  **A**    YES, SIR.

24  **Q**    AREN'T YOU SUGGESTING HERE THAT SIX MONTHS, EIGHT

25  MONTHS LATER AFTER YOU INVESTED, AFTER YOU STARTED

1  REFERRING THIS TO PEOPLE, YOU CALLED THEM UP.  ISN'T THAT

2  WHAT THIS SUGGESTS?

3  **A**    THAT SUGGESTS WHAT, SIR?  I'M SORRY, I MISSED YOUR --

4  I DIDN'T GRAB WHAT YOU ARE SAYING.

5  **Q**    AREN'T YOU TELLING PEOPLE THAT YOU CALLED THEM UP

6  ABOUT SIX OR EIGHT MONTHS AFTER YOU INVESTED?

7  **A**    I SPECIFICALLY SAID, SO SIX OR EIGHT MONTHS LATER I

8  CALLED THEM UP AND I SAID I GOT A PROBLEM.  I DID SAY THAT

9  STATEMENT, YES, SIR.

10  **Q**    THAT MEANS SIX OR EIGHT MONTHS AFTER YOU INVESTED

11  EVERY DIME OF YOUR MONEY?

12  **A**    YES, SIR.

13  **Q**    AND AT THAT POINT YOU SAY, I WANT TO BE ON THE BOARD

14  OF DIRECTORS TO PROTECT PEOPLE'S MONEY?

15  **A**    I SAID, I WANT TO BE ON THE BOARD OF DIRECTORS.

16  **Q**    WELL, YOU SAID HERE, I'M CONCERNED EVERYBODY IS DOING

17  WHAT I TELL THEM TO DO AND I GOT NO CONTROL OVER THEM,

18  RIGHT, OVER YOU GUYS?

19  **A**    WHERE DO YOU WANT ME TO READ, YOUR HIGHLIGHT OR YOUR

20  RED LINE?

21      I'M CONCERNED, PEOPLE -- EVERYBODY'S DOING WHAT I

22  TELL THEM TO DO AND I HAD NO CONTROL OVER YOU GUYS.

23      YES, SIR, I SAID THAT.

24  **Q**    AND SO YOU SAY, I WANT TO BE ON THE BOARD OF

25  DIRECTORS?

1    **A**    I WOULD LIKE TO BE ON THE BOARD OF DIRECTORS, YES,

2    SIR.

3    **Q**    BUT YOU WERE ACTUALLY ON THE BOARD OF DIRECTORS A

4    FULL YEAR BEFORE YOU EVER INVESTED, RIGHT?

5    **A**    I DON'T REMEMBER THE TIMELINE, I'M SORRY.

6            **THE COURT:**  MR. BRAGDON, IT'S TIME FOR THE

7    LADIES AND GENTLEMEN OF THE JURY TO HAVE THEIR AFTERNOON

8    BREAK.

9        DON'T TALK ABOUT THE CASE, DON'T LET ANYBODY TALK

10   ABOUT THE CASE WITH YOU.  WE'LL HAVE A 15 MINUTE RECESS.

11   FOLLOW MY OTHER INSTRUCTIONS.  EVERYONE REMAIN SEATED

12   WHILE THE LADIES AND GENTLEMEN OF THE JURY LEAVE THE ROOM.

13       (RECESS TAKEN.)

14           **THE COURT:**  LET'S BRING THE JURY BACK.

15       (JURORS ENTER INTO THE COURTROOM.)

16           **THE COURT:**  WELCOME BACK, LADIES AND GENTLEMEN.

17   HOPE YOU ALL ENJOYED THE BREAK.  I JUST NEED TO CONFIRM

18   YOU DIDN'T TALK ABOUT THE CASE AND YOU FOLLOWED MY OTHER

19   INSTRUCTIONS.

20       YOU MAY CONTINUE CROSS-EXAMINATION, MR. BRAGDON.

21           **MR. BRAGDON:**  THANK YOU, YOUR HONOR.

22   **BY MR. BRAGDON:**

23   **Q**    SO WE WERE TALKING ABOUT HOW THIS BASICALLY SAYS SIX

24   OR EIGHT MONTHS LATER AFTER YOU INVESTED EVERY DIME OF

25   YOUR MONEY THAT YOU SAID YOU WANTED TO BE ON THE BOARD OF

1  DIRECTORS, RIGHT?

2  **A**   YES, SIR.

3  **Q**   NOW, LET'S LOOK AT EXHIBIT 294.  LET'S ZOOM IN ON

4  THAT A LITTLE BIT.

5      IN TERMS OF YOU PERSONALLY, YOU DIDN'T ACTUALLY

6  INVEST ANY MONEY, RIGHT?

7  **A**   I INVESTED.  I GIVE CATHY MONEY FOR HER 401K, YES,

8  SIR.

9  **Q**   BUT EVERYTHING WAS DONE THROUGH HER 401K?

10  **A**   YES, SIR.

11  **Q**   THE FIRST INVESTMENT WAS MAY OF 2007; IS THAT RIGHT?

12  **A**   THAT'S WHAT IT SHOWS HERE, YES, SIR.

13  **Q**   TO THE BEST OF YOUR MEMORY THAT'S CORRECT?

14  **A**   I JUST HAVE TO ASSUME, YES, SIR.  I DON'T KNOW.

15  **Q**   LOOKING AT EXHIBIT 41, THIS IS AN E-MAIL.  WHAT'S THE

16  DATE ON THIS E-MAIL?

17  **A**   MARCH OF '07.

18  **Q**   AND IT SHOWS -- IT TALKS ABOUT A TRI-FOLD FLYER?

19  **A**   YES.

20  **Q**   LET'S LOOK AT THE ATTACHMENT TO THE E-MAIL.  SO IN

21  MARCH OF 2007 YOU ARE LISTED AS A DIRECTOR, RIGHT?

22  **A**   THAT'S WHAT IT LOOKS LIKE, SIR.

23  **Q**   DIDN'T YOU ESSENTIALLY BECOME A DIRECTOR PRETTY MUCH

24  RIGHT AFTER THE TIME YOU WENT DOWN AND MET JIM KIRK IN

25  NORTH CAROLINA IN JULY OF 2006?

1   **A**   I HONESTLY DO NOT REMEMBER THE TIMELINE AT ALL.

2   **Q**   WELL, THE TIMELINE IS THE OPPOSITE OF WHAT YOU SAID

3   IN YOUR PRESENTATION, RIGHT?

4   **A**   YOU'LL HAVE TO BE MORE SPECIFIC ABOUT THE

5   PRESENTATION AND THE TIMELINE.

6   **Q**   LET'S LOOK AT EXHIBIT 206T, PAGE TWO, TOP HALF.

7   HERE'S ANOTHER TELLING OF THIS STORY AT NEW ZION

8   BAPTIST CHURCH.  YOU ARE SAYING YOU WERE LOOKING FOR A

9   PLACE TO PUT YOUR INVESTMENT, RIGHT?

10  **A**   GIVE ME A LINE TO LOOK AT.

11  **Q**   AT THE TOP.

12  **A**   I WAS LOOKING FOR A PLACE TO PUT MINE.

13  **Q**   IF YOU SEE ON THE RED LINE THAT I PUT ON THE SCREEN:

14  AN SEC ATTORNEY RECOMMENDED A LITTLE COMPANY IN NORTH

15  CAROLINA?

16  **A**   YES, SIR.

17  **Q**   AND HE TOLD YOU IT WAS THE CAR BUSINESS?

18  **A**   YES, SIR.

19  **Q**   AND THEN YOU SAY DOWN HERE:  WHEN I SAW THEY WERE A

20  LEGITIMATE BUSINESS I INVESTED WITH THEM.

21  YOU SEE THE RED LINE?

22  **A**   I DO SEE IT.

23  **Q**   YOU SAID THAT?

24  **A**   YES, SIR.

25  **Q**   THIS IS SOMETHING YOU SAID AT A LOT OF THE

1  PRESENTATIONS, RIGHT, NOT JUST THIS ONE?

2  **A**    I DON'T KNOW HOW MANY I SAID THAT AT, SIR.

3  **Q**    AND THEN YOU SAY THAT AFTER YOU INVESTED PEOPLE

4  STARTED ASKING YOU ABOUT WHERE YOU INVESTED AND YOU TOLD

5  THEM ABOUT THIS COMPANY, RIGHT?

6  **A**    YES, SIR.

7  **Q**    BUT YOU STARTED PUSHING AND SELLING SURE LINE LONG

8  BEFORE YOU EVER INVESTED, RIGHT?

9  **A**    NO, SIR, I NEVER SOLD SURE LINE.

10 **Q**    YOU STARTED REFERRING PEOPLE TO SURE LINE LONG BEFORE

11 YOU EVER INVESTED, DIDN'T YOU?

12 **A**    I STARTED REFERRING PEOPLE TO SURE LINE BEFORE I

13 INVESTED ANY MONEY, YES, SIR.

14 **Q**    WELL, AND THIS IS TALKING ABOUT A FINANCIAL

15 INVESTMENT, ISN'T IT?

16 **A**    WHICH LINE ARE YOU REFERRING TO?

17 **Q**    YOU WERE TALKING ABOUT A PLACE TO PUT YOURS AND THEN

18 YOU TALK ABOUT HOW YOU INVESTED WITH THEM?

19 **A**    WELL, THAT'S ABOUT 20 LINES AWAY FROM EACH OTHER.

20        I WAS LOOKING FOR A GOOD PLACE TO PUT MY MONEY AND

21 THEN I THOUGHT I FOUND A GOOD PLACE TO PUT MY MONEY, YES,

22 SIR.  THEN IT SAYS HERE:  SO WHEN I SAW THEY WERE A

23 LEGITIMATE BUSINESS I INVESTED WITH THEM.

24        AND, AGAIN, IN MY TERMINOLOGY, I STARTED INVESTING

25 MYSELF AND MY BUSINESS, MY COMPANY, IN THERE.

1  **Q**    WHEN YOU SAID THESE WORDS, "I INVESTED WITH THEM,"

2  YOU ARE TELLING US YOU DIDN'T MEAN MONEY?

3  **A**    YES, SIR.

4  **Q**    WELL, WHEN YOU TOLD THIS STORY, PEOPLE GENERALLY

5  DIDN'T ASK YOU IF YOU MADE ANY COMMISSIONS, DID THEY?

6  **A**    EVERY TIME ANYONE ASKED ME IF I MADE ANY MONEYS AT

7  ALL, I ALWAYS ANSWERED IN THE AFFIRMATIVE, WE DID NOT MAKE

8  ANY COMMISSIONS, NO, SIR.

9  **Q**    WELL, EXCEPT FOR JOE ELWELL, YOU DIDN'T TELL HIM YOU

10  MADE ANY MONEY WHEN HE ASKED YOU, RIGHT?

11  **A**    I DON'T RECALL THAT CONVERSATION AT ALL, BUT I'VE

12  ALWAYS TOLD ANYBODY WHO ASKS ME IF THEY SAY, "DO YOU MAKE

13  ANY MONEY," I ALWAYS TOLD THEM I MADE MONEY FROM THE CAR

14  BUSINESS.

15  **Q**    WELL, SOLID ROCK BAPTIST CHURCH TOO, YOU SAID WHEN

16  YOU WRITE A CHECK FOR THIS COMPANY I DON'T GET ANY MONEY.

17  **A**    I DON'T GET ANY MONEY FROM THAT CHECK, THAT'S

18  CORRECT.

19  **Q**    BUT I DON'T THINK YOU ACTUALLY ANSWERED MY QUESTION.

20  **A**    TRY ME AGAIN.

21  **Q**    MY QUESTION WAS:  WHEN YOU TOLD THIS STORY, PEOPLE

22  GENERALLY DIDN'T ASK YOU IF YOU GOT ANY MONEY FROM THEIR

23  INVESTMENT, DID THEY?  YOU DIDN'T GET THAT ASKED THAT

24  QUESTION MUCH, DID YOU?

25  **A**    I DON'T RECALL ANYBODY AT THE CHURCH ASKING ME THAT

1  QUESTION, NO, SIR.

2  **Q**  I'M TALKING ABOUT IN GENERAL.

3  **A**  I CAN'T ANSWER IN GENERAL.

4  **Q**  OF THE HUNDREDS AND THOUSANDS OF PEOPLE YOU TOLD

5  ABOUT SURE LINE, YOU ONLY GOT ASKED A COUPLE TIMES IF YOU

6  MADE A COMMISSION?

7  **A**  I DON'T KNOW, SIR.  I DON'T KNOW HOW MANY TIMES I GOT

8  ASKED.

9  **Q**  HOW MANY TIMES WAS IT, I'M ASKING YOU.

10  **A**  I CAN'T GIVE YOU A NUMBER BUT EVERY TIME I WAS ASKED

11  I ALWAYS ANSWERED TRUTHFULLY.

12  **Q**  IT WASN'T SOMETHING PEOPLE ASKED BECAUSE YOU MADE IT

13  SOUND LIKE YOU WERE JUST AN INVESTOR TOO, DIDN'T YOU?

14  **A**  I DON'T KNOW WHY THEY DID OR DID NOT ASK, SIR.  YOU

15  ARE ASKING ME TO SPECULATE ON WHAT THEY THINK AND I CAN'T

16  TELL YOU THAT.

17  **Q**  WASN'T WHETHER OR NOT YOU MADE MONEY, WASN'T THAT AN

18  IMPORTANT FACTOR FOR PEOPLE TO KNOW?

19  **A**  I DON'T KNOW, SIR.

20  **Q**  YOU ALSO TOLD MANY, MANY INVESTORS THAT YOU BOUGHT

21  20 PERCENT OF THE COMPANY, DIDN'T YOU?

22  **A**  I DID SAY THAT, YES, SIR.

23  **Q**  THAT WAS FALSE?

24  **A**  WELL, I DON'T KNOW IF IT WAS OR NOT.  WHEN I ASKED TO

25  BE A PART OWNER, WHEN I ASKED TO OWN SOME STOCK OR BE A

PART OF THE COMPANY, I INITIALLY ASKED IF THEY WOULD GIVE
ME PART OF THE COMPANY.  I LATER ON ASKED IF I COULD BUY A
PART OF THE COMPANY.  I THINK THAT'S IN THE RECORD.

I GOT STOCK, YES, SIR, I DID.  I GOT, LIKE ON TWO
DIFFERENT OCCASIONS, CATHY AND I HAD A CONVERSATION ABOUT
IT AND HER FIRST COMMENT WAS THERE'S NO REASON WHY THEY
WOULD EVEN GIVE YOU ANY OF THEIR STOCK OR ANY PART OF THE
COMPANY.  I SAID IT DOESN'T HURT TO ASK.

AT ONE TIME WE SPECULATED THAT PERHAPS THEY GAVE ME
STOCK IN LIEU OF DONATIONS.  WE NEVER DISCUSSED IT PAST
THAT DAY.  THE STOCK CAME, I DID NOT LOOK A GIFT HORSE IN
THE MOUTH, I TOOK THE STOCK.  SO WHEN I SAID I BOUGHT INTO
THE COMPANY, I MAY HAVE.

**Q**    DO YOU THINK YOU MIGHT HAVE PAID MONEY FOR YOUR
STOCK?

**A**    I THINK IT'S VERY POSSIBLE, YES, SIR, IN MONEYS THAT
THEY WOULD NORMALLY SEND ME IN DONATIONS.  IN LIEU OF
DONATIONS, THEY SEND ME STOCK.

**Q**    YOU JUST HAVE NO IDEA BECAUSE YOU WEREN'T PAYING
ATTENTION TO THE MONEY?

**A**    I NEVER KNEW -- IF YOU WALKED UP TO ME AND SAID HERE,
MR. KIMMEL, HERE'S A THOUSAND DOLLARS FOR YOUR MINISTRY, I
WOULDN'T ASK YOU FOR YOUR MOTIVATION BEHIND IT OR WHERE
YOU GOT IT OR IF I REFERRED SOMEBODY TO YOUR LAW FIRM.  I
TAKE IT AS A BLESSING FROM THE LORD AND I WOULD TAKE IT.

1    I HAVE NO TROUBLE WITH THAT.

2    **Q**    BUT THERE WERE NO NEGOTIATIONS ABOUT PURCHASING THE

3    STOCK?

4    **A**    SAY AGAIN, THERE WAS NO WHAT?

5    **Q**    THERE WERE NO NEGOTIATIONS ABOUT PURCHASING THE

6    STOCK, RIGHT?

7    **A**    NO, JUST MY ASKING AND RECEIVING.

8    **Q**    YOU DIDN'T SIT DOWN ACROSS THE TABLE AND NEGOTIATE,

9    RIGHT?

10   **A**    CORRECT.

11   **Q**    IT WASN'T A PERIOD THAT TOOK SIX MONTHS?

12   **A**    CORRECT.

13   **Q**    IT WASN'T EVEN A PERIOD THAT -- IT WASN'T EVEN

14   SOMETHING THAT TOOK ONE MONTH, RIGHT?

15   **A**    WELL, I THINK IT WAS ABOUT SIX OR EIGHT MONTHS SPAN

16   BETWEEN THE FIRST SHARES I GOT AND THE SECOND SHARES I

17   GOT.  I BELIEVE THERE WAS, BECAUSE I DON'T REMEMBER WHEN I

18   GOT THE FIRST ONES BUT I REMEMBER I GOT THE SECOND ONES IN

19   DECEMBER.

20   **Q**    BUT THERE WAS NOT A LOT OF DISCUSSION ABOUT IT,

21   RIGHT?

22   **A**    I DON'T KNOW WHAT THEY HAD ON THEIR END.  THERE

23   WASN'T ON MINE.  I ASKED FOR IT AND THEN DROPPED IT.

24   **Q**    YOU ACTUALLY GOT YOUR FIRST SHARES WITHIN ABOUT A

25   MONTH OF WHEN YOU ASKED, RIGHT?

1   **A**    I DON'T RECALL THAT, I'M SORRY.

2   **Q**    LET'S LOOK AT EXHIBIT 206T, PAGE TWO, BOTTOM HALF.

3   LET'S LOOK AT, I GUESS ABOUT THE FIFTH LINE THAT'S UP

4   HERE.

5        DIDN'T YOU TELL NEW ZION BAPTIST CHURCH THAT AFTER A

6   BUNCH OF NEGOTIATIONS ABOUT AFTER SIX MONTHS OF WORK I

7   ENDED UP BUYING 20 PERCENT OF THE COMPANY.  AND THAT'S

8   UNTRUE?

9   **A**    I ASSUME THAT'S A TRUE TRANSCRIPT.

10  **Q**    YEAH, BUT THE STATEMENT TO THE CHURCH, THE STATEMENT

11  YOU MADE WAS UNTRUE, WASN'T IT?  YOU DIDN'T HAVE

12  NEGOTIATIONS; YOU DIDN'T DO SIX MONTHS OF WORK TO GET THE

13  STOCK, RIGHT?

14  **A**    I KNOW THERE WAS ABOUT SIX OR EIGHT MONTHS BETWEEN

15  THE FIRST AND SECOND, I REMEMBER THAT.

16  **Q**    YOU JUST TOLD US THERE WEREN'T REALLY ANY

17  NEGOTIATIONS, RIGHT?

18  **A**    RIGHT.

19  **Q**    YOU ARE NOT CHANGING YOUR STORY ABOUT THAT, ARE YOU?

20  **A**    NO, WHAT I JUST ANSWERED WAS I SAID I KNOW THERE WAS

21  BETWEEN SIX OR EIGHT MONTHS BEFORE I GOT THE SECOND ONE.

22  **Q**    BUT THERE WEREN'T A BUNCH OF NEGOTIATIONS.  THAT PART

23  IS FALSE, RIGHT?

24  **A**    I DON'T RECALL ANY NEGOTIATIONS, NO, SIR.

25  **Q**    SO YOU LIED ABOUT THAT?

1  **A**    BUT YOU HAVE TO REMEMBER, I TRAVELED 35 TO 40 WEEKS A

2  YEAR AND I PREACHED ALMOST EVERY WEEK AND I TALKED TO

3  THOUSANDS OF PEOPLE.  I TOLD STORIES AGAIN AND AGAIN AND

4  AGAIN AND I'M SURE SOME OF THIS STUFF RUNS TOGETHER.

5  **Q**    YOU ARE SAYING THAT WAS JUST A MISTAKE?

6  **A**    I DON'T KNOW.  YES, THAT WAS A MISTAKE.

7  **Q**    WELL, LET'S LOOK AT EXHIBIT 57, PAGE ONE.  LET'S ZOOM

8  IN ON THE TOP HALF FOR A SECOND.

9     THIS IS A LETTER DATED AUGUST 16, 2008, FROM YOU TO

10  JIM KIRK, RIGHT?

11  **A**    YES, SIR.

12  **Q**    IT'S ABOUT A MONTH AFTER YOU MET HIM IN NORTH

13  CAROLINA AND AGREED TO RAISE MONEY FOR HIM IN EXCHANGE FOR

14  A 10 PERCENT COMMISSION, RIGHT?

15  **A**    WELL, YOUR STATEMENT IS NOT TRUE.  IT'S ABOUT A MONTH

16  AFTER MY MEETING WITH JIM KIRK WHERE THEY AGREE TO MAKE

17  DONATIONS TO MY MINISTRY.

18  **Q**    OKAY.  ABOUT A MONTH BEFORE THIS LETTER YOU HAD GONE

19  TO NORTH CAROLINA?

20  **A**    I HAD, YES, SIR.

21       **THE COURT:**  YOU SAID THE LETTER WAS '08.  IT'S

22  '06, RIGHT?

23       **MR. BRAGDON:**  SORRY.  THAT'S MY MISTAKE, YOUR

24  HONOR.

25  **BY MR. BRAGDON:**

1   Q    SO IT'S AUGUST 16, 2006; IS THAT RIGHT?

2   A    YES, SIR.

3   Q    LET'S LOOK AT PAGE 2 FIRST.  LET'S ZOOM IN ON THE

4   THIRD PARAGRAPH.

5        YOU SAY IN THAT, ABOUT THE THIRD AND FOURTH LINE

6   THERE:  OUR CURRENT AGREEMENT WOULD REMAIN IN EFFECT AS IT

7   IS TODAY?

8   A    YES, SIR.

9   Q    THE AGREEMENT THAT YOU GET 10 PERCENT FOR EVERY

10  DOLLAR YOU RAISE, RIGHT?

11  A    NO, SIR.

12  Q    WHAT AGREEMENT?

13  A    THE AGREEMENT IS, AS I'VE STATED BEFORE, THAT I WOULD

14  REFER PEOPLE TO SURE LINE AND THEY WOULD MAKE DONATIONS TO

15  MY MINISTRY.  IT WAS NEVER ONE-FOR-ONE, IT WAS JUST I

16  WOULD REFER, THEY WOULD MAKE DONATIONS.

17  Q    DONATIONS OF WHATEVER AMOUNT THEY WANTED?

18  A    WHATEVER THEY DECIDED, AS ANY CHURCH DOES.  I RECEIVE

19  DONATIONS FROM CHURCHES AS WELL AND I NEVER DECIDE WHAT

20  THEY GIVE.  WHATEVER THEY GIVE IS WHAT I GET.

21  Q    AND IN THIS PARAGRAPH YOU ASK FOR 10 PERCENT OF THE

22  COMPANY?

23  A    YES, SIR.

24  Q    YOU DON'T ASK TO BUY IT?

25  A    NO, SIR.

1  Q    YOU DON'T OFFER TO PAY ANY MONEY FOR IT?

2  A    IN THIS LETTER, NO, SIR.

3  Q    AND YOU SAY THAT YOU DON'T WANT TO BE A PART OF THE

4  DAY-TO-DAY OPERATIONS?

5  A    CORRECT.

6  Q    YOU DON'T WANT TO BE PART OF RUNNING THE COMPANY?

7  A    CORRECT.

8  Q    YOU JUST WANT TO GET NEW BUSINESS?

9  A    I'M SORRY?

10 Q    YOU WANT TO PROCURE NEW BUSINESS, NEW NOTES?

11 A    WELL, AGAIN, THAT'S YOUR WORDS.  I ALWAYS JUST -- IT

12 WAS REFERRED TO AS I WAS REFERRING PEOPLE TO SURE LINE.

13 WHETHER THEY BOUGHT IT OR NOT, THAT WAS THEIR BUSINESS.

14 Q    I ACTUALLY THOUGHT IT WAS YOUR WORDS.  DIDN'T YOU SAY

15 MY MISSION WOULD BE THAT OF PROCURING NEW BUSINESS?

16 A    THERE IT IS.  YES, SIR, I DID SAY THAT.  SORRY, MY

17 MISTAKE.

18 Q    AND YOU THOUGHT IT WOULD BE EASIER TO GET NEW NOTES,

19 NEW BUSINESS, IF YOU COULD ANNOUNCE PUBLICLY THAT THIS WAS

20 YOUR COMPANY?

21 A    THAT'S WHAT IT SAYS THERE.

22 Q    NO, THAT'S WHAT YOU SAID, RIGHT?

23 A    THAT'S WHAT I SAID.

24 Q    AND THAT'S TRUE, RIGHT?

25 A    I WOULD THINK SO, YES, SIR.

1  **Q**    WHAT YOU WROTE IN THIS LETTER WAS NOT FALSE.  IT WAS

2  EASIER TO PROCURE MONEY FOR THE NOTES IF YOU COULD SAY

3  THIS WAS YOUR BUSINESS?

4  **A**    YES, SIR.

5  **Q**    AND YOU ALSO -- NOW, GIVE ME JUST A SECOND.

6      (PAUSE IN THE PROCEEDINGS.)

7      WHEN YOU TALK ABOUT NEW BUSINESS HERE, YOU ARE NOT

8  TALKING ABOUT SELLING CARS, RIGHT?

9  **A**    CORRECT.

10  **Q**    YOU ARE TALKING ABOUT GETTING NOTE HOLDERS?

11  **A**    TALKING ABOUT?

12  **Q**    REFERRING NOTE HOLDERS.

13  **A**    CORRECT.

14  **Q**    LET'S TURN BACK TO PAGE ONE AND LET'S LOOK AT THE

15  BOTTOM HALF HERE, STARTING WITH THE NUMBERED LIST

16  "CREDIBILITY" ALL THE WAY TO THE BOTTOM.

17      YOU SAY HERE, ABOUT THE MIDDLE OF THAT "CREDIBILITY"

18  PARAGRAPH, THAT WE AS A GROUP ARE VERY SLOW TO MOVE AND WE

19  ARE VERY CAREFUL WHOM WE TRUST, RIGHT?

20  **A**    YES, SIR.

21  **Q**    WHEN YOU SAY "WE AS A GROUP," YOU MEAN INDEPENDENT

22  BAPTISTS?

23  **A**    YES, SIR.

24  **Q**    AND THEN YOU SAY THAT ONCE THAT TRUST IS ESTABLISHED

25  WE PUT OUR FULL FAITH AND TRUST IN THAT PERSON OR COMPANY?

**A**    YES, SIR.

**Q**    YOU ALSO SAY THAT THERE ARE PLACES AND CONFERENCES

THAT SURE LINE OR JIM KIRK CAN'T GO TO OR BE A PART OF,

RIGHT?

**A**    NO, SIR.  I SAID THERE ARE MANY PLACES AND

CONFERENCES YOU JUST CANNOT GO TO OR BE A PART OF.

**Q**    WELL THE LETTER IS TO JIM KIRK, RIGHT?

**A**    YES, SIR.

**Q**    AREN'T YOU REFERRING TO HIM?

**A**    I AM, BUT YOU SAID SURE LINE.  I DIDN'T SAY THAT.

**Q**    WEREN'T YOU SAYING UNLESS YOU WERE A PART OF SURE

LINE, SURE LINE COULD NOT SHOW UP IN THESE PLACES?

**A**    SURE LINE CAN'T OR WOULDN'T SHOW BECAUSE IT'S A

BUILDING.  WE'RE TALKING ABOUT JIM KIRK HERE.

**Q**    OKAY.  THE CHURCH -- AND YOU TOLD THEM THAT THE

CHURCH ARENAS ARE MORE RESTRICTIVE THAN OTHERS TO

OUTSIDERS, RIGHT?

**A**    YES, SIR.

**Q**    THE ONLY WAY TO PENETRATE THEM IS WITH SOMEONE FROM

WITHIN THE GROUP?

**A**    YES, SIR.

**Q**    YOU WANTED TO BE THAT PERSON?

**A**    I THINK I WAS THAT PERSON.

**Q**    AND YOU COULD BE THAT PERSON BECAUSE YOU WERE AN

INSIDER?

**A**     I WAS A MEMBER OF THE INDEPENDENT BAPTIST MOVEMENT,
YES, SIR.

**Q**     AND IF YOU COULD ALSO SAY THAT THIS WAS YOUR COMPANY,
IT WOULD BE EASIER TO GET PEOPLE TO INVEST?

**A**     IT WOULD BE MORE ACCEPTABLE.

**Q**     AND MORE PEOPLE WOULD WANT TO SIGN UP, RIGHT?

**A**     WELL, THAT WOULD BE THE HOPE.  YOU GOT TO UNDERSTAND
MY HEART.  I THOUGHT WE HAD FOUND A COMPANY THAT WAS GOING
TO BE GOOD FOR THE PEOPLE THAT I LOVE MOST IN THIS WORLD;
MY FAMILY, MY BROTHER-IN-LAW AND SISTER, MY SON, MY
DAUGHTERS, MY NIECES AND NEPHEWS, THE PEOPLE AT CHURCH
THAT I HAVE KNOWN FOR 30, 35 YEARS.  I THOUGHT THAT WE HAD
FOUND A COMPANY THAT COULD PROVIDE THAT STABILITY, OR
MONEY, AND I WANTED EVERYBODY TO HAVE IT.

**Q**     AND IF YOU WERE A PART OF THE COMPANY --

**A**     LET ME FINISH MY STATEMENT.  IF YOU AND I HAD MET IN
A CHURCH SITUATION SOMEWHERE --

          **MR. BRAGDON:**  YOUR HONOR, I WOULD ASK THE
WITNESS --

          **THE COURT:**  I'LL SUSTAIN IT.

          **MR. BRAGDON:**  I WOULD JUST ASK HE NOT REFER TO
ME AS COUNSEL.

          **THE COURT:**  MR. BRAGDON.

          **MR. BRAGDON:**  YES, YOUR HONOR.

          **THE COURT:**  NEITHER OF YOU WILL ARGUE WITH ONE

1    ANOTHER.  THIS IS A QUESTION AND ANSWER FORMAT.  NEITHER

2    OF YOU ARE IN CHARGE.  ANSWER THE QUESTION, STOP, ASK

3    ANOTHER QUESTION.  NEXT QUESTION.

4    **BY MR. BRAGDON:**

5    **Q**    WHEN YOU ASKED FOR SHARES IN THIS COMPANY, IT WAS

6    BECAUSE IT WOULD HELP YOU GET PEOPLE TO INVEST IN THE NOTE

7    PROGRAM?

8    **A**    WHEN I ASKED FOR SHARES IN THE COMPANY, IT WAS A HOPE

9    THAT BECAUSE I WOULD BE AN OWNER OR PART OWNER OF THE

10   COMPANY THAT I WOULD HAVE MORE INFLUENCE IN THE COMPANY,

11   NOT BECAUSE I WAS TRYING TO GET MORE PEOPLE.  IT WAS FOR

12   MY BENEFIT TO HAVE INFLUENCE.

13   **Q**    YOU WEREN'T TRYING TO MAKE A PROFIT OFF OF YOUR

14   SHARES?

15   **A**    I WAS NOT TRYING TO MAKE A PROFIT OFF?

16   **Q**    OF YOUR SHARES, OF YOUR OWNERSHIP IN THE COMPANY?

17   **A**    I HOPED TO ONE DAY MAKE A PROFIT OFF MY OWNERSHIP.

18   **Q**    LET'S LOOK AT EXHIBIT 205T AT PAGE FOUR, BOTTOM

19   THIRD.

20        YOU SAY HERE THAT YOU ENDED UP BUYING ABOUT

21   10 PERCENT OF THE COMPANY; IS THAT RIGHT?

22   **A**    HIGHLIGHT YOUR LINE.

23        ENDED UP BUYING 10 PERCENT OF THE COMPANY AND THEN

24   SIX MONTHS LATER I BOUGHT ANOTHER 10 PERCENT.

25   **Q**    YOU DIDN'T ACTUALLY BUY ANY SHARES OF THE COMPANY?

1  **A**   I THINK I EXPLAINED THAT EARLIER, THAT I'M NOT SURE

2  IF I DID OR NOT.  I KNOW I DIDN'T WRITE A CHECK BUT I

3  DON'T KNOW WHETHER OR NOT MONEYS WAS NOT SENT OR THESE

4  WERE SENT IN LIEU OF MONEYS.

5  **Q**   WAS IT YOUR PRACTICE AT YOUR CONFERENCE TO TELL

6  PROSPECTIVE INVESTORS THINGS ABOUT SURE LINE THAT YOU HAD

7  NO IDEA IF THEY WERE TRUE OR NOT?

8  **A**   YOU WILL HAVE TO BE MORE SPECIFIC.

9  **Q**   WELL YOU ARE SAYING THAT YOU DIDN'T KNOW IF THIS WAS

10 ACTUALLY TRUE, IF IT WAS TRUE THAT YOU BOUGHT SHARES IN

11 THE COMPANY, RIGHT?

12         **THE COURT:**  YES OR NO, THAT'S WHAT YOU ARE

13 SAYING.

14         **THE WITNESS:**  I'M TRYING TO ANALYZE HIS

15 QUESTION.

16         **THE COURT:**  THE QUESTION IS A YES OR NO.  YES OR

17 NO.

18         **THE WITNESS:**  COULD I HAVE THE QUESTION AGAIN,

19 PLEASE?

20         **THE COURT:**  YES.

21 **BY MR. BRAGDON:**

22 **Q**   YOU DIDN'T KNOW, AT THE TIME YOU SAID THIS, WHETHER

23 YOU HAD ACTUALLY BOUGHT SHARES IN THE COMPANY?

24 **A**   I KNEW I HAD BOUGHT SHARES IN THE COMPANY -- I KNEW I

25 OWNED SHARES IN THE COMPANY, I DID NOT KNOW HOW.  I DID

1    NOT WRITE A CHECK BUT WE ASSUMED IT WAS IN LIEU OF THE

2    DONATIONS.

3    **Q**    BUT WHAT YOU ARE SAYING IS THAT EVEN THOUGH YOU

4    DIDN'T KNOW WHETHER IT WAS TRUE OR NOT, YOU TOLD PEOPLE

5    THAT YOU BOUGHT IT?

6    **A**    I FELT I DID BUY THEM, YES, SIR.

7    **Q**    AND YOU KNEW THAT THEY WOULD THINK THAT YOU BOUGHT

8    THEM WITH MONEY?

9    **A**    WELL, I DON'T KNOW WHAT THEY THOUGHT, SIR.

10              **THE COURT:**  THE QUESTION IS WHAT YOU THOUGHT,

11   NOT WHAT ANYBODY ELSE THOUGHT.  DID YOU THINK, WHEN YOU

12   MADE THAT STATEMENT, THAT YOU WERE GIVING THE IMPRESSION

13   THAT YOU HAD WRITTEN A CHECK FOR THE STOCK?

14              **THE WITNESS:**  NO, SIR.

15              **THE COURT:**  NEXT QUESTION.

16   **BY MR. BRAGDON:**

17   **Q**    YOU SAID HERE THAT THEY'RE MAKING TOO MUCH MONEY, I

18   NEED TO MAKE MORE OF THIS MONEY; IS THAT RIGHT?

19   **A**    YES, SIR.

20   **Q**    SO YOU ARE TELLING THEM THAT YOU BOUGHT THE COMPANY

21   SO THAT YOU COULD MAKE MORE MONEY FROM THE COMPANY?

22   **A**    YES, SIR.

23   **Q**    LOOKING AT EXHIBIT 304, DID YOU TELL PASTOR JOE

24   ELWELL THAT YOU INVESTED $450,000 OF YOUR OWN MONEY IN

25   SURE LINE?

1    **A**    NO, SIR.

2    **Q**    LOOKING AT EXHIBIT 314 AND EXHIBIT 162, DID YOU TELL

3    JOHN DAVID ROGERS THAT YOU INVESTED 2.2 MILLION OF YOUR

4    OWN MONEY?

5    **A**    NO, SIR.

6    **Q**    DID YOU TELL THEM THAT YOU INVESTED ALL OF YOUR

7    COMMISSIONS --

8    **A**    NO, SIR.

9    **Q**    -- INTO SURE LINE?

10   **A**    NO, SIR.

11   **Q**    LOOKING AT EXHIBIT 306 AND EXHIBIT 181, DID YOU TELL

12   MICHAEL HAYNES THAT YOU INVESTED 1 MILLION OF YOUR OWN

13   MONEY?

14   **A**    NO, SIR.

15   **Q**    BUT YOU DID TELL PEOPLE THAT YOU INVESTED ALL OF YOUR

16   MONEY?

17   **A**    I TOLD PEOPLE THAT I INVESTED ALL OF OUR MONEY, YES,

18   SIR.

19   **Q**    AND ALL OF YOUR WIFE'S MONEY?

20   **A**    ALL OF OUR INVESTED MONEY WAS SHARED, YES, SIR.

21   **Q**    SPECIFICALLY, YOU SAID YOU INVESTED ALL OF MY MONEY?

22   **A**    YES, SIR.

23   **Q**    AND THEN YOU SAID YOU INVESTED ALL OF MY WIFE'S

24   MONEY?

25   **A**    YES, SIR.

1   Q    AND ALL OF MY CHILDRENS' MONEY?

2   A    YES, SIR.

3   Q    ONE OF YOUR CHILDREN WASN'T ACTUALLY INVESTED, RIGHT?

4   A    I ONLY HAVE TWO KIDS AND BOTH OF THEM ARE INVESTED.

5   Q    WHAT'S YOUR DAUGHTER'S NAME?

6   A    EDITH LUTZ, L-U-T-Z.

7   Q    SHE INVESTED AS WELL?

8   A    YES, SIR.

9   Q    HOW MUCH?

10  A    2,500, 3,000.

11  Q    WAS THAT ALL OF HER MONEY?

12  A    WELL THEY ARE FULL TIME MINISTRY PEOPLE AND THEY

13  DON'T MAKE MUCH MONEY.

14  Q    WAS THAT ALL OF HER MONEY?

15  A    AS FAR AS I KNOW.

16  Q    LET'S LOOK AT EXHIBIT 285.  LET'S ZOOM IN ON THE TOP

17  HALF.

18       IN 2006, YOU RECEIVED ABOUT $78,000 FROM SURE LINE?

19  A    YES, SIR.

20  Q    YOU DIDN'T INVEST ANY OF THAT MONEY?

21  A    NO, SIR.

22  Q    IN 2007, YOU RECEIVED ABOUT $411,000 FROM SURE LINE?

23  A    YES, SIR.

24  Q    AND LET'S LOOK AT, I BELIEVE IT'S EXHIBIT 294.  LET

25  ME CHECK MY NOTES.  YES, 294.

1   SO YOU INVESTED ABOUT $37,000 IN 2007?

2 **A** YES, SIR.

3 **Q** AND THAT WAS ACTUALLY YOUR WIFE'S 401K, RIGHT?

4 **A** YES, SIR.

5 **Q** THAT WASN'T ACTUALLY ANY OF THE MONEY YOU RECEIVED

6 FROM SURE LINE?

7 **A** I'M NOT SURE.  I DON'T REMEMBER THAT.

8 **Q** AND IN '08 YOU INVESTED -- YOUR WIFE INVESTED ABOUT

9 $5,000?

10 **A** YES, SIR.

11 **Q** AND THEN IN '08 YOU RECEIVED ABOUT $360,000 FROM SURE

12 LINE?

13 **A** YES, SIR.

14 **Q** AND IN '09 SHE INVESTED ABOUT $5,000; IS THAT RIGHT?

15 **A** YES, SIR.

16 **Q** AND IN '09 YOU RECEIVED $320,000 FROM SURE LINE?

17 **A** YES, SIR.

18 **Q** IN 2010 SHE INVESTED ABOUT 20,000, RIGHT?

19 **A** YES, SIR.

20 **Q** AND YOU RECEIVED 400,000, OVER 400?

21 **A** I THINK THAT'S RIGHT.

22 **Q** AND IN 2011 SHE INVESTED ABOUT 7,500?

23 **A** YES, SIR.

24 **Q** AND YOU RECEIVED, AGAIN, ABOUT 400,000?

25 **A** YES, SIR.

1  **Q**   WAS IT ACCURATE TO SAY THAT YOU INVESTED ALL OF YOUR

2  MONEY IN SURE LINE?

3  **A**   WHEN I SAY "ALL," I MEAN OUR MONEYS.  HER MONEY IS MY

4  MONEY, MY MONEY IS HER MONEY.  ALL OF OUR INVESTMENT

5  MONEY, SHORT OF MAYBE A COUPLE THOUSAND DOLLARS IN THE AG

6  EDWARD THING WAS IN SURE LINE.

7  **Q**   SO EVEN THOUGH YOU WERE MAKING HUNDREDS OF THOUSANDS

8  OF DOLLARS EACH YEAR AND INVESTING VIRTUALLY NONE OF IT,

9  YOU STILL THINK THAT STATEMENT IS ACCURATE?

10 **A**   WELL, I WAS INVESTING VIRTUALLY NONE OF IT IN SURE

11 LINE.  I WAS INVESTING IN MISSIONS, PEOPLE, KEEPING KIDS

12 IN SCHOOL, THINGS LIKE THAT.

13         **MR. BRAGDON:**  OBJECTION, YOUR HONOR.

14         **THE COURT:**  OVERRULED.

15         **THE WITNESS:**  I WAS INVESTING IN MISSIONS AND

16 PEOPLE AND CHURCHES AND FOR ABOUT A PERIOD OF ABOUT FOUR

17 YEARS TO THE TUNE OF $500,000 A MONTH TO KEEP KIDS IN

18 SCHOOL.  MY INVESTMENTS WERE IN PEOPLE.

19 **BY MR. BRAGDON:**

20 **Q**   AND A LOT OF PERSONAL EXPENDITURES TOO, RIGHT?

21 **A**   WELL, YOU HAVE TO BE MORE SPECIFIC THAN THAT.

22 **Q**   EATING OUT?

23 **A**   WE ATE OUT.

24 **Q**   SHOPPING?

25 **A**   WE DO SHOP, YES, SIR.

1   **Q**    YOU WANTED PROSPECTIVE INVESTORS TO THINK THAT YOU

2   HAD A HAND IN RUNNING SURE LINE, DIDN'T YOU?

3   **A**    I DID.

4   **Q**    THEY TRUSTED YOU?

5   **A**    I ASSUME THEY DID.

6   **Q**    BUT THEY DIDN'T KNOW JIM KIRK?

7   **A**    MOST OF THEM DID NOT.

8   **Q**    AND AT LEAST WHEN YOU INITIALLY TALKED TO THEM THEY

9   DIDN'T KNOW GLEN SMITH EITHER?

10  **A**    WHEN I INITIALLY TALKED TO THEM?

11  **Q**    SURE.

12  **A**    THEY DIDN'T KNOW ANYBODY THERE, NO.

13  **Q**    THEY DIDN'T KNOW CAROL GRAFF?

14  **A**    NO, SIR.

15  **Q**    SO IF THEY THOUGHT YOU WERE RUNNING THE COMPANY, THEY

16  WOULD BE MORE LIKELY TO THINK THE INVESTMENT WAS SAFE?

17  **A**    I DON'T KNOW THAT ANYBODY THOUGHT I WAS RUNNING THE

18  COMPANY.  I THINK YOU HAVE SEEN IN MY LETTER TO JIM I

19  DIDN'T WANT TO RUN THE COMPANY, THE DAY-TO-DAY RUNNING OF

20  THE COMPANY.

21  **Q**    DIDN'T YOU TELL PROSPECTIVE INVESTORS THAT YOU HAD

22  VETO POWER?

23  **A**    I DID.

24  **Q**    DID YOU HAVE VETO POWER OVER THE DECISIONS OF SURE

25  LINE?

1  **A**   MY VETO POWER WAS IN THAT IF ANYTHING CHANGED IN THE

2  WAY SURE LINE RAN THEIR BUSINESS, THEY WERE SUPPOSED TO

3  RUN IT BY ME AND I WOULD HAVE VETO POWER TO ANY OF THOSE

4  CHANGES.

5  **Q**   LET'S LOOK AT EXHIBIT 201T AT 5.  LET'S LOOK AT THE

6  BOTTOM THIRD.

7      DID YOU TELL JIM KIRK THAT YOU WANTED TO KNOW EVERY

8  PIECE OF PAPER THAT GOES THROUGH SURE LINE AND SIGN OFF ON

9  IT?

10  **A**   I WANT TO KNOW EVERY PIECE OF PAPER THAT CHANGED THE

11  WAY SURE LINE WAS -- THE WAY IT WAS EXPRESSED TO ME, THAT

12  IF ANYTHING CHANGED I WANT TO KNOW EVERY PIECE OF PAPER

13  THAT GOES THROUGH AND I WANT TO SIGN OFF ON IT.

14  **Q**   SPECIFICALLY, I'M ASKING ABOUT WHAT YOU TOLD HIM?

15  **A**   TOLD WHO?

16  **Q**   JIM KIRK.

17  **A**   YES, SPECIFICALLY I TOLD JIM KIRK THAT I WANTED VETO

18  POWER OVER ANY CHANGE THAT HE MADE IN SURE LINE FROM THE

19  WAY I FIRST SAW IT.

20  **Q**   DID YOU TELL HIM THAT YOU WANTED TO KNOW EVERY PIECE

21  OF PAPER THAT GOES THROUGH?

22  **A**   I THINK I SAID IT.  AGAIN, I WANT TO KNOW EVERY PIECE

23  OF PAPER THAT CHANGED ANYTHING.

24  **Q**   SO YOU DIDN'T TELL HIM THAT YOU WANTED TO SEE EVERY

25  PIECE OF PAPER THAT WENT THROUGH?

1  **A**    NO.

2  **Q**    JUST THE PIECES OF PAPER THAT FUNDAMENTALLY CHANGED

3  THE COMPANY?

4  **A**    YES, SIR.

5  **Q**    AND YOU DIDN'T TELL HIM THAT YOU WANTED TO SIGN OFF

6  ON EVERY PIECE OF PAPER?

7  **A**    THAT CHANGED THE COMPANY, YES, SIR.

8  **Q**    YOU DIDN'T TELL HIM EVERY PIECE OF PAPER?

9  **A**    NO, NOT EVERY PIECE OF PAPER.

10  **Q**    JUST THE ONES THAT FUNDAMENTALLY CHANGED THE COMPANY?

11  **A**    YES, SIR.

12  **Q**    AND FROM 2006 TO 2011, THERE WASN'T A SINGLE PIECE OF

13  PAPER THEY GAVE YOU TO SIGN OFF ON, WAS THERE?

14  **A**    THEY DID NOT.

15  **Q**    AS FAR AS YOU KNOW, THERE WASN'T A SINGLE PIECE OF

16  PAPER THAT FUNDAMENTALLY CHANGED THE COMPANY?

17  **A**    THAT'S CORRECT.

18  **Q**    BUT YOU TOLD INVESTORS YOU WERE SEEING EVERY PIECE OF

19  PAPER?

20  **A**    WHERE DO YOU SEE THAT AT?

21  **Q**    EVERY PIECE OF PAPER.

22  **A**    SORRY, JUDGE, I DON'T MEAN TO ARGUE.  DIDN'T YOU SAY

23  THAT I --

24  **Q**    YOU SAID YOU WANT TO KNOW EVERY PIECE OF PAPER THAT

25  GOES THROUGH?

1   **A**   YES, SIR, I DID SAY I WANT TO KNOW EVERY PIECE OF

2   PAPER THAT GOES THROUGH THE COMPANY, I WANT TO SIGN OFF ON

3   IT, YES.

4   **Q**   AND FROM MID-2009 TO 2011, YOU HARDLY SAW A SINGLE

5   PIECE OF PAPER ABOUT THE FINANCIALS OF THE COMPANY, DID

6   YOU?

7   **A**   CORRECT.

8   **Q**   LET'S LOOK AT EXHIBIT 208T AT PAGE ONE, BOTTOM THIRD.

9   LOOKING TOWARDS, I GUESS, THE THIRD LINE UP FROM THE

10  BOTTOM, YOU TOLD INVESTORS THAT YOU WATCHED THE OTHER

11  MEMBERS OF THE BOARD OF DIRECTORS, RIGHT?

12  **A**   YES, SIR.

13  **Q**   AND LET'S LOOK AT EXHIBIT 201T -- HANG ON.  ACTUALLY,

14  LET'S LOOK AT 205T AT PAGE FOUR.  LET'S ZOOM IN ON THE

15  BOTTOM THIRD.

16      YOU SAID THAT THEY TOLD YOU THAT NOTHING WILL BE DONE

17  UNLESS YOU SIGN OFF ON IT?

18  **A**   CORRECT.

19  **Q**   WHO TOLD YOU THAT?

20  **A**   MR. KIRK.

21  **Q**   HE TOLD YOU THAT NOTHING WILL BE DONE UNLESS YOU SIGN

22  OFF ON IT?

23  **A**   YEAH, AGAIN, HE'S REFERRING TO IN A CHANGE TO THE

24  BUSINESS PLAN.

25  **Q**   BUT IN THE TIME YOU WERE INVOLVED YOU DIDN'T HAVE TO

1  SIGN OFF ON ANYTHING?

2  **A**    IF THEY DIDN'T CHANGE ANYTHING I DIDN'T SIGN OFF ON

3  ANYTHING.

4  **Q**    LOOKING AT EXHIBIT 301 AND EXHIBIT 189, WHEN RICHARD

5  LUMSDEN CALLED YOU AFTER THE INVESTMENT WENT BAD, DID YOU

6  DENY BEING ON THE BOARD OF DIRECTORS?

7  **A**    I DON'T THINK SO.  I DON'T RECALL THAT.

8  **Q**    WHEN HE SAID THAT YOU SAID THAT YOU WERE ON THE BOARD

9  OF DIRECTORS, DID YOU SAY, "NOW WHY WOULD I SAY THAT?"

10  **A**    I DON'T RECALL THAT STATEMENT, NO, SIR.

11  **Q**    THE SPIRITUAL BOARD OF DIRECTORS, THAT WAS YOUR IDEA?

12  **A**    YES, SIR.

13  **Q**    AND YOU SELECTED THE FOUR PEOPLE WHO WOULD BE ON THIS

14  SPIRITUAL BOARD OF DIRECTORS OTHER THAN YOURSELF?

15  **A**    I DID, YES, SIR.

16  **Q**    DR. SCHAAP PASTORED ONE OF THE LARGEST CHURCHES IN

17  AMERICA?

18  **A**    YES, SIR.

19  **Q**    YOUR CHURCH?

20  **A**    YES, SIR.

21  **Q**    FIRST BAPTIST HAMMOND?

22  **A**    YES, SIR.

23  **Q**    IT HAD A PASTOR'S COLLEGE OR CONFERENCE EVERY YEAR

24  THAT THOUSANDS CAME TO?

25  **A**    YES, SIR.

1  Q    IT WAS ASSOCIATED WITH A BIBLE COLLEGE, HYLES

2  ANDERSON?

3  A    YES, SIR.

4  Q    AND A LOT OF THE PASTORS OF INDEPENDENT BAPTIST

5  CHURCHES HAD ATTENDED HYLES ANDERSON?

6  A    YES, SIR.

7  Q    DR. SCHAAP TRAVELED A COUPLE TIMES A MONTH, ON

8  AVERAGE, PREACHING AT OTHER CHURCHES?

9  A    YES, SIR.

10 Q    SO HE WAS VERY WELL KNOWN IN THIS RELIGIOUS

11 COMMUNITY?

12 A    YES, SIR.

13 Q    REVEREND ELWELL WAS ALSO WELL KNOWN, RIGHT?

14 A    YES, SIR.

15 Q    HE VISITED AROUND 35 CHURCHES A YEAR?

16 A    YES, SIR.

17 Q    THE TIME HE WAS SELECTED TO BE ON THE SPIRITUAL BOARD

18 OF DIRECTORS HE VISITED SOMEWHERE BETWEEN 400 AND 500?

19 A    HOW MANY CHURCHES HE VISITED?

20 Q    YEAH.

21 A    I DON'T KNOW THAT.

22 Q    REVEREND HAYNES WAS ALSO WELL KNOWN?

23 A    YES, SIR.

24 Q    AND REVEREND BOZEMAN, HE HAD A LARGE INDEPENDENT

25 BAPTIST CHURCH IN THE CHARLOTTE AREA?

1    **A**    YES, SIR.

2    **Q**    THESE WERE PEOPLE THAT A LOT OF PROSPECTIVE INVESTORS

3    WOULD HAVE HEARD OF ONE OR MORE OF THEM?

4    **A**    YES, SIR.

5    **Q**    THEY WERE PEOPLE THAT CARRIED A LOT OF TRUST IN YOUR

6    RELIGIOUS COMMUNITY?

7    **A**    YES, SIR.

8    **Q**    AND SO WHEN YOU TOLD PEOPLE THAT THERE WAS A

9    SPIRITUAL BOARD OF DIRECTORS WITH THESE MEMBERS ON IT,

10   THAT MADE THEM MORE LIKELY TO TRUST THE COMPANY?

11   **A**    YOU COULD SPECULATE THAT, YES, SIR.

12   **Q**    LOOKING AT -- DIDN'T YOU SAY THAT THE SPIRITUAL BOARD

13   OF DIRECTORS HAD TO SIGN OFF ON EVERYTHING?

14   **A**    I DID.  AGAIN, REFERRING TO ANY CHANGES IN THE

15   COMPANY.

16   **Q**    WITH THESE STATEMENTS, YOU DIDN'T SAY THIS ONLY

17   REFERS TO ANY MAJOR CHANGES IN THE COMPANY, DID YOU?

18   **A**    I DID NOT.

19   **Q**    YOU DIDN'T CLARIFY THAT FOR ANY OF THE CHURCHES?

20   **A**    I NEVER SAID THAT.

21   **Q**    YOU DIDN'T SAY, AS A PRACTICAL MATTER THIS SPIRITUAL

22   BOARD OF DIRECTORS HAS NEVER HAD ANY MEETINGS?

23   **A**    I THINK I WAS ASKED THAT A COUPLE OF TIMES WHEN THE

24   MEETINGS WERE, COULD PEOPLE WHO OWNED NOTES, COULD THEY

25   COME TO THEM.  AND THOSE PEOPLE I TOLD WE NEVER HAD A

1  MEETING -- WE HAVEN'T HAD ANY MEETINGS YET.

2  **Q**    FOR THE MOST PART, YOU WEREN'T ASKED AND YOU DIDN'T

3  SAY?

4  **A**    FOR THE MOST PART -- I DIDN'T HEAR THE LAST PART OF

5  YOUR QUESTION.

6  **Q**    FOR THE MOST PART YOU WEREN'T ASKED THAT QUESTION?

7  **A**    FOR THE MOST PART, NO.

8  **Q**    AND YOU DIDN'T VOLUNTEER IT?

9  **A**    NO, SIR.

10  **Q**    YOU NEVER ACTUALLY PLANNED OR INTENDED FOR THIS

11  SPIRITUAL BOARD OF DIRECTORS TO DO ANYTHING?

12  **A**    YOU ARE TRAILING.  SAY IT AGAIN, PLEASE.

13  **Q**    LET ME MOVE THIS MICROPHONE CLOSER.

14       YOU DIDN'T PLAN FOR THE SPIRITUAL BOARD OF DIRECTORS

15  TO DO ANYTHING, DID YOU?

16  **A**    THAT'S NOT TRUE, SIR, NOT TRUE AT ALL.

17  **Q**    WELL, YOU DIDN'T HAVE A MEETING, RIGHT?

18  **A**    CORRECT.

19  **Q**    YOU DIDN'T HAVE A CONFERENCE CALL?

20  **A**    CORRECT.

21  **Q**    YOU DIDN'T PRESENT ANY DECISIONS TO THEM?

22  **A**    CORRECT.

23  **Q**    YOU DIDN'T GIVE THEM ANY PAPERWORK TO SIGN OFF ON

24  RELATED TO THE COMPANY?

25  **A**    CORRECT.

**Q**   YOU DIDN'T GIVE THEM ANY FINANCIALS OF THE COMPANY TO REVIEW?

**A**   I DID NOT, NO, SIR.

**Q**   YOU DIDN'T EVEN BRING ANY OF THEM TO AUTOMOCION DEALERSHIPS IN NORTH CAROLINA TO LOOK AT?

**A**   I DID NOT.

**Q**   YOU NEVER TOLD JIM KIRK THAT THESE PEOPLE WERE GOING TO HAVE AUTHORITY OR POWERS IN THE COMPANY, DID YOU?

**A**   JIM KIRK TOLD ME THAT, THAT THEY WOULD SIGN OFF ON ANY CHANGES IN THE COMPANY.  THE REASON I SELECTED THESE MEN WAS, AGAIN, BECAUSE THEY WERE VERY, VERY STRONG MEN AND VERY STRONG PERSONALITIES, AND MY HOPES WERE THAT IF THEY SNIFFED OUT ANYTHING, IF THEY SAW ANYTHING BAD, SAW ANYTHING THEY DIDN'T LIKE, KNOWING HOW THEY WERE IN THEIR MINISTRY THAT THEY WOULD PROBABLY TAKE IT ON THEIR OWN. THAT'S WHY I WANTED THEM.

SECONDLY, FOR THEM TO PRAY FOR THE COMPANY BECAUSE THEY ARE VERY SPIRITUAL MEN.

**Q**   YOU CLAIM -- LET ME BACK UP.  JIM KIRK NEVER MET ANY OF THESE PEOPLE, DID HE?

**A**   HE MAY HAVE MET THEM AT THE CONFERENCE HE WAS AT IN HAMMOND, I'M NOT SURE.

**Q**   THIS WAS THE ONE IN '07?

**A**   I DON'T REMEMBER WHICH ONE IT WAS, SIR.

**Q**   THE SPIRITUAL BOARD OF DIRECTORS, HE FORMED THAT AT

1   THE END OF 2009, RIGHT?

2   **A**    I CAN'T REMEMBER THAT EITHER, BUT I ASSUME YOU ARE

3   RIGHT.

4   **Q**    IT'S FAIR TO SAY THAT THESE WERE PEOPLE THAT JIM KIRK

5   DIDN'T KNOW VERY WELL?

6   **A**    KNOW VERY WELL?  NO, HE DIDN'T KNOW ANY OF OUR PEOPLE

7   VERY WELL.

8   **Q**    MAYBE HE MET THEM ONE TIME?

9   **A**    PERHAPS.

10  **Q**    YOU CLAIM JIM KIRK, HAVING MAYBE MET THESE

11  INDIVIDUALS ONE TIME, AGREED TO GIVE THEM VETO POWER OVER

12  MAJOR DECISIONS IN THE COMPANY?

13  **A**    THAT'S A TRUE STATEMENT.  I THINK IT'S BECAUSE HE

14  TRUSTED ME AND THE MEN THAT I PICKED.

15  **Q**    BUT YOU WEREN'T MAKING MAJOR DECISIONS IN THE COMPANY

16  EITHER, RIGHT?

17  **A**    I WAS MAKING NO DECISION, NO, SIR.

18  **Q**    SO EVEN THOUGH YOU HADN'T BEEN MAKING ANY MAJOR

19  DECISIONS OR NO DECISIONS IN THE COMPANY, YOU CLAIM THAT

20  HE TRUSTED YOU TO PICK OTHER PEOPLE TO MAKE MAJOR

21  DECISIONS IN THE COMPANY?

22  **A**    THAT'S WHAT HE DID.

23  **Q**    LOOKING AT EXHIBIT 304, DIDN'T YOU TELL JOE ELWELL

24  THAT FIRST BAPTIST OF HAMMOND HAD INVESTED OVER

25  $1 MILLION?

1  **A**    NO, SIR, I SAID OUR CHURCH HAD INVESTED OVER A

2  MILLION DOLLARS.

3  **Q**    BUT IT HAD NOT, HAD IT?

4  **A**    YES, IT DID, MANY TIMES MORE THAN THAT.

5  **Q**    OH, THE PEOPLE OF THE CHURCH?

6  **A**    WELL, OUR CHURCH, THE PEOPLE ARE THE CHURCH.  THE

7  CHURCH IS NOT A BUILDING, THE CHURCH IS PEOPLE.

8  **Q**    OH, SO HE MISUNDERSTOOD, IS THAT WHAT YOU ARE SAYING?

9  **A**    I DON'T KNOW IF HE DID OR NOT.  THAT'S WHAT I TOLD

10 HIM.  I TOLD HIM OUR CHURCH HAD INVESTED OVER A MILLION

11 DOLLARS IN THIS PROGRAM.

12 **Q**    WHEN YOU SAID "OUR CHURCH," YOU DIDN'T MEAN THE

13 ENTITY, YOU MEANT THE PEOPLE WITHIN THE CHURCH?

14 **A**    YEAH, THAT'S WHAT THE CHURCH IS, PEOPLE.

15 **Q**    LET'S LOOK AT EXHIBIT 201T AT PAGE SEVEN.  LET'S ZOOM

16 IN AT THE TOP OF THE SECOND PARAGRAPH, THE BOTTOM

17 PARAGRAPH.  I MAY HAVE WRITTEN DOWN MY REFERENCE WRONG.

18 MAYBE -- YEAH, LET'S ZOOM IN AGAIN.  MAYBE I DID HAVE IT

19 RIGHT.

20      SO HERE YOU SAY WE HAVE ONE CHURCH THAT HAS OVER A

21 MILLION WITH US, RIGHT?

22 **A**    YES, SIR.

23 **Q**    BUT THE CONTEXT OF THIS IS ABOUT HOW MUCH ONE

24 INDIVIDUAL PERSON CAN INVEST, RIGHT?  ARE YOU TELLING THEM

25 THAT THEY CAN'T INVEST MORE THAN $250,000 APIECE?

1  **A**   YES, THERE WAS A TIME WHEN JIM OR GLEN SAID WE DON'T

2  WANT PEOPLE INVESTING MORE THAN 250,000 PER INDIVIDUAL, SO

3  IF THEY NEEDED TO REDEEM THEM THEY COULD DO IT FAIRLY

4  QUICKLY.

5  **Q**   SO YOU IF YOU WANT TO INVEST $1 MILLION, YOU HAVE TO

6  DO IT IN FOUR SEPARATE INVESTMENTS?

7  **A**   THAT'S WHAT THEY INSTRUCTED ME, YES.

8  **Q**   SO YOU ARE TALKING ABOUT ONE PERSON POTENTIALLY

9  INVESTING $1 MILLION IN FOUR SEPARATE INVESTMENTS?

10  **A**   THIS HIGHLIGHTED AREA YOU HAVE HERE, WE HAVE ONE

11  CHURCH WITH OVER A MILLION DOLLARS WITH US.  THE CONTEXT

12  THERE WAS THAT WE HAVE A CHURCH WITH OVER A MILLION

13  DOLLARS WITH US, MEANING THE PEOPLE.

14  **Q**   SO YOU'RE NOT SAYING HERE THAT ONE CHURCH HAS

15  INVESTED $1 MILLION?

16  **A**   YES, SIR.  I SAID WE HAVE ONE CHURCH WITH OVER A

17  MILLION DOLLARS WITH US.

18  **Q**   BUT NOT THE CHURCH ITSELF?

19  **A**   DAVID, THE PEOPLE ARE THE CHURCH.

20  **Q**   BUT THE CHURCHES HAVE AN ENTITY, RIGHT?

21  **A**   THE CHURCH HAS AN ENTITY, YES.

22  **Q**   A BUSINESS ENTITY?

23  **A**   UH-HUH.

24  **Q**   THE CHURCH ENTITY DIDN'T INVEST A MILLION DOLLARS?

25  **A**   THE CHURCH ENTITY DID NOT INVEST A MILLION DOLLARS.

1  **Q**    RIGHT.  LET'S LOOK AT EXHIBIT 202T AT PAGE TWO.

2  LET'S ZOOM IN ON THE MIDDLE OF THE PAGE.

3        HERE YOU SAY FOUR TO $5 MILLION OUT OF OUR CHURCH,

4  RIGHT?

5  **A**    YES, SIR.

6  **Q**    THAT CLEARLY REFERS TO THE PEOPLE?

7  **A**    I THINK SO, YES, SIR.

8  **Q**    BUT BEFORE YOU SAID $1 MILLION FROM THE CHURCH?

9  **A**    OVER A MILLION.

10  **Q**    AND YOU CLAIM THAT YOU MEANT THE PEOPLE OF A CHURCH

11  BOTH TIMES?

12  **A**    BECAUSE THE PEOPLE --

13  **Q**    -- YOU DIDN'T -- APOLOGIZE.

14  **A**    -- THE PEOPLE I WAS TALKING TO WERE CHURCH PEOPLE AND

15  THEY UNDERSTOOD THAT THE CHURCH IS PEOPLE.

16  **Q**    LOOKING AT EXHIBIT 310 AND EXHIBIT 159, DIDN'T YOU

17  TELL JAMES WILLIS THAT JACK SCHAAP WAS ON THE BOARD OF

18  DIRECTORS FOR SURE LINE?

19  **A**    SPIRITUAL BOARD OF DIRECTORS, YES, SIR.

20  **Q**    DIDN'T YOU TELL HIM HE WAS JUST ON THE BOARD OF

21  DIRECTORS?

22  **A**    IF I TOLD THEM ANYTHING ABOUT JACK SCHAAP, I WOULD

23  HAVE SAID THE SPIRITUAL BOARD OF DIRECTORS.  I DON'T KNOW

24  WHAT HE GOT FROM IT, BUT --

25  **Q**    DID YOU SAY THAT JACK SCHAAP HAD CHECKED OUT THE

1  INVESTMENT?

2  **A**   I DID.

3  **Q**   BUT HE DIDN'T GO TO NORTH CAROLINA, DID HE?

4  **A**   I DON'T KNOW IF HE DID OR NOT.

5  **Q**   HE DIDN'T REVIEW THE FINANCIALS OF THE COMPANY?

6  **A**   I DON'T KNOW IF HE DID OR NOT.

7  **Q**   YOU DIDN'T GIVE HIM FINANCIALS OF THE COMPANY?

8  **A**   NO, I REVIEWED WHAT THEY GAVE ME.

9  **Q**   YOU ALSO SAID THAT DAVID GIBBS HAD CHECKED ON THE

10  COMPANY?

11  **A**   NO, SIR.  I SAID I SENT DAVID GIBBS THE MATERIAL, HAD

12  HIM LOOK AT IT FOR ME.

13  **Q**   YOU DIDN'T SAY THAT -- YOU NEVER SAID THAT HE CHECKED

14  OUT THE COMPANY?

15  **A**   I KNOW I SENT DAVID GIBBS SOME MATERIAL.  I DON'T

16  REMEMBER IF I SAID HE CHECKED IT OUT.  I MEAN, THAT'S WHY

17  I SENT HIM THE PAPERWORK WAS TO CHECK IT OUT.

18  **Q**   HE DIDN'T GO THERE?

19  **A**   DIDN'T GO WHERE?

20  **Q**   DAVID GIBBS DIDN'T GO TO SURE LINE, DID HE?

21  **A**   I DON'T KNOW WHETHER HE DID OR NOT, SIR.

22  **Q**   LET'S LOOK AT EXHIBIT 203T AT PAGE ONE.  LET'S LOOK

23  AT THE TOP THIRD OF THIS.  LET'S LOOK DOWN HERE TOWARDS

24  THE BOTTOM OF WHAT WE SEE.

25      YOU SAY, I CAN TELL YOU THAT WE'VE BEEN CHECKED OUT

1  BY THE BETTER BUSINESS BUREAU, THE SEC, DAVID GIBBS, JACK

2  SCHAAP, EVERYBODY AND THEIR MOTHER'S CHECKED US OUT AND

3  IT'S CLEAN AS A WHISTLE; IS THAT RIGHT?

4  **A**    I DID SAY THAT, YES, SIR.

5  **Q**    DAVID GIBBS IS A WELL-KNOWN LAWYER?

6  **A**    YES, SIR.

7  **Q**    HE'S A SERIOUS CHRISTIAN?

8  **A**    YES, SIR.

9  **Q**    STARTED THE CHRISTIAN LEGAL SOCIETY?

10 **A**    CHRISTIAN LAW ASSOCIATION.

11 **Q**    OH, SORRY, CHRISTIAN LAW ASSOCIATION.  AND THIS

12 STATEMENT THAT HE HAD CHECKED IT OUT, YOU SAID THIS TO

13 JEAN SMITH AS WELL, RIGHT?

14 **A**    I SAID IT TO JEAN SMITH?

15 **Q**    YEAH.

16 **A**    I AM SURE I PROBABLY DID.

17 **Q**    AND MICHAEL HAYNES?

18 **A**    I DON'T KNOW FOR SURE.

19 **Q**    A LOT OF INDEPENDENT BAPTISTS ARE FAMILIAR WITH THE

20 NAME DAVID GIBBS, RIGHT?

21 **A**    YES, SIR.

22 **Q**    DAVID GIBBS NEVER GAVE YOU PERMISSION TO USE HIS

23 NAME, DID HE?

24 **A**    CORRECT.

25 **Q**    IN FACT, HE SPECIFICALLY ASKED YOU NOT TO?

1   **A**   THAT'S CORRECT.

2   **Q**   AND YOU CONTINUED TO USE IT EVEN AFTER HE ASKED YOU

3   NOT TO, DIDN'T YOU?

4   **A**   I ONLY RECALL USING IT ONE TIME AFTER HE WROTE ME A

5   LETTER ASKING ME NOT TO USE IT.  I DON'T RECALL THAT.

6   **Q**   LET'S ZOOM IN ON THE TOP OF THIS EXHIBIT WITH THE

7   DATE.  THIS IS FROM TRIDENT BAPTIST CHURCH IN 2010, RIGHT?

8   **A**   YES, SIR.

9   **Q**   AND WE JUST TALKED ABOUT JEAN SMITH A MINUTE AGO.

10  SHE INVESTED IN 2010, RIGHT?

11  **A**   I THINK THAT'S WHAT SHE SAID.

12  **Q**   YOU HAD CONVERSATIONS WITH HER ABOUT DAVID GIBBS IN

13  2010?

14  **A**   I OBVIOUSLY DID.

15  **Q**   MICHAEL HAYNES AGREED TO LEAVE HIS MONEY IN IN 2011,

16  RIGHT?

17  **A**   I THINK THAT'S RIGHT.

18  **Q**   HE INVESTED IN 2009?

19  **A**   I THINK THAT'S RIGHT.

20  **Q**   LET'S LOOK AT EXHIBIT 71.  ZOOM IN ON THE TOP HALF,

21  INCLUDING THE DATE.

22      THIS IS A LETTER FROM YOU TO DAVID GIBBS?

23  **A**   YES, SIR.

24  **Q**   YOU'RE RESPONDING TO -- AND IT'S FEBRUARY 21, 2008,

25  RIGHT?

1    **A**    YES, SIR.

2    **Q**    IT'S BEFORE THAT PRESENTATION WE JUST LOOKED AT,

3    RIGHT?

4    **A**    YES, SIR.

5    **Q**    BEFORE MICHAEL HAYNES INVESTED?

6    **A**    YES, SIR.

7    **Q**    BEFORE JEAN SMITH INVESTED?

8    **A**    YES, SIR.

9    **Q**    AND YOU SAY THAT:  I DID NOT NOR HAVE I EVER SAID

10   THAT YOU ENDORSE ANYTHING AT ANY ONE OF MY CONFERENCES,

11   RIGHT?

12   **A**    CORRECT.

13   **Q**    AND YOU ALSO SAY:  IN THE FUTURE I WILL NOT MENTION

14   YOU OR CLA, RIGHT?

15   **A**    CORRECT.  IN MY CONFERENCES I WILL NOT MENTION,

16   CORRECT.

17   **Q**    YOU DIDN'T KEEP THAT PROMISE, DID YOU?

18   **A**    I DON'T RECALL EVER MENTIONING HIM IN MY CONFERENCES

19   AFTER THAT.

20   **Q**    WASN'T WHAT WE WERE JUST LOOKING AT, WASN'T THAT A

21   CLIP FROM A CONFERENCE, THAT TRANSCRIPT?  I CAN PUT IT

22   BACK UP ON THE SCREEN.

23   **A**    OKAY.

24   **Q**    LET'S LOOK AT EXHIBIT 203T AT PAGE ONE.

25        THIS IS A CONFERENCE YOU GAVE AT TRIDENT BAPTIST

1  CHURCH, RIGHT?

2  **A**   YES, SIR.

3  **Q**   IT'S THE CHURCH FOR MICHAEL HAYNES?

4  **A**   YES, SIR.

5  **Q**   AND THE WHOLE CONFERENCE IS ACTUALLY IN EVIDENCE AS

6  AN EXHIBIT, AS EXHIBIT 203, RIGHT?

7  **A**   YES, SIR.

8  **Q**   AND LET'S ZOOM DOWN A LITTLE BIT.

9      THIS IS AFTER FEBRUARY 21, 2008, RIGHT?

10 **A**   YES, SIR.

11 **Q**   AND YOU SAID THAT DAVID GIBBS HAD CHECKED YOU OUT?

12 **A**   I DID.

13 **Q**   EVEN THOUGH HE SPECIFICALLY TOLD YOU NOT TO SAY THAT?

14 **A**   YES, SIR.

15 **Q**   THAT WAS A FALSE STATEMENT YOU MADE TO PROSPECTIVE

16 INVESTORS, RIGHT?

17 **A**   THE STATEMENT WASN'T FALSE.  YOU MEAN THE STATEMENT I

18 SAID WHERE DAVID GIBBS CHECKED IT OUT?  WHICH ONE DO YOU

19 MEAN?

20 **Q**   YEAH, THE STATEMENT THAT HE HAD CHECKED IT OUT.

21 **A**   THAT WAS NOT A FALSE STATEMENT.

22 **Q**   WELL, HE TOLD YOU NOT TO SAY THAT BECAUSE HE HADN'T

23 CHECKED IT OUT, RIGHT?

24 **A**   I DON'T KNOW WHY HE TOLD ME NOT TO SAY THAT BUT THIS

25 STATEMENT HERE YOU ARE SHOWING IS A TRUE STATEMENT.  I

1   SAID DAVID GIBBS HAD CHECKED IT OUT.  DAVID GIBBS TOLD ME

2   HE CHECKED IT OUT.  DAVID GIBBS SAID HE WOULD NOT

3   RECOMMEND IT BECAUSE HE DIDN'T LIKE THE CAR BUSINESS BUT

4   HE DIDN'T FIND ANYTHING WRONG WITH IT AND NOT TO USE HIS

5   NAME AGAIN IN MY CONFERENCES.

6   **Q**   WELL, YOU'RE IMPLYING THAT HE CHECKED IT OUT AND IT'S

7   CLEAN AS A WHISTLE.

8   **A**   I'M SAYING DISTINCTLY THAT DAVID GIBBS TOLD ME HE

9   FOUND NOTHING WRONG WITH IT IN THE PAPERWORK THAT I SENT

10  HIM.  HE DID CHECK IT OUT.

11  **Q**   YOU ALSO SAY THE BETTER BUSINESS BUREAU HAD CHECKED

12  IT OUT?

13  **A**   YES, SIR, I DID.

14  **Q**   THAT'S NOT TRUE.

15  **A**   I DON'T KNOW IF IT IS OR NOT.  I WAS TOLD THAT BY

16  GLEN SMITH.

17  **Q**   YOU CLAIM GLEN SMITH TOLD YOU THAT?

18  **A**   GLEN SMITH OR JIM KIRK.  I GOT ALL OF MY INFORMATION

19  FROM THEM CONCERNING THE SEC AND BETTER BUSINESS BUREAU.

20  **Q**   YOU DON'T REMEMBER WHICH ONE?

21  **A**   WHICH ONE WHAT?

22  **Q**   WHICH ONES TOLD YOU THAT?

23  **A**   AT VARIOUS TIMES I THINK THEY BOTH HAVE.

24  **Q**   THEY TOLD YOU THE BETTER BUSINESS BUREAU CHECKED IT

25  OUT?

1  **A**    YES, SIR.

2  **Q**    AND THE SEC CHECKED IT OUT?

3  **A**    YES, SIR.

4  **Q**    THE FBI CHECKED IT OUT?

5  **A**    THAT'S WHAT THEY TOLD ME.

6  **Q**    DID THEY TELL YOU THE FBI HAD INVESTIGATED IT AND

7  DETERMINED THAT IT WAS LEGITIMATE?

8  **A**    YES, AS A MATTER OF FACT JIM KIRK WAS PROUD AT ONE

9  TIME WHEN HE TOLD ME IT'S GOOD THAT WE HAVE BEEN CHECKED

10 OUT AND THEY FOUND NOTHING, AND IT MAKES YOU COMFORTABLE.

11 HE WAS MAKING ME COMFORTABLE, OBVIOUSLY, BUT THAT'S WHAT

12 HE TOLD ME.

13 **Q**    YOU BELIEVED THAT?

14 **A**    SURE.

15 **Q**    YOU REPEATED THAT.  YOU SAID THAT IN YOUR

16 CONFERENCES?

17 **A**    YES.

18 **Q**    BECAUSE YOU KNEW THAT THAT WOULD GIVE PEOPLE

19 ADDITIONAL ASSURANCES THAT THIS WAS A SAFE INVESTMENT?

20 **A**    WELL, I KNEW JIM KIRK HAD TOLD ME.  I ASSUMED HE WAS

21 TELLING ME THE TRUTH.  AS I SAID BEFORE, I WAS COMFORTABLE

22 WITH THE COMPANY AND I WANTED EVERYBODY IN IT.

23 **Q**    AND YOU KNEW THAT THAT WAS, SAYING THOSE THINGS WOULD

24 MAKE PEOPLE MORE COMFORTABLE WITH THE INVESTMENT?

25 **A**    I HOPED IT WOULD.

1   **Q**   DIDN'T YOU KNOW THAT INVESTING IN SURE LINE INVOLVED

2   SOME RISK?

3   **A**   THE WAY IT WAS EXPLAINED TO ME, ON COLLATERALIZED

4   NOTES THERE WAS NO RISK.  THE TRUSTEE WAS SUPPOSED TO HAVE

5   A HUNDRED PERCENT CONTROL OF THE COLLATERAL, AND HIS JOB

6   WAS TO WATCH THE COMPANY AND IF HE SAW ANYTHING THAT HE

7   WAS TO SEIZE THAT COLLATERAL, SELL IT, AND MAKE MY PEOPLE

8   WHOLE.

9   **Q**   DID DAVID GIBBS WARN YOU THAT THERE WAS SOME RISK?

10  **A**   DID DAVID GIBBS WARN ME THERE WAS SOME RISK?

11  **Q**   YES.

12  **A**   NOT THAT I RECALL.

13  **Q**   LET'S LOOK AT EXHIBIT 71, PAGE TWO, SECOND PARAGRAPH

14  ON THAT PAGE.

15      DIDN'T HE TELL YOU IN HIS LETTER, OR E-MAIL, DIDN'T

16  HE REFER TO IT AS A NON-SECURED PROGRAM?

17  **A**   HE DID SAY THAT, AND THAT'S WHY I TRIED TO EXPLAIN TO

18  HIM HOW IT WAS SECURED.  I DON'T THINK HE UNDERSTOOD THAT,

19  BUT HE DID SAY HE THOUGHT IT WAS A NON-SECURED PROGRAM,

20  EVEN THOUGH IT WAS SUPPOSEDLY COLLATERALIZED AND HELD BY

21  ANOTHER ATTORNEY.  AND I MENTIONED TO HIM THE SEC ATTORNEY

22  THAT DREW THE PAPERWORK UP, MR. BARTKO, HAD ASSURED US

23  THAT THAT'S EXACTLY WHAT IT WAS, IT WAS A WAY TO PROTECT

24  THE NOTE HOLDERS.

25  **Q**   LET ME PUT UP ON THE SCREEN JUST FOR YOU EXHIBIT 319.

1      IS THAT GREG BARTKO?

2 **A**   I MET FACE TO FACE WITH GREG BARTKO I THINK TWO

3 TIMES, ONCE WHEN I WAS AT HIS OFFICE AND ONCE WHEN HE CAME

4 TO MY CONFERENCE.  I CAN'T HONESTLY SAY IF IT IS OR NOT.

5 **Q**   OKAY.  NOW, ONE OF THE DOCUMENTS THAT WOULD BE SENT

6 TO INVESTORS OR THAT SOMETIMES YOU WOULD GIVE THEM WAS A

7 COLLATERALIZED LOAN AGREEMENT OR NOTE AGREEMENT?

8 **A**   YES, SIR.

9 **Q**   DID YOU READ THAT?

10 **A**   I'M SURE I READ CATHY'S BACK WHEN SHE PUT HER MONEY

11 THERE.  I'M SURE I READ IT DIFFERENT TIMES.  YES, I'M SURE

12 I READ IT.

13       **MR. BRAGDON:**  IF I COULD HAVE A MOMENT, YOUR

14 HONOR?

15       **THE COURT:**  YOU MAY.

16    (PAUSE IN THE PROCEEDINGS.)

17 **BY MR. BRAGDON:**

18 **Q**   LET'S LOOK AT EXHIBIT 45, PAGE ONE.  LET'S ZOOM IN ON

19 THE TOP HERE.

20    THIS IS THE E-MAIL FROM GLEN SMITH TO YOU IN 2007,

21 RIGHT?

22 **A**   YES, SIR.

23 **Q**   GIVING YOU THE CURRENT VERSION OF THE COLLATERALIZED

24 LOAN AGREEMENT?

25 **A**   YES, SIR.

1  **Q**    LET'S LOOK AT PAGE TWO, BOTTOM HALF.  ACTUALLY, I'M

2  SORRY, LET'S LOOK AT PAGE THREE.  I WANT TO LOOK AT THIS

3  PARAGRAPH THAT TALKS ABOUT COLLATERAL VALUATION.

4       ONE OF THE DEFINITIONS OF COLLATERAL OR PART OF WHAT

5  COLLATERAL IS IS THE CARS, RIGHT?

6  **A**    THE SOLD CARS AND CARS UNDER CONTRACT, YES, SIR.

7  **Q**    SO THE CARS AND THEN THE NOTES ON THE CARS THAT HAVE

8  BEEN SOLD?

9  **A**    YES, SIR.

10 **Q**    BUT THOSE ARE REALLY THE TWO MAIN CATEGORIES?

11 **A**    THEY ALSO TOLD ME THAT THEY HAD, WORD THAT I THINK

12 GLEN USED, WAS THE WORD "POOL," "POOL ASSETS" I THINK WAS

13 WHAT HE SAID, WHERE HE HAD THE UNSOLD CARS, THE CARS UNDER

14 CONTRACT, BUILDINGS THEY OWNED, TOOLS.  A TOTAL OF ALL

15 THEIR ASSETS WAS WHAT THE COLLATERAL WAS.

16 **Q**    BUT IN TERMS OF THAT, THE REALLY TWO LARGEST

17 CATEGORIES ARE THE CARS AND THE LOANS ON THE CARS?

18 **A**    WELL, I'D HAVE TO GUESS THAT.  AT THAT TIME I THINK

19 THEY HAD SOME OTHER PROPERTIES, I'M NOT SURE, BUT I'M SURE

20 THAT WAS A BIG HUNK OF IT.

21 **Q**    AND IN ORDER FOR THIS TO BE SAFE, IF SOMETHING WENT

22 WRONG WITH THE COMPANY THEY HAD TO BE ABLE TO SELL THESE

23 CARS RELATIVELY QUICKLY AND GET A VALUE THAT EXCEEDS THE

24 AMOUNT OF THE NOTES, RIGHT?

25 **A**    MR. HILL, WHO WAS SUPPOSED TO BE IN CHARGE OF THE

1 COLLATERAL, I UNDERSTAND THAT WAS TO BE HIS JOB, HE WOULD

2 SEIZE ALL THE ASSETS, WHATEVER THE ASSETS WERE, AND THEN

3 STOP EVERYTHING AND THEN SELL THOSE ASSETS TO MAKE THE

4 PEOPLE WHOLE.

5 **Q** SELL THEM FOR CASH?

6 **A** SELL THEM FOR CASH?

7 **Q** YEAH.

8 **A** I THINK THE RECEIVER IS STILL SELLING CARS RIGHT NOW

9 ON THE PAYMENT PLAN, I BELIEVE. SO I ASSUME IT'S A

10 COMBINATION OF THOSE THINGS.

11 **Q** IN ANY EVENT, THEY WOULD SELL THEM AND TRY TO COLLECT

12 THE MONEY?

13 **A** YES, SIR.

14 **Q** SO THE VALUE THAT THEY HAD TO GET FOR THE CARS HAD TO

15 BE EQUAL OR, YOU KNOW, FOR ALL OF THESE ASSETS IN

16 COMBINATION HAD TO BE EQUAL OR GREATER THAN THE AMOUNT --

17 **A** EQUAL TO, YES, SIR.

18 **Q** YOU WERE SO CONFIDENT OF THIS THAT YOU FELT -- YOU

19 ARE CLAIMING YOU THOUGHT THERE WAS NO RISK?

20 **A** YES, SIR, THAT'S TRUE.

21 **Q** BUT THE WAY THESE CARS WERE VALUED FOR COLLATERAL

22 PURPOSES, AT LEAST AT THE BEGINNING, WAS BASED ON WHAT THE

23 RETAIL PRICE WAS THAT SURE LINE WAS PUTTING ON THE CARS,

24 THE STICKER PRICE, RIGHT?

25 **A** I THINK JIM SAID THAT THEY HAD THE PRICE OF THE CAR,

1  THEY DOUBLED IT AND THEN THEY ADD THE FINANCES TO IT AND

2  THAT'S WHAT THEY CALLED TOTAL VALUE.

3  **Q**   RIGHT.  YOU COULDN'T SELL THE CAR FOR THAT AMOUNT FOR

4  CASH, RIGHT?

5  **A**   I DON'T THINK THEY SOLD CARS FOR CASH.  I THINK THEY

6  SOLD EVERYTHING THROUGH AN INSTALLMENT PLAN.

7  **Q**   AND A RECEIVER COULDN'T SELL A CAR FOR THAT AMOUNT

8  FOR CASH, RIGHT?

9  **A**   I DON'T KNOW IF HE COULD OR NOT.  WE HOPED HE COULD.

10  **Q**   YOU HAVE BEEN IN BUSINESS FOR QUITE A WHILE, RIGHT?

11  **A**   YES, SIR.

12  **Q**   AND YOU UNDERSTAND THAT AND YOU'VE ACTUALLY HAD

13  INTERACTIONS WITH THE CAR BUSINESS, RIGHT; YOU HAD

14  EXPERIENCE IN THAT?

15  **A**   ON THE BACK SIDE OF IT, SELLING EQUIPMENT TO CAR

16  COMPANIES, YES, SIR.

17  **Q**   YOU UNDERSTAND -- AND YOU HAVE HAD CONVERSATIONS WITH

18  JIM KIRK ABOUT THE USED CAR BUSINESS, RIGHT?

19  **A**   YES, SIR.

20  **Q**   YOU UNDERSTAND THAT A CAR BUSINESS CAN SELL A CAR FOR

21  A HIGHER PRICE IF IT GIVES THE BUYER A LOAN THAN IT CAN IF

22  IT'S CHARGING CASH FOR THE VEHICLE?

23  **A**   SURE.  THE RETURN WOULD BE MUCH GREATER.

24  **Q**   AND YOU UNDERSTAND THAT IF YOU VALUE THE COLLATERAL

25  FOR THE PRICE THAT YOU GET FOR WITH A LOAN, THAT YOU ARE

1  NOT GOING TO BE ABLE TO GET THAT SAME PRICE IF YOU JUST

2  HAVE TO GET IT ALL AND SELL IT FOR CASH?

3  **A**    THAT WOULD BE A TRUE STATEMENT.

4  **Q**    BUT HERE THEY'RE VALUING IT FOR THE PRICE THAT THEY

5  WOULD GET ON THEIR LOT WITH A LOAN, RIGHT?

6  **A**    THE COLLATERAL CONSISTED OF CARS UNSOLD, JUST THE

7  VALUE OF THAT CAR, AND THEN ALSO CARS SOLD AND THE VALUE

8  THAT THEY WERE GOING TO RETURN.

9  **Q**    AND WE'LL TALK ABOUT THE CARS SOLD IN JUST A MINUTE.

10  RIGHT NOW I'M TALKING ABOUT THE PART OF COLLATERAL THAT'S

11  THE CARS ON THE LOT.

12  **A**    THE CARS NOT SOLD YET?

13  **Q**    RIGHT, THE CARS NOT SOLD YET.

14  **A**    OKAY.

15  **Q**    THEY WERE LISTING THE COLLATERAL AMOUNT AS THE

16  STICKER PRICE ON THE CAR THAT THEY WOULD GET WITH THE

17  LOAN?

18  **A**    NO, I DON'T KNOW THAT.  I WAS ONLY ON THE LOT ONCE OR

19  TWICE, I DIDN'T REALLY PAY ATTENTION TO THE STICKERS.  BUT

20  THE WAY I UNDERSTOOD IT IS WHATEVER THEY PAID FOR THE CAR

21  TO GET IT UP READY TO SALE, THEY WOULD DOUBLE THAT PRICE

22  AND THAT'S WHAT WAS ON THE STICKER, NOT THE PAYMENTS.

23  **Q**    IT'S THAT STICKER PRICE, THAT RETAIL PRICE, THAT THEY

24  VALUE IT FOR COLLATERAL PURPOSES?

25  **A**    YES, SIR.  WELL, I'M NOT SURE.

1    **Q**   WELL, LOOK AT THE CONTRACT RIGHT HERE.

2    **A**   OKAY.

3    **Q**   DOESN'T IT SAY THAT IT'S VALUED -- APOLOGIZE, IT WAS

4    ON JURY MUTE.

5         DOESN'T IT SAY HERE, UNDER "COLLATERAL VALUATION",

6    IT'S VALUED AT THE DETAIL RETAIL PRICE?

7    **A**   SAYS IT SHOULD BE VALUED AT THE CONTRACT BALANCE.

8              **THE COURT:**  JUST IGNORE THE BOX.  IT'S THE

9    SECOND LINE.

10             **THE WITNESS:**  SECOND LINE?  TO THE EXTENT THERE

11   IS COLLATERAL SET FORTH IN THIS SCHEDULE, COLLATERAL

12   CONSISTS OF VEHICLES IN INVENTORY, NOT SOLD, AND UNDER

13   INSTALLMENT LOAN CONTRACT, SHALL BE VALUED AT ITS DEALER

14   RETRIAL PRICE AS DETERMINED BY THE BORROWER BASED UPON THE

15   CONDITION AND MILEAGE OF THE VEHICLE.

16   **BY MR. BRAGDON:**

17   **Q**   THE BORROWER IS SURE LINE, RIGHT?

18   **A**   I THOUGHT THE BORROWER WAS BUYING THE CAR.  BUT, YES,

19   THE BORROWER IS SURE LINE, YES, SIR.

20   **Q**   SO THE BORROWER SETS A RETAIL PRICE.  THAT'S THE

21   STICKER PRICE ON THE LOT, RIGHT?

22   **A**   YES, SIR.

23   **Q**   THAT'S THE PRICE THEY VALUE THIS COLLATERAL AT?

24   **A**   THAT'S WHAT IT SAYS.

25   **Q**   NOW, THE SECOND PART OF THE COLLATERAL IS THESE LOANS

1  ON THE CAR, RIGHT?

2  **A**   YES, SIR.

3  **Q**   AND FOR THOSE, FOR DETERMINING COLLATERAL FOR THAT,

4  THEY DETERMINED THE TOTAL AMOUNT OF PAYMENTS THEY WOULD

5  GET OVER THE LIFE OF THE LOAN?

6  **A**   YES, SIR.

7  **Q**   BUT YOU UNDERSTAND THESE WERE HIGH RISK LOANS, RIGHT?

8  **A**   I DO, YES, SIR.

9  **Q**   A LOT OF THEM AREN'T GOING TO WORK, RIGHT?

10 **A**   THAT'S A GOOD ASSUMPTION.

11 **Q**   SO IF THOSE ARE TWO OF YOUR MAJOR PIECES OF

12 COLLATERAL SECURING THE INVESTMENT, ISN'T THERE A RISK?

13 **A**   THE WAY I UNDERSTOOD IT, AS LONG AS THERE WAS MORE IN

14 COLLATERAL THAN THERE WAS IN NOTES, THERE WAS NO RISK.

15 **Q**   BUT IF THE COLLATERAL IS OVERVALUED, IF IT'S VALUED

16 FOR MORE THAN YOU COULD SELL IT FOR, ISN'T THERE RISK?

17 **A**   I GUESS IT WOULD DEPEND ON HOW MUCH COLLATERAL WAS

18 OUT THERE.  I'M ASSUMING THAT THERE WAS MORE THAN JUST THE

19 DOLLAR -- WE ALWAYS ASSUMED, AND WE WERE TOLD, THAT THERE

20 WAS ALWAYS MORE COLLATERAL THAN WAS NEEDED.  SO THERE WAS

21 ALWAYS A BUFFER THERE.

22 **Q**   THAT BUFFER ACTUALLY GOT SMALLER OVER TIME, RIGHT?

23 **A**   WELL, LAST NUMBER I SAW WAS 1.23 FOR EVERY 1 DOLLAR

24 INVESTED.

25 **Q**   STARTED OUT OVER TWO TO ONE, RIGHT?

1  **A**    RIGHT.

2  **Q**    WENT TO ONE AND A HALF TO ONE, RIGHT?

3  **A**    YES, SIR.

4  **Q**    AND THEN YOU ARE CLAIMING THAT THE LAST ONE YOU SAW

5  IS A 1.23?

6  **A**    THE LAST ONE I REMEMBER IS 1.23.

7  **Q**    THAT'S NOT A LOT OVER THE LOAN, RIGHT?

8  **A**    23 PERCENT.

9  **Q**    SO IF THE CARS OR THE ASSETS ARE MORE THAN 23 PERCENT

10  OVER VALUE, THEN THERE'S RISK, RIGHT?

11  **A**    IF THAT WAS THE ONLY ASSET.  LIKE I SAID, THERE ARE

12  OTHER ASSETS, WERE PROPERTIES AND EQUIPMENT, TOOLS, OFFICE

13  EQUIPMENT, THINGS LIKE THAT.

14  **Q**    WELL, BUT THEY'RE ALL ADDED TOGETHER TO GET TO THAT

15  1.23, RIGHT?

16  **A**    I ASSUME SO, YES.

17  **Q**    SO IT'S NOT LIKE YOU HAVE 1.23 AND CARS AND LOANS AND

18  THEN ANOTHER BIG AMOUNT FOR OTHER ASSETS, RIGHT?

19  **A**    1.23 IN ALL ASSETS.

20  **Q**    LET'S LOOK AT EXHIBIT 202T AT PAGE TWO AND LET'S ZOOM

21  IN ON THE TOP THIRD.

22       IN THE MIDDLE OF WHERE WE'RE LOOKING, YOU ARE TALKING

23  A LITTLE BIT ABOUT PUTTING ALL YOUR EGGS IN ONE BASKET,

24  RIGHT?

25  **A**    YES.

**Q**    THIS IS A PRESENTATION FROM SUMMERSET BAPTIST CHURCH
IN NEW JERSEY?

**A**    OKAY.

**Q**    AND YOU SAY THAT IT'S IMPORTANT IN THE MARKET TO
SPREAD YOUR RISK?

**A**    THAT'S TRUE.

**Q**    AND THEN YOU TELL THEM THAT WHEN YOU HAVE A FUND THAT
HAS A GUARANTEED 12 PERCENT, THERE'S NO RISK?

**A**    CORRECT.

**Q**    AND YOU ARE CLAIMING HERE TODAY THAT YOU THOUGHT AN
INVESTMENT IN SURE LINE POSED NO RISK?

**A**    YES, SIR, EXACTLY.

**Q**    THIS CLAIM OF NO RISK, THAT'S SOMETHING THAT YOU TOLD
A LOT OF INVESTORS, RIGHT?

**A**    I DON'T KNOW HOW MANY TIMES I TOLD THEM.  I'M SURE I
MENTIONED IT MANY TIMES.

**Q**    YOU WOULD, IN FACT, ENCOURAGE PEOPLE, IF THEY WERE
COMFORTABLE WITH IT, TO PUT ALL OF THEIR MONEY IN SURE
LINE?

**A**    I DID.

**Q**    THAT WAS SOMETHING YOU TOLD JOHN DAVID ROGERS?

**A**    I DID.

**Q**    THAT WAS SOMETHING YOU SAID AT HERITAGE BAPTIST
CHURCH?

**A**    WHO'S THE PASTOR?

1   **Q**    THAT'S THE ONE IN LOCUS GROVE, GEORGIA, NEAR WHERE

2   YOUR BROTHER-IN-LAW LIVED?

3   **A**    YES, SIR.

4          **MR. BRAGDON:**  IF I COULD HAVE A MOMENT, YOUR

5   HONOR?

6          **THE COURT:**  YOU MAY.

7     (PAUSE IN THE PROCEEDING.)

8   **BY MR. BRAGDON:**

9   **Q**    ANOTHER THING THAT YOU TOLD INVESTORS IS THAT SURE

10  LINE DIDN'T NEED THEIR MONEY?

11  **A**    I DID SAY THAT, YES, SIR.

12  **Q**    YOU SAID THAT AT A NUMBER OF YOUR CHURCH

13  PRESENTATIONS?

14  **A**    I DON'T THINK SO.  I THINK I WAS ASKED THAT QUESTION

15  ONCE OR TWICE AS TO WHY SURE LINE WAS PAYING 12 PERCENT.

16  I THINK MAYBE ONCE OR TWICE, I DON'T RECALL IT IN LOTS OF

17  CHURCHES.

18  **Q**    YOU AT LEAST SAID IT AT SOME CHURCHES?

19  **A**    I DID SAY IT ONCE OR TWICE, YES, SIR.

20  **Q**    TO PROSPECTIVE INVESTORS?

21  **A**    YES, SIR.

22  **Q**    BUT SURE LINE DID NEED THEIR MONEY, DIDN'T THEY?

23  **A**    I DID NOT KNOW THAT.  ALL THE INFORMATION I HAD FROM

24  JIM AND GLEN WAS THAT EVERYTHING WAS ROSY AND MONEY WAS

25  COMING IN AND EVERYBODY WAS DOING WELL AND THE INVESTORS

1   WERE ALL GETTING THEIR MONEY EVERY MONTH.  ALL THE

2   EVIDENCE I SAW OR HEARD WAS GOOD.

3   **Q**   DID GLEN SMITH EVER TELL YOU THAT HE WANTED TO CANCEL

4   THE PROGRAM?

5   **A**   THAT HE WANTED TO CANCEL THE PROGRAM?

6   **Q**   YEAH.

7   **A**   I DON'T RECALL THAT.

8   **Q**   DID JIM KIRK EVER TELL YOU THAT HE WANTED TO CANCEL

9   THE PROGRAM?

10  **A**   THERE WAS A PHONE CALL AND GLEN MAY HAVE BEEN ON

11  IT -- I'M NOT SURE IF GLEN WAS ON IT OR NOT -- WHERE JIM

12  SAID WE MAY HAVE TO START THINKING ABOUT EITHER CLOSING

13  THE PROGRAM OR SCALING IT BACK BECAUSE THE INTEREST WAS

14  TOO HIGH AND THAT THEY THOUGHT THEY COULD GET CHEAPER

15  MONEY ELSEWHERE.  I DON'T KNOW IF GLEN WAS ON THAT PHONE

16  CALL OR NOT.

17  **Q**   SO JIM -- YOU'RE CLAIMING THAT JIM KIRK TOLD YOU THAT

18  THEY NEEDED TO CLOSE THE PROGRAM OR SCALE IT BACK BECAUSE

19  THEY DIDN'T REALLY NEED THIS INVESTMENT MONEY?

20  **A**   HE TOLD ME TO START THINKING ABOUT IT AND I WAS

21  ALWAYS ARGUING AGAINST IT.  I THOUGHT IT WAS ONE OF THE

22  REASONS WHY -- EVERY REPORT I HAD SHOWED SURE LINE WAS

23  SUCCESSFUL AND IF IT WAS SUCCESSFUL I FELT LIKE IT WAS

24  BECAUSE WE WERE HELPING GOD'S PEOPLE GET THIS 12 PERCENT.

25  SO I ALWAYS ARGUED AGAINST IT.  I PREVAILED, OBVIOUSLY,

1    BUT I THINK WE TALKED ABOUT THAT AT LEAST THE LAST COUPLE

2    OF YEARS MAYBE.

3    **Q**    SO YOU TOLD INVESTORS THAT YOU FOUGHT YOUR PARTNERS

4    EVERY YEAR TO GET THEM TO KEEP THE PROGRAM?

5    **A**    I DID, AT LEAST THE LAST TWO.  I DON'T KNOW IF IT WAS

6    THE LAST THREE OR NOT.  THE LAST TWO, I DID TELL THEM, MY

7    PROSPECTIVE INVESTORS, THAT I FOUGHT MY PARTNERS, MY

8    FELLOW STOCKHOLDERS, TO KEEP IT OPEN.

9    **Q**    YOU NOW KNOW, AFTER THE FACT, THAT SURE LINE WAS

10   DESPERATE FOR MONEY, RIGHT?

11   **A**    I KNOW THAT NOW, YES, SIR.

12   **Q**    BUT YOU ARE CLAIMING AT THE TIME, IN SPITE OF BEING

13   DESPERATE FOR MONEY, THAT JIM KIRK WAS TELLING YOU THAT WE

14   DON'T NEED THE MONEY ANYMORE?

15   **A**    I CAN ONLY TELL YOU WHAT HE SAID.

16   **Q**    DIDN'T GLEN SMITH TELL YOU, IN THE SUMMER OF 2009,

17   THAT THEY NEEDED YOU TO RAISE MORE MONEY OR THEY WERE

18   GOING TO RUN OUT OF MONEY TO PAY INTEREST PAYMENTS?

19   **A**    NO, SIR.

20   **Q**    DIDN'T HE TELL YOU THAT AGAIN IN THE SUMMER OF 2010?

21   **A**    HE NEVER TOLD ME THAT.

22   **Q**    DIDN'T HE SAY IT AGAIN IN 2011?

23   **A**    HE'S NEVER TOLD ME THAT.

24   **Q**    YOU TOLD JAMES JONES IN 2011 THAT 12 PERCENT YIELD

25   WAS PROBABLY RUNNING OUT SOON?

1  **A**   I TOLD HIM THAT I FELT I WASN'T GOING TO BE ABLE TO

2  PREVAIL MUCH LONGER, I WAS FIGHTING FOR IT EVERY YEAR, I

3  WAS TOLD IT WAS GOING TO STOP.

4  **Q**   YOU TOLD CHRISTY MADDOX IN NOVEMBER OF 2011 THAT IT

5  WAS RUNNING OUT SOON?

6  **A**   IF I TOLD CHRISTY ANYTHING, I TOLD HER THAT I WAS

7  TOLD IT WAS GOING TO STOP.

8  **Q**   YOU ALSO TOLD INVESTORS THAT THE BOOKS AND RECORDS OF

9  SURE LINE WERE AUDITED?

10  **A**   I DID, YES, SIR.

11  **Q**   THAT WAS NOT TRUE?

12  **A**   I DON'T KNOW IF IT WAS OR NOT.  I WAS TOLD IT WAS.

13  THEY ALWAYS ASSURED ME THAT IT WAS ABOVE BOARD; THEY

14  ALWAYS ASSURED ME THAT ANYBODY COULD COME TO SURE LINE ANY

15  TIME THEY WANTED TO.  I EVEN RECOMMENDED THAT INVESTORS DO

16  THAT.  I DON'T KNOW IF THEY DID OR NOT.  FROM WHAT WE KNOW

17  NOW IT WAS A SCAM.

18  **Q**   YOU TOLD INVESTORS THAT YOU KNEW EVERYTHING, YOU KNEW

19  WHAT WAS GOING ON IN THE COMPANY, RIGHT?

20  **A**   YES, I DID.

21  **Q**   BUT YOU NEVER LOOKED AT ANY AUDITS?

22  **A**   I DID NOT.

23  **Q**   YOU NEVER SAW ANY AUDIT PAPERWORK?

24  **A**   I JUST TOOK THEIR WORD FOR IT.

25  **Q**   YOU NEVER TALKED TO ANY AUDITOR OR EMPLOYEE OF ANY

1  AUDITOR?

2  **A**   NO, SIR.

3  **Q**   WHO TOLD YOU THAT SURE LINE WAS AUDITED?

4  **A**   SITTING HERE THIS MOMENT I CAN'T TELL YOU IF IT WAS

5  JIM OR GLEN, BUT IT WOULD HAVE BEEN ONE OF THE TWO, OR

6  BOTH.

7  **Q**   WHO DID THEY TELL YOU AUDITED THE COMPANY?

8  **A**   WHO DID THEY TELL ME AUDITED THE COMPANY?

9  **Q**   YEAH.

10  **A**   I DON'T THINK THEY EVER MENTIONED A NAME.

11  **Q**   SO YOU TOLD INVESTORS, PROSPECTIVE INVESTORS, THAT IT

12  WAS AUDITED AND YOU HAD NO IDEA WHO AUDITED IT AT ALL?

13  **A**   ALL I HAD WAS WHAT THEY TOLD ME.

14  **Q**   AND THEY DIDN'T TELL YOU WHO AUDITED IT?

15  **A**   I DON'T RECALL IT.

16  **Q**   AND THEY DIDN'T GIVE YOU ANY VERIFICATION?

17  **A**   NO, SIR.

18  **Q**   THEY DIDN'T EVEN SAY IN WRITING IT WAS AUDITED?

19  **A**   THEY DIDN'T DO WHAT?

20  **Q**   THEY DIDN'T EVEN SAY IN WRITING THAT IT WAS AUDITED?

21  **A**   I DON'T REMEMBER SEEING ANYTHING IN WRITING, NO, SIR.

22  **Q**   NONE OF THOSE BOOKLETS ABOUT SURE LINE SAY THAT?

23  **A**   IT'S BEEN YEARS SINCE I LOOKED AT THOSE BOOKLETS.

24  I'M NOT SURE IF THAT'S TRUE.  I DON'T KNOW.

25  **Q**   THEY DIDN'T EVER SEND YOU AN E-MAIL TO THAT EFFECT?

1   **A**   JUST VERBAL CONVERSATION.

2   **Q**   BASED ON THOSE VERBAL CONVERSATIONS THAT WAS ANOTHER

3   HOOK THAT YOU USED TO ENCOURAGE PEOPLE TO INVEST?

4   **A**   HOOK IS KIND OF A HARSH WORD.  IT WAS WHAT I WAS

5   TOLD.  I BELIEVED IN THESE MEN, I BELIEVED THEM TO BE

6   HONEST, AND LIKE I TOLD YOU, UP UNTIL THE DATE THAT YOU

7   TOLD US THAT THEY ADMITTED GUILT, I BELIEVED THEM.  I HAD

8   NO REASON NOT TO BELIEVE THEM.

9   **Q**   WERE YOU ON THAT PHONE CALL WITH VICTIMS IN THE

10  SUMMER OF --

11  **A**   MY WIFE, SHE HAD A LETTER GIVING HER A NUMBER.  I DID

12  AS WELL.  SO CATHY PUT THE PHONE ON, WHAT YOU CALL IT,

13  HANDS FREE SO I COULD HEAR IT, YES, SIR.

14  **Q**   YOU PARTICIPATED ON A PHONE CALL FOR VICTIMS OF SURE

15  LINE?

16  **A**   I DID.  I MEAN, I LISTENED TO IT, YES, SIR.

17  **Q**   AT THE BEGINNING OF THAT PHONE CALL EVERYONE WAS

18  ASKED TO IDENTIFY WHO THEY WERE, RIGHT?

19  **A**   I DON'T THINK I WAS THERE AT THE FIRST OF IT.

20  **Q**   WERE YOU THERE WHEN OTHER PEOPLE WERE IDENTIFYING

21  THEIR NAMES?

22  **A**   I DID.  I HEARD MY WIFE MENTION HER NAME.

23  **Q**   SHE DIDN'T MENTION THAT YOU WERE THERE, DID SHE?

24  **A**   NO, I THINK YOU INDICATED -- I DON'T REMEMBER HOW IT

25  HAPPENED, BUT I KNOW SHE MENTIONED HER NAME AND I HEARD

1  OTHER PEOPLE MENTIONING THEIR NAMES.

2  **Q**   SHE DID NOT MENTION YOUR NAME?

3  **A**   I DID NOT.  I THOUGHT IT WOULD BE A DETRIMENT.

4  **Q**   WHEN WAS TWO-TO-ONE COLLATERALIZATION NO LONGER TRUE?

5  **A**   WHEN WAS --

6  **Q**   ORIGINALLY THEY WERE PROMISING THAT IT WAS

7  COLLATERALIZED TWO-TO-ONE?

8  **A**   YES, SIR.

9  **Q**   WHEN WAS THAT NO LONGER TRUE?

10  **A**   I'M NOT SURE.

11  **Q**   BUT IT DEFINITELY WASN'T TRUE IN 2011, RIGHT?

12  **A**   THE LAST NUMBER I SAW WAS 1.23-TO-ONE.

13  **Q**   YOU SAW THAT IN 2008, DIDN'T YOU?

14  **A**   I BELIEVE THAT WAS THE LAST NUMBER I SAW, MAYBE 2009.

15  **Q**   SO IT WASN'T TWO-TO-ONE COLLATERALIZED IN 2011,

16  RIGHT?

17  **A**   NO.  LIKE I JUST SAID, THE LAST NUMBER I SAW WAS

18  1.23-TO-ONE.

19  **Q**   SO WAS IT COLLATERALIZED TWO-TO-ONE IN 2011?

20  **A**   NO, SIR, 1.23.

21  **Q**   LOOKING AT EXHIBIT 315, 316 AND 166, DIDN'T YOU TELL

22  LEONARD LUDWICK AND J. PAUL SMITH OF OLD TIME BAPTIST

23  CHURCH, IN THE PRESENTATION THERE, THAT IT WAS

24  COLLATERALIZED TWO-TO-ONE?

25  **A**   NO, SIR.  I THINK BROTHER LUDWICK WAS MISTAKEN.  HE

1  HAD TALKED TO ME ABOUT IT YEARS EARLIER WHEN IT WAS

2  TWO-TO-ONE.  I DON'T KNOW WHY HE SAID THAT.  I'M JUST

3  ASSUMING HE WAS REFERRING TO -- I KNOW HE SAID IT WAS THAT

4  DAY WHEN I WAS THERE BUT I THINK HE WAS REMEMBERING YEARS

5  PRIOR.  BUT, NO, SIR, I DON'T REMEMBER EVER TELLING

6  TWO-TO-ONE, NO, SIR.

7  **Q**    DID YOU GO BACK TO THE PEOPLE THAT INVESTED WHEN IT

8  WAS TWO-TO-ONE COLLATERALIZED, DID YOU GO BACK AND TELL

9  THEM IT WASN'T TWO-TO-ONE COLLATERALIZED ANYMORE?

10  **A**    NO, SIR, AS LONG AS THEY HAD SOME POSITIVE COLLATERAL

11  I WAS HAPPY.

12  **Q**    J. PAUL SMITH, HE AND HIS WIFE, THEIR FIRST

13  INVESTMENT WAS IN 2011, RIGHT?

14  **A**    I THINK THAT'S WHAT HE TESTIFIED TO.

15  **Q**    YOU DON'T REMEMBER ONE WAY OR THE OTHER?

16  **A**    NO, SIR.

17  **Q**    DIDN'T YOU TELL THEM IT WAS TWO-TO-ONE

18  COLLATERALIZED?

19  **A**    I DON'T RECALL THAT, SIR.

20  **Q**    LOOKING AT EXHIBIT 307, DIDN'T YOU SAY IN FRONT OF

21  CHRISTY MADDOX AND HER HUSBAND THAT SHE WAS THE ONLY ONE

22  IN HER FAMILY WHO HADN'T TRUSTED YOU WITH HER MONEY?

23  **A**    I HEARD HER SAY THAT BUT I DON'T REMEMBER SAYING

24  THAT.

25  **Q**    HER PARENTS HAD INVESTED, RIGHT?

1   **A**   YES, SIR.

2   **Q**   SHE ALSO HAS A BROTHER?

3   **A**   SHE DOES.

4   **Q**   MICHAEL HAYNES, II?

5   **A**   YES, SIR.

6   **Q**   HE NEVER INVESTED, DID HE?

7   **A**   NOT TO MY KNOWLEDGE, BUT I HAVE NO KNOWLEDGE OF THAT.

8   **Q**   DID YOU EVER SAY THAT GLEN SMITH WAS PRESIDENT OF A

9   BANK?

10  **A**   I DID.

11  **Q**   THAT WASN'T TRUE, WAS IT?

12  **A**   IT WAS TRUE AS FAR AS I WAS CONCERNED.  JIM KIRK TOLD

13  ME HE HIRED GLEN SMITH FROM A BANK WHERE HE WAS PRESIDENT.

14  AGAIN, TRYING TO MAKE ME CONFIDENT, I'M SURE.

15  **Q**   DID YOU EVER ASK GLEN SMITH THAT?

16  **A**   NO, SIR, I DIDN'T NEED TO.

17  **Q**   WITH A LOT OF THESE STATEMENTS, WHAT YOU ARE TELLING

18  US IS YOU ASKED ONE OR THE OTHER, GLEN SMITH OR JIM KIRK,

19  THEY TOLD YOU SOMETHING AND YOU ACCEPTED THAT WITHOUT

20  QUESTIONING?

21  **A**   MY INITIAL MEETING WITH THEM, AS I MENTIONED TO YOU,

22  I WAS TRYING TO DETERMINE IF I COULD TRUST THESE PEOPLE

23  BASED ON WHETHER OR NOT I COULD DETERMINE IF THEY WERE

24  CHRISTIAN OR CLAIMED TO BE CHRISTIAN SO THEY, IN MY CAMP,

25  IF THEY WERE TRUSTWORTHY.  SO FROM THEN ON OUT, AND THE

1   LAST REPORTS I GOT WERE DECENT, I JUST TOOK THEM AT FACE

2   VALUE.

3   **Q**   WHEN YOU FLEW UP TO NORTH CAROLINA AFTER AN INITIAL

4   CONVERSATION WITH KIRK AND YOU FLEW UP IN JULY OF 2006,

5   THAT WAS YOUR FIRST TIME MEETING JIM KIRK IN PERSON,

6   RIGHT?

7   **A**   YES, SIR.

8   **Q**   AND YOU HAD ACTUALLY ONLY TALKED TO HIM ON THE PHONE

9   ONCE OR TWICE?

10  **A**   I THINK ONCE.

11  **Q**   SO AT THAT POINT IN TIME YOU DID NOT HAVE A CLOSE

12  RELATIONSHIP WITH HIM, RIGHT?

13  **A**   NO, THAT'S WHY I FLEW UP, I WANTED TO MEET HIM.

14  **Q**   HE WAS A STRANGER?

15  **A**   JUST A PHONE CALL IS ALL I KNEW OF HIM.

16          **THE COURT:**  MR. BRAGDON, I'M GOING TO LET THE

17  JURY GO HOME FOR THE EVENING.

18      LADIES AND GENTLEMEN, DON'T TALK ABOUT THE CASE,

19  DON'T LET ANYBODY TALK ABOUT THE CASE WITH YOU, DON'T DO

20  ANY INDEPENDENT RESEARCH, FOLLOW MY OTHER INSTRUCTIONS.

21  BE SAFE GETTING HOME AND BACK.  WE'LL START PROMPTLY

22  TOMORROW MORNING AT 9:00 O'CLOCK.  I WANT TO THANK YOU FOR

23  BEING CONSCIENTIOUS ABOUT ONE ANOTHER'S TIME.

24      EVERYONE REMAIN SEATED WHILE THE LADIES AND GENTLEMEN

25  OF THE JURY LEAVE THE ROOM.  MR. KIMMEL, YOU CAN RETURN TO

1    YOUR SEAT.

2         (WITNESS EXCUSED.)

3         (JURORS ABSENT FROM THE COURTROOM.)

4         **THE COURT:**  I'M JUST TRYING TO GET A SENSE ON

5    TIMING.  DO YOU HAVE A SENSE, MR. BRAGDON, ABOUT HOW MUCH

6    LONGER THE CROSS IS GOING TO GO?  PART OF WHY I ASKED, I'M

7    TRYING TO, AND THE OTHER QUESTION I HAVE FOR MR. VANN IS

8    GOING TO BE HOW MANY OF THE OTHER DEFENSE WITNESSES ARE

9    JUST PURE CHARACTER WITNESSES, WHICH THEY WILL BE REALLY

10   SHORT, AS OPPOSED TO SOMEBODY WHO WAS AN INVESTOR AND THEN

11   ALSO HAS A CHARACTER OPINION, WHICH THEY'RE OBVIOUSLY

12   DIFFERENT AND A LITTLE LONGER, ALTHOUGH NOT VERY LONG.

13        MR. BRAGDON, DO YOU HAVE A SENSE?

14        **MR. BRAGDON:**  IT IS A LITTLE HARD FOR ME TO HAVE

15   A REAL GOOD SENSE SO I'LL PROBABLY REORGANIZE SOME OF MY

16   NOTES TONIGHT.  MY GUESS AT THIS STAGE WOULD BE AN HOUR TO

17   HOUR AND A HALF APPROXIMATELY.

18        **THE COURT:**  AND THEN MR. VANN, AGAIN, I'M JUST

19   TRYING TO SEE IF MR. KIMMEL IS DONE SOMETIME AFTER THE MID

20   MORNING BREAK BUT BEFORE LUNCH, HOW MANY MORE WITNESSES DO

21   YOU HAVE?

22        **MR. VANN:**  YOUR HONOR, I HAVE SEVEN, OF WHICH

23   TWO ARE VICTIM WITNESSES AND THE OTHER FIVE WILL BE -- I'M

24   SORRY, THERE WOULD BE FOUR TOTAL.  I'VE GOT TWO THAT ARE

25   VICTIMS AND THEN FOUR MORE THAT ARE NOT, SO FOUR

1    CHARACTER.

2              **THE COURT:** OKAY.

3              **MR. VANN:** AND I HAVE THE TWO, IF WE MAKE IT TO

4    WEDNESDAY, THAT ARE BOTH VICTIMS. IF WE GET THROUGH

5    TOMORROW, THEY WILL BE HERE FIRST THING WEDNESDAY MORNING.

6              **THE COURT:** TWO MORE OR THOSE ARE THE TWO?

7              **MR. VANN:** NO, SIR, TWO SEPARATE ONES. THEY ARE

8    SCHEDULED FOR WEDNESDAY. THEY COULDN'T GET HERE BEFORE

9    WEDNESDAY. THEY ARE VICTIMS AS WELL, THEY ARE NOT JUST

10   CHARACTER.

11             **THE COURT:** SO TOMORROW YOU HAVE BASICALLY MR.

12   KIMMEL AND THEN FOUR PURE CHARACTER WITNESSES, IS THAT

13   WHAT YOU ARE TELLING ME?

14             **MR. VANN:** NO, SIR. I HAVE TWO VICTIM WITNESSES

15   TOMORROW, PLUS FOUR CHARACTER WITNESSES TOMORROW.

16             **THE COURT:** AND THEN TWO MORE VICTIMS ON

17   WEDNESDAY MORNING?

18             **MR. VANN:** YES, SIR. THAT WOULD BE IT.

19             **THE COURT:** I'M CONCERNED ABOUT BEING DONE WITH

20   WITNESSES AT ABOUT LUNCH TOMORROW AND NOT HAVING ANYTHING

21   TO DO. SO YOU HAVE TWO VICTIMS, FOUR PURE CHARACTER

22   WITNESSES FOR TOMORROW.

23        THE OTHER THING I WANT TO TALK ABOUT IS CLOSING

24   ARGUMENTS. THIS CASE IS GOING TO GET TO THE JURY EITHER

25   TOMORROW OR FIRST THING WEDNESDAY, IT SEEMS TO ME, OR

1    PRETTY MUCH WEDNESDAY MORNING CERTAINLY AT THE LATEST.

2         **MR. VANN:**  I WOULD THINK YOU ARE RIGHT, YOUR

3    HONOR.

4         **THE COURT:**  YOU AGREE WITH THAT, MR. BRAGDON?

5         **MR. BRAGDON:**  YES, YOUR HONOR.

6         **THE COURT:**  ABOUT HOW LONG DO YOU THINK IT'S

7    GOING TO TAKE YOU TO CLOSE?

8         **MR. BRAGDON:**  WE WOULD LIKE TO REQUEST AN HOUR

9    AND A HALF, YOUR HONOR.

10        **THE COURT:**  MR. VANN?

11        **MR. VANN:**  I WOULD REQUEST AN HOUR, YOUR HONOR.

12        **THE COURT:**  WHERE ARE THESE TWO PEOPLE THAT ARE

13   SUPPOSED TO BE HERE ON WEDNESDAY COMING FROM?

14        **MR. VANN:**  ONE IS DRIVING DOWN FROM DETROIT,

15   MICHIGAN, AND THE OTHER ONE IS --

16        **THE COURT:**  WHICH ONE IS THAT?

17        **MR. VANN:**  THE ONE DRIVING DOWN IS REVEREND JIM

18   BINNEY AND THEN THERE'S DR. STUART MASON, WHO'S COMING

19   FROM THE INDIANA AREA, YOUR HONOR.  DR. BINNEY, HE'S

20   DRIVING DOWN FROM MICHIGAN AND DR. MASON IS COMING FROM

21   CROWN POINT, INDIANA.

22        **THE COURT:**  OKAY.  WELL, WOULD YOU RATHER HAVE

23   THE CHARGE CONFERENCE TOMORROW MORNING BEFORE COURT OR AT

24   LUNCH TOMORROW, MR. BRAGDON?

25        **MR. BRAGDON:**  I WOULD PREFER TO HAVE IT BEFORE

1  COURT.

2      **THE COURT:**  MR. VANN, IT'S MY PRACTICE TO, AND

3  I'VE GOT THE CHARGE PRETTY MUCH DONE, THE DRAFT.  YOU'LL

4  SEE IN THE DRAFT THAT I AM READY TO HAND OUT, AND THE

5  DRAFT VERDICT FORM, THERE'S A FEW THINGS THAT ARE BOLDEN

6  JUST IN CASE THERE ARE ANY CHANGES TO IT, BUT I THINK WITH

7  THE CHARGE AND WHATNOT, THE DRAFT OF THE CHARGE IS PRETTY

8  STRAIGHTFORWARD.

9      JUST TO BE CONSCIENTIOUS OF THE JURY'S TIME, I LIKE

10  TO DO THINGS EITHER BEFORE COURT OR AT NIGHT OR AT LUNCH,

11  SO THAT WHEN THEY ARE HERE THEY'RE EITHER HEARING

12  WITNESSES OR ARGUMENTS.  I WOULD ASK YOU ALL TO STAY, AT

13  LEAST ONE LAWYER FOR EACH SIDE, I KNOW MR. VANN FOR YOUR

14  SIDE THAT MEANS YOU, TO STAY HERE, PROBABLY WILL BE 15

15  MINUTES, DEPENDING ON HOW LONG IT TAKES TO MAKE COPIES.

16  ONE OF MY LAW CLERKS WILL BRING OUT A COPY OF THE DRAFT

17  CHARGE AND DRAFT VERDICT FORM.

18      SO THAT IF WE ARE, I WILL SAY IF WE'RE DONE WITH

19  WITNESSES AT NOON TOMORROW, I MEAN, THERE HAVE BEEN

20  MULTIPLE CHARACTER WITNESSES, VICTIM CHARACTER WITNESSES,

21  THERE'S A CUMULATIVE ELEMENT, TO ME, ABOUT SORT OF TAKING

22  AN AFTERNOON OFF FOR THE JURY.  I'LL HEAR FROM YOU ABOUT

23  IT BUT IT SEEMS TO ME IF THAT'S WHERE WE ARE, MY

24  INCLINATION WOULD BE TO SAY IF THERE'S NOT A WITNESS HERE

25  WHO'S READY, AND IT'S AROUND LUNCH TIME, THEN WE'RE GOING

1    TO HEAR ARGUMENTS AFTER LUNCH AND NOT WAIT ANOTHER HALF A

2    DAY.  I MEAN, I'LL HEAR FROM YOU ABOUT THAT BUT IT SEEMS

3    TO ME, PARTICULARLY WITH THE NUMBER OF FOLKS WHO HAVE

4    EXPRESSED OPINIONS AND WHATNOT, WHICH THAT'S FINE, BUT IF

5    WE DON'T HAVE A WITNESS READY.  NOW, IF WE'RE CLOSE TO THE

6    END OF DAY, THAT'S DIFFERENT.

7         YOU WANT TO BE HEARD ON THAT?

8         **MR. VANN:**  YOUR HONOR, I GUESS MY ONLY ISSUE

9    WOULD BE THAT I THINK WE MADE GOOD EFFORTS TO GET PEOPLE

10   HERE TO BE AVAILABLE.  THESE ARE PEOPLE COMING FROM GREAT

11   DISTANCES AT THEIR OWN EXPENSE, PEOPLE WHO ALSO WERE

12   PERSONS WHO HAD INVESTMENTS IN SURE LINE WHO I THINK HAVE,

13   IF NOT A RIGHT, AT LEAST AN INTEREST IN THIS MATTER AND

14   PERHAPS RIGHT TO BE HEARD BY THE JURY AS WELL.

15        WE WERE TAKING, I KNOW THE GOVERNMENT MADE EFFORTS,

16   WE STAYED IN TOUCH WITH EACH OTHER THROUGHOUT THIS

17   PROCESS.  THEY LET US KNOW LAST WEEK THEY WOULD GET DONE

18   SOONER, BUT I HAVE PEOPLE THAT MADE PLANS AND THEY CAN'T

19   MAKE THEM THAT CLOSE.  SO I THINK WE MADE EFFORTS TO GET

20   PEOPLE HERE TO TRY TO HAVE THEM IN A TIMELY MANNER, TO NOT

21   WASTE THE JURY'S TIME.

22        AGAIN, WHILE IT MAY SEEM, TO A CERTAIN DEGREE,

23   CUMULATIVE, I GUARANTEE PERHAPS TO DR. MASON AND REVEREND

24   BINNEY, THEY WOULDN'T NECESSARILY THINK IT'S CUMULATIVE.

25   ONE OF THEM I KNOW IS ALREADY ON HIS WAY AND I ASSUME THE

1    OTHER ALREADY HAS PAID FOR A PLANE TICKET.  SO I HATE TO

2    HAVE THAT BE THE LAST CASE THEY HAVE OF THIS MATTER, WOULD

3    BE THAT THEY WERE ASKED TO COME AND JUST DUE TO THE PACE

4    OF THE TRIAL THEY WEREN'T ALLOWED TO BE HEARD.

5         **THE COURT:**  MR. BRAGDON, WHAT DO YOU HAVE TO

6    SAY?

7         **MR. BRAGDON:**  YOUR HONOR, COULD I HAVE A MOMENT?

8         **THE COURT:**  YES.

9      (PAUSE IN THE PROCEEDINGS.)

10        **MR. BRAGDON:**  YOUR HONOR, I CERTAINLY UNDERSTAND

11   THE COURT'S CONCERN ABOUT NOT WASTING THE JURY'S TIME.

12   HOWEVER, FROM THE GOVERNMENT'S PERSPECTIVE, WE DO NOT FEEL

13   LIKE WE WOULD BE PREJUDICED IN ANY WAY BY ALLOWING THOSE

14   WITNESSES TO TESTIFY ON WEDNESDAY MORNING.  SO WE WOULD

15   NOT OBJECT, IF WE'RE NOT AT THE END OF THE DAY TOMORROW,

16   WE WOULD NOT OBJECT TO -- I WOULD STILL EXPECT WE WOULD

17   FINISH UP WEDNESDAY AND DO ARGUMENTS ON WEDNESDAY, WHICH I

18   THINK WAS WITHIN THE ORIGINAL TIMEFRAME THAT WE PROPOSED

19   TO THE JURY.  SO THAT WOULD BE OUR POSITION.

20        **THE COURT:**  ALL RIGHT.  DO YOU WANT TO DO THE

21   CHARGE CONFERENCE WEDNESDAY MORNING THEN?

22        **MR. BRAGDON:**  THAT WILL BE FINE, YOUR HONOR.

23        **THE COURT:**  MR. VANN?

24        **MR. VANN:**  THAT WOULD BE FINE.  OR PERHAPS, YOUR

25   HONOR, IF WE DO FIND -- I'M SURE THE COURT, IN THE EVENT

1 THAT WE FIND WE GET TO TOMORROW SAY 3:30, WE COULD DO IT,

2 YOU KNOW, AT THE END OF THE DAY TOMORROW AND BE AVAILABLE

3 TO USE THAT TIME.  THAT IS A POSSIBILITY OF TIME USE AS

4 WELL.

5     TO ANSWER YOUR QUESTION, WEDNESDAY MORNING IS FINE

6 ALSO, OR TOMORROW AFTERNOON WOULD BE OKAY, TOO.

7         **THE COURT:**  ALL RIGHT.  I ASK ONE LAWYER FOR THE

8 GOVERNMENT TO STAY AND MR. VANN TO STAY.  I'LL GET YOU THE

9 DRAFT VERDICT FORM AND THE DRAFT CHARGE.

10    WE'LL JUST PLAN ON DOING THE CHARGE CONFERENCE AT THE

11 END OF COURT TOMORROW, WHENEVER THAT IS.  I'LL BE VERY

12 SURPRISED, FRANKLY, IF IT'S 5:00 O'CLOCK AND I WILL BE --

13 WELL, I WILL LEAVE IT AT THAT.  BUT WE WILL DO THAT AFTER

14 COURT TOMORROW AT WHATEVER POINT THAT IS, BUT I WILL HAVE

15 THE DRAFT VERDICT FORM.

16    MR. VANN, IT IS MY PRACTICE JUST TO BASICALLY ASK --

17 I'D ASK YOU AND I'D ASK MR. BRAGDON IF THERE'S AN

18 OBJECTION ON THE VERDICT FORM, TELL ME THE SPECIFIC PAGE

19 AND LANGUAGE AND LIKEWISE WITH RESPECT TO THE DRAFT OF THE

20 CHARGE, JUST BECAUSE IT WILL MOVE THE CHARGE CONFERENCE

21 ALONG.  IT ALSO ALLOWS, IF THERE ARE ANY OBJECTIONS, TO

22 THINK ABOUT WHAT THEY ARE AND TO THINK ABOUT WHETHER I

23 AGREE WITH WHOEVER IS MAKING AN OBJECTION, TO MAKE ANY

24 CHANGES SO THAT WHEN THE CASE ENDS WE GET RIGHT TO THE

25 NEXT STAGE IN THE CASE AND WE'RE NOT WAITING AROUND FOR

1  THE CHARGE TO BE CHANGED.

2     IT IS MY PRACTICE TO SEND A COPY OF THE CHARGE BACK

3  WITH THE JURY SO THAT MY NOTE TAKERS ON THE JURY DON'T

4  THINK THEY HAVE TO FURIOUSLY TAKE DOWN WHAT I HAVE TO SAY

5  IN THE JURY INSTRUCTIONS.

6     SO I'D ASK ONE LAWYER ON EACH SIDE TO STAY.  IT

7  SHOULD BE NO MORE THAN 15 MINUTES BEFORE WE GET A DRAFT OF

8  THE VERDICT FORM AND CHARGE TO YOU.  WE'LL PLAN ON DOING

9  THE CHARGE CONFERENCE AFTER COURT TOMORROW.

10     WE'LL BE IN RECESS UNTIL 9, AND I WOULD ANTICIPATE

11  THEN THAT THE JURY WOULD HEAR ARGUMENTS ON WEDNESDAY

12  MORNING.

13     (OVERNIGHT RECESS TAKEN.)

14

15

16

17

18

19

20

21

22

23

24

25

1          TUESDAY, JUNE 24, 2014

2          (WITNESS, THOMAS KIMMEL, RETURNS TO THE WITNESS

3    STAND.)

4               **THE COURT:**  GOOD MORNING.  LET'S BRING THE JURY

5    BACK.

6          (JURORS ENTER INTO THE COURTROOM.)

7               **THE COURT:**  WELCOME BACK, LADIES AND GENTLEMEN.

8    I HOPE YOU ALL ENJOYED YOUR OVERNIGHT RECESS.  GOOD

9    MORNING.  I JUST NEED TO CONFIRM YOU DIDN'T TALK ABOUT THE

10   CASE WITH ANYBODY AND NOBODY TALKED ABOUT THE CASE WITH

11   YOU AND YOU FOLLOWED MY OTHER INSTRUCTIONS.

12        YOU MAY CONTINUE THE CROSS-EXAMINATION, MR. BRAGDON.

13              **MR. BRAGDON:**  THANK YOU, YOUR HONOR.

14                    **CONTINUING CROSS-EXAMINATION**

15   **BY MR. BRAGDON:**

16   **Q**    MR. KIMMEL, DID ANYONE FROM SURE LINE EVER TELL YOU

17   THAT SURE LINE WAS LOSING MONEY?

18   **A**    THAT SURE LINE WAS LOSING MONEY?

19   **Q**    YEAH.

20   **A**    NO, SIR.

21   **Q**    LOOKING AT EXHIBIT 228, ON TUESDAY JUNE 24, 2008,

22   DIDN'T JIM KIRK AND CAROL GRAFF MEET WITH YOU IN YOUR

23   OFFICE IN INDIANA?

24   **A**    THEY DID.

25   **Q**    AND THE PURPOSE OF THIS VISIT WAS TO TELL YOU THAT

1    SURE LINE WAS LOSING MONEY AND ASKED YOU TO RAISE MORE

2    MONEY, WASN'T IT?

3    **A**    WELL NO, THE PURPOSE THEY TOLD ME WAS THEY WANTED ME

4    TO -- THEY WANTED TO BRING ME UP TO SPEED ON WHERE THE

5    COMPANY WAS, WHERE THEY THOUGHT THE COMPANY WAS GOING, AND

6    THAT THEY WANTED ME TO INCREASE PRODUCTION OR SALES, I

7    DON'T KNOW WHAT TERM THEY USED.  THAT'S WHEN I TOLD THEM I

8    DIDN'T WORK FOR THEM.

9    **Q**    LET'S LOOK AT EXHIBIT 1, PAGE SEVEN, THE 2008

10   MID-YEAR FINANCIAL REVIEW.  THIS SHOWS SURE LINE LOSING

11   $67,467 A MONTH, RIGHT?

12   **A**    I DON'T KNOW.  I THINK IT SHOWED IT FOR THAT MONTH.

13   I DON'T KNOW IF THAT WAS A RUNNING TOTAL, BUT AS LONG AS I

14   HAVE BEEN IN BUSINESS, $67,000, I THOUGHT IT WAS -- I

15   REALLY WAS NOT SURE IF IT WAS ONE MONTH, RUNNING MONTH,

16   I'M NOT SURE.  BUT IN A NEW START-UP, THAT WOULD NOT BE

17   TOO UNUSUAL FOR SEVERAL YEARS.  MANY COMPANIES I KNOW

18   ABOUT HAVE LOST MILLIONS OF DOLLARS IN THEIR START-UP.

19   MANY COMPANIES ON THE STOCK EXCHANGE TODAY HAVE LOST

20   MULTIPLE MILLIONS, HAVEN'T MADE A DOLLAR YET, WAITING TO

21   MAKING MONEY.  SO $67,000 AS A LOSS, IF IT WAS THAT

22   PARTICULAR MONTH, TO ME WASN'T EXORBITANT AT ALL.

23   **Q**    THIS IS A REPORT FOR THE WHOLE FIRST HALF OF THE

24   YEAR, RIGHT?

25   **A**    I DON'T KNOW, THAT'S WHAT I'M SAYING.  BASED ON THE

1    NUMBERS IT LOOKS LIKE IT PROBABLY WAS.

2    **Q**    RIGHT HERE IT'S TALKING ABOUT CURRENT CASH INTAKE PER

3    MONTH IS $173,372, RIGHT?

4    **A**    YES, SIR.

5    **Q**    AND TOTAL EXPENSES PER MONTH IS $240,839?

6    **A**    YES, SIR.

7    **Q**    AND SO THE DIFFERENCE, AGAIN PER MONTH, IS A LITTLE

8    OVER 67,000, RIGHT?

9    **A**    YES, SIR.

10   **Q**    LOOKING AT PAGE ONE, THIS IS THE MID-YEAR REVIEW AND

11   SO -- RIGHT?

12   **A**    YES, SIR.

13   **Q**    FOR 2008?

14   **A**    YES, SIR.

15   **Q**    AND SO WHEN IT GIVES YOU THOSE FIGURES IT'S TELLING

16   YOU WHAT THEIR AVERAGE MONTHLY LOSSES HAVE BEEN FOR THAT

17   HALF OF THE YEAR?

18   **A**    YES, SIR.

19   **Q**    LOOKING BACK AT EXHIBIT 1, PAGE SEVEN, $67,000,

20   THAT'S ABOUT 39 PERCENT OF THEIR REVENUE, ISN'T IT?

21   **A**    I'LL TAKE YOUR WORD FOR IT.

22   **Q**    ISN'T 39 PERCENT, ISN'T THAT SIGNIFICANT IN TERMS OF

23   AN AVERAGE MONTHLY LOSS?

24   **A**    I DIDN'T THINK IT WAS FOR A NEW START-UP.

25   **Q**    NOW, I THOUGHT YOU TOLD ME JUST A MINUTE AGO THAT

1   NOBODY EVER TOLD YOU THAT SURE LINE WAS LOSING MONEY.

2   **A**   YES, SIR, I DID SAY THAT.

3   **Q**   BUT YOU DID RECEIVE THIS REPORT, RIGHT?

4   **A**   I DID.  YES, SIR, I DID.

5   **Q**   AND IT DID SHOW THAT SURE LINE WAS LOSING MONEY?

6   **A**   IT SHOWED 67,000, YES, SIR.

7   **Q**   AND, IN FACT, THEY GAVE YOU THIS REPORT ON THAT TRIP

8   IN INDIANA, DIDN'T THEY?

9   **A**   YES, SIR.  I THINK THAT'S WHEN THEY SUPPLIED IT.

10  **Q**   DURING THAT -- LET'S LOOK AT EXHIBIT 46.  DURING THAT

11  TRIP, CAROL GRAFF GAVE YOU A COPY OF THIS AS WELL, RIGHT?

12  **A**   YES, SIR.

13  **Q**   AND LET'S LOOK AT PAGE FOUR.  ONE OF THE THINGS THIS

14  SAYS IS:  TO BE OPERATING IN THE BLACK IN FOUR MONTHS WE

15  NEED TO BE ABLE TO PURCHASE 60 CARS PER MONTH, RIGHT?

16  **A**   CORRECT.

17  **Q**   AND IN THE "BLACK" MEANS NOT LOSING MONEY, RIGHT?

18  **A**   CORRECT.

19  **Q**   AND TO PURCHASE THAT MANY CARS PER MONTH THEY WANTED

20  $270,000 A MONTH?

21  **A**   I DIDN'T HEAR THE LAST WORD.  THEY WANTED 270,000?

22  **Q**   TO BE ABLE TO PURCHASE THOSE CARS, PURCHASE 60 CARS A

23  MONTH?

24  **A**   YES, THEY NEEDED $270,000 TO PURCHASE 60 CARS A

25  MONTH.

1  **Q**   THEY WANTED YOU TO RAISE THAT MONEY?

2  **A**   THEY DID ASK ME TO RAISE THAT MONEY.

3  **Q**   LET'S LOOK AT PAGE SIX.

4       NOW, THIS TALKS ABOUT TO ACTUALLY ACHIEVE, NOT JUST

5  TO BREAK EVEN BUT TO ACTUALLY ACHIEVE PROFITABILITY, THEY

6  NEED TO BE ABLE TO PURCHASE 80 CARS A MONTH?

7  **A**   THAT'S WHAT IT SAYS, YES, SIR.

8  **Q**   AND TO DO THAT THEY NEED $400,000 A MONTH?

9  **A**   YES, SIR.

10 **Q**   AND THEY WANT YOU TO RAISE THAT MONEY?

11 **A**   THEY SAID IT NEEDED TO BE RAISED.  MY COMMENT TO THEM

12 WAS:  HOW ARE YOU GOING TO DO IT?  THEY SAID THROUGH CAR

13 SALES, WE WERE ON A PATH OF PROFITABILITY AND WE WILL BE

14 PROFITABLE, I THINK SHE SAID, IN ABOUT FOUR MONTHS AND

15 THEY NEEDED TO RAISE THAT KIND OF MONEY.  THEY WANTED TO

16 KNOW HOW I COULD HELP.

17 **Q**   AND THIS IS WHEN YOU GOT UPSET BECAUSE YOU SAID, "I

18 DON'T WORK FOR YOU"?

19 **A**   I DON'T WORK FOR YOU, YES, SIR.

20 **Q**   LET'S LOOK AT EXHIBIT 2, PAGE ONE.  THIS IS THE YEAR

21 END REPORT -- THE FIRST PART OF THIS EXHIBIT IS THE YEAR

22 END REPORT FOR 2008, RIGHT?

23 **A**   YES, SIR.

24 **Q**   YOU RECEIVED THIS?

25 **A**   YES, SIR.

1   Q    AND LET'S LOOK AT PAGE TWO.  LET'S ZOOM IN ON THE TOP

2   RIGHT HAND SIDE WHERE IT SHOWS CAR SALES FOR 2008.

3        IN ANY MONTH FROM JUNE TO DECEMBER 2008, IN ANY MONTH

4   FROM THE SECOND HALF OF 2008, DID THEY SELL 80 CARS?

5   A    THEY DID NOT.

6   Q    IN ANY MONTH DID THEY SELL 60 CARS?

7   A    THEY DID NOT.

8   Q    AND THEY TOLD YOU THAT JUST TO BREAK EVEN THEY NEEDED

9   TO BE ABLE TO SELL 60 CARS A MONTH FOR FOUR MONTHS?

10  A    YES, SIR.

11  Q    WHEN YOU RECEIVED THIS REPORT, YOU KNEW THAT SURE

12  LINE WASN'T PROFITABLE, DIDN'T YOU?

13  A    I CALLED HIM AND ASKED HIM ABOUT THIS REPORT.  I

14  ASKED HIM ABOUT THE NUMBERS THAT HAD BEEN GIVEN TO ME.  IF

15  YOU LOOK AT THE CENTER COLUMN YOU SEE THE PERCENT OF

16  INCREASE OVER THE PRIOR YEAR OF ANYWHERE FROM 155 PERCENT

17  ALL THE WAY UP TO 600 PERCENT OR 800 PERCENT.

18       SO THEY ASSURED ME, BASED ON THOSE NUMBERS AND BASED

19  ON WHAT THEY PROJECTED AND BASED ON THE FACT THAT THE NEW

20  CAR SALES WERE DOWN AND USED CAR SALES WERE UP, THAT

21  THOUGH THESE NUMBERS LOOKED BAD THEY FULLY BELIEVED AND

22  ASSURED ME THAT THEY COULD SELL MORE CARS.

23       CAROL WAS GOING TO DO SOME DIFFERENT TYPE OF

24  ADVERTISEMENT, THEY WERE GOING TO DO SOME MORE WORK TO GET

25  PEOPLE IN THE DOOR, AND CONVINCED ME THAT BASED ON WHAT

1    THEY DID THE YEAR PRIOR THAT THE NEXT YEAR SHOULD LOOK

2    THAT GOOD OR BETTER.

3    **Q**    BUT THE YEAR PRIOR, LET'S ZOOM IN ON 2007.  THEY

4    ACTUALLY -- LET'S SEE IF WE CAN ZOOM IN ON A WHOLE YEAR.

5    THEY NEVER ACTUALLY SOLD MORE THAN 60 CARS IN 2007?

6    **A**    NO, AGAIN, BECAUSE I WAS IN BUSINESS, IF YOU ZOOM A

7    LITTLE FURTHER TO THE RIGHT YOU WILL SEE THE PERCENTAGES.

8    AGAIN, IF YOU HAVE BEEN IN BUSINESS YOU ARE LOOKING AT

9    WHAT THE PROJECTIONS LOOK LIKE.

10       IF ANY BUSINESS STARTS OUT AND DOESN'T LOOK DOWN THE

11   ROAD, THINK THEY WILL BE SUCCESSFUL THEY WOULDN'T BE.  BUT

12   I'M LOOKING AT WHAT THEY DID THE YEAR BEFORE, THE AMOUNT

13   OF INCREASE, AND THE POSSIBILITY OF NEW ADVERTISEMENT, NEW

14   STRATEGIES, NEW WAY OF DOING THINGS.

15       EVEN AT ONE POINT WE TALKED ABOUT, AND I THINK IT WAS

16   BROUGHT OUT EARLIER, WE CHANGED OR THEY CHANGED, AT MY

17   SUGGESTION, INSTEAD OF LOOKING AT PEOPLE, I THINK GLEN

18   SMITH SAID THE MIRROR TEST, IF THEY WERE BREATHING AND HAD

19   A JOB, THEY HAD A CAR.  WE STARTED LOOKING AT THEIR DEBT

20   RATIO.  THAT'S SOMETHING I TALK ABOUT AT MY CONFERENCES.

21   DEBT RATIO WILL TELL YOU A GREAT DEAL ABOUT WHETHER THEY

22   CAN REPAY.  I SUGGESTED THEY START LOOKING AT DEBT RATIOS

23   AND NOT GIVING EVERYBODY A CAR, WHICH MEANS LESS CAR SALES

24   BUT, IN THEORY, BUT PROFIT PER CARS BECAUSE PEOPLE WOULD

25   BE ABLE TO PAY.

1  **Q**    HANG ON A SECOND.  YESTERDAY YOU SAID THAT YOU HAD NO

2  REAL INVOLVEMENT IN THE COMPANY.

3  **A**    I HAD SUGGESTION VOLUME, THAT'S THE REASON I WANTED

4  TO OWN 20 PERCENT OF THE COMPANY SO I COULD GIVE

5  SUGGESTIONS, BOTH SPIRITUALLY AND WHAT BUSINESS EXPERTISE

6  I HAD.

7  **Q**    AND SO YOU'RE NOW CLAIMING THAT THIS IDEA OF, YOU

8  KNOW, HAVING STRICTER STANDARDS FOR CUSTOMERS BUYING CARS

9  WAS ACTUALLY YOUR IDEA?

10  **A**    I SUGGESTED TO JIM AND CAROL, YES.

11  **Q**    A MINUTE AGO YOU SAID THAT THEY TOLD YOU THAT

12  EVERYTHING WAS GOING TO BE OKAY, DON'T WORRY ABOUT THESE

13  LOW SALES, WE'LL MAKE IT UP LATER.  WHO ARE YOU CLAIMING

14  TOLD YOU THAT?

15  **A**    I BELIEVE THIS IS THE SHEETS THEY GAVE ME.  I BELIEVE

16  THESE ARE THE NUMBERS THEY GAVE ME WHEN THEY CAME TO MY

17  OFFICE, JIM AND CAROL.

18  **Q**    I'M NOT ASKING WHO GAVE YOU THIS.  I'M SAYING YOU

19  CLAIMED THAT SOMEONE TOLD YOU THAT EVERYTHING WAS GOING TO

20  BE OKAY AND YOU DIDN'T NEED TO WORRY THAT THERE WEREN'T 60

21  CARS A MONTH BEING SOLD, THAT THEY WERE GOING TO MAKE

22  MONEY ANYWAY.  WHO DO YOU CLAIM TOLD YOU THAT?

23  **A**    JIM AND CAROL.

24  **Q**    ISN'T WHAT THEY ACTUALLY TOLD YOU THAT THEY WERE

25  LOSING MONEY AND THAT THEY WANTED YOU TO RAISE MORE?

1    **A**    THEY DID TELL ME THEY WANTED TO RAISE MONEY.  THEY

2    SAID THEY WERE LOSING MONEY BUT TO NOT WORRY ABOUT IT

3    BECAUSE THEY HAD THINGS IN THE PIPELINE THEY THOUGHT WOULD

4    MAKE THEM MORE SUCCESSFUL.  WHEN I LOOKED AT THE

5    PERCENTAGES, I FELT COMFORTABLE TOO.

6    **Q**    THIS IS ACTUALLY THE MEETING THEY HAD WITH YOU IN

7    INDIAN THAT WAS IN THE MIDDLE OF 2008?

8    **A**    I BELIEVE THAT'S RIGHT.

9    **Q**    THIS IS THE REPORT FOR YEAR END 2008, RIGHT?

10   **A**    YES, SIR.

11   **Q**    DID THEY MEET PERSONALLY WITH YOU ABOUT THIS REPORT,

12   TOO?

13   **A**    I WILL BE HONEST WITH YOU, I CANNOT REMEMBER WHICH

14   REPORT.  I REMEMBER THE MEETING IN 2008 BUT I CAN'T

15   REMEMBER WHICH REPORT.  THEY DID BRING THE REPORTS.

16   **Q**    WAS THERE JUST ONE MEETING ABOUT THEIR FINANCES?

17   **A**    BEST OF MY REMEMBRANCE.

18   **Q**    LET'S LOOK AT -- IF WE CAN PULL UP BOTH EXHIBITS 47

19   AND 49 UP ON THE SCREEN.

20        AFTER THAT MEETING IN INDIANA IN THE MIDDLE OF 2008,

21   YOU SENT A LETTER TO JIM KIRK AND CAROL GRAFF, RIGHT?

22   **A**    I DID YES, SIR.

23   **Q**    AND EXHIBIT 47 IS THAT LETTER?

24   **A**    THAT'S PART OF IT.

25   **Q**    THE FIRST PAGE?

**A**    YES, SIR.

**Q**    OKAY.  AND THEN CAROL GRAFF SENT YOU A RESPONSE; IS

THAT RIGHT?

**A**    YES, SIR.

**Q**    BY E-MAIL?

**A**    YES, SIR.

**Q**    AND THAT'S EXHIBIT 49?

**A**    YES, SIR.

**Q**    AND IT MAY BE DIFFICULT FOR YOU TO SEE, BUT WAS THE

E-MAIL JUNE 30, 2008?  WE'LL ZOOM IN FOR YOU.

**A**    YES, SIR.

**Q**    AND SHE COPIED JIM KIRK ON IT AS WELL?

**A**    YES, SIR.

**Q**    NOW, LET'S ZOOM IN ON EXHIBIT 49 ON PARAGRAPH TWO,

THAT SECOND NUMBERED PARAGRAPH.

AFTER YOUR MEETING, WEREN'T YOU KEENLY AWARE THAT

THEIR GOAL WAS JUST TO BREAK EVEN IN A FEW MONTHS?

**A**    THAT'S HER WORDS.  I'M SURE SHE MEANS "ARE:"  AS YOU

ARE KEENLY AWARE, OUR GOAL IS TO ACHIEVE OUR BREAK-EVEN

POINT IN A FEW MONTHS.

**Q**    WERE YOU AWARE OF THAT?

**A**    SURE.

**Q**    AND LET'S ZOOM OUT AND LET'S GO TO PARAGRAPH FIVE OF

EXHIBIT 47.

YOUR FIFTH POINT HERE IS TO ASK TO LOOK INTO

1    INSURANCE FOR THE DIRECTORS?

2    **A**    YES, SIR.

3    **Q**    YOU WERE A DIRECTOR?

4    **A**    YES, SIR.

5    **Q**    SO ONE OF THE PEOPLE YOU WANTED INSURANCE FOR WAS

6    YOURSELF?

7    **A**    YES, SIR.

8    **Q**    AND THEY HAD JUST TOLD YOU THAT SURE LINE WAS LOSING

9    MONEY?

10   **A**    YES, SIR.

11   **Q**    AND YOU MADE A LOT OF PROMISES TO INVESTORS ABOUT

12   THIS INVESTMENT?

13   **A**    YOU HAVE TO BE MORE SPECIFIC.

14   **Q**    WELL, LET ME JUST ASK YOU:  DIDN'T YOU WANT INSURANCE

15   BECAUSE YOU WERE AFRAID OF BEING SUED BY INVESTORS?

16                **MR. VANN:**  OBJECTION.

17                **THE COURT:**  OVERRULED.  YOU CAN ANSWER.

18                **THE WITNESS:**  NO.  NO, I WAS LOOKING FOR HEALTH

19   INSURANCE.  I CAN'T GET INSURED.

20   **BY MR. BRAGDON:**

21   **Q**    YOU CLAIM THAT THIS PARAGRAPH WAS ABOUT HEALTH

22   INSURANCE?

23   **A**    ABSOLUTELY, YES, SIR.

24   **Q**    YOU WEREN'T AN EMPLOYEE.

25   **A**    JUST MY OWN COMPANY, FAITHFUL STEWARDS.

1  Q    AND YOU TOLD US YESTERDAY THAT YOU DIDN'T EXPECT

2  COMPENSATION AT ALL, RIGHT?

3  A    CORRECT.

4  Q    THAT THEY WERE JUST GIVING GIFTS TO YOUR MINISTRY?

5  A    THAT'S CORRECT.

6  Q    AND YOU ARE CLAIMING HERE THAT THIS REFERS TO HEALTH

7  INSURANCE?

8          MR. VANN:  OBJECTION, ASKED AND ANSWERED.

9          THE COURT:  OVERRULED.

10         THE WITNESS:  YES, SIR, I SPECIFICALLY WAS

11 LOOKING FOR SOME HEALTH INSURANCE.  I HAVE HEALTH

12 PROBLEMS.

13 BY MR. BRAGDON:

14 Q    LET'S LOOK AT PARAGRAPH FIVE ON EXHIBIT 49.  CAROL'S

15 RESPONSE IS THAT ONCE THE COMPANY IS IN THE BLACK FOR A

16 CONSISTENT PERIOD OF TIME, THAT THE BOARD OF DIRECTORS

17 WILL DISCUSS THIS?

18 A    THAT'S WHAT SHE SAYS.

19 Q    MEANING ONCE THEY ARE NOT LOSING MONEY ANYMORE?

20         MR. VANN:  OBJECTION.

21         THE COURT:  OVERRULED.

22         THE WITNESS:  THAT'S WHAT IN THE BLACK MEANS.

23 BY MR. BRAGDON:

24 Q    AND THEY NEVER DID GIVE INSURANCE FOR DIRECTORS, DID

25 THEY?

1    **A**    THEY NEVER DID.

2    **Q**    THEY NEVER MADE ANY MONEY EITHER, DID THEY?

3    **A**    WELL, THEY TOLD ME THEY WERE MAKING ALL KINDS OF

4    MONEY AFTER 2009.

5    **Q**    AT NO POINT IN 2008 DID YOU ACTUALLY RECEIVE A REPORT

6    SHOWING THAT SURE LINE WAS MAKING A PROFIT?

7    **A**    I THINK THE ONLY REPORTS I SAW WAS THE ONES YOU

8    SHOWED.

9    **Q**    AT NO POINT IN 2009 DID YOU RECEIVE A REPORT SHOWING

10   THAT THEY WERE MAKING A PROFIT EITHER?

11   **A**    NEVER MADE A REPORT PAST THE FIRST QUARTER.

12   **Q**    AND NOT IN 2010 EITHER?

13   **A**    I RECEIVED NO REPORTS IN 2010 EITHER.

14   **Q**    AND 2011?

15   **A**    I RECEIVED NO REPORTS IN 2011 EITHER.

16   **Q**    IN FACT, THE ONLY REPORT THAT SHOWED ANYTHING ABOUT

17   THEIR PROFITABILITY WAS IN MID YEAR 2008?

18   **A**    CORRECT.

19   **Q**    AT LEAST FROM 2008 TO 2011, RIGHT?

20   **A**    WELL, IT SHOWED 2008.

21   **Q**    BUT THE ONLY REPORT IN THAT 2008 TO 2011 TIMEFRAME

22   THAT RELATED TO PROFITABILITY --

23   **A**    WAS THAT ONE.

24   **Q**    OKAY.  AND THAT SHOWED 67,000 A MONTH LOSS?

25   **A**    YES, SIR.

1  Q    LET'S LOOK AT EXHIBIT 2, PAGE ONE.  THIS IS THE

2  FINANCIAL REVIEW, YEAR END 2008.  I JUST WANT TO FLIP

3  THROUGH PAGES TWO, THREE, FOUR, FIVE, AND SIX.  WHEN WE

4  GET TO PAGE SIX, THIS ACTUALLY LOOKS TO ME LIKE A SEPARATE

5  REPORT FROM THE END OF YEAR 2008.  IS IT A SEPARATE

6  REPORT?

7  A    I THOUGHT -- IT LOOKS TO ME LIKE IT CAME WITH ALL THE

8  OTHER STUFF.  I'M NOT SURE.

9  Q    OKAY.  BUT THIS ONE HERE DOESN'T HAVE CAR SALES FOR

10  NOVEMBER AND DECEMBER 2008?

11  A    IT DOES NOT.

12  Q    AND LET'S ACTUALLY LOOK AT THE PAGE BEFORE FOR JUST A

13  SECOND.  THERE'S A COLLATERALIZATION PAGE RELATED TO THE

14  YEAR END 2008, RIGHT?

15  A    YES, SIR.

16  Q    AND THEN IF WE FLIP OVER TO PAGE NINE OF THIS

17  EXHIBIT, THERE'S ANOTHER COLLATERALIZATION PAGE AS WELL,

18  IT LOOKS LIKE FOR A DIFFERENT TIME PERIOD?

19  A    YES, SIR.

20  Q    DIDN'T YOU GET A REPORT FROM SURE LINE IN ABOUT

21  OCTOBER 2008 OR IN NOVEMBER 2008?

22  A    I CAN'T TESTIFY TO THAT.

23  Q    LET'S LOOK AT EXHIBIT 77.  IS THIS A LETTER FROM YOU

24  TO JACK SCHAAP?

25  A    IT DOESN'T SAY JACK SCHAAP BUT I'M ASSUMING IT IS.

**Q** DID YOU OFTEN REFER TO HIM AS PREACHER?

**A** YES, SIR.

**Q** BUT THIS IS A LETTER FROM YOU, RIGHT?

**A** IT IS A LETTER FROM ME, YES, SIR.

**Q** LET'S ZOOM IN ON THAT TOP HALF. ITEM THREE SAYS: ENCLOSED YOU WILL FIND UPDATED DEALERSHIP SALES/REVENUE NUMBERS FOR THE YEAR?

**A** YES, SIR.

**Q** AND THOSE WOULD HAVE BEEN THINGS THAT YOU WOULD HAVE PROVIDED FROM -- THAT YOU GOT FROM SURE LINE, RIGHT?

**A** I CAN ONLY ASSUME IT IS. I DON'T REMEMBER THAT.

**Q** AND THE DATE ON THIS LETTER IS NOVEMBER 18, 2008?

**A** YEAH.

**Q** SO WASN'T THE NUMBERS THAT YOU WERE PROVIDING, WASN'T THAT THE SECOND HALF OF EXHIBIT 2?

**A** I CAN ASSUME IT IS. I DON'T RECALL, IT'S BEEN SO LONG AGO.

**Q** LET'S LOOK AT EXHIBIT 3, PAGE ONE. THIS IS THE MARCH FINANCIAL REVIEW?

**A** YES, SIR.

**Q** AND YOU RECEIVED THAT ONE AS WELL?

**A** YES, SIR.

**Q** GOING BACK TO EXHIBIT 1, PAGE SIX, THE MID-YEAR REPORT FOR 2008. THIS IS THE COLLATERALIZATION PAGE; IS THAT RIGHT?

**A**    YES, SIR.

**Q**    AND LOOKING AT ACCOUNTS RECEIVABLES, WHAT THIS IS
SHOWING IS THAT THE TOTAL CONTRACT BALANCE THAT THOSE
ACCOUNTS WOULD PAY OVER TIME?

**A**    YES, SIR, LOOKS THAT WAY.

**Q**    LET'S ZOOM OUT.  FOR NOW, LET'S STAY ZOOMED OUT.  I
THINK WE CAN READ IT.

         THE END STOP PROJECTED VALUE, IS THAT THE VALUE OF
THE CARS?

**A**    CARS IN STOCK, YES, SIR.

**Q**    THE ONES THAT HAVEN'T BEEN SOLD YET?

**A**    YES, SIR, I THINK SO.

**Q**    AND FURNISHING AND EQUIPMENT, THAT'S THE THIRD
COLUMN, RIGHT?

**A**    YES, SIR.

**Q**    AND IS THAT THE SUM OR THE ADDING KIND OF THE THINGS
UNDERNEATH -- IT GIVES ADDITIONAL DETAIL DOWN BELOW UNDER
ASSET DETAIL; IS THAT RIGHT?

**A**    IT DOES.

**Q**    SO THE FURNISHING AND EQUIPMENT INCLUDES FURNISHING
AND FIXTURES, VEHICLE REPAIR EQUIPMENT AND OFFICE
EQUIPMENT?

**A**    IT DOES.

**Q**    AND THE TOTAL IS 500,000?

**A**    THAT'S WHAT IT SAYS, YES.

1  Q    AND THE FOURTH COLUMN IS LISTED AS CASH IN BANK?

2  A    YES, SIR.

3  Q    AND THERE'S A GRAND TOTAL HERE OF 7.9 MILLION?

4  A    YES, SIR.

5  Q    AND SO BASICALLY THE COLLATERAL IS BROKEN INTO FOUR

6  CATEGORIES?

7  A    YES, SIR.

8  Q    AND THEN THAT TOTAL COLLATERAL IS REWRITTEN RIGHT

9  HERE IN THE CENTER LEFT HAND SIDE OF THE PAGE?

10  A    YES, SIR.

11  Q    AND THEN UNDERNEATH IT THERE'S A TOTAL NOTE HOLDER

12  MONEY LISTED?

13  A    YES, SIR.

14  Q    AND THAT'S 6.4 MILLION?

15  A    YES, SIR.

16  Q    AND THEN UNDERNEATH THAT IT SAYS, EXCESS

17  OVER-COLLATERALIZATION OF 1.5 MILLION?

18  A    IT DOES.

19  Q    AND THEY DID THAT BY SUBTRACTING THE NOTE HOLDER

20  MONEY FROM THE TOTAL COLLATERAL?

21  A    YES, SIR.

22  Q    AND THEN YOU HAD MENTIONED -- THIS IS THE MID-YEAR

23  2008 REPORT, RIGHT?

24  A    I BELIEVE IT WAS, YES, SIR.

25  Q    YOU HAD MENTIONED THIS 1.23 PERCENT, OR 1.23-TO-ONE

1  COLLATERAL; IS THAT RIGHT?

2  **A**    YES, SIR.

3  **Q**    THE WAY YOU CALCULATE THAT NUMBER IS BY DIVIDING THE

4  TOTAL COLLATERAL BY THE TOTAL NOTE HOLDER MONEY?

5  **A**    I THINK THAT'S RIGHT, YES, SIR.

6  **Q**    OKAY.  NOW, LET'S LOOK AT EXHIBIT 2, PAGE NINE.  THIS

7  IS THAT SECOND HALF OF EXHIBIT 2, THE ONE THAT APPEARED TO

8  BE FOR OCTOBER OF 2008.

9      HERE THE TOTAL COLLATERAL IS A LITTLE OVER

10  9.6 MILLION, RIGHT?

11  **A**    YES, SIR.

12  **Q**    BUT THE NOTES HAVE ALSO GONE UP, THEY'RE 8 MILLION

13  NOW?

14  **A**    YES, SIR.

15  **Q**    AND THAT EXCESS OVER-COLLATERALIZATION IS A LITTLE

16  OVER 1.6 MILLION?

17  **A**    YES, SIR.

18  **Q**    AND IF WE WOULD LOOK -- LET'S LOOK OVER TO PAGE 11.

19  HERE IT SHOWS THAT IT'S 1.2 PERCENT COLLATERALIZED; IS

20  THAT RIGHT?

21  **A**    IT DOES.

22  **Q**    AND, AGAIN, THAT'S TAKEN BY TAKING THIS BIGGER

23  NUMBER, THE TOTAL COLLATERAL, AND DIVIDING IT BY THAT

24  8 MILLION?

25  **A**    YES, SIR.

1    Q    NOW, LET'S LOOK AT THE YEAR END 2008 REPORT,

2    EXHIBIT 2, PAGE FIVE.

3         TOTAL COLLATERAL HAS GONE UP TO A LITTLE ABOVE

4    11.2 MILLION, RIGHT?

5    A    YES, SIR.

6    Q    TOTAL NOTE HOLDER MONEY IS ALSO UP TO A LITTLE OVER

7    10.2 MILLION, RIGHT?

8    A    YES, SIR.

9    Q    AND THE AMOUNT OVER-COLLATERALIZATION IS A LITTLE

10   OVER $1 MILLION?

11   A    YES, SIR.

12   Q    SO THAT COLLATERAL FIGURE HAS GONE DOWN BY HALF A

13   MILLION?

14   A    OKAY.

15   Q    IS THAT RIGHT?

16   A    YES, SIR.

17   Q    AND, AGAIN, YOU CAN FIGURE OUT THE PERCENTAGE OF

18   COLLATERALIZATION BY DIVIDING THIS TOP, THE 11.2 MILLION

19   FIGURE BY THE 10.2 MILLION FIGURE; IS THAT RIGHT?

20   A    YES, SIR.

21   Q    AND DOES THAT COME OUT TO 1.10 FOR EVERY DOLLAR

22   INVESTED?

23   A    I DON'T HAVE A CALCULATOR HERE.

24        MR. BRAGDON:  WITH THE COURT'S PERMISSION, COULD

25   I PUT A CALCULATOR ON THE SCREEN?

1      **THE COURT:** THAT'S FINE.

2   **BY MR. BRAGDON:**

3   **Q**   SO LET'S DO THIS MATH.  LET'S PUT IN 11,261,679 AND

4   LET'S DIVIDE IT BY 10,225,866.59.  SO 1.10 PERCENT?

5   **A**   YES, SIR.

6   **Q**   SO COLLATERAL IS NO LONGER 1.23?

7   **A**   THAT'S CORRECT.

8   **Q**   AND IT'S NO LONGER $1.20?

9   **A**   THAT'S CORRECT.

10  **Q**   IT'S NOW 1.10?

11  **A**   THAT'S CORRECT.

12  **Q**   NOW, LET'S LOOK AT THE MARCH 2009 REPORT, EXHIBIT 3,

13  PAGE SIX.  ACTUALLY, I THINK MAYBE -- LET'S TRY EXHIBIT 3,

14  PAGE FIVE.  I MAY HAVE MY PAGE WRONG.

15      SO NOW TOTAL COLLATERAL IS A LITTLE ABOVE

16  10.4 MILLION?

17  **A**   YES, SIR.

18  **Q**   AND NOTE HOLDER MONEY TOTAL IS 10.2 MILLION,

19  ESSENTIALLY THE SAME?

20  **A**   YES, SIR.

21  **Q**   AND AMOUNT OVER-COLLATERALIZATION IS 247,866.72?

22  **A**   CORRECT.

23  **Q**   ISN'T THAT ABOUT 1.02 FOR EVERY DOLLAR?

24  **A**   APPROXIMATELY, YES, SIR.

25  **Q**   SO THIS IS THE LAST REPORT YOU GOT, RIGHT?

**A**    I THINK SO.

**Q**    AND AT THIS POINT IT'S PRECARIOUSLY CLOSE TO BEING UNDER-COLLATERALIZED?

**A**    YES, SIR.

**Q**    LOOKING AT EXHIBIT 303 AND 184.  DIDN'T YOU TELL PROSPECTIVE INVESTORS IN OCTOBER OF 2010 THAT THERE WAS 1.23 PER EVERY DOLLAR INVESTED, AND THAT THIS WAS AUDITED?

**A**    I KNOW SOMEWHERE IN MY PRESENTATION AFTER THAT LAST REPORT YOU SHOWED, THAT I BEGAN TO TALK ABOUT AT LEAST A DOLLAR OF COLLATERAL FOR EVERY DOLLAR THAT WAS OUT THERE. I'M NOT SURE IF THAT WAS THE MEETING SHE WAS IN OR NOT. IF I DID TELL HER 1.23, I DON'T RECALL THAT.

**Q**    WELL, LET'S LOOK AT EXHIBIT 201, PAGE NINE.  I'M SORRY, 201T, PAGE NINE.  LET'S ZOOM IN ON THE HIGHLIGHTED SECTION IN THE MIDDLE OF THE PAGE, THE THIRD MAIN PARAGRAPH.

    THIS WAS A PRESENTATION AT SOUTH HAVEN BAPTIST CHURCH, RIGHT?

**A**    I'LL TAKE YOUR WORD FOR THAT.

**Q**    IN OCTOBER OF 2010?

**A**    I'LL TAKE YOUR WORD ON THAT.

**Q**    AND IT SAYS:  RIGHT NOW WE HAVE ASSETS IN EXCESS OF $1.23 FOR EVERY NOTE WE HAVE OUT THERE -- FOR EVERY DOLLAR WE HAVE OUT THERE?

**A**    YES, SIR.

1  **Q**   AND THEN AT THE BOTTOM IT SAYS, THAT'S AUDITED?

2  **A**   THE BOTTOM SAYS WHAT?

3  **Q**   "THAT'S AUDITED."

4  **A**   YES, SIR.

5  **Q**   LET'S LOOK BACK AT EXHIBIT 3, PAGE FIVE.  THIS FIGURE

6  OVER HERE ON THE RIGHT HAND SIDE UNDER THE GRAND TOTAL

7  AMOUNT.

8  **A**   YES, SIR.

9  **Q**   IT'S ACTUALLY JUST A 10.0; IS THAT RIGHT?

10  **A**   YES, SIR.

11  **Q**   AND THAT WOULD BE LESS THAN THE NOTE HOLDER AMOUNT,

12  RIGHT?

13  **A**   YES, SIR.

14  **Q**   BUT THERE'S THIS $450,000 EQUITY OWNERSHIP IN

15  AUTOMOCION THAT GETS ADDED, RIGHT?

16  **A**   YES, SIR.

17  **Q**   WHAT WAS THAT?

18  **A**   IF MY MEMORY TELLS ME CORRECTLY, I BELIEVE THAT

19  JIM -- I CAN'T REMEMBER HOW THEY DID THAT.  I REMEMBER I

20  WAS TOLD THAT THEY WERE -- SURE LINE HAD BOUGHT AUTOMOCION

21  OR AUTOMOCION HAD BECOME A PART OF SURE LINE.  SOMEHOW IT

22  BECAME ONE, AUTOMOCION AND SURE LINE.  I'M NOT SURE

23  EXACTLY HOW THEY DID IT.

24  **Q**   WELL, THIS REPORT ALREADY INCLUDES ALL OF THE CARS

25  THAT AUTOMOCION HAS, RIGHT?

1  **A**   YES, SIR.

2  **Q**   IT INCLUDES ALL OF THE EQUIPMENT THAT IT HAS?

3  **A**   YES, SIR.

4  **Q**   AND IT INCLUDES ALL OF THE CAR LOANS?

5  **A**   YES, SIR.

6  **Q**   IT INCLUDES ALL THE CASH IN THE BANK, RIGHT?

7  **A**   YES, SIR.

8  **Q**   WHAT DOES THAT $450,000 REPRESENT THAT WASN'T ALREADY

9  INCLUDED ON THIS SHEET?

10  **A**   I DON'T KNOW.

11  **Q**   A MAIN THEME IN YOUR SEMINARS WAS TO HELP PEOPLE GET

12  OUT OF DEBT?

13  **A**   YES, SIR.

14  **Q**   DIDN'T YOU ENCOURAGE SOME PROSPECTIVE INVESTORS TO

15  GET INTO DEBT?

16  **A**   THERE WERE SITUATIONS THAT I CAN RECALL WHERE, AND I

17  DON'T RECALL THE SPECIFIC, BUT I DO RECALL THERE WAS SOME

18  SITUATIONS WITH SOME PEOPLE WHO WERE LOOKING FOR

19  INVESTMENT MONEYS AND A BUSINESS PRACTICE THAT I TOLD THEM

20  WAS AVAILABLE TO THEM, WAS THAT THEY COULD INDEED BORROW

21  ON AN ASSET, IF THEY WERE DEBT FREE, THEY COULD BORROW ON

22  AN ASSET AND AS LONG AS -- I THINK THE WAY THE BIBLE

23  TEACHES, AS LONG AS THE ASSET AMOUNT WAS MORE THAN THE

24  BORROWING AMOUNT, THERE WOULD NOT BE A DEBT.  I THINK IT'S

25  ROMANS 13:8, TEACHES US, THAT VERSE TEACHES US TO NOT PUT

1    OURSELVES IN A POSITION WHERE WE OWE SOMEBODY SOMETHING.

2        SO IN SECULAR TERMS IT WOULD BE BORROWING MONEY.  FOR

3    INSTANCE ON MAYBE ON A HOME THAT WAS PAID OFF, AND TAKE A

4    SMALL PORTION OR A PORTION OF THAT MONEY, INVEST IT IN

5    WHAT I THOUGHT WAS A GOOD, SOLID INVESTMENT, FIXED RATE

6    RETURN, THE PRINCIPAL WAS ALWAYS PROTECTED SO THAT THERE

7    WAS NEVER A BIBLICAL DEBT.  THERE WAS A SECULAR DEBT BUT

8    NOT A BIBLICAL DEBT.  SO AT ANY GIVEN TIME THEY COULD TAKE

9    THE ASSET, IN THIS CASE THE STERLING OR SURE LINE, AND

10   LIQUIDATE, GET THEIR MONEY BACK, AND PAY THE SECULAR DEBT

11   OFF.

12   **Q**    JUST FROM LOOKING AT EXHIBIT 307 FROM A SECULAR

13   PERSPECTIVE, YOU ENCOURAGED CHRISTY MADDOX TO BORROW MONEY

14   TO INVEST?

15   **A**    I DON'T REMEMBER EVER ENCOURAGING CHRISTY TO BORROW

16   MONEY.

17   **Q**    LOOKING AT EXHIBIT 306, YOU ENCOURAGED MR. HAYNES TO

18   BORROW MONEY TO INCUR DEBT?

19   **A**    I DON'T RECALL THAT.

20   **Q**    YOU ENCOURAGED JOE ELWELL TO TAKE OUT A LOAN AND

21   PURCHASE SOME ADDITIONAL PROPERTIES SO THAT THE MONEY HE

22   HAD FROM A PROPERTY SALE COULD BE USED?

23   **A**    THAT WAS NOT TRUE AT ALL.  I DIDN'T ENCOURAGE HIM TO

24   BUY PROPERTY, TO BORROW MONEY.  NO, I DIDN'T DO THAT.

25   **Q**    LOOKING AT EXHIBIT 401T, PAGE TWO, BOTTOM OF THE

1    PAGE.

2         **THE COURT:**  DID YOU SAY 201T OR 401T?

3         **MR. BRAGDON:**  I'M SORRY, I MEANT 204T, PAGE TWO,

4    BOTTOM OF THE PAGE.

5    **BY MR. BRAGDON:**

6    **Q**    LET'S ZOOM OUT AND GET A LITTLE MORE CONTEXT.  LET'S

7    GET THE BOTTOM HALF OF THE PAGE.

8         DIDN'T YOU ENCOURAGE PEOPLE TO BORROW FROM THEIR 401K

9    TO INVEST IN SURE LINE?

10   **A**    YES, BORROWING FROM THEIR 401K IS BORROWING FROM

11   YOURSELF.  IT'S LIKE TAKING IT OUT OF YOUR SAVINGS

12   ACCOUNT, WHICH IS WHAT A 401K IS, A QUALIFIED SAVINGS

13   ACCOUNT.  TAKE IT OUT OF SOMETHING THAT WASN'T DOING WELL,

14   PUT IT IN SOMETHING THAT WAS DOING BETTER AND THEN PAY

15   YOURSELF BACK INTEREST.  SO I WAS TALKING ABOUT BORROWING

16   MONEY THAT BELONGED TO YOU.

17   **Q**    YOU DON'T DENY, REGARDLESS OF THE SPECIFIC PEOPLE I

18   MENTIONED, YOU DON'T DENY THAT IN GENERAL YOU DID ADVISE,

19   FROM A SECULAR PERSPECTIVE, YOU DID ADVISE SOME PEOPLE TO

20   BORROW MONEY TO INVEST IN SURE LINE?

21   **A**    NOT AS A GENERAL PRINCIPAL, NO, SIR.  NEVER FROM THE

22   PULPIT, NEVER FROM A SEMINAR.  THERE WAS SOME SPECIFIC

23   CASES WHERE FOR THEIR SPECIFIC SITUATION IT WAS AN OPTION.

24   **Q**    LET'S LOOK AT -- I'M GOING TO PUT UP ON THE SCREEN

25   JUST FOR YOU EXHIBIT 78.

1   **A**   OKAY.

2   **Q**   THIS IS AN E-MAIL FROM YOU TO JIM KIRK, RIGHT?

3   **A**   IF YOU COULD RAISE IT UP A LITTLE BIT FOR ME?

4   **Q**   SURE.

5   **A**   YES, SIR.

6   **Q**   IT'S DATED JANUARY 19, 2009?

7   **A**   IT IS.

8   **Q**   AND IT'S ABOUT A NOTE HOLDER?

9   **A**   YES, SIR.

10          **MR. BRAGDON:**  MOVE TO ADMIT.

11          **THE COURT:**  IT WILL BE RECEIVED.

12  **BY MR. BRAGDON:**

13  **Q**   ACTUALLY, I'D LIKE TO LOOK AT THIS BOTTOM E-MAIL.

14  YOU'RE FORWARDING AN E-MAIL TO JIM KIRK, RIGHT?

15  **A**   YES, SIR, LOOKS LIKE IT.

16  **Q**   SO LET'S LOOK AT THE E-MAIL THAT YOU ARE FORWARDING.

17  THIS E-MAIL IS FROM HANK MERISON TO YOU, RIGHT?

18  **A**   YES, SIR.

19  **Q**   HE'S TELLING YOU THAT THEY DECIDED TO BORROW $30,000

20  AT 7.75 PERCENT AND PUT IT IN SURE LINE?

21  **A**   COULD I READ THE LETTER, PLEASE?

22  **Q**   SURE.

23          (PAUSE IN THE PROCEEDINGS.)

24  **A**   OKAY.  AND YOUR QUESTION?

25  **Q**   SURE.  LET ME REPEAT THE QUESTION.  HE'S TELLING YOU

1    THAT THEY BORROWED 7.75 PERCENT -- BORROWED $30,000 AT

2    7.75 PERCENT AND PUT IT IN SURE LINE?

3    **A**    YES.

4    **Q**    AND LET'S ZOOM OUT AND ZOOM IN TO THE TOP OF THE

5    E-MAIL.  YOUR COMMENT TO JIM KIRK ABOUT THE E-MAIL IS:

6    THOUGHT YOU MIGHT LIKE TO READ A LETTER FROM ANOTHER NOTE

7    HOLDER?

8    **A**    YES, SIR.

9    **Q**    YOU SAID ON DIRECT ONE OF THE THINGS YOU TOLD PEOPLE

10   ABOUT THE INVESTMENT WAS TO GET SPIRITUAL COUNSELING?

11   **A**    I DID.

12   **Q**    AND YOU DID EVERYTHING YOU COULD TO GET PASTORS TO

13   RECOMMEND SURE LINE, DIDN'T YOU?

14   **A**    I DON'T THINK I MADE A CONCERTED EFFORT TO GET ANY

15   PASTOR TO RECOMMEND SURE LINE.  I ALWAYS APPRECIATED WHEN

16   THEY DID, AND MANY DID.

17   **Q**    WELL, YOU MADE SURE THAT A LOT OF THEM GOT A

18   1 PERCENT FEE FOR RECOMMENDING SURE LINE, RIGHT?

19   **A**    I TRIED, BUT I DON'T THINK MAYBE BUT TWO OR THREE GOT

20   THAT 1 PERCENT FEE.  I DON'T REMEMBER ANY MORE THAN THAT.

21   **Q**    YOU ALSO MADE IT A POINT TO LOWER THE MINIMUM FOR

22   PASTORS SO THAT THEY COULD INVEST MORE EASILY THAN OTHER

23   PEOPLE, RIGHT?

24   **A**    ANYBODY IN FULL-TIME CHRISTIAN SERVICE, BE IT SCHOOL

25   TEACHER, PASTOR, MISSIONARY, EVEN SECRETARIES TYPICALLY

1    MAKE VERY LITTLE MONEY.  SO, YES, I ASKED MR. KIRK IF HE

2    COULD LOWER THE REQUIREMENTS FROM 25,000 DOWN TO 5,000 SO

3    THOSE PEOPLE COULD PARTICIPATE.

4    **Q**    BECAUSE IF THEY WERE PARTICIPATING THEY WOULD BE MORE

5    LIKELY TO RECOMMEND IT TO OTHERS?

6    **A**    I DON'T KNOW IF THEY WOULD OR NOT, BUT THAT WAS MY

7    GOAL.  MY GOAL WAS TO HELP PEOPLE HAVE SOME MONEY IN A

8    RETIREMENT FUND.

9    **Q**    ONE OF THE PASTORS THAT GOT A 1 PERCENT FEE WAS SANDY

10   BOZEMAN?

11   **A**    YES, SIR.

12   **Q**    HE WAS ON THE SPIRITUAL BOARD OF DIRECTORS?

13   **A**    HE WAS.

14   **Q**    ANOTHER ONE WAS JACK SCHAAP?

15   **A**    YES, SIR.

16   **Q**    HE WAS ON THE SPIRITUAL BOARD OF DIRECTORS?

17   **A**    HE WAS.

18   **Q**    YOU DIDN'T TELL INVESTORS ABOUT THE 1 PERCENT FEE,

19   DID YOU?

20   **A**    NO, SIR.

21   **Q**    I'D LIKE TO LOOK AT EXHIBIT 201T, PAGE ONE.  LET'S

22   ZOOM IN ON THAT LAST THREE LINES OF THAT SECOND PARAGRAPH.

23       YOU TALKED ABOUT -- BEFORE YOU INVESTED IN SURE LINE

24   YOU TALKED ABOUT GIVING MONEY TO A CHRISTIAN INVESTOR?

25   **A**    YES, SIR.

1  **Q**   THAT'S SOMETHING THAT YOU SAID AT SEVERAL

2  PRESENTATIONS?

3  **A**   YES, SIR.

4  **Q**   THE CHRISTIAN INVESTOR YOU ARE REFERRING TO IS SCOTT

5  HOLLENBECK?

6          **MR. VANN:**  OBJECTION.

7          **THE COURT:**  OVERRULED.

8          **THE WITNESS:**  I DON'T RECALL EXACTLY.  I TRIED

9  TO INVEST -- EVERYTHING I DO I TRY TO DO WITH CHRISTIANS.

10  I DON'T RECALL EXACTLY WHO THIS GUY WAS.

11  **BY MR. BRAGDON:**

12  **Q**   DIDN'T YOUR WIFE INVEST $35,000 WITH THE WEBB GROUP?

13  **A**   SHE DID.

14  **Q**   AND THE WEBB GROUP WAS A COMPANY OWNED BY SCOTT

15  HOLLENBECK?

16  **A**   I DON'T KNOW THAT.

17  **Q**   SHE INVESTED IT IN 2003, RIGHT, END OF 2003?

18  **A**   I DON'T KNOW THAT.  I DON'T REMEMBER THAT.

19  **Q**   SCOTT HOLLENBECK WAS PROMISING 12 PERCENT INTEREST?

20  **A**   I'M SORRY, I DON'T REMEMBER THAT.

21          **MR. VANN:**  OBJECTION, RELEVANCE.

22          **THE COURT:**  OVERRULED.

23  **BY MR. BRAGDON:**

24  **Q**   HE WAS ALSO PROMISING INSURANCE FOR THE INVESTMENT?

25          **MR. VANN:**  OBJECTION, CALLS FOR FACTS NOT IN

```
1   EVIDENCE.
2           THE COURT:  OVERRULED.
3           THE WITNESS:  I DON'T RECALL THAT.
4   BY MR. BRAGDON:
5   Q    AND THAT INSURANCE WAS FRAUDULENT?
6           MR. VANN:  OBJECTION.
7           THE COURT:  OVERRULED.
8           THE WITNESS:  I DON'T KNOW ANYTHING ABOUT THAT.
9   BY MR. BRAGDON:
10  Q    MOST OF THE MONEY WAS GOING TO A COAL MINE?
11          MR. VANN:  OBJECTION.
12          THE COURT:  OVERRULED.
13          THE WITNESS:  I DON'T KNOW THAT.
14  BY MR. BRAGDON:
15  Q    WELL, YOU SAY IN A NUMBER OF YOUR PRESENTATIONS THAT
16  IT TOOK THREE YEARS TO GET 75 PERCENT OF THE MONEY BACK,
17  RIGHT?
18  A    YES, SIR.
19  Q    AND ACTUALLY GREG BARTKO WAS ONE OF THE LAWYERS
20  INVOLVED WITH GETTING THE MONEY BACK?
21  A    CORRECT.
22  Q    BUT IT DIDN'T TAKE YOU THREE YEARS TO GET YOUR WIFE'S
23  MONEY BACK, DID IT?
24  A    I SAID I BELIEVED IT.  I DON'T RECALL AT THAT TIME,
25  NO, I DON'T KNOW.
```

1          **MR. BRAGDON:**  IF I COULD HAVE A MOMENT, YOUR

2    HONOR?

3         (PAUSE IN THE PROCEEDINGS.)

4    **BY MR. BRAGDON:**

5    **Q**    I'VE HANDED YOU EXHIBITS 198 AND 212.  I THINK

6    ACTUALLY BEFORE WE TALK ABOUT THOSE I'D LIKE TO GET A

7    LITTLE CONTEXT FROM YOU.

8         THE INVESTORS THAT BARTKO WORKED TO GET THEIR MONEY

9    BACK, IT TOOK THREE YEARS AND THERE WAS LITIGATION

10   INVOLVED, RIGHT?

11             **MR. VANN:**  OBJECTION, RELEVANCE.

12             **THE COURT:**  OVERRULED.

13             **THE WITNESS:**  I THINK THAT'S RIGHT.

14   **BY MR. BRAGDON:**

15   **Q**    WHAT WAS YOUR ANSWER?

16   **A**    I THINK THAT'S CORRECT.

17   **Q**    AND YOU ACTUALLY SAY IN SOME OF THESE PRESENTATIONS

18   THAT YOU WERE WORKING WITH GREG BARTKO?

19   **A**    I THINK THAT'S CORRECT.

20   **Q**    AND THEY DIDN'T GET IT BACK FROM SCOTT HOLLENBECK OR

21   THE WEBB GROUP DIRECTLY, RIGHT?

22   **A**    I THINK THEY GOT IT BACK FROM WHERE THEY GOT THE

23   MONEY INVESTED.

24   **Q**    FROM THE RECEIVER.  THERE WAS A RECEIVER APPOINTED,

25   RIGHT?

1    **A**    I JUST HONESTLY DON'T REMEMBER THE DETAILS.

2    **Q**    THE RECEIVER WAS ACTUALLY GLEN SMITH, WASN'T IT?

3    **A**    I DON'T REMEMBER THAT.

4    **Q**    OKAY.  BUT YOUR WIFE GOT HER MONEY BACK IN 2004 AND

5    2005, DIDN'T SHE?

6    **A**    I THINK SO.

7    **Q**    LOOK AT EXHIBIT 198.  THAT'S A DEPOSIT SLIP FROM YOUR

8    BANK ACCOUNT, RIGHT?

9    **A**    YES, SIR.

10   **Q**    AND THERE'S A CHECK ATTACHED TO IT?

11   **A**    YES, SIR.

12        **MR. BRAGDON:**  MOVE TO ADMIT.

13        **MR. VANN:**  OBJECTION.

14        **THE COURT:**  IT WILL BE RECEIVED.  IT MAY BE

15   PUBLISHED.

16   **BY MR. BRAGDON:**

17   **Q**    LET'S PUT THAT UP ON THE SCREEN.

18        SO THIS IS THE DEPOSIT SLIP.  LET'S ACTUALLY LOOK AT

19   THE NEXT PAGE, PAGE TWO.  IT'S A CHECK FROM WEBB FINANCIAL

20   SERVICES TO CATHY KIMMEL, CORRECT?

21   **A**    RIGHT.

22   **Q**    FOR $10,000?

23   **A**    IT IS.

24   **Q**    AND IT'S JUNE 7, 2004?

25   **A**    IT IS.

**Q**   SO THIS IS ABOUT SIX MONTHS AFTER SHE INVESTED IN DECEMBER?

**A**   I DON'T SEE THAT BUT I'M ASSUMING IT'S CORRECT.

**Q**   WELL, THE OTHER EXHIBIT YOU HAVE IS 212, THAT'S ANOTHER DEPOSIT SLIP, RIGHT?

**A**   IT IS.

**Q**   AND ATTACHED TO THAT IS ANOTHER CHECK FROM WEBB FINANCIAL SERVICES TO CATHY KIMMEL, RIGHT?

**A**   CORRECT.

    **MR. BRAGDON:**  MOVE TO ADMIT.

    **MR. VANN:**  OBJECTION.

    **THE COURT:**  IT WILL BE RECEIVED AND MAY BE PUBLISHED.

**BY MR. BRAGDON:**

**Q**   AND LET'S LOOK AT PAGE TWO.  LET'S ZOOM IN.

    SO THIS IS ACTUALLY FROM THE WEBB GROUP TO CATHY KIMMEL FOR $60,000; IS THAT RIGHT?

**A**   IT IS, YES, SIR.

**Q**   SHE ACTUALLY GOT DOUBLE HER MONEY BACK?

**A**   YES, SIR.

**Q**   WITHOUT ANY LITIGATION?

**A**   I WOULD HAVE TO GUESS YES.

**Q**   WELL THIS IS COMING DIRECTLY FROM THE WEBB GROUP, RIGHT?

**A**   YES, SIR.

1  **Q**   BUT THAT'S NOT WHAT YOU TOLD PEOPLE IN PRESENTATIONS,

2  IS IT?

3  **A**   NO, SIR.

4  **Q**   WEREN'T YOU EXPECTING -- STRIKE THAT.

5       AFTER SHE GOT HER MONEY BACK, DIDN'T SCOTT HOLLENBECK

6  RUN OUT OF MONEY ABOUT A COUPLE OF MONTHS LATER?

7            **MR. VANN:**   OBJECTION.

8            **THE COURT:**   OVERRULED.

9            **THE WITNESS:**   I DON'T KNOW THAT.

10  **BY MR. BRAGDON:**

11  **Q**   WERE YOU EXPECTING THAT CATHY KIMMEL WOULD BE ABLE TO

12  GET HER MONEY OUT OF SURE LINE BEFORE IT CRASHED, TOO?

13            **MR. VANN:**   OBJECTION.

14            **THE COURT:**   OVERRULED.

15            **THE WITNESS:**   WAS I EXPECTING THAT CATHY WOULD

16  GET HER MONEY OUT OF SURE LINE BEFORE IT CRASHED?  I

17  DIDN'T HAVE ANY ANTICIPATION OF SURE LINE CRASHING.

18  **BY MR. BRAGDON:**

19  **Q**   LOOKING AT EXHIBIT 137, YOU HAD A CONFERENCE IN

20  DURHAM, NORTH CAROLINA?

21  **A**   WHICH ONE ARE YOU REFERRING TO?

22  **Q**   IN OCTOBER, LATE OCTOBER 2007?

23  **A**   YES, SIR.

24  **Q**   LIBERTY BAPTIST CHURCH?

25  **A**   YES, SIR.

**Q** YOU HAD DINNER WITH JIM KIRK AND CAROL GRAFF THAT
NIGHT?

**A** LET ME CORRECT SOMETHING HERE. THE NIGHT THAT I HAD
DINNER WITH JIM AND CAROL I BELIEVE WAS AT FELLOWSHIP
BAPTIST CHURCH IN DURHAM, NOT LIBERTY.

**Q** OH, SO DO YOU KNOW WHEN YOU WENT TO FELLOWSHIP
BAPTIST CHURCH?

**A** NO, I KNOW WHEN I HAD DINNER WITH THEM. I KNOW THE
ONE MEETING THEY CAME, THE ONE CHURCH THEY CAME TO.

**Q** WHAT WAS THE DATE OF THAT, IF YOU RECALL?

**A** I DON'T REMEMBER THAT.

**Q** SO IT WASN'T THIS TIME. TO THE BEST OF YOUR MEMORY
IT WAS NOT THIS OCCASION?

**A** CORRECT.

**Q** SOMETIME THAT EVENING YOU ALL HAD A CONVERSATION
ABOUT SCOTT HOLLENBECK, DIDN'T YOU?

**A** I DON'T RECALL THAT.

**Q** YOU TOLD JIM KIRK THAT YOUR WIFE HAD INVESTED MONEY?

**A** I DON'T RECALL THE CONVERSATION AT ALL.

**Q** DIDN'T YOU TELL HIM THAT SHE HAD PULLED HER MONEY
OUT?

**A** I DON'T RECALL ANYTHING ABOUT A CONVERSATION LIKE
THAT AT ALL.

**Q** DIDN'T YOU SAY YOU CAN'T CON A CON MAN?

**A** THAT'S BEEN SAID MANY TIMES THAT I SAID THAT. IT'S A

1    STATEMENT THAT I MAKE THAT'S MISQUOTED.  I HAVE SAID MANY

2    TIMES, YOU CANNOT CON A CONNED MAN.  AND MY MEANING IS

3    SIMPLY THAT, IT'S VERY HARD TO CON OR TRICK SOMEBODY WHO'S

4    BEEN CONNED OR TRICKED BEFORE, AND THAT'S THE STATEMENT I

5    MADE.  IT'S VERY HARD TO CON A CONNED MAN, SOMEBODY WHO

6    HAS BEEN CONNED BEFORE.  BUT I DON'T REMEMBER MAKING THAT

7    STATEMENT WITH JIM.  THAT'S JUST A STATEMENT THAT I MAKE

8    FROM TIME TO TIME.

9    **Q**    SO WHENEVER YOU HAVE MADE A STATEMENT LIKE THAT, YOU

10   ARE CLAIMING THAT IT WAS WITH C-O-N-N-E-D, NOT C-O-N?

11   **A**    CORRECT.

12   **Q**    YOU ACTUALLY GOT A COMMISSION FROM SCOTT HOLLENBECK,

13   DIDN'T YOU?

14   **A**    I DON'T RECALL A COMMISSION FROM SCOTT HOLLENBECK.

15   **Q**    WELL, HE WAS GETTING 6 PERCENT, RIGHT?

16   **A**    I DON'T KNOW WHAT SCOTT WAS GETTING.

17   **Q**    AND IF YOU REFERRED SOMEONE TO HIM, HE GAVE YOU

18   3 PERCENT, RIGHT?

19   **A**    I DON'T REMEMBER THAT.

20   **Q**    DIDN'T HE GIVE YOU HALF OF HIS COMMISSION?

21   **A**    I DON'T REMEMBER THAT.

22          **MR. BRAGDON:**  YOUR HONOR, MAY I APPROACH?

23          **THE COURT:**  YOU MAY.

24          **MR. BRAGDON:**  IF I COULD HAVE ACTUALLY A MINUTE,

25   YOUR HONOR?

1      **THE COURT:** YOU MAY.

2      (PAUSE IN THE PROCEEDINGS.)

3  **BY MR. BRAGDON:**

4  **Q**    YOU CAN GO AHEAD AND START LOOKING THROUGH THOSE.

5  **A**    WHERE WOULD YOU LIKE ME TO START?

6  **Q**    WELL, LET ME TELL YOU WHAT YOU HAVE.  IN FRONT OF YOU

7  YOU HAVE EXHIBITS 199, 200, 210, 211 AND 213.  I WANT YOU

8  TO IDENTIFY IF THEY ARE ALL DEPOSIT SLIPS FOR YOUR

9  FAITHFUL STEWARDS' BANK ACCOUNT AT THE BANK OF CALUMET.  I

10 WON'T GIVE THE ACCOUNT NUMBERS, BUT JUST CONFIRM THAT THEY

11 ARE DEPOSIT SLIPS.

12 **A**    199 IS A CHECK MADE OUT TO CATHY.

13 **Q**    WELL, YOU DON'T -- AT THIS POINT I JUST -- YOU DON'T

14 NEED TO TELL ME WHAT THEY ARE SPECIFICALLY.  WE'LL TALK

15 ABOUT THAT IN A MINUTE.  AT THIS POINT IF YOU COULD JUST

16 CONFIRM THAT THEY ARE DEPOSIT SLIPS TO YOUR BANK ACCOUNT?

17 **A**    THAT'S A DEPOSIT SLIP TO MY BANK ACCOUNT.

18 **Q**    THAT WAS 199?

19 **A**    199.  AND THIS IS A DEPOSIT SLIP TO MY BANK ACCOUNT.

20 **Q**    200?

21 **A**    200.  210 IS A DEPOSIT TO -- THAT DOESN'T MAKE SENSE,

22 BUT THE DEPOSIT SLIP SAYS $12,000 AND THE CHECK SAYS $15,

23 BUT --

24     **MR. VANN:** OBJECTION.

25     **THE COURT:** MR. KIMMEL, JUST LOOK AT THE

1   DOCUMENTS.

2          **THE WITNESS:**  YES, SIR.  YOU ARE RIGHT, YES,

3   SIR, IT IS A DEPOSIT SLIP.

4   **BY MR. BRAGDON:**

5   **Q**   YOU SAID 210 WAS A DEPOSIT SLIP AS WELL?

6   **A**   YES, SIR.  211 IS A DEPOSIT SLIP.  212 IS A DEPOSIT

7   SLIP.

8   **Q**   WAS IT ACTUALLY 213?

9   **A**   YES, SIR.

10  **Q**   THAT'S A DEPOSIT SLIP AS WELL?

11  **A**   YES, IT IS.

12         **MR. BRAGDON:**  MOVE TO ADMIT.

13         **MR. VANN:**  OBJECTION.

14         **THE COURT:**  OVERRULED.  THEY WILL BE RECEIVED.

15  **BY MR. BRAGDON:**

16  **Q**   LET'S LOOK AT EXHIBIT 199, PAGE THREE.  LET'S ZOOM IN

17  ON THE CHECK.  DIDN'T YOU REFER RICH DRIESMAN (PHONETIC)

18  TO SCOTT HOLLENBECK?

19  **A**   I DID.

20  **Q**   AND YOU GOT A 3 PERCENT COMMISSION?

21  **A**   I DID.

22  **Q**   AND THAT WAS FOR $1,050?

23  **A**   YES, SIR.

24  **Q**   LET'S LOOK AT EXHIBIT 200, PAGE TWO.  AND LET'S ZOOM

25  IN ON THAT CHECK AS WELL.

1      YOU REFERRED PASTOR REID, IN AUGUST OF 2004, TO SCOTT

2   HOLLENBECK?

3   **A**    I DID.

4   **Q**    AND HE INVESTED ABOUT $180,000?

5   **A**    I DON'T KNOW WHAT HE INVESTED.

6   **Q**    BUT YOU GOT A 3 PERCENT COMMISSION OF $5,400?

7   **A**    I DID GET THAT, YES, SIR.

8   **Q**    YOU MET PASTOR REID IN ARKANSAS WHEN YOU GAVE ONE OF

9   YOUR CONFERENCES THERE, RIGHT?

10  **A**    YES, SIR.

11  **Q**    AND THEN HE INVITED YOU TO HIS CHURCH IN HAWAII AFTER

12  HE MOVED TO HAWAII?

13  **A**    HE DID.

14  **Q**    YOU GAVE HIM DETAILED INFORMATION ABOUT A DISCIPLES

15  TRUST INVESTMENT WITH SCOTT HOLLENBECK?

16  **A**    I DON'T REMEMBER WHAT I GAVE HIM.

17  **Q**    LOOKING AT EXHIBIT 210, PAGE THREE.  YOU REFERRED

18  DR. MUCHLER IN DECEMBER OF 2004?

19  **A**    YES, SIR.

20  **Q**    AND YOU RECEIVED A $12,000, THREE PERCENT COMMISSION?

21  **A**    YES, SIR.

22  **Q**    HE INVESTED 400,000?

23  **A**    THAT'S WHAT IT INDICATES.

24  **Q**    LET'S ACTUALLY LOOK AT EXHIBIT 213, PAGE SEVEN.

25  LET'S ZOOM IN ON THAT PAGE.

1    NOW, THIS IS A COMMISSION CHECK BUT IT'S WRITTEN TO

2  YOUR WIFE; IS THAT RIGHT?

3  **A**    IT IS.

4  **Q**    AND IT'S FOR $2,500?

5  **A**    IT IS.

6  **Q**    AND FOR 2 PERCENT RELATED TO THE INVESTMENT OF

7  JEFFRIES AND REGISTER?

8  **A**    IT IS.

9  **Q**    YOU HAD VISITED PEOPLES BAPTIST CHURCH IN FEBRUARY OF

10  2005?

11  **A**    I CAN'T TELL YOU WHEN.

12  **Q**    BUT YOU AND SCOTT HOLLENBECK ACTUALLY BOTH MET WITH

13  MICHAEL REGISTER TOGETHER, DIDN'T YOU?

14  **A**    I DON'T REMEMBER THAT.

15  **Q**    NOW, THIS CHECK, THIS ONE IS AFTER YOUR WIFE GOT HER

16  MONEY OUT, ISN'T IT?

17  **A**    IT APPEARS TO BE, YES, SIR.

18  **Q**    LOOKING AT EXHIBIT 141, MIDDLE OF THE -- LOOKING AT

19  EXHIBIT 141, MIDDLE OF THE PAGE, YOU GAVE A CONFERENCE AT

20  NEW ZION BAPTIST CHURCH IN AUGUST OF 2011, RIGHT?

21  **A**    YES, SIR.  THAT'S WHAT THE SCHEDULE SAYS.

22  **Q**    AND LOOKING AT EXHIBIT 313 AND EXHIBIT 165, THIS WAS

23  THE PRESENTATION THAT HENRY FOLWELL ATTENDED, RIGHT?

24  **A**    I THINK SO.

25  **Q**    DO YOU REMEMBER MEETING WITH HIM?

1    **A**    I DO NOT.

2    **Q**    OKAY.  AND LOOKING AT EXHIBIT 206T AT PAGE TWO, LET'S

3    ZOOM IN ON THE TOP HALF.  I'D LIKE YOU TO LOOK

4    SPECIFICALLY AROUND THAT SIXTH AND SEVENTH LINE.

5        YOU SAY THAT AN SEC ATTORNEY RECOMMENDED THIS LITTLE

6    COMPANY DOWN IN NORTH CAROLINA?

7    **A**    CORRECT.

8    **Q**    THAT WAS GREG BARTKO?

9    **A**    YES.

10    **Q**    BUT AT THE TIME GREG BARTKO WAS LOCKED UP, RIGHT?

11            **MR. VANN:**  OBJECTION.

12            **THE COURT:**  OVERRULED.

13            **THE WITNESS:**  I DON'T KNOW WHEN HE WAS LOCKED

14    UP.

15            **THE COURT:**  LADIES AND GENTLEMEN, I REMIND YOU

16    THAT WHETHER SOMEBODY ELSE HAS ADMITTED TO A CRIME OR

17    LOCKED UP FOR A CRIME IS NOT EVIDENCE THAT THE DEFENDANT

18    COMMITTED A CRIME.  YOU ARE HERE TO DECIDE ULTIMATELY

19    WHETHER THE GOVERNMENT HAS PROVEN BEYOND A REASONABLE

20    DOUBT ITS CASE WHEN IT'S TIME FOR YOU ALL TO DECIDE THAT.

21        SO TO THE EXTENT YOU HAVE HEARD TESTIMONY OF PEOPLE

22    CONVICTED OF FELONIES OR OTHER OFFENSES, THAT'S NOT

23    EVIDENCE THAT THE DEFENDANT COMMITTED ANY CRIMES, AND I

24    REMIND YOU OF THAT.  YOU MAY CONTINUE.

25

BY MR. BRAGDON:

**Q**    WASN'T GREG BARTKO CONVICTED IN FEDERAL COURT IN

NOVEMBER 2010?

**A**    I DON'T KNOW THAT.

         **MR. VANN:**  OBJECTION.

**Q**    YOU'RE CLAIMING THAT YOU HAVE NO IDEA THAT HE HAD

BEEN CONVICTED?

**A**    I DIDN'T SAY THAT AT ALL.

**Q**    WELL, AT THE TIME YOU GAVE THIS PRESENTATION, DID YOU

KNOW THAT HE HAD BEEN CONVICTED?

         **MR. VANN:**  OBJECTION.

         **THE COURT:**  OVERRULED.

         **THE WITNESS:**  I'M NOT SURE OF THAT.

BY MR. BRAGDON:

**Q**    YOU DON'T KNOW ONE WAY OR THE OTHER?

**A**    I DON'T RECALL.

**Q**    DIDN'T YOU FIND OUT SHORTLY AFTER HE HAD GOTTEN

CONVICTED THAT HE HAD BEEN CONVICTED?

**A**    I DON'T RECALL WHEN I GOT --

         **MR. VANN:**  OBJECTION.

         **THE COURT:**  OVERRULED.

         **THE WITNESS:**  I DON'T KNOW WHEN I WAS INFORMED.

I DON'T KNOW WHO INFORMED ME.

BY MR. BRAGDON:

**Q**    BUT THIS PRESENTATION, THIS PRESENTATION IS OVER NINE

1  MONTHS LATER, RIGHT?

2  **A**    I DON'T KNOW WHEN HE GOT CONVICTED, IF IT WAS LATER

3  OR NOT.

4  **Q**    YOU WERE AWARE THAT HE WAS -- WERE YOU AWARE THAT HE

5  WAS CONVICTED OF MAIL FRAUD AND THE SALE OF UNREGISTERED

6  SECURITIES?

7  **A**    I DON'T KNOW WHAT HE WAS CONVICTED OF.

8         **MR. VANN:**  OBJECTION.

9         **THE COURT:**  OVERRULED.  REMEMBER MY LIMITING

10  INSTRUCTION, LADIES AND GENTLEMEN.

11  **BY MR. BRAGDON:**

12  **Q**    TO THIS DAY YOU DON'T KNOW WHAT HE WAS CONVICTED OF?

13         **MR. VANN:**  OBJECTION.

14         **THE COURT:**  OVERRULED.

15         **THE WITNESS:**  I'VE NEVER SEEN ANYTHING ON HIM OR

16  WHAT HE WAS CONVICTED OF.

17  **BY MR. BRAGDON:**

18  **Q**    WELL, YOU DIDN'T TELL ANYBODY AT YOUR PRESENTATIONS

19  THAT THE SEC ATTORNEY WHO REFERRED THIS INVESTMENT TO YOU

20  HAD BEEN CONVICTED, DID YOU?

21  **A**    I DID NOT.

22         **MR. BRAGDON:**  COULD I HAVE A MOMENT, YOUR HONOR?

23         **THE COURT:**  YOU MAY.

24      (PAUSE IN THE PROCEEDINGS.)

25         **MR. BRAGDON:**  NO FURTHER QUESTIONS.

1          **THE COURT:**  ALL RIGHT.  REDIRECT EXAMINATION?

2          **MR. VANN:**  THANK YOU, YOUR HONOR.

3                    **REDIRECT EXAMINATION**

4    **BY MR. VANN:**

5    **Q**    FOR THE RECORD, MR. KIMMEL, ARE YOU AWARE OF WHETHER

6    OR NOT MR. BARTKO WAS CHARGED IN REGARD TO ANYTHING

7    RELATED TO SURE LINE?

8    **A**    AM I AWARE –– SAY IT AGAIN.

9    **Q**    WHETHER OR NOT HE WAS CHARGED BY THE GOVERNMENT WITH

10   ANY OFFENSES RELATED TO SURE LINE?

11   **A**    I DO NOT.

12          **MR. BRAGDON:**  YOUR HONOR, IF WE CAN JUST

13   STIPULATE FOR THE RECORD THAT THEY ARE NOT RELATED TO SURE

14   LINE?

15          **THE COURT:**  THAT'S FINE.

16          **MR. BRAGDON:**  IF THAT'S ALL RIGHT WITH DEFENSE

17   COUNSEL.

18          **MR. VANN:**  THAT'S PERFECTLY FINE.

19   **BY MR. BRAGDON:**

20   **Q**    NOW, MR. KIMMEL, YOU WERE ASKED ABOUT YOUR

21   INVOLVEMENT IN SURE LINE.  WHY WOULD YOU WANT TO BE ON THE

22   BOARD OF DIRECTORS?

23   **A**    WELL, IT WAS AN EFFORT OF MINE TO HAVE SOME KIND OF

24   CONTROL OF WHAT WAS GOING ON.  I WANTED TO BE A PART OF

25   IT.  I WANTED TO HAVE CONTROL PRIMARILY.

1  **Q**    WHY DID YOU WANT TO OWN 20 PERCENT OF THE COMPANY?

2  **A**    SO THAT I COULD HAVE SOME WAY IN THE DIRECTION OF THE

3  COMPANY.

4  **Q**    DID YOU EVER HIDE THE FACT THAT YOU WERE AN OWNER OR

5  A MEMBER OF THE BOARD OF DIRECTORS AT THE MEETINGS YOU HAD

6  HAD WHERE THIS WOULD COME UP OR SURE LINE WOULD COME UP?

7  **A**    NO, SIR, I NEVER DID.

8  **Q**    BUT YOU DON'T DENY THE FACT THAT YOU INDICATED IN

9  MANY OF THESE MEETINGS THAT YOU INDICATED YOU BOUGHT THE

10 STOCK?

11 **A**    I DISCUSSED IT, YES.

12 **Q**    NOW, THE GOVERNMENT, MR. BRAGDON, ASKED YOU DID YOU

13 IN FACT RECEIVE 1.976 PLUS MILLION DOLLARS IN PAYMENTS

14 OVER THE TIMEFRAME YOU WERE WORKING WITH SURE LINE; IS

15 THAT CORRECT?

16 **A**    YES, SIR.

17 **Q**    AND HOW MUCH DID YOU DETERMINE -- HOW MUCH DID YOU

18 PERSONALLY INVEST IN SURE LINE?

19 **A**    THROUGH MY WIFE, A TOTAL OF 75,000, OR I THINK OUR

20 ACCOUNTS WERE A TOTAL OF 75,000.  I THINK WE STARTED OFF

21 WITH 35 OR SO.

22 **Q**    YOU WERE ASKED ABOUT OTHER CHILDREN.  YOU MENTIONED

23 EDITH ANN LUTZ?

24 **A**    I DID.

25 **Q**    DID SHE IN FACT HAVE AN INVESTMENT?

1   **A**   2,500, I BELIEVE.

2   **Q**   WHAT WAS THE SOURCE OF THAT INVESTMENT?

3   **A**   I GAVE IT TO HER.

4   **Q**   DID YOU ALSO HAVE A SMALL INVESTMENT IN YOUR OWN NAME

5   OF APPROXIMATELY THE SAME AMOUNT?

6   **A**   YES, I HAD SOME INVESTMENTS OF MY OWN.

7   **Q**   YOU WERE ASKED ABOUT THE CALL THAT WAS MADE IN -- HOW

8   DID YOU KNOW ABOUT THE CALL MADE FROM THE U. S. ATTORNEY'S

9   OFFICE?

10   **A**   I DID.

11   **Q**   HOW DID YOU KNOW?

12   **A**   I GOT A LETTER, A VICTIM NOTIFICATION LETTER.

13   **Q**   AND DID MRS. KIMMEL GET ONE AS WELL?

14   **A**   SHE DID.

15   **Q**   DID ONE COME FOR TJ TO YOUR ADDRESS?

16   **A**   I DIDN'T SEE ONE TO TJ, NO.

17   **Q**   NOW, YOU WERE ASKED A SERIES OF QUESTIONS HERE

18   TOWARDS THE END OF YOUR CROSS-EXAMINATION ABOUT SCOTT

19   HOLLENBECK.  DID HE HAVE ANY INVOLVEMENT WHATSOEVER IN

20   SURE LINE?

21   **A**   NOT TO MY KNOWLEDGE.

22   **Q**   DID YOU HAVE ANY CONTACT WITH HIM CONCERNING SURE

23   LINE?

24   **A**   NO, SIR.

25   **Q**   WAS HE EVER A NOTE HOLDER OR INVESTOR IN SURE LINE?

1    **A**    I CAN'T ANSWER THAT, BUT NOT TO MY KNOWLEDGE.

2    **Q**    YOU WERE ASKED ABOUT THE MONEYS YOU RECEIVED FROM

3    SURE LINE AND YOU SAID YOU DID NOT RECEIVE A COMMISSION?

4    **A**    CORRECT.

5    **Q**    WELL THEN, HOW DO YOU EXPLAIN THE FACT THAT YOU DID

6    IN FACT RECEIVE $1.976 MILLION?

7    **A**    THEY DONATED THOSE FUNDS TO MY MINISTRY.

8    **Q**    NOW, THAT JUST SOUNDS LIKE JUST A DIFFERENT WORD.

9    WOULD YOU EXPLAIN WHAT YOU MEAN BY, WHEN YOU USE THE TERM

10   DONATION?

11   **A**    WELL, THERE'S A BIG DIFFERENCE BETWEEN DONATIONS AND

12   COMMISSIONS.  IN A COMMISSION SITUATION, A SALE IS MADE, A

13   COMMISSION IS GIVEN AND THAT'S HOW SOMEONE GETS PAID.  IF

14   THAT SALE IS CANCELLED OR REVERSED FOR ANY REASON, THE

15   MONEYS HAVE TO BE RETURNED BECAUSE THE SALE IS NO LONGER A

16   SALE, THE MONEYS HAVE TO BE RETURNED.

17        IN A SITUATION OF A DONATION, WE CALL THEM FREE WILL,

18   IT'S YOUR OWN DISCRETION HOW MUCH AND HOW OFTEN AND WHEN

19   TO DO IT.  IT'S TOTALLY UP TO YOU; IT'S YOUR DECISION TO

20   DO THAT.

21        ONE OF THE REASONS WHY I ALWAYS CALLED THESE THINGS

22   AND LIST THEM ON MY BANK REPORTS AS DONATIONS, NUMBER ONE,

23   THAT'S WHAT WE DISCUSSED WHEN WE SET THIS WHOLE THING UP,

24   I WAS GOING TO RECEIVE WHATEVER DONATION THEY DECIDED.

25   AND THE FACT THAT THOUGH MANY PEOPLE REDEEM THEIR NOTES

1  OVER THE YEARS, SOME PEOPLE REDEEMED THEM BECAUSE OF

2  EMERGENCIES WITHIN DAYS OR WEEKS AFTER THEY INVESTED.  NO

3  MONEY WAS EVER ASKED TO BE RETURNED.  HAD IT BEEN A SALE,

4  OBVIOUSLY MONEYS WOULD HAVE BEEN ASKED TO BE RETURNED.

5  BECAUSE IT'S A DONATION, THERE'S NO RETURN.  SO I GUESS

6  THAT'S THE BIGGEST DIFFERENCE.

7  **Q**    WOULD IT BE SAFE TO SAY YOU ANTICIPATED THAT SURE

8  LINE WOULD PROVIDE THESE DONATIONS, DIDN'T YOU?

9  **A**    I DID.  THEY PROMISED THEM TO ME.  THEY SAID -- THEIR

10 COMMENT WAS, "YOU WILL ACCEPT DONATIONS, WILL YOU NOT?"

11 THEY GOT A LITTLE FRUSTRATED WITH ME WHEN I WOULD NOT SIGN

12 A CONTRACT, WOULD NOT AGREE TO AN EMPLOYMENT AGREEMENT,

13 WOULD NOT AGREE TO EVEN THINK A NUMBER.

14     BOBBY STANLEY, THE GENTLEMAN THERE THAT DAY WHO DIED,

15 SAID, "YOU DO TAKE DONATIONS, DO YOU NOT?"  I SAID,

16 "THAT'S HOW I MAKE MY LIVING, I GO TO CHURCHES, I PREACH,

17 I TAKE DONATION.  SO, YES, I WILL TAKE DONATIONS."

18 **Q**    NOW, YOU WERE ASKED HOW MUCH YOU HAD INVESTED IN SURE

19 LINE AND WE DISCUSSED THAT.  WHAT DID YOU USE THE

20 1.976 MILLION?  THAT'S A LOT OF MONEY OVER SIX YEARS.

21 WHERE DID IT GO?

22            **MR. BRAGDON:**  OBJECTION.

23            **THE COURT:**  SUSTAINED.  NEXT QUESTION.

24 **BY MR. VANN:**

25 **Q**    IN REGARD TO YOUR, AGAIN YOUR INVOLVEMENT IN THE

1  CORPORATION, WASN'T -- STRIKE THAT.  WAS THAT REFLECTED IN

2  THE BUSINESS RECORDS OF SURE LINE, YOUR STATUS IN THE

3  CORPORATION?

4  **A**  I NEVER SAW THAT.  I DON'T KNOW.

5  **Q**  IF YOU WOULD LOOK, FOR EXAMPLE, AT THE INFORMATION

6  PACKAGE THAT WAS SENT.

7  **A**  OKAY.

8  **Q**  WOULD YOUR NAME BE IN THERE?

9  **A**  IT WOULD.

10  **Q**  NOW, YOU INDICATED YOU WANTED TO HAVE SOME

11  INVOLVEMENT IN THE CORPORATION?

12  **A**  I DID.

13  **Q**  DID YOU INITIALLY WRITE A LETTER TO JAMES KIRK ABOUT

14  BECOMING AN OWNER AND GETTING STOCK?

15  **A**  I DO RECALL THAT.

16  **Q**  IN FACT, YOU WROTE A LETTER IN AUGUST, LITERALLY

17  RIGHT AFTER JOINING THE CORPORATION, ISN'T THAT RIGHT, IN

18  AUGUST OF 2006?

19  **A**  I THINK SO.

20  **Q**  AND DO YOU RECALL WRITING THAT LETTER IN AUGUST?

21  **A**  MAYBE IF I CAN SEE THE LETTER MAYBE IT WILL JOG MY

22  MEMORY.

23  **Q**  COULD I HAVE EXHIBIT 57 PUT UP, PLEASE?

24  **A**  OH, YEAH, I REMEMBER THAT.

25  **Q**  DO YOU RECALL WRITING THAT LETTER?

1  **A**    YES, SIR.

2  **Q**    AND HOW LONG AFTER YOUR INITIAL CONTACT WITH JIM KIRK

3  DID YOU WRITE THIS LETTER, APPROXIMATELY?

4  **A**    HOW LONG AFTER I MET JIM DID I WRITE THE LETTER?

5  **Q**    UH-HUH.

6  **A**    I THINK I MET JIM IN JUNE OR JULY.  I WROTE THIS IN

7  AUGUST.

8  **Q**    AND I ASK YOU TO, IF YOU CAN, TO LOOK AT -- YOU WERE

9  ASKED -- STRIKE THAT.  WHY DID YOU WRITE THIS LETTER?

10 **A**    IT WAS A RESPONSE -- CAN I READ THE LETTER?

11 **Q**    SURE.

12 **A**    CAN YOU BLOW IT UP JUST A LITTLE FOR ME?

13     (PAUSE IN THE PROCEEDINGS.)

14     THE SECOND PARAGRAPH PROBABLY IS THE GIST OF IT:  I

15 THINK WE COULD DO MUCH FOR THE CAUSE OF CHRIST TOGETHER AS

16 A JOINT FORCE TO HELP A GREAT MANY PEOPLE ALONG THE WAY.

17 I WANT TO BE SURE YOU UNDERSTAND THAT I DIDN'T WANT TO TIE

18 MYSELF -- I WAS CAREFUL ABOUT TYING MYSELF TO SOMETHING

19 THAT COULD GO WRONG.

20     COULD YOU SCROLL DOWN SOME?

21     I TALKED ABOUT THE CREDIBILITY, TALKED ABOUT

22 BUSINESS.  NEXT PAGE, PLEASE?

23     I TALKED ABOUT THE CONFERENCES AND MY POSITION THERE

24 WITH THE CONFERENCES.  I TALKED ABOUT MR. BARTKO.  AND

25 THEN I GET DOWN TO WHY, THAT WAS THE REASON WHY FOR THE

1  LETTER, I WANT TO BE PART OF THE ORGANIZATION.  I'M ASKING

2  FOR 10 PERCENT PART OF THE COMPANY AND I WAS ASKING FOR

3  OWNERSHIP IN THE COMPANY.

4  **Q**    WELL, WOULD IT HAVE BEEN NECESSARY TO BE ON THE BOARD

5  OF DIRECTORS AND/OR HAVE STOCK OWNERSHIP IN SURE LINE TO

6  DO WHAT YOU WERE BEING ASKED TO DO, I MEAN INITIALLY?

7  **A**    IT WOULD NOT HAVE BEEN IMPORTANT TO OWN A PART OF THE

8  COMPANY TO REFER ANYBODY TO THE COMPANY.  I COULD REFER

9  ANYBODY I WANT TO.

10 **Q**    WOULD IT HAVE BEEN ESSENTIAL -- YOU INDICATE THAT IT

11 WOULD HAVE BEEN IMPORTANT FOR YOU TO BE A PART OF THE

12 COMPANY?

13 **A**    YES, SIR.

14 **Q**    WOULD IT HAVE BEEN ESSENTIAL FOR YOU TO BE PART OF

15 THE COMPANY?

16 **A**    WOULD NOT HAVE BEEN ESSENTIAL.

17 **Q**    COULD YOU HAVE STILL GONE TO THE SEMINARS YOU GAVE

18 OVER THE YEARS AND SAID WHAT YOU SAID WITHOUT BEING A

19 MEMBER OF THE BOARD OF DIRECTORS AND OWNING THE SHARES OF

20 THE COMPANY?

21 **A**    I DIDN'T DECIDE, WHEN I FIRST MET THEM, THAT I LIKED

22 THE PROGRAM.  I FELT COMFORTABLE WITH THE PEOPLE AND THAT

23 I COULD REFER PEOPLE TO THEM, AND I WOULD HAVE REFERRED

24 PEOPLE TO THEM AS LONG AS THEY TOOK CARE OF THOSE PEOPLE.

25 **Q**    NOW, YOU WERE ASKED ABOUT WHETHER OR NOT -- ABOUT

1  STOPPING THE PROGRAM.  FORMALLY, DID ANYONE EVER TELL YOU

2  TO STOP COLLECTING NOTES?

3  **A**    NO.

4  **Q**    AT ANY POINT IN TIME?

5  **A**    NO.

6  **Q**    WAS THERE SOME DISCUSSION THAT THEY MIGHT ASK YOU OR

7  THAT THEY MIGHT GO PUBLIC, THINGS OF THAT NATURE?

8  **A**    YEAH, THEY TOLD ME THAT ALL THE TIME, THAT -- AND,

9  AGAIN, WE KNOW NOW THE NUMBERS WEREN'T GOOD, BUT THEY TOLD

10 ME THAT EVERYTHING LOOKED WELL AND LOOK FOR THE DAY WHEN

11 THEY COULD GO PUBLIC.

12 **Q**    IN FACT, DID YOU TRY TO STAY INVOLVED WITH THE

13 WORKINGS OF THE COMPANY AS IT PROGRESSED?

14 **A**    I TRIED TO KEEP ABREAST OF THE INFORMATION, YOU KNOW,

15 WHERE THEY WERE AND WHAT THEY WERE DOING.

16 **Q**    NOW, IN FACT, YOU WROTE A LETTER -- IF YOU COULD PUT

17 UP, PLEASE, MA'AM, NUMBER 47?

18     I BELIEVE YOU WERE JUST SHOWN THAT.  DO YOU RECOGNIZE

19 THAT LETTER?

20 **A**    YES, I DO RECOGNIZE THAT LETTER.

21 **Q**    AND IT IS, IN FACT, IT GOES INTO A THIRD PAGE; ISN'T

22 THAT RIGHT?

23 **A**    I HAVE TO TAKE A LOOK.  IT'S THREE PAGES, YES, SIR.

24 **Q**    NOW, AGAIN, WHY DID YOU WRITE THAT LETTER?

25 **A**    WELL, THEY HAD COME TO CHICAGO OR COME TO MY OFFICE

1  THERE IN HAMMOND, INDIANA, AND THEY ASKED TO SPEAK WITH

2  ME.  I FLEW OVER OR DROVE UP.  WE STARTED MEETING AND

3  IMMEDIATELY IT TURNED FROM A MEETING OF BRINGING ME UP TO

4  DATE TO PUTTING PRESSURE ON ME TO SELL MORE, AND THAT WAS

5  NOT OUR AGREEMENT.  MY AGREEMENT WAS TO REFER PEOPLE.

6  PEOPLE WOULD MAKE THEIR OWN DECISION.  I SAID THE WORDS,

7  "I DO NOT WORK FOR YOU.  MY MINISTRY IS FAITHFUL STEWARDS,

8  THAT'S WHO I WORK FOR.  THIS MAY BE A GOOD TIME TO END OUR

9  RELATIONSHIP."

10      JIM HAD INTRODUCED -- NOT INTRODUCED CAROL TO ME BUT

11  INTRODUCED CAROL AS THE NEW BOSS, IF YOU WILL, THAT I WAS

12  TO GO THROUGH HER AND THAT SHE WAS TALKING ABOUT ALL OF

13  THESE NUMBERS, THAT SHE WANTED ME TO HIT THESE NUMBERS.

14  THAT'S WHERE I TOLD THEM IT WAS TIME TO SEPARATE BECAUSE

15  THAT'S NOT WHAT I DO.

16  **Q**   NOW, I'M GOING TO ASK YOU TO LOOK AT ITEM NUMBER

17  FOUR.  WOULD YOU READ THAT FOR US?

18  **A**   IT WAS A REVIEW OF THE THINGS WE TALKED ABOUT.  ONE

19  WAS YOU ARE GOING TO SEND ME THE NEW NAME OF THE TRUSTEE

20  WITH THE COMPANY NAME.

21  **Q**   WHY WAS THAT IMPORTANT TO YOU?

22  **A**   THE COLLATERAL IS IMPORTANT TO ME.  THE COLLATERAL

23  WAS WHAT PROTECTED THE INVESTORS.  I WANTED TO HAVE A NAME

24  THAT I COULD CHECK TO SEE IF INDEED THERE WAS SUCH A MAN,

25  IF THERE WAS AN OFFICE, IF THERE WAS A PHONE NUMBER.  I

1  WAS TOLD HE WAS AN ATTORNEY AND THEY WOULD GET BACK TO ME

2  WHO THE GUY WAS.

3  **Q**    AND IF YOU COULD -- WHEN YOU FINISHED THAT LETTER

4  WITH A FAIRLY LONG SECOND PAGE DEALING WITH THE SPIRITUAL

5  NATURE ASPECTS OF THE BUSINESS?

6  **A**    I DID.

7  **Q**    I WON'T ASK YOU TO READ THAT.  IF YOU WOULD LOOK TO

8  49, PAGE ONE.  HIGHLIGHT THE SECOND KIND OF LATER

9  PARAGRAPH ABOUT TWO THIRDS OF THE WAY DOWN.  I GUESS BOTH

10  OF THEM.

11      IS THIS THE INFORMATION -- FIRST OF ALL, DO YOU

12  RECOGNIZE THIS DOCUMENT AS 49, THE E-MAIL FROM CAROL

13  GRAFF?

14  **A**    I DO.

15  **Q**    DOES SHE RESPOND TO YOUR INTEREST IN WHO THE TRUSTEE

16  IS?

17  **A**    SHE DOES.

18  **Q**    SHE GIVES YOU TWO FULL PARAGRAPHS IN REGARD TO THIS

19  GENTLEMAN; ISN'T THAT RIGHT?

20  **A**    SHE DOES.

21  **Q**    AND DID THAT SATISFY, AT LEAST AT THAT POINT IN TIME,

22  SATISFY YOU THAT THERE WAS IN FACT A TRUSTEE HOLDING THE

23  NOTES WHICH YOU BELIEVED WERE THE COLLATERAL, THAT YOUR

24  COLLATERAL FOR THE INVESTMENTS THAT THE PEOPLE YOU

25  REFERRED HAD MADE TO SURE LINE?

1    **A**    IT SATISFIED ME WITH THE INFORMATION OF WHO HE WAS.

2    I THEN WENT TO CHECK AND TRIED TO FIND OUT IF IT WAS

3    LEGITIMATE.  I TRIED TO PULL HIM UP ON THE COMPUTER.

4    **Q**    IS THERE A WILLIAM HILL?

5    **A**    THERE IS A WILLIAM F. HILL, YES, SIR.

6    **Q**    AFTER YOU STARTED YOUR REFERRALS WITH SURE LINE IN

7    THE SUMMER OF 2006, DID GREG BARTKO, TO THE BEST OF YOUR

8    KNOWLEDGE, STAY INVOLVED WITH THE BUSINESS?

9    **A**    THEY REFERRED TO GREG QUITE OFTEN, BUT I DON'T REALLY

10   KNOW WHAT HIS INVOLVEMENT WAS.  HE WAS REFERRED TO AS

11   THEIR ATTORNEY.

12   **Q**    AGAIN, I BELIEVE IT WAS STIPULATED NOTHING IN REGARD

13   TO WHAT HE DID -- NOTHING RELATED TO THE CONVICTION YOU

14   HEARD ABOUT HAD ANYTHING TO DO WITH SURE LINE?

15   **A**    THAT'S MY UNDERSTANDING.

16   **Q**    NOW, YOU WERE ASKED UNDER DIRECT EXAMINATION DID YOU

17   REFER TO GLEN SMITH AS A PRESIDENT OF A BANK?

18   **A**    YES, I WAS TOLD HE WAS HIRED AWAY FROM A BANK; HE WAS

19   THE PRESIDENT OF SOME BANK.

20   **Q**    I ASK YOU TO LOOK AT -- IF WE COULD BRING UP NUMBER

21   44, PLEASE.  GO TO PAGE 16.  COULD YOU HIGHLIGHT THE GLEN

22   SMITH PARAGRAPH?

23        AND, MR. KIMMEL, LOOK FOUR LINES FROM THE BOTTOM OF

24   THE SECTION INVOLVING GLEN SMITH AND START WHEREVER YOU

25   WANT IN REGARD TO WHAT IT SAYS.

1    **A**    HE COMPLETED TAX CLASSES AT H&R BLOCK, SERVED AS

2    CHIEF COMPLIANCE OFFICER FOR A PUBLICLY TRADED COMPANY, AS

3    PRESIDENT OF A MERCHANT BANKING FIRM AND ON THE BOARD OF

4    SEVERAL PRIVATE COMPANIES AND COMMUNITY ASSOCIATIONS.

5    MR. SMITH ADDS SUBSTANTIAL INVESTMENT BANKING EXPERIENCE

6    AND IS A WIDELY LICENSED NASD REGISTERED REPRESENTATIVE

7    HOLDING SERIES 7, 24, 28, AND 63 NASD LICENSES.

8    **Q**    SO EVEN HE REFERRED TO HIMSELF AS THE PRESIDENT OF A

9    BANK OR BANKING FIRM?

10   **A**    HE DOES.

11   **Q**    IS THIS SAME PARAGRAPH REPEATED IN LATER REVISIONS TO

12   THE, AND THIS IS PART OF THE INFORMATION PACKAGE PRESENTED

13   BY SURE LINE, ISN'T THIS INFORMATION REPEATED IN

14   SUBSEQUENT EDITIONS OF THIS SAME PACKAGE?

15   **A**    I BELIEVE SO.

16   **Q**    NOW, THROUGH THE YEARS YOU WOULD REVISE YOUR -- WOULD

17   IT BE YOUR PRACTICE TO REVISE THE COLLATERALIZATION RATES

18   THAT YOU WERE SAYING AT THE SEMINARS?

19   **A**    WOULD I PROVIDE THOSE RATES?

20   **Q**    PROVIDE THEM AND REVISE THEM, CHANGE THEM?

21   **A**    OH, YES.

22   **Q**    WHY?

23   **A**    WELL, BECAUSE THE COLLATERAL CHANGES.

24   **Q**    NOW, MR. BRAGDON ASKED YOU ABOUT THERE WAS A MOST

25   RECENT ONE, THE COLLATERALIZATION RATE HAD GONE DOWN.  HAD

1  THERE BEEN PREVIOUS INDICATIONS WHERE THE

2  COLLATERALIZATION RATE HAD BEEN 1.23-TO-ONE?

3  **A**    YES, SIR.

4  **Q**    NOW, I ASK YOU TO LOOK AT GOVERNMENT'S EXHIBIT NO. 2.

5  WHO WAS THAT PREPARED BY?

6  **A**    I ASSUME CAROL.

7  **Q**    AND THE INFORMATION CONTAINED WITHIN WAS COLLECTED

8  AND PREPARED BY WHOM?

9  **A**    I ASSUME CAROL.

10  **Q**    GO TO, COUNTING THE TITLE PAGE, PAGE SIX, PLEASE.

11  LOOK ON THAT.  DO YOU SEE, HALFWAY DOWN THE PAGE, A

12  PERCENTAGE THAT LISTS THE TOTAL AMOUNT OF CAR SALES AND

13  THE TOTAL AMOUNT OF INCREASE FROM 2006 TO 2007?

14  **A**    I DO.

15  **Q**    AND DOES IT SHOW AN INCREASE, PROJECTED INCREASE, FOR

16  2008?

17  **A**    IT DOES.

18  **Q**    AND WHAT WAS THE TOTAL ESTIMATED NUMBER AT THAT POINT

19  IN TIME?

20  **A**    ESTIMATE NUMBER OF?

21  **Q**    CAR SALES, I'M SORRY.

22  **A**    CAR SALES?  IF I'M READING IT CORRECTLY, 623.

23  **Q**    NOW, IF I COULD HAVE YOU LOOK AT GOVERNMENT'S EXHIBIT

24  NO. 3, PAGE FIVE.  THAT WOULD BE THE COLLATERALIZATION.

25  ALL THE NUMBERS ON HERE, ARE THESE PREPARED BY CAROL

1  GRAFF?

2  **A**   I ASSUME THAT TO BE TRUE.

3  **Q**   AND WAS THERE STILL A POSITIVE COLLATERALIZATION EVEN

4  AT THAT POINT IN TIME?

5  **A**   THERE WAS.

6  **Q**   NOW, MR. KIMMEL, WHAT WAS YOUR BIGGEST CONCERN IN

7  REGARD TO THE NOTE HOLDERS AND THEIR PROTECTION?

8  **A**   THE SINGLE MOST IMPORTANT THING TO ME WAS THE

9  COLLATERAL.

10  **Q**   WHAT DO YOU MEAN BY THAT?

11  **A**   I ALWAYS WANTED TO BE SURE THAT THEIR INVESTMENT WAS

12  PROTECTED.  WE WERE TOLD, ALL OF US WERE TOLD, FROM DAY

13  ONE THAT THE COLLATERAL WAS THE THING THAT PROTECTED THE

14  NOTES.

15  **Q**   AND THE NOTES WERE BEING HELD BY WHOM?

16  **A**   WILLIAM F. HILL.

17  **Q**   WAS THAT YOUR UNDERSTANDING?

18  **A**   IT WAS IN PRINT AS WELL.  I HEARD IT VERBALLY AND I

19  SAW IT IN PRINT.  I HAD NO REASON TO BELIEVE OTHERWISE.

20  **Q**   SO WHEN YOU ARE ASKED DID THE BUSINESS MAKE ANY

21  MONEY, DURING THIS SAME TIME PERIOD WERE YOU AWARE OF

22  WHETHER OR NOT YOUR NOTE HOLDERS WERE STILL RECEIVING

23  THEIR MONTHLY PAYMENT?

24  **A**   I WAS AWARE, AND OF THE ONES I WAS AWARE OF, THEY

25  WERE ALWAYS RECEIVING THEIR INTEREST PAYMENTS.

1 **Q** AND TO THE BEST OF YOUR KNOWLEDGE, WERE YOU AWARE, AT

2 LEAST BASED UPON THE INFORMATION PROVIDED BY CAROL GRAFF,

3 THAT THE NOTES WERE STILL COLLATERALIZED?

4 **A** YES, SIR.

5 **Q** SO WAS IT A GREAT CONCERN TO YOU THAT THE BUSINESS

6 ITSELF HAD AN OPERATING LOSS FOR A PARTICULAR MONTH?

7 **A** NO, SIR. WHEN ANY OF US HAD BEEN IN BUSINESS WE SEE

8 TRENDS, WE WATCH FOR TRENDS. WE REALIZE THAT WITH

9 START-UPS YOU ARE GOING TO HAVE SOME LOSSES. WE REALIZED

10 THAT EVEN DURING THOSE LOSS YEARS, EMPLOYEES WERE BEING

11 PAID, NOTE HOLDERS WERE BEING PAID. IT'S NOT UNUSUAL TO

12 SEE, IN THE EARLY BUSINESSES, LOSSES.

13 **Q** AND AFTER GOVERNMENT'S EXHIBIT NO. 3, DID YOU GET

14 SENT ANYMORE MONTHLY STATEMENTS OR MID-YEAR STATEMENTS OR

15 END OF YEAR STATEMENTS IN REGARD TO -- THAT LOOKED LIKE

16 THIS?

17 **A** I THINK THAT WAS THE LAST ONE.

18 **Q** YOU DID GET AN END OF THE YEAR LETTER WRITTEN BY GLEN

19 SMITH BUT WITH THE NAME OF JIM KIRK ON IT; IS THAT

20 CORRECT?

21 **A** I GOT A LETTER THAT WAS SUPPOSED TO BE JIM KIRK BUT I

22 FOUND OUT THE OTHER DAY IT WAS WRITTEN BY GLEN.

23 **Q** NOW, YOU HAD INDICATED THAT THERE WAS QUESTIONS ABOUT

24 WHETHER OR NOT -- ABOUT THE RELIGIOUS NATURE OF SURE LINE

25 AND HOW IMPORTANT IT WAS. ISN'T IT TRUE THAT JIM KIRK

1  PLAYED UP THAT RELIGIOUS ASPECT TO YOU?

2  **A**    EVERY TIME WE TALKED, HE TALKED IN A SPIRITUAL TONE

3  AND I BELIEVE NOW THAT PERHAPS IT MAY NOT HAVE BEEN REAL.

4  BUT, YES, HE DID TALK TO ME ON A SPIRITUAL LEVEL.  WE

5  PRAYED TOGETHER MANY TIMES.

6  **Q**    IF YOU COULD BRING UP GOVERNMENT'S EXHIBIT 63.

7         **THE COURT:**  WE'RE GOING TO TAKE OUR MID-MORNING

8  BREAK AT THIS POINT.  WE'LL TAKE A BREAK UNTIL 10:55.

9      DON'T TALK ABOUT THE CASE, DON'T LET ANYBODY TALK

10  ABOUT THE CASE WITH YOU.  FOLLOW ALL OF MY OTHER

11  INSTRUCTIONS.  EVERYONE REMAIN SEATED WHILE THE LADIES AND

12  GENTLEMEN OF THE JURY LEAVE THE ROOM.

13     (RECESS TAKEN.)

14         **THE COURT:**  LET'S BRING THE JURY BACK.

15     (JURORS ENTER INTO THE COURTROOM.)

16         **THE COURT:**  WELCOME BACK, LADIES AND GENTLEMEN.

17  HOPE YOU ALL ENJOYED YOUR BREAK.  I JUST NEED TO CONFIRM

18  YOU DIDN'T TALK ABOUT THE CASE, NO ONE TALKED ABOUT THE

19  CASE WITH YOU AND YOU FOLLOWED MY OTHER INSTRUCTIONS.

20     YOU MAY CONTINUE REDIRECT EXAMINATION, MR. VANN.

21         **MR. VANN:**  THANK YOU, YOUR HONOR.

22  **BY MR. VANN:**

23  **Q**    MR. KIMMEL, YOU WERE ASKED ABOUT THE SPIRITUAL NATURE

24  OF SURE LINE?

25  **A**    YES, SIR.

1  **Q**    WAS THE SPIRITUAL ASPECT ALSO REFERENCED BY MR. KIRK

2  AND MS. GRAFF, OR AT LEAST MR. KIRK?

3  **A**    DID HE EVER -- DID HE REFERENCE CHRISTIAN THINGS,

4  YES, SIR.

5  **Q**    BRING UP JUST FOR US GOVERNMENT'S EXHIBIT 63.  ASK

6  YOU TO LOOK AT THAT DOCUMENT.

7      FIRST, CAN YOU IDENTIFY IT, MR. KIMMEL?

8  **A**    IF YOU CAN SCROLL A LITTLE.  OKAY.  YES, I RECOGNIZE

9  IT.

10  **Q**    AND YOU DO RECOGNIZE IT?

11  **A**    I DO.

12  **Q**    WOULD IT ASSIST YOU IN YOUR TESTIMONY HERE TODAY?

13  **A**    WOULD IT WHAT?

14  **Q**    WOULD IT ASSIST YOU IN YOUR TESTIMONY HERE TODAY?

15  **A**    YES, SIR.

16  **Q**    FIRST OF ALL, CAN YOU IDENTIFY IT?  WITHOUT SAYING

17  WHAT'S IN IT, CAN YOU IDENTIFY WHAT IT IS?

18  **A**    IT IS AN E-MAIL FROM ME TO JIM REFERENCING ANOTHER

19  E-MAIL.

20  **Q**    STOP RIGHT THERE.

21  **A**    OKAY.

22  **Q**    SO HOW CAN YOU TELL IT'S FROM YOU?

23  **A**    IT SAYS AT THE TOP, FROM THOM KIMMEL.

24          **MR. VANN:**  I'M GOING TO MOVE TO INTRODUCE THIS

25  AS DEFENDANT'S EXHIBIT NO. 1.  IT'S LISTED AS GOVERNMENT'S

1    EXHIBIT 63, IF THE COURT WILL ALLOW.

2              **THE COURT:**  ALL RIGHT.  IT WILL BE RECEIVED.

3    **BY MR. VANN:**

4    **Q**    ASK YOU TO LOOK AT -- FIRST, NOW, TELL US, CAN YOU

5    READ FOR US YOUR INITIAL NOTE THAT YOU E-MAILED?

6    **A**    WOW, GREAT LETTER.  HAPPY TO BE IN BUSINESS WITH THE

7    LIKES OF JIM KIRK, TK.

8    **Q**    IS THERE AN ATTACHMENT OR A SUBSEQUENT E-MAIL THAT

9    WAS FORWARDED TO YOU BY JIM KIRK?

10   **A**    THERE IS.

11   **Q**    IS THAT WHAT IS BELOW WHAT YOU JUST READ?

12   **A**    YES, SIR.

13   **Q**    COULD YOU READ THAT FOR US?

14   **A**    DEAR JOSH, YOUR KIND WORDS ARE GREATLY APPRECIATED.

15   WE AT SURE LINE HAVE CERTAINLY BEEN BLESSED WITH THE HELP

16   OF PEOPLE LIKE THOM KIMMEL AND YOURSELF.  WE SPENT MONTHS

17   TRYING TO PUT TOGETHER A PROGRAM THAT WOULD HELP PROVIDE

18   MORE FINANCING TO CREDIT-CHALLENGED CUSTOMERS, WHILE AT

19   THE SAME TIME OFFERING A SECURE AND REWARDING RETURN TO

20   THE NOTE HOLDERS THAT ENABLE US TO INCREASE OUR BUSINESS.

21   WE ARE FORTUNATE TO BE, I ASSUME IT IS "IN," A BUSINESS

22   WHERE WE CAN PURCHASE A USED PRODUCT AT LOW COST, ADD A

23   LITTLE SPIT AND POLISH AND RESELL IT AT A PROFIT MARGIN

24   AND A RATE OF RETURN THAT PERMITS US TO SHARE THE

25   FINANCIAL REWARDS WITH THE LENDERS AS WELL AS THE FOLKS

```
1   WHO INTRODUCE THEM TO US.  WE SHARE COMMON VALUES AND SEEK

2   COMMON GOALS.  ONE POINT OF INTEREST THAT FEW PEOPLE KNOW,

3   OUR TRUSTEE, AATROC, INC. IS AN ACRONYM FOR ANXIOUSLY

4   AWAITING THE RETURN OF CHRIST.  UNTIL THAT DAY ARRIVES, WE

5   WILL COUNT OUR BLESSINGS AND CONTINUE TO BUILD

6   RELATIONSHIPS AND MAKE DONATIONS IN THE SERVICE OF THE

7   LORD FOR THE FRUITS HE PROVIDES.  THANK YOU, JIM KIRK.
```

8   **Q**    THAT'S THE SAME JIM KIRK THAT GOT ON THE STAND AND

9   SAID HE WAS AN AGNOSTIC?

10              **MR. BRAGDON:**  OBJECTION.

11              **THE COURT:**  SUSTAINED.

12   **BY MR. VANN:**

13   **Q**    NOW, YOU CONTINUE TO PURSUE -- WANTING SURE LINE TO

14   PURSUE HELP WITH MISSIONARIES AND THINGS OF THAT NATURE;

15   IS THAT CORRECT?

16   **A**    I DID.

17   **Q**    NOW, WERE THESE EFFORTS LIMITED SOLELY TO THE UNITED

18   STATES?

19   **A**    THEY WERE OVER THE UNITED STATES AND WORLDWIDE AS

20   WELL.

21   **Q**    OKAY.  AND WHAT DO YOU MEAN WHEN YOU SAY WORLDWIDE?

22   **A**    WE TRIED TO PROVIDE -- MY ENCOURAGEMENT WAS TO

23   PROVIDE VEHICLES AND MONEYS TO MISSIONARIES WORLDWIDE.

24   **Q**    I ASK YOU TO LOOK AT, JUST FOR US, GOVERNMENT'S

25   EXHIBIT NO. 74.

1       FIRST OF ALL, MR. KIMMEL, DO YOU RECOGNIZE WHAT'S

2  MARKED AS GOVERNMENT'S EXHIBIT NO. 74 FOR THE PURPOSES --

3  FIRST OF ALL, DO YOU RECOGNIZE IT?

4  **A**    I DO.

5  **Q**    AND WITHOUT SAYING WHAT'S IN IT, WHAT IS IT?

6  **A**    IT'S AN E-MAIL.

7  **Q**    FROM WHOM?

8  **A**    FROM ME.

9  **Q**    TO WHOM?

10  **A**    TO JIM KIRK.

11  **Q**    AND WOULD IT ASSIST IN YOUR TESTIMONY?

12  **A**    YES, SIR.

13       **MR. VANN:**  WE NOW MOVE TO INTRODUCE WHAT'S NOW

14  DEFENDANT'S EXHIBIT NO. 2, WHICH IS TITLED GOVERNMENT'S

15  EXHIBIT NO. 74, FOR THE PURPOSES OF THESE QUESTIONS.

16       **THE COURT:**  IT WILL BE RECEIVED.

17  **BY MR. VANN:**

18  **Q**    WOULD YOU TELL US WHAT THAT E-MAIL IS ABOUT OR THE

19  BACK STORY OF THIS E-MAIL?

20  **A**    THIS IS PASTOR DAN MCGILLIS FROM ST. LOUIS.  HE HAD

21  COME TO VISIT OUR CHURCH UP AT FIRST BAPTIST AND MY PASTOR

22  HAD TOLD ME THAT WHEN THEY WERE TAKING THEIR CHILD OUT OF

23  THE LITTLE SMALL CAR THEY HAD, HE DROPPED THE BABY AND THE

24  BABY HAD SPINA BIFIDA, HE DROPPED THE CHILD.  HE WANTED TO

25  KNOW IF WE COULD HELP.

1  **Q**    DID YOU INQUIRE OR TRY TO GET ABOUT GETTING VANS?  GO

2  AHEAD NOW, READ THE E-MAIL FOR US.

3  **A**    HI JIM, HERE'S THE INFO ON THE PREACHER FOR THE VAN.

4  HIS NAME IS DANIEL MCGILLIS, HIS ADDRESS AND PHONE NUMBER.

5  ALSO HAVE YOU HAD ANY PROGRESS ON GETTING ME SOME MORE

6  NUMBERS ON THE VANS FOR AFRICA?  REMEMBER WE ARE LOOKING

7  AT PRICES AND AVAILABILITY ON TWO VANS, EITHER TOYOTAS OR

8  NISSANS.  THANKS SO MUCH FOR YOUR HELP.  TK

9  **Q**    FOR THE RECORD, WERE THERE OTHER E-MAILS AND

10  CORRESPONDENCE CONCERNING THESE VANS?

11  **A**    I BELIEVE THERE WERE MANY.

12  **Q**    ALL RIGHT.  I BELIEVE YOU WERE ASKED YESTERDAY ABOUT

13  OTHER FAMILY MEMBERS AND YOU INDICATED THAT YOUR DAUGHTER

14  WAS ALSO A NOTE HOLDER; IS THAT CORRECT?

15  **A**    SHE IS.

16  **Q**    AND HER FULL NAME IS WHAT?

17  **A**    EDITH ANN LUTZ.

18  **Q**    COULD YOU BRING UP GOVERNMENT'S EXHIBIT NO. 280, PAGE

19  25.  WOULD YOU GO ABOUT HALFWAY, LINE ITEM NUMBER SEVEN

20  FROM THE BOTTOM.  I'M SORRY, IT'S PAGE 26.

21    IS THAT NAME -- ASK YOU TO LOOK AT THE LINED ITEM

22  BROUGHT UP.  IS THAT YOUR DAUGHTER?

23  **A**    IT IS.

24  **Q**    IT INDICATES SHE HAS BEEN A NOTE HOLDER SINCE WHEN?

25  **A**    NOVEMBER OF '07.

1  **Q**    AND TO THE BEST OF YOUR KNOWLEDGE, WERE ANY OF THESE

2  MONEYS RECOVERED ON HER BEHALF?

3  **A**    I DON'T THINK SO.

4  **Q**    WHEN YOU FIRST BECAME INVOLVED WITH SURE LINE, WAS

5  CAROL GRAFF PART OF THE SURE LINE TEAM, SURE LINE

6  MANAGEMENT?

7  **A**    I DON'T THINK SO.

8  **Q**    DID SHE EVENTUALLY BECOME PART OF THE SURE LINE

9  MANAGEMENT?

10 **A**    SHE DID.

11 **Q**    AND WAS SHE IN FACT MADE CHIEF OPERATING OFFICER,

12 PRESIDENT, AND DIRECTOR?

13 **A**    I BELIEVE SO.

14 **Q**    IF YOU COULD PLEASE BRING UP GOVERNMENT'S EXHIBIT

15 NO. 94.  IT'S THE 2010 INFORMATION PACKAGE, PAGE 15.  AND

16 COULD YOU HIGHLIGHT THE PARAGRAPH ABOUT CAROL GRAFF, WHICH

17 IS AT THE BOTTOM OF THE PAGE.

18     MR. KIMMEL, IS THIS THE INFORMATION YOU ARE READING

19 HERE ON CAROL GRAFF, IS THAT THE INFORMATION THAT WAS

20 PROVIDED TO YOU AS TO HER QUALIFICATIONS AND EXPERTISE IN

21 REGARD TO BECOMING THE CHIEF OPERATING OFFICER, PRESIDENT,

22 DIRECTOR AND ESSENTIALLY THE PERSON WHO KEPT THE FINANCIAL

23 RECORDS FOR SURE LINE?

24 **A**    YES, SIR.

25 **Q**    IS THERE ANYTHING IN HERE THAT YOU AT LEAST WERE MADE

1 AWARE OR NOT AWARE THAT WAS INACCURATE?

2 **A** ANYTHING INACCURATE?

3 **Q** TO THE BEST OF YOUR KNOWLEDGE?

4 **A** NO, SIR.

5 **Q** WAS THERE ANYTHING HERE THAT LED YOU TO BELIEVE THAT

6 SHE WOULD NOT PROVIDE ACCURATE BOOKKEEPING AND INFORMATION

7 TO YOU?

8 **A** NO, SIR.

9 **Q** NOW, WHEN DID YOU FINALLY DECIDE OR COME TO THE

10 CONCLUSION THAT SURE LINE WAS NOT A LEGITIMATE BUSINESS?

11 WHEN DID YOU FINALLY DECIDE OR COME TO YOUR OWN CONCLUSION

12 IT WAS NOT A LEGITIMATE BUSINESS?

13 **A** I THOUGHT IT WAS LEGITIMATE ALL THE WAY UP UNTIL THE

14 TIME MR. KIRK AND MS. GRAFF AND GLEN SMITH SAID THEY WERE

15 CROOKS, THAT THEY PLED OUT A DEAL WITH THE GOVERNMENT.

16 **MR. VANN:** I HAVE NO OTHER QUESTIONS AT THIS

17 TIME, YOUR HONOR.

18 **THE COURT:** RECROSS?

19 **MR. BRAGDON:** THANK YOU, YOUR HONOR.

20 **RECROSS—EXAMINATION**

21 **BY MR. BRAGDON:**

22 **Q** NOW, MR. KIMMEL, YOU TESTIFIED THAT YOUR DAUGHTER

23 INVESTED A COUPLE THOUSAND DOLLARS?

24 **A** YES, SIR.

25 **Q** AND YOUR SON INVESTED SOME MONEY?

1    **A**    YES, SIR, ABOUT 15,000.

2    **Q**    AND THEN THERE WAS ALSO AN INVESTMENT FOR AT LEAST

3    ONE GRANDCHILD OF YOURS?

4    **A**    WELL, I GAVE IT TO, I DON'T REMEMBER, MY SON OR

5    DAUGHTER COULDN'T PUT AN IRA IN THE CHILD'S NAME.

6    **Q**    AND YOUR WIFE INVESTED ABOUT $75,000?

7    **A**    TOTAL, YES, SIR.

8    **Q**    AND THESE FACTS ARE THINGS THAT YOU MENTIONED A LOT

9    IN YOUR INVESTMENT SEMINARS, RIGHT?

10   **A**    WHEN I MENTIONED FACTS ABOUT INVESTORS AND FAMILY, I

11   ALWAYS MENTIONED MY SISTER AND BROTHER-IN-LAW.

12   **Q**    YOU WOULD SAY SOMETHING TO THE EFFECT OF, EVERY DIME

13   I INVEST -- EVERY DIME I HAVE IS INVESTED IN SURE LINE,

14   ALL OF MY SON'S, ALL OF MY DAUGHTER'S, ALL OF MY

15   GRANDCHILDREN, RIGHT?

16   **A**    YES, SIR.

17   **Q**    AND YOUR SON WAS NOT GOING TO LIE ABOUT ANY

18   INVESTMENTS HE HAD, RIGHT?

19   **A**    I WOULDN'T THINK SO.

20   **Q**    AND YOUR DAUGHTER WOULDN'T LIE EITHER, RIGHT?

21   **A**    I WOULDN'T EXPECT HER TO.

22   **Q**    AND YOUR WIFE WOULDN'T LIE ABOUT ANY INVESTMENTS THAT

23   SHE WOULD HAVE HAD, RIGHT?

24   **A**    I WOULD THINK NOT.

25   **Q**    YOUR WIFE ATTENDS FIRST BAPTIST HAMMOND?

1    **A**    SHE DOES.

2    **Q**    THERE'S A LOT OF PEOPLE THAT GO TO THAT CHURCH?

3    **A**    YES, SIR.

4    **Q**    A LOT OF INVESTORS?

5    **A**    YES, SIR.

6    **Q**    AT ONE POINT YOU SAID FOUR TO $5 MILLION WORTH OUT OF

7    THAT CHURCH?

8    **A**    I DON'T REMEMBER THE EXACT NUMBER.  I KNOW OVER A

9    MILLION OR TWO.  I DON'T REMEMBER EXACTLY.

10    **Q**    AND YOUR SON VISITS THAT CHURCH SOMETIMES?

11    **A**    MY SON VISITS THAT CHURCH?

12    **Q**    YEAH.

13    **A**    SURE.

14    **Q**    YOUR DAUGHTER DOES AS WELL?

15    **A**    YES, SIR.

16    **Q**    WHERE DOES SHE LIVE?

17    **A**    SHE LIVES IN HAMMOND.

18    **Q**    DOES SHE ATTEND THAT CHURCH?

19    **A**    SHE DOES.

20    **Q**    SO SHE INTERACTS A LOT WITH THE PEOPLE OF THE CHURCH?

21    **A**    SURE.

22    **Q**    INCLUDING NOTE HOLDERS?

23    **A**    I DON'T KNOW THAT.  MOST OF THE NOTE HOLDERS ARE

24    OLDER PEOPLE AND SHE'S A YOUNG GIRL.

25    **Q**    BUT YOU KNEW -- STRIKE THAT.

1      YOU KNEW THAT TELLING PEOPLE THAT YOUR CHILDREN AND

2  YOUR WIFE INVESTED WOULD HELP YOU GET ADDITIONAL INVESTORS

3  TO SURE LINE, DIDN'T YOU?

4  **A**    I WAS ASKED MANY TIMES IF OUR FAMILY INVESTED, SO I

5  WOULD TELL.  I DON'T REMEMBER EVER HOLDING A CONFERENCE IN

6  MY CHURCH.

7  **Q**    BUT THAT FACT WAS SOMETHING THAT WAS IMPORTANT TO

8  PEOPLE, KNOWING THAT YOUR FAMILY INVESTED, THAT WAS A FACT

9  THAT WAS IMPORTANT TO THEM IN MAKING THEIR INVESTMENT?

10  **A**    I COULD ASSUME IT WAS.  I DON'T KNOW THAT.

11  **Q**    AND IF THEY HAD NOT INVESTED AND YOU TOLD PEOPLE THAT

12  THEY HAD, PEOPLE WOULD FIND OUT BECAUSE THEY COULD ASK

13  YOUR CHILDREN, RIGHT?

14  **A**    IF I TOLD THEM THEY HAD OR HADN'T, IS THAT WHAT YOU

15  ARE SAYING?  REPHRASE IT FOR ME, I'M SORRY.

16  **Q**    NO PROBLEM.  YOU COULDN'T LIE ABOUT THAT FACT BECAUSE

17  YOUR FAMILY WOULD KNOW THE TRUTH, RIGHT?

18          **MR. VANN:**  OBJECTION.

19          **THE COURT:**  REPHRASE.

20  **BY MR. BRAGDON:**

21  **Q**    YOU COULDN'T FALSELY TELL PEOPLE THAT YOUR FAMILY HAD

22  INVESTED BECAUSE THEY COULD JUST ASK YOUR FAMILY, RIGHT?

23          **MR. VANN:**  RENEW THE OBJECTION.

24          **THE COURT:**  OVERRULED.

25          **THE WITNESS:**  I COULDN'T AND WOULDN'T, YES.

**BY MR. BRAGDON:**

**Q**    SO IN ORDER TO BE ABLE TO TELL PEOPLE THAT YOUR
FAMILY INVESTED, YOU HAD TO ACTUALLY HAVE SOME INVESTMENTS
IN THEIR NAMES, RIGHT?

**A**    I HAD INVESTMENTS IN THEIR NAMES FOR THE SAME REASON
I ENCOURAGED EVERYBODY TO INVEST, I THOUGHT IT WAS GOOD
FOR THEIR FUTURE.  I HAD NO ULTERIOR MOTIVES.

**Q**    WE TALKED A LITTLE BIT ABOUT MISSIONS AND HANDICAPPED
VANS, RIGHT?

**A**    YES, SIR.

**Q**    WASN'T THAT ANOTHER TECHNIQUE TO HELP MAKE SURE THAT
THE SPIRITUAL COUNSEL YOU WERE ADVISING PEOPLE TO GET
WOULD SUGGEST THAT THEY INVEST IN SURE LINE?

**A**    NO, SIR.  THAT WAS TO TELL PEOPLE EXACTLY WHAT SURE
LINE WAS DOING.

**Q**    THESE HANDICAPPED VANS COST SURE LINE ABOUT EIGHT TO
$12,000?

**A**    I DON'T KNOW WHAT THEY COST.

**Q**    LET'S LOOK AT EXHIBIT 70, PAGE ONE.  LET'S LOOK AT
THE TOP OF THE PAGE.

     THIS IS TALKING ABOUT ONE OF THOSE HANDICAP VANS,
RIGHT?

**A**    YES, SIR.

**Q**    AND IT SAYS IT WAS $8,000?

**A**    IT DOES.

1    **Q**    DIDN'T YOU TELL PEOPLE IN YOUR PRESENTATIONS THAT A

2    GOOD USED HANDICAP VAN COST 50 TO $60,000?

3    **A**    AT RETAIL, YES, THAT'S A TRUE STATEMENT.

4    **Q**    WEREN'T YOU SUGGESTING THAT'S HOW MUCH SURE LINE PAID

5    FOR IT?

6    **A**    NO, SIR.

7    **Q**    LET'S LOOK AT EXHIBIT 205T AT PAGE FIVE.  LET'S ZOOM

8    IN ON THE TOP HALF.

9         SO HERE YOU ARE TALKING ABOUT HANDICAPPED VANS,

10   RIGHT, IN THE MIDDLE OF THIS?

11   **A**    I SAID IT MAY COST YOU JUST TO MAKE A HANDICAP VAN 20

12   TO $30,000 JUST TO MAKE A HANDICAP VAN, BUT TYPICALLY THEY

13   WILL COST YOU 50 OR 60,000 BUCKS IF YOU BUY A GOOD USED

14   ONE.

15   **Q**    TWENTY TO $30,000 TO MAKE ONE?

16   **A**    YES, SIR.

17   **Q**    THAT WAS UNTRUE?

18   **A**    NO, SIR.  BEFORE I WENT WITH SURE LINE I TRIED MANY

19   DIFFERENT TIMES TO BUY VANS FROM VAN COMPANIES AND ALL OF

20   THOSE VANS WERE EXTREMELY, EXTREMELY EXPENSIVE.  AS I

21   UNDERSTAND IT, IT COST $60,000 TO RETROFIT A VAN THAT YOU

22   BRING TO THEM.  SO THE NUMBERS I HAD EVEN BEFORE I WENT TO

23   SURE LINE WAS THESE ADVANCE WERE 20, $30,000 TO EITHER

24   RETROFIT, AND UP TO $60,000 TO BUY ONE TO BUY A LATE MODEL

25   USED ONE.

1  Q    SURE LINE NEVER SPENT 20,000 BUCKS ON --

2  A    -- I'M NOT SURE WHAT SURE LINE SPENT ON THEIR VANS.

3  Q    YOU DO KNOW THE ONE YOU IDENTIFIED IN THAT LETTER

4  JUST A MINUTE AGO WAS $8,000?

5  A    YES, SIR, THAT WAS NEGOTIATED FOR THIS GENTLEMAN TO

6  GET A VAN FROM SURE LINE AND I ASKED THEM IF THEY WOULD

7  CUT ME A DEAL, AND THEY CAME BACK WITH THE $8,000 FIGURE.

8  Q    AS WHAT IT WOULD COST THEM TO DO, RIGHT?

9  A    THAT'S WHAT HE TOLD ME BUT I DON'T KNOW WHAT THAT

10  WAS.  THE DEAL I WAS LOOKING FOR WAS AN INEXPENSIVE VAN

11  FOR THIS FAMILY.

12  Q    YOU SAY IN THIS PRESENTATION THAT YOU DESIGNATED TO

13  GIVE AWAY SIX HANDICAPPED VANS THAT YEAR, RIGHT?

14  A    AGAIN, THAT WAS ANOTHER PROPOSAL I HAD AT SURE LINE,

15  THAT WE COULD COME UP WITH -- GIVE A NUMBER AND THE NUMBER

16  THAT JIM CAME UP WITH WAS SIX.  I WAS TO LET PEOPLE KNOW

17  THAT THERE WERE SIX AVAILABLE, WOULD THEY PLEASE WRITE ME

18  A LETTER AND I WOULD SEND THEM LETTERS.

19  Q    YOU NEVER GAVE AWAY SIX?

20  A    I DON'T KNOW HOW MANY SURE LINE GAVE AWAY.  MY JOB

21  WAS TO SOLICIT THEM, TURN THE INFORMATION OVER TO THEM.

22  Q    BUT YOU USED THIS INFORMATION TO HELP YOU GET PEOPLE

23  TO INVEST IN SURE LINE?

24  A    NO, SIR.

25  Q    YOU TALKED A LITTLE BIT ABOUT THAT LETTER,

1  EXHIBIT 63, OR I GUESS E-MAIL THAT JIM KIRK WROTE?

2  **A**    YES, SIR.

3  **Q**    LET'S ZOOM IN ON THE PART UNDERNEATH, I GUESS THE

4  MIDDLE TWO THIRDS, ALL THE WAY THROUGH THE END OF THE

5  E-MAIL.

6      PASTOR JOSH, IS HE SOMEONE WHO WAS A PROSPECTIVE

7  INVESTOR?

8  **A**    I DON'T KNOW WHO PASTOR JOSH IS.

9  **Q**    YOU WOULD HAVE KNOWN AT THE TIME, RIGHT?

10  **A**    I DON'T KNOW THAT I WOULD.  THERE'S MANY INVESTORS

11  THAT I NEVER MET.

12  **Q**    WASN'T THE PURPOSE OF THIS E-MAIL TO ASSURE, AGAIN

13  OBTAIN AN INVESTOR AT SURE LINE?

14  **A**    I DON'T KNOW THAT THIS LETTER EVER WENT OUT TO

15  ANYBODY ELSE.  I THINK IT WAS JUST AN E-MAIL FROM JIM TO

16  ME.  I DON'T KNOW --

17  **Q**    ISN'T IT AN E-MAIL FROM JIM TO PASTOR JOSH?  IT

18  DOESN'T SAY DEAR THOM, RIGHT?

19  **A**    HE FORWARDED THE E-MAIL TO ME.  THE E-MAIL WAS FROM

20  JOSH, WHOEVER THAT IS, TO JIM, AND THEN JIM FORWARDED THAT

21  E-MAIL TO ME.

22  **Q**    JIM KIRK WANTED PEOPLE, POTENTIAL INVESTORS, TO THINK

23  HE WAS A CHRISTIAN, RIGHT?

24  **A**    I DON'T KNOW THAT.

25  **Q**    YOU KNEW HE WASN'T A CHRISTIAN, DIDN'T YOU?

1    **A**    I DIDN'T KNOW THAT.  HE TOLD ME HE WAS SAVED WHEN HE

2    WAS SEVEN YEARS OLD.

3    **Q**    ACCORDING TO YOUR STORY, THE VERY FIRST TIME HE MET

4    YOU HE WAS CRYING IN THE CAR, RIGHT?

5    **A**    HE WAS TRYING TO?

6    **Q**    HE WAS CRYING IN THE CAR WITH YOU; IS THAT RIGHT?

7    **A**    YES, HE DID BREAK DOWN.

8    **Q**    HE WAS A TOTAL STRANGER BEFORE THAT DAY?

9    **A**    YES, SIR.

10   **Q**    BUT YOU ALL ESTABLISHED SUCH AN EMOTIONAL BOND THAT

11   HE JUST BROKE DOWN AND STARTED CRYING ABOUT HIS SALVATION

12   AND HIS RELIGION?

13   **A**    THAT HAPPENS ALL THE TIME.

14   **Q**    SO HE NEVER TOLD YOU THAT HE WAS AN AGNOSTIC?

15   **A**    NO, SIR.  HE TOLD ME --

16   **Q**    -- LOOKING AT THAT E-MAIL, YOU ARE CLAIMING YOU

17   THOUGHT THAT WAS GENUINE?

18   **A**    THAT'S WHAT HE SAID TO THIS PASTOR JOSH.  HE SENT THE

19   E-MAIL, IT HAS HIS NAME TO IT.

20   **Q**    ARE YOU CLAIMING YOU THOUGHT IT WAS GENUINE?

21   **A**    I DID.

22   **Q**    YOU SAID THAT THE SINGLE MOST IMPORTANT THING TO YOU

23   WAS COLLATERAL, RIGHT?

24   **A**    AS FAR AS THE SAFETY OF THE NOTE, YES, SIR.

25   **Q**    BUT IN TERMS OF THE REPORTS YOU SAW, THE COLLATERAL

1    WAS DROPPING LIKE A ROCK, RIGHT?

2    **A**    NEVER DROPPED BELOW ONE-TO-ONE IN ANY REPORT I SAW.

3    **Q**    IT WAS REAL CLOSE AND YOU QUIT GETTING REPORTS,

4    RIGHT?

5    **A**    YES, SIR.

6    **Q**    NOW, GENERALLY --

7             **MR. BRAGDON:**    IF I COULD HAVE A MOMENT, YOUR

8    HONOR?

9             **THE COURT:**    YES, SIR.

10           (PAUSE IN THE PROCEEDINGS.)

11   **BY MR. BRAGDON:**

12   **Q**    GENERALLY YOUR PRESENTATIONS WERE GEARED TO PEOPLE

13   GETTING OUT OF DEBT, RIGHT?

14   **A**    YES, SIR.

15   **Q**    AND BECAUSE INTEREST PAYMENTS, THEY CAN BE RUINOUS TO

16   A FAMILY, RIGHT?

17   **A**    THEY CAN MAKE OR BREAK YOU, YES, SIR.

18   **Q**    INTEREST PAYMENTS CAN BE RUINOUS TO A COMPANY TOO,

19   CAN'T THEY?

20   **A**    SURE.

21   **Q**    AND YET YOU HELPED SURE LINE RACK UP OVER $20 MILLION

22   IN DEBT AT 12 PERCENT, RIGHT?

23   **A**    I REFERRED POTENTIAL INVESTORS TO SURE LINE.    THAT

24   WAS MY PARTICIPATION.

25   **Q**    BUT IT WAS A DEBT, RIGHT?

1    **A**    IT WAS A DEBT.

2    **Q**    IT WAS A BIG DEBT.

3    **A**    THE OPPOSITE SIDE OF THE DEBT WAS THE 20 TO

4    25 PERCENT INTEREST, COMPOUND INTEREST THEY WERE EARNING

5    FROM THE PEOPLE WHO BOUGHT THE CARS COMPARED TO 12 PERCENT

6    SIMPLE INTEREST.  SO JUST LOOK AT -- IF YOU ARE ASKING

7    INTEREST ALONE, THE INTEREST THAT THEY WERE PAYING WAS FAR

8    SMALLER THAN THE INTEREST THEY WERE RECEIVING.

9    **Q**    LET'S LOOK AT EXHIBIT 289.  IN 2011, THEIR MONTHLY

10    INTEREST JUST TO PAY NOTE HOLDERS, IT TOPS $200,000,

11    RIGHT?

12    **A**    YES, SIR.

13    **Q**    LET'S LOOK AT EXHIBIT 1, PAGE SEVEN.  THIS IS THE

14    MOST RECENT REPORT WHERE YOU ACTUALLY SAW THEIR CASH

15    INTAKE, RIGHT?

16    **A**    YES, SIR.

17    **Q**    AND IT'S 173,000?

18    **A**    CORRECT.

19           **MR. BRAGDON:**  NO FURTHER QUESTIONS?

20           **THE COURT:**  THANK YOU, MR. KIMMEL.  PLEASE WATCH

21    YOUR STEP STEPPING DOWN, SIR.  THERE'S A STEP UP AS YOU

22    COME OFF THE STAND.

23

24

25                  END OF TRIAL TESTIMONY

1                            CERTIFICATE

2      THIS IS TO CERTIFY THAT THE FOREGOING TRANSCRIPT OF

3  PROCEEDINGS TAKEN AT THE CRIMINAL SESSION OF UNITED STATES

4  DISTRICT COURT IS A TRUE AND ACCURATE TRANSCRIPTION OF THE

5  PROCEEDINGS TAKEN BY ME IN MACHINE SHORTHAND AND

6  TRANSCRIBED BY COMPUTER UNDER MY SUPERVISION.

7      THIS THE 13TH DAY OF SEPTEMBER, 2014.

8

9                       /S/ DONNA J. TOMAWSKI

10                    DONNA J. TOMAWSKI
                          OFFICIAL COURT REPORTER

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25